UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTESA SANPAOLO, S.P.A.,<br><br>       Plaintiff,<br><br>   -against-<br><br>CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CRÉDIT AGRICOLE SECURITIES (U.S.A.) INC., THE PUTNAM ADVISORY COMPANY, LLC, MAGNETAR CAPITAL LLC, MAGNETAR CONSTELLATION FUND, LP, AND MAGNETAR CAPITAL FUND, LP,<br><br>      Defendants. | No. 12-cv-2683 (RWS)<br><br>**ECF CASE**<br>**Electronically Filed**<br><br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF THE PUTNAM ADVISORY
COMPANY LLC'S MOTION TO DISMISS THE COMPLAINT**

MILBANK, TWEED, HADLEY &
   McCLOY LLP
Thomas A. Arena
Sean M. Murphy
Justin A. Alfano
William P. Gross
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant
   Putnam Advisory Company LLC*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .......................................................................................................................... 4

    A.    Pyxis ABS CDO 2006-1 ................................................................................ 4

    B.    Intesa ............................................................................................................... 6

    C.    The Alleged Representations To Intesa Regarding Putnam's Role As
        Collateral Manager....................................................................................... 7

        1.    The Investor Presentation ....................................................... 7

        2.    The Offering Memorandum....................................................... 8

    D.    The Alleged Fraudulent Scheme................................................................ 10

ARGUMENT .............................................................................................................................. 11

I.      STANDARD ON A MOTION TO DISMISS ................................................................. 11

II.    INTESA'S CLAIMS UNDER SECTION 10(b) OF THE 1934 ACT ARE
        BARRED BY THE FIVE YEAR STATUTE OF REPOSE ........................................... 12

III.   INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE
        DISMISSED FOR FAILURE TO STATE A CLAIM ................................................... 14

    A.    Intesa Fails To Allege That Putnam Acted With Scienter ................................. 14

        1.    Intesa Fails To Allege A Plausible Motive For Putnam's
            Participation In The Alleged Fraudulent Scheme.................................... 15

        2.    Intesa Fails To Allege Circumstantial Evidence Of Putnam's
            Participation In The Alleged Fraudulent Scheme.................................... 17

    B.    Intesa Fails To Plead An Actionable Misrepresentation With The
        Particularity Required By Rule 9(b) and the PSLRA ......................................... 20

        1.    The Offering Memorandum Disclosed The Eligibility Criteria For
            Asset Selection And The Existence Of Short Counterparties.................. 20

        2.    General Statements Regarding Putnam's Experience And
            Capabilities Are Not Actionable............................................................... 23

        3.    Putnam Cannot Be Held Liable For Alleged Misstatements It Did
            Not Make ................................................................................................... 23

IV.   INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS
        AGAINST PUTNAM SHOULD BE DISMISSED........................................................ 24

V.    INTESA'S CIVIL CONSPIRACY CLAIM AGAINST PUTNAM SHOULD BE
        DISMISSED ................................................................................................................. 25

VI.   CONCLUSION............................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007).........................................................................11, 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................11

*Boudinot v. Shrader,*
    No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172 (S.D.N.Y. Feb. 15, 2012) ........3, 13

*Brady v. Lynes,*
    No. 05 Civ. 6540 (DAB), 2008 WL 2276518 (S.D.N.Y. June 2, 2008)................................25

*Brecher v. Citigroup, Inc.,*
    797 F. Supp. 2d 354 (S.D.N.Y. 2011)...................................................................16

*Cada v. Baxter Healthcare Corp.,*
    920 F.2d 446 (7th Cir. 1990) ..............................................................................12

*Cohen v. Stevanovich,*
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)..........................................................3, 16, 25

*Defer LP v. Raymond James Fin., Inc.,*
    654 F. Supp. 2d 204 (S.D.N.Y. 2009)...................................................................16

*Dooner v. Keefe, Bruyette & Woods, Inc.,*
    No. 00 Civ. 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003)................................16

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009).............................................................................15, 23

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)...................................................................16

*Ellan Corp. v. Dongkwang Int'l Co.,*
    No. 09 Civ. 414 (LAP), 2011 WL 4343844 (S.D.N.Y. Aug. 15, 2011)................................25

*Epirus Capital Mgmt., LLC v. Citigroup, Inc.,*
    No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200 (S.D.N.Y. Apr. 28, 2010)........20, 21

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,*
    375 F.3d 168 (2d Cir. 2004)...............................................................................11

*Excel Elecs. & Photo Corp v. Aetna Cas. & Sur. Co.*,
    No. 90 Civ. 6508 (JMC), 1991 WL 259257 (S.D.N.Y. Nov. 27, 1991).................................18

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010).........................12, 19

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).........................................................................................................11

*Good Hill Partners L.P. v. WM Asset Holdings Corp.*,
    583 F. Supp. 2d 517 (S.D.N.Y. 2008)........................................................................................14

*In re Beacon Assoc. Litig.*,
    No. 09 Civ. 777 (LBS), 2012 WL 1123728 (S.D.N.Y. April 4, 2012)....................................13

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................................................11

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)........................................................................................16

*In re Citigroup Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)..........................................................................................9

*In re Exxon Mobil Corp. Sec. Litig.*,
    500 F.3d 189 (3d Cir. 2007)........................................................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)........................................................................................19

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)........................................................................................11

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    No. 09 Civ. 9887 (LAP), 2012 U.S. Dist. LEXIS 19879 (S.D.N.Y. Feb. 15, 2012)...............14

*In re Societe Generale Sec. Litig.*,
    No. 08 Civ. 2495 (RMB), 2010 U.S. Dist. LEXIS 107719 (S.D.N.Y. Sept. 29, 2010)...........23

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011)................................................................................................................24

*Loreley Fin. (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Inv. Bank*,
    No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011)................................................................ passim

*McCann v. Hy-Vee, Inc.*,
    663 F.3d 926 (7th Cir. 2011) ...............................................................................................12, 13

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
    747 F. Supp. 2d 406 (S.D.N.Y. 2010)........................................................................................24

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)...................................................................................19

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)..............................................................................................21

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)........................................................................23

*Pope Invs. II LLC v. Deheng Law Firm*,
    No. 10 Civ. 6608 (LLS), 2011 U.S. Dist. LEXIS 134012 (S.D.N.Y. Nov. 18, 2011) ............16

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)............................................................................4

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988)........................................................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) ..........12, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................14, 15, 20

*Wachovia Equity Sec. Litig. v. Wachovia Corp.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................17, 23

## STATUTES

15 U.S.C. § 78j(b) ...........................................................................................................14

15 U.S.C. § 78u-4(b)................................................................................................12, 15

## RULES

17 C.F.R. 240.10b-5(b) ...................................................................................................14

C.P.L.R. § 3016(b) ..........................................................................................................18

Federal Rule of Civil Procedure 9(b)................................................................... passim

Federal Rule of Civil Procedure 12(b)(6) ...................................................................1, 4

Putnam Advisory Company, LLC ("Putnam"), respectfully submits this memorandum of law in support of its motion to dismiss the Complaint filed by Intesa Sanpaolo, S.p.A. ("Plaintiff" or "Intesa") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Putnam incorporates by reference the arguments set forth in the memoranda of law in support of the motions to dismiss pursuant to Rules 9(b) and 12(b)(6) filed by co-defendants Crédit Agricole Corporate and Investment Bank and Crédit Agricole Securities (U.S.A.) Inc. (together "CA-CIB"), and Magnetar Capital LLC, Magnetar Financial LLC, and Magnetar Capital Fund, LP (collectively "Magnetar") in this action.

## PRELIMINARY STATEMENT

Unwilling to accept the consequences of its investment decision to purchase a financial instrument tied to risky subprime mortgages, Intesa seeks to recoup its losses by alleging a broad scheme to defraud involving a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis CDO" or "Pyxis"). At the core of its Complaint, Intesa alleges that Putnam, the collateral manager of the Pyxis CDO, intentionally selected "toxic assets" for inclusion in the CDO's portfolio for the express purpose of causing the $1.5 billion CDO to fail. Intesa alleges that Putnam engaged in this conduct to enable Magnetar—not Putnam—to reap "hundreds of millions of dollars" on short positions referencing such "toxic assets." (Compl. ¶ 2.) There are no well-pleaded allegations, however, supporting this sensational claim. The Complaint does not allege that Putnam selected any assets that violated any of the "Eligibility Criteria" set forth in the confidential offering memorandum for the Pyxis CDO dated October 2, 2006 (the "Offering Memorandum" or "OM"), or that any of the assets selected for the Pyxis portfolio had received lower credit ratings than required by such Eligibility Criteria. Nor does the Complaint allege that anyone from Putnam ever spoke directly to Intesa or that, as collateral

1

manager, Putnam owed a fiduciary duty to Intesa or to any prospective investors in the CDO.

Putting aside the dearth of any plausible allegations tying Putnam to such a scheme, the Complaint attempts to sidestep the fact that Intesa was not even an investor in the Pyxis CDO.  Instead, the Complaint alleges that Intesa entered into a credit default swap ("CDS") in which it made a sizeable bet that the Class A notes issued by the Pyxis CDO would not fail (the "Swap").  Putnam, however, was not the counterparty to this transaction, and the Complaint does not allege that Putnam had any involvement in Intesa's investment.  The sole basis on which Intesa seeks to link Putnam to its investment decision is that, before the effective date of the Swap, Intesa received copies of the Pyxis offering materials which referenced Putnam's role as the CDO's collateral manager.  As discussed below, nothing in those offering materials even remotely supports a claim sounding in fraud against Putnam.

The New York Supreme Court has previously rejected the same core allegations underlying Intesa's Complaint.  In *Loreley Financing (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Investment Bank*, the court dismissed fraud claims brought by a Pyxis noteholder against Putnam, holding that the same types of allegations asserted by Intesa here were not sufficient to plead with the requisite particularity that Putnam had abdicated its responsibility for selecting assets for the Pyxis portfolio or had otherwise engaged in fraudulent conduct.  *See Loreley Fin. (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Inv. Bank*, No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) ("*Loreley*").

The Complaint against Putnam fails on three separate and independent grounds.

<u>First</u>, Intesa's federal securities law claims are time-barred because the five-year period of repose applicable to such claims expired prior to the commencement of this action. That period of repose began to run, at the very latest, as of the date of the last misrepresentation

alleged in the Complaint.  *See, e.g.,  Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 U.S.

Dist. LEXIS 19172, at *14-15 (S.D.N.Y. Feb. 15, 2012).  Intesa does not allege any

misrepresentations, by any defendant, occurring on or after April 6, 2007 (*i.e.*, five years prior to

the filing of the Complaint on April 6, 2012).  Accordingly, its federal securities law claims must

be dismissed.

> Second, the Complaint does not allege a theory of motive sufficient to support a

plausible theory of scienter.  At bottom, Intesa alleges that Putnam, a large and respected

financial institution, knowingly engaged in a billion dollar fraud to earn ordinary collateral

manager fees.  There is no allegation that Putnam received anything other than its fully disclosed

contractual fee for serving as the collateral manager or that the fees it earned in this capacity

were outsized or extraordinary in any respect.  In fact, a significant portion of Putnam's fee was

subordinated to the payments owed by Pyxis to noteholders; if the CDO failed, Putnam would

not receive its full fee.  These allegations fall well short of establishing scienter.  *See Cohen v.

Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.).

> Nor does the Complaint allege any conscious misbehavior sufficient to establish

scienter.  The Complaint relies upon a number of press reports and other sources to support its

theory of fraud, but none of these sources makes any particularized allegations about the Pyxis

CDO or about Putnam's purported selection of "toxic assets" in the Pyxis CDO.  Relatedly, the

Complaint alleges that Putnam should have disclosed that co-defendant Magnetar was taking a

short position against the Pyxis CDO.  But the Offering Memorandum, which Intesa

acknowledges it read, fully disclosed that more than 75% of the portfolio—with a notional value

well in excess of $1 billion—would consist of CDS and that third parties would be taking the

short position on those securities.  Accordingly, a sophisticated investor like Intesa knew that an

enormous number of "short" bets were being made with respect to the Pyxis CDO, directly contrary to Intesa's long position.

Third, the Complaint fails to allege any actionable misrepresentations or omissions by Putnam.  Putnam was not responsible for the vast majority of the information set forth in the Offering Memorandum.  In any event, even if Putnam bore such responsibility, Intesa cannot point to anything in the offering materials that was inaccurate.  The Offering Memorandum described at great length the composition of the securities that would be collateralizing the CDO (the vast majority of which were subprime and mid-prime residential mortgage backed securities ("RMBS")), the relatively low credit rating of those securities (many of which were rated "BBB"), and all structural features of the CDO.  In page after page of carefully-drafted disclosures, this document detailed the very risks relating to the assets Intesa claims were misrepresented.  Intesa does not identify any assets selected by Putnam for the Pyxis portfolio that violated any of the detailed Eligibility Criteria set forth in the Offering Memorandum.

## **BACKGROUND**[1]

### A.    **Pyxis ABS CDO 2006-1**

Pyxis was a "hybrid" CDO, meaning that its $1.5 billion collateral portfolio included both "cash" and "synthetic" underlying assets.  (Compl. ¶ 54.)  As fully disclosed in the Offering Memorandum, approximately 23% (or $350 million par value) of the Pyxis portfolio was comprised of "cash" assets—that is, actual RMBS bonds, CDO notes, and other securities purchased by Pyxis.  The remaining approximately 77% (or $1.15 billion par value) of the

---

[1]    Where a complaint relies on statements contained in documents, the Court may consider those documents in ruling on a Rule 12(b)(6) motion even if they were not attached to the complaint.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.").

portfolio was comprised of "synthetic" assets, which were created through CDS referencing RMBS bonds, CDO notes, and other securities that were not actually owned by Pyxis. (Compl. ¶ 54.) Pyxis was the protection seller or "long counterparty" for such CDS; it received a "premium" from the "short counterparty" in exchange for the obligation "to make loss payments" to the short counterparty if the referenced assets performed poorly. (Compl. ¶ 55.) Accordingly, investors in the Pyxis CDO were on notice that sophisticated institutional investors, in the aggregate, were making enormous bets that the collateral underlying the Pyxis CDO would perform poorly. The Pyxis CDO closed on October 3, 2006. (Compl. ¶ 57.)

The Complaint alleges that CA-CIB was the arranger of the CDO and the initial purchaser of the note securities issued by the Pyxis CDO. These securities were later made available for sale to qualified institutional investors. As alleged in the Complaint, Magnetar was an investor in the CDO, purchasing the Class X notes and the equity issued by Pyxis and also taking short positions on unspecified CDS in the Pyxis portfolio. (Compl. ¶ 58.)

According to the Complaint, Putnam served as the collateral manager for the Pyxis CDO. Pursuant to the collateral management agreement between Putnam and the Pyxis CDO dated October 3, 2006 (the "Collateral Management Agreement"), Putnam agreed to acquire collateral and manage the Pyxis portfolio according to the terms of the CDO's Indenture, including the Eligibility Criteria set forth in the Offering Memorandum.[2] (Compl. ¶ 79.) The Offering Memorandum disclosed that Putnam was entitled to an annual senior collateral management fee of 0.15% of the notional value of the portfolio and a subordinated collateral management fee of 0.05% of the notional value of the portfolio. (OM at 191-92.)

Significantly, Putnam's right to receive the subordinated collateral management

---

[2]     Intesa points to the Collateral Management Agreement as a basis for its claims (*see* Compl. ¶¶ 107, 118, 128, 137), but Intesa was not a party to the Collateral Management Agreement and the Complaint is devoid of any allegation that Intesa was provided with a copy of such agreement.

fee was junior in priority to the noteholders' rights to receive interest payments on their securities.  (*See* OM at 70-74.)  According to the priority of payments set forth in the Offering Memorandum, Putnam would receive its subordinated collateral management fee only ***after*** all six classes of noteholders (starting with Class A-1 and ending with Class X) received the amount each such class was entitled to receive per distribution date.  Putnam therefore would receive this fee only if the Pyxis CDO performed sufficiently well to first pay the noteholders.  (*Id.*)

**B.    Intesa**

Intesa, formerly known as Banca Intesa S.p.A, is a large and sophisticated financial institution organized under the laws of Italy.  (Compl. ¶ 12.)  Intesa was not an investor in the Pyxis CDO; it did not purchase any notes or equity issued by the Pyxis CDO, and it did not enter into any CDS that were to be included in the Pyxis CDO portfolio.  Instead, according to the Complaint, in September 2006 Intesa and CA-CIB allegedly "came to an understanding" that they would enter into the Swap, whereby Intesa would be the protection seller (*i.e.*, the long counterparty) and CA-CIB would be the protection purchaser (*i.e.*, the short counterparty) on $180 million of the Class A-1 notes issued by Pyxis.  (Compl. ¶ 67.)  Intesa performed "rigorous due diligence" prior to entering into the Swap, including "an analysis of the deal's structure . . . and the assets included in the CDO's portfolio."  (Compl. ¶ 22.)

Unmentioned in the Complaint is that Intesa simultaneously entered into a second CDS with CA-CIB, in which Intesa *bought protection* (*i.e.*, took a short position) on the Class B notes issued by Pyxis.[3]  Intesa characterizes this type of position as "betting against the credit quality" of the Pyxis CDO and its underlying portfolio of assets.  (Compl. ¶ 2.)  Thus, Intesa

---

[3]    This short position is reflected in documents that Intesa refers to in the Complaint.  (*See* Kuck Decl. Ex. D (email attaching the Term Sheet referenced at Compl. ¶¶ 63, 107 and reflecting the September 2006 understanding referenced at Compl. ¶ 67); *see also* Compl. ¶ 84 ("Calyon sent Intesa 'spread' valuations for the Pyxis Class A-1 and Class B notes.").)

engaged in precisely the type of short trade that it alleges the Defendants should have disclosed that Magnetar had made against the Pyxis collateral portfolio.

On April 30, 2008, more than 18 months after the closing of the Pyxis CDO, Fitch Ratings Ltd. downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Swap.  Intesa thereafter paid $180 million under the Swap and received Class A-1 Pyxis notes in return, which it alleges to be "virtually worthless" today. (Compl. ¶ 10.)

### C.   The Alleged Representations To Intesa Regarding Putnam's Role As Collateral Manager

The Complaint does not allege that Putnam participated in any direct communications with Intesa in connection with its investment decision.  As alleged in the Complaint, the only information purportedly relayed to Intesa about Putnam's role as collateral manager was set forth in offering documents sent to prospective investors in the Pyxis CDO.

### 1.   The Investor Presentation

The Complaint alleges that in August 2006, CA-CIB provided Intesa with a 52-page set of investor presentation materials, which the Complaint refers to as the "Pitchbook" (Kuck Decl. Ex. G (the "Investor Presentation")).[4]  (Compl. ¶ 74.)  Intesa alleges that the Investor Presentation "purported to describe, among other things, the structure of the Pyxis CDO, the types of assets that would be selected for inclusion in the portfolio, and the rigorous selection process that would be employed by Putnam to identify and analyze those assets."  (Compl. ¶ 63.) Intesa further alleges that CA-CIB represented that Putnam was involved in the preparation of certain sections of the Pitchbook, including the "sections describing Putnam's superior knowledge, expertise, and purportedly rigorous asset selection criteria."  (Compl. ¶ 64.)  The

---

[4]    To avoid burdening the Court with unnecessary duplication, all exhibit cites herein refer to the Declaration of Lea Haber Kuck in support of CA-CIB's Motion to Dismiss the Complaint dated June 1, 2012.

Complaint alleges that these statements were false because Putnam purportedly ceded control over the asset selection process to Magnetar, which enabled Magnetar to pick "toxic" assets for the Pyxis portfolio.  (Compl. ¶ 7.)

Under the heading "Important Information," prospective investors in the Pyxis CDO were explicitly informed that the Investor Presentation was "prepared solely for information purposes," that "the information contained [t]herein does not purport to contain all of the information that may be required to evaluate the securities that may be issued," and that any recipient should "read the Offering Memorandum" and "conduct its own independent analysis of the data referred to [t]herein."  (Investor Presentation at 2.)  The materials disclosed that 72% of the securities selected for the Pyxis portfolio would be rated on the border between speculative grade and investment grade, with 39% rated "BBB-" (the lowest possible investment grade), 20% rated "BBB," and 13% rated "BBB+."  (*Id.* at 14.)

### 2.     The Offering Memorandum

The Complaint alleges that Intesa received and reviewed the Offering Memorandum (Kuck Decl. Ex. A).  (*See* Compl. ¶¶ 78-79, 82, 107, 118, 128, 137.)  The Offering Memorandum expressly disclosed that Putnam was not responsible for any information contained therein, except for a five-page section setting forth limited information concerning Putnam's role as collateral manager.  This section simply described Putnam's corporate structure, its experience as an investment management firm, and biographies of several of its officers and employees expected to provide collateral management services to the Pyxis CDO. (*See* OM at 187-91.)  Intesa alleges that this section "further touted Putnam's vast experience in managing structured assets" and disclosed that Putnam would select and manage the assets in the Pyxis portfolio.  (Compl. ¶ 78.)  According to the Complaint, these statements were purportedly false because Magnetar, not Putnam, allegedly selected the collateral for the Pyxis portfolio.

(Compl. ¶ 7.)

Though nowhere disclosed in the Complaint, the Offering Memorandum also set forth, over the course of a 35-page section entitled "Risk Factors," the many risks associated with the notes and underlying collateral.  (OM at 23-58.)  Among other warnings, the Offering Memorandum specifically cautioned that "[a] substantial portion of the Issuer's portfolio will consist of RMBS securities," including mid-prime mortgage securities with weighted average FICO[5] scores of 625 to 675 and subprime mortgage securities with weighted average FICO scores of 625 or lower that were not underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.  (OM at 31, 140.) Potential investors were warned that the assets in the Pyxis portfolio could be affected by "the credit risk due to borrower default and the servicer's failure to perform," as well as "the impact of general economic conditions on the rate of defaults and losses on residential mortgage loans." (*Id*. at 31.)

In a section entitled "Security for the Notes," the Offering Memorandum set forth 57 pages of disclosures concerning the composition of the Pyxis CDO portfolio, including the "Eligibility Criteria" that governed Putnam's selection of these assets.  (*Id*. at 112-69.)  Among the Eligibility Criteria were rules setting forth minimum and maximum concentrations of assets by security type (including the disclosure that not less than 80% of the assets in the Pyxis portfolio would consist of subprime and mid-prime RMBS), minimum credit rating requirements, and restrictions on the purchase of assets that have been downgraded or placed on

---

[5]       "FICO score" refers to the number assigned by the Fair Isaac Corporation to rank consumers by how likely they are to pay their credit obligations as agreed.  *See* Fico/Products/Scores/Fico Score, http://www.fico.com/en /Products/Scoring/Pages/FICO-score.aspx (last visited Feb. 14, 2011).  The lower the FICO score, the higher the risk of default.  *See In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 576 (S.D.N.Y. 2010) ("And because a subprime mortgage – which is generally defined as one issued to a borrower with a 'FICO' score of 620 or below – carries a higher risk of default than a traditional mortgage, a CDO backed by subprime mortgages poses a higher risk to those holding its certificates.").

negative credit watch.  (*See id.* at 115-125; 145-48.)  The Complaint does not allege that the collateral selected for the Pyxis CDO violated any of these Eligibility Criteria.

###### D.    The Alleged Fraudulent Scheme

The Complaint purports to describe a broad scheme in which defendants "secretly joined forces to launch a series of CDOs under the guise of *bona fide* investments for the benefit of CDO noteholders (*i.e.*, the 'long' investors), which, in reality, were vehicles designed by Magnetar to place short positions on billions of dollars of subprime mortgage bonds at below-market costs."  (Compl. ¶ 44.)  In support of this alleged fraudulent scheme, Intesa cites (i) an article published by the non-profit news service ProPublica (Compl. ¶¶ 3, 8, 45, 104); (ii) a book by a financial journalist (Compl. ¶ 47); (iii) certain regulatory proceedings concerning other CDOs in which Putnam was not involved (Compl. ¶ 3); and (iv) the alleged correlation between the assets in the Pyxis portfolio and the assets selected for other CDOs in which Putnam did not have any role (Compl. ¶¶ 90, 93).

None of these sources, standing alone or in combination, provides any support for the broad conspiracy alleged in the Complaint.  As discussed at greater length below, neither the ProPublica article nor the book by the financial journalist identifies any misconduct by Putnam; in fact, Putnam is not reported to have had any involvement in the vast majority of CDOs in which Magnetar allegedly invested.  The only mention of Putnam in either source is a passing mention in the ProPublica article of the fact that a Magnetar employee had once worked at Putnam.  Likewise, the regulatory investigations referenced in the Complaint concern CDOs other than Pyxis in which Putnam did not participate in any capacity.  Lastly, the so-called correlation study preformed by Intesa is irrelevant.  Intesa claims that a portion of the assets in the Pyxis portfolio consisted of CDO or RMBS notes from the same issuers as assets selected by other collateral managers for CDOs in which Magnetar allegedly invested.  There is no

allegation, however, that any of these assets were hidden from investors, including Intesa, or that any of the assets selected for the Putnam CDO failed to meet any of the detailed Eligibility Criteria set forth in the Offering Memorandum.

<u>**ARGUMENT**</u>

I.   **STANDARD ON A MOTION TO DISMISS**

In deciding a motion to dismiss, a court must accept as true well-pleaded allegations in a complaint. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  This Court, however, "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001).  In addition, the Court should not credit factual assertions or characterizations that are refuted by the objective record. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).  The law no longer requires a moving defendant to show that the plaintiff can prove "no set of facts" entitling it to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007).  Instead, a plaintiff must allege facts that render their claim not merely "conceivable," but truly "plausible." *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (*Twombly* applies to "all civil actions").

To satisfy the Rule 9(b) pleading requirements, a fraud claim alleging material misstatements or omissions must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).  A plaintiff pleading securities fraud claims also must meet the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA requires that a complaint specify each

11

allegedly misleading statement and why it is misleading; if an allegation is made on information and belief, the complaint must also state with particularity all facts on which the belief is formed. 15 U.S.C. § 78u-4(b)(1).  "As the Second Circuit has repeatedly required, plaintiffs 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'"  *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *7 (S.D.N.Y. Sept. 28, 2010).

## II.   INTESA'S CLAIMS UNDER SECTION 10(b) OF THE 1934 ACT ARE BARRED BY THE FIVE YEAR STATUTE OF REPOSE

"Section 804(a)(2) of the Sarbanes-Oxley Act [of 2002] is a statute of repose which requires that a plaintiff bring a section 10(b) or Rule 10b-5 claim within five years of the violation of the securities laws, regardless of when the plaintiff discovered the violation." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005) (citing 28 U.S.C. § 1658(b)).  As the Seventh Circuit recently explained, the five-year statute of repose is "strong medicine" warranted because, among other reasons, "business planning is impeded by contingent liabilities that linger indefinitely."  *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011) (Posner, J.); *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) ("The rule in the federal courts is that both tolling doctrines—equitable estoppel and equitable tolling—are . . . grafted on to federal statutes of limitations," but "[n]either tolling doctrine applies to statutes of repose, their very purpose is to set an outer limit unaffected by what the plaintiff knows.") (internal citations omitted).

In determining when the violation occurred for the purpose of calculating the repose period, courts in the Southern District of New York have "consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were

made." *Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172, at *14 (S.D.N.Y. Feb. 15, 2012) (citing *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 355 (S.D.N.Y. 2011); and *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 491 (S.D.N.Y. 2008)). The two Circuit Courts that have construed Section 804(a)(2) of the Sarbanes-Oxley Act have likewise held that the "violation" occurs at the time of the alleged misrepresentation, not at the time of the purchase or sale of the securities at issue.  *See McCann*, 663 F.3d at 932 ("The violation in this case, defined as it should be—as the misrepresentation—occurred in August 2002, more than five years before the suit was filed. The suit is therefore untimely."); *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 200 (3d Cir. 2007) ("[T]he repose period applicable to § 10(b) claims as set out in §§ 9(e) and 1658(b)(2) begins to run on the date of the alleged misrepresentation.").

Where, as here, the Complaint purports to allege multiple misrepresentations, courts have held that the repose period "begins when the last alleged misrepresentation was made." *Teamsters Local 445 Freight Div. Pension Fund*, 2005 U.S. Dist. LEXIS 19506, at *19 (collecting cases); *In re Beacon Assoc. Litig.*, No. 09 Civ. 777 (LBS), 2012 WL 1123728, at *5 (S.D.N.Y. April 4, 2012) (same).  Accordingly, for Intesa's claims to be timely, the last misrepresentation alleged in the Complaint must have been made on or after April 6, 2007 (*i.e.*, five years prior to the filing of the Complaint on April 6, 2012).

The Complaint, however, does not allege any misrepresentations to have been made after that date.  As discussed above, the purported misrepresentations attributed to Putnam relate to the adequacy of the disclosures in the Investor Presentation and Offering Memorandum, both of which Intesa concedes that it received before April 6, 2007.  And the last purported misrepresentation or omission identified in the Complaint attributed to any defendant relates to

market valuations allegedly provided to Intesa in March 2007.  (*See* Compl. ¶ 83.)  Even

assuming *arguendo* that these valuations were false and misleading and that Putnam had a role in

their preparation—neither of which the Complaint adequately alleges—Intesa received these

materials more than five years before the commencement of this action.  Accordingly, the

Complaint fails to allege a misrepresentation within the five-year repose period, and therefore

Intesa's federal securities law claims should be dismissed on this ground alone.

## III.    INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

To state a misrepresentation claim under Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), "Plaintiffs must 'allege that the

defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

the plaintiff[s'] reliance was the proximate cause of its injury.'" *In re Merrill Lynch Auction Rate*

*Sec. Litig.*, No. 09 Civ. 9887 (LAP), 2012 U.S. Dist. LEXIS 19879, at *18 (S.D.N.Y. Feb. 15,

2012).  A failure to plead any of these elements with the requisite particularity necessitates

dismissal.  *See, e.g., Good Hill Partners L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517,

520-21 (S.D.N.Y. 2008).  Because Intesa fails to adequately allege scienter or, in the alternative,

actionable misrepresentations or omissions by Putnam with the particularity required by Rule

9(b) and the PSLRA, Intesa's Section 10(b) and Rule 10b-5 claims must be dismissed.

### A.    Intesa Fails To Allege That Putnam Acted With Scienter

Liability under Section 10(b) requires proof that the defendant acted with scienter.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  A plaintiff can establish

scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to

commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The heightened pleading standards of the PSLRA require that a plaintiff state with particularity facts evidencing scienter and that those allegations give rise to a "strong inference" that the defendant acted with the requisite state of mind.  *Tellabs*, 551 U.S. at 313-14; *see* 15 U.S.C. § 78u-4(b)(1), (2).  In determining whether the facts alleged in a complaint give rise to a strong inference of scienter, courts must consider "competing inferences rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.  "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*

### 1.  Intesa Fails To Allege A Plausible Motive For Putnam's Participation In The Alleged Fraudulent Scheme

Intesa's theory of motive is implausible and does not support a compelling inference of scienter.  On the one hand, Intesa acknowledges that Putnam "was one of the largest U.S. mutual funds companies with nearly 70 years of experience managing money, that it had $180 billion in assets for nearly 10 million shareholders and approximately 170 institutions, and . . . that it was reputedly a leader in compliance and transparent business practices."  (Compl. ¶ 65.)  Yet Intesa alleges that Magnetar somehow "bought" Putnam's "cooperation and acquiescence" in a multi-billion dollar conspiracy with the promise of "skinny" collateral management fees and "cumulative business."  (Compl. ¶ 50.)

To begin with, Intesa fails to acknowledge that a significant portion of Putnam's collateral management fee was junior in priority to the interest payments to be made to Pyxis noteholders.  (*See* OM at 70-74.)  In other words, Putnam would receive its entire collateral management fee only in the event the Pyxis CDO performed sufficiently well to first pay all six classes of noteholders (starting with Class A-1 and ending with Class X) the maximum amount

they were entitled to receive on each applicable distribution date.  Putnam had no incentive to design a CDO that would fail; any such failure would result in Putnam not receiving the full collateral management fee it had otherwise earned.

Moreover, Intesa nowhere alleges that the entire collateral management fee to be earned by Putnam was outsized or extraordinary.  The law is well-settled that the desire to earn ordinary fees is not a permissible basis for inferring scienter.  *See, e.g.*, *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.) ("[T]he desire to earn management fees is a motive generally possessed by . . . managers, and as such, does not suffic[iently] allege a 'concrete and personal benefit' resulting from fraud.").  Indeed, courts in the Second Circuit have uniformly held such allegations to be insufficient to survive a motion to dismiss.[6]  Even assuming that the Pyxis CDO never paid off any principal outstanding on its notes, the most that Putnam would earn as a collateral management fee was approximately $3 million per year.  It lacks all plausibility to suggest that a large and respected financial institution would have a motive to commit a billion dollar fraud to reap a few million dollars in fees.  *See Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572 (JGK), 2003 WL 135706, at *3 (S.D.N.Y. Jan. 17, 2003) (rejecting theory of motive that was "clearly self-defeating, if not irrational").

---

[6]     *See, e.g.*, *Brecher v. Citigroup, Inc.*, 797 F. Supp. 2d 354, 370 (S.D.N.Y. 2011) ("[T]he bare desire to earn management fees is too general to support a strong inference of scienter."); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) (rejecting as insufficient allegation "that defendants' motive was to . . . earn substantial sales commissions and fees . . . .  An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient.  This Circuit has repeatedly held that similar allegations of a generalized motive that could be imputed to any for-profit endeavor therefore are not sufficiently concrete for purposes of inferring scienter."); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) (holding that alleged motive "to obtain fees for services . . . [is] insufficient to give rise to a strong inference of scienter . . . .  Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter."); *Pope Invs. II LLC v. Deheng Law Firm*, No. 10 Civ. 6608 (LLS), 2011 U.S. Dist. LEXIS 134012, at *19 (S.D.N.Y. Nov. 18, 2011) ("'[A]llegations of the motivation to receive fees for services' do not 'suffice to establish motive,' as '[a]ll firms in the securities industry want to increase profits . . . .'") (citation omitted); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute.").

**2.      Intesa Fails To Allege Circumstantial Evidence Of Putnam's
Participation In The Alleged Fraudulent Scheme**

Having failed to allege a plausible motive for Putnam's participation in the

alleged fraudulent scheme, Intesa must satisfy the heightened pleading standard for establishing

motive through circumstantial evidence of conscious misbehavior.  *See Wachovia Equity Sec.*

*Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011) ("Where motive is not

apparent, a plaintiff may also raise a strong inference of scienter by showing circumstantial

evidence of conscious misbehavior or recklessness, although 'the strength of the circumstantial

allegations must be correspondingly greater.'").  As set forth in detail below, ***none*** of the sources

cited in the Complaint contains ***any*** facts suggesting that Putnam was a knowing participant in

the alleged fraudulent scheme.

<u>First</u>, Intesa claims that it learned of the alleged fraudulent scheme "when some of

the critical facts relating to this collusion were first reported" in a ProPublica article.  (Compl. ¶

8.)  Relying on anonymous sources, ProPublica reported that, beginning in 2005 and continuing

through 2007, Magnetar invested in at least 28 subprime mezzanine CDOs, sold by at least 10

different investment banks, and managed by at least 16 different collateral managers, including

the Pyxis CDO.  *See* Jesse Eisinger and Jake Bernstein, *The Magnetar Trade: How One Hedge*

*Fund Helped Keep the Bubble Going*, ProPublica, Apr. 9, 2010 (Kuck Decl. Ex. E).  Putnam,

however, is reported to have been the collateral manager for only two of these transactions, one

of which was the Pyxis CDO.

Significantly, the ProPublica article ***does not*** implicate Putnam in any way or

even discuss the Pyxis CDO.  ProPublica does not report that any collateral manager, much less

Putnam specifically, received extraordinary fees or was promised a role in future deals in

consideration for selecting inappropriate collateral for the CDO it managed.  The only mention

of Putnam in the ProPublica article is a single reference to the employment history of the Magnetar employee Jim Prusko, who is reported to have previously worked at Putnam. *Id.* at 3. Based solely on this innocuous fact, Intesa makes the speculative leap, unadorned with any factual support, that "the principal individual at Putnam responsible for selecting the Pyxis portfolio" had an "especially close" relationship with Prusko, which "made it easy for Magnetar to secretly hijack" the asset selection process for the Pyxis portfolio. (Compl. ¶¶ 51, 89.) The alleged fact of Mr. Prusko's prior employment at Putnam is not sufficient to support an inference of the broad misconduct alleged in the Complaint.

In *Loreley*, the New York Supreme Court dismissed a fraud claim against Putnam premised on essentially identical allegations. *Loreley*, Index No. 650673/2010, at 8-9 (N.Y. Sup. Ct.) (Schweitzer, J.). There, as here, the plaintiff's theory was that "since Magnetar hired a former employee of Putnam, and the press has speculated on the basis of unnamed sources that Magnetar ran a scam, Putnam must be at the heart of it." *Id*. at 9-10. The *Loreley* court rejected this theory, stating that the ProPublica article "makes no particularized allegations about Pyxis 2006-1 or about Putnam itself" and thus the plaintiff's "assertion that Magnetar colluded with the arranger and collateral manager of Pyxis 2006-1 to cherry-pick unsuitable collateral for that CDO is simply speculation." *Id*. at 10. The same result is warranted here.[7]

From a legal standpoint, the ProPublica article contains nothing more than broad assertions from anonymous sources, often contradictory, that are not particularized to Putnam or the Pyxis CDO. Intesa's allegations premised on the ProPublica article thus cannot survive a motion to dismiss. *See Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives and press reports of other

---

[7]     *See Excel Elecs. & Photo Corp v. Aetna Cas. & Sur. Co.*, No. 90 Civ. 6508 (JMC), 1991 WL 259257, at *6 (S.D.N.Y. Nov. 27, 1991) ("C.P.L.R. § 3016(b) is apparently intended to correspond to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.").

occasions . . . .").[8]

       Second, Intesa cites a book entitled *Econned* written by a financial journalist[9] which discusses Magnetar's role in certain CDOs, but notably fails to mention either Putnam or Pyxis.  (*See* Compl. ¶ 47.)  This attempt to cobble together support for its fraud allegations also fails, as allegations based on non-particularized reports fail to plead fraud with the requisite particularity.  *See Miller*, 473 F. Supp. 2d at 586; *Loreley*, Index No. 650673/2010, at 9 (including *Econned* among "anecdotal print reports citing unidentified or confidential sources, none of which tie Putnam to the alleged scam.").

       Third, in an attempt to dress-up its conclusory allegations by way of analogy, Intesa alleges that the Pyxis transaction "was not the first transaction in which Magnetar colluded with [CA-CIB] and others," citing certain regulatory proceedings commenced by the U.S. Securities and Exchange Commission and the Securities Division of the Commonwealth of Massachusetts.  (Compl. ¶ 3.)  Putnam is not alleged to have had any involvement in the CDOs at issue in the cited regulatory proceedings, and thus Intesa's "broad brush" allegations cannot serve as a basis for inferring that Putnam intentionally participated in the alleged fraudulent scheme.  *See Loreley*, Index No. 650673/2010, at 9 ("It is a compilation of anecdotal behavior which relates to the story of a grand financial scam, but, with respect to Putnam, its allegations

---

[8]     *See also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09-CV-4050, 2010 WL 3790810, at *17, 19-20 (S.D.N.Y. Sept. 28, 2010) (dismissing fraud claims as a matter of law where general reports about mortgage originator were not tied to specific security purchased by plaintiff); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (reliance on media reports does not relieve plaintiff of burden of identifying and linking sources with particularized allegations of misconduct); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (rejecting "guilt by association" theory of securities fraud).

[9]     Although the Complaint misleadingly refers to *Econned*'s author, Susan Webber (who uses the pen name Yves Smith), as a "former Goldman Sachs banker" (Compl. ¶ 47), the book makes clear that the author had not worked at Goldman Sachs for years and had no first-hand information relating to the structuring of CDOs in general, or the Pyxis CDO in particular.  Indeed, Ms. Webber's biography on the website of Aurora Advisors Inc., the management consulting firm she founded, reveals that she last worked at Goldman Sachs **29 years ago** as a corporate finance associate in 1983.  *See* http://www.auroraadvisors.com/resume_webber.html (last visited June 1, 2012).

are conclusory and lack the specificity necessary to state a cause of action for fraud.").

Finally, Plaintiff alleges that Putnam invested "over half of Pyxis's cash allocated to CDO investments in four other Magnetar CDOs,"[10] and that there was an "undisclosed, remarkably high correlation" between the assets selected for Pyxis and the portfolios of other CDOs in which Magnetar allegedly invested.  (Compl. ¶ 90.)  The Complaint, however, does not allege that any of the assets in the Pyxis portfolio did not meet any of the detailed Eligibility Criteria set forth in the Offering Memorandum or otherwise explain why any overlap in collateral securities with other CDOs for which Putnam did not act as collateral manager was improper.  *See Epirus Capital Mgmt., LLC v. Citigroup, Inc.*, No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200, at *15 (S.D.N.Y. Apr. 28, 2010) ("Plaintiff ha[s] not pled any facts to suggest that the performance or selection process for the allegedly worthless assets for [the CDO] was materially different from the performance or selection process for the other assets in [the CDO's] portfolio.").

In view of the foregoing, Intesa has failed to allege facts sufficient to give rise to a "strong inference 'of scienter that is' cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *See Tellabs*, 551 U.S. at 314.

### B.   Intesa Fails To Plead An Actionable Misrepresentation With The Particularity Required By Rule 9(b) and the PSLRA

#### 1.   The Offering Memorandum Disclosed The Eligibility Criteria For Asset Selection And The Existence Of Short Counterparties

Intesa alleges that Putnam somehow ceded control over the asset selection process to Magnetar, and thereby allowed the collateral portfolio to be assigned "weaker assets over

---

[10]   The Complaint seeks to inflate the significance of this purported correlation.  The Complaint fails to disclose that the Eligibility Criteria limited the inclusion of "CDO Securities" in the Pyxis portfolio to a maximum of 15% of the $1.5 billion portfolio.  (OM at 121.)   The vast majority of assets in the portfolio were not CDOs, but RMBS.

stronger ones, so as to benefit Magnetar's short CDS positions at the expense of long investors like Intesa."  (Compl. ¶ 30.)  But Intesa does not allege which particular assets Magnetar selected or that any of these assets violated the Eligibility Criteria set forth in the Offering Memorandum. As discussed above, the Offering Memorandum contained numerous detailed disclosures setting forth the composition of the securities collateralizing the CDO (mostly subprime and mid-prime RMBS) and the low minimum credit rating of those securities (at least "BBB-" by S&P and "Baa3" by Moody's).  Over the course of 35 pages of "Risk Factors," the Offering Memorandum repeatedly warned potential investors about the risks associated with an investment in the notes and the underlying portfolio of assets, including that a "substantial portion" of the Pyxis portfolio—at least 80% according to the Eligibility Criteria—would consist of RMBS securities (OM at 124), and that as much as 50% of the portfolio would consist of subprime RMBS, with weighted average FICO scores of 625 or lower (OM at 31, 140).  Similarly, the Investor Presentation warned that approximately 72% of the assets in the final portfolio would be rated on the border between speculative grade and investment grade, with 39% rated "BBB-," 20% rated "BBB," and 13% rated "BBB+."  (Investor Presentation at 14.)  In short, no investor reading these disclosures could have been misled into believing, as Intesa now asserts, that the portfolio would consist of "prime RMBS" assets.  (Compl. ¶ 5.)  *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir. 1996) (dismissing Rule 10b-5 and common law fraud claims where plaintiffs failed to proffer a "reasoned basis to dismiss as boilerplate the disclosure of risk contained throughout the prospectuses."); *Epirus Capital Mgmt., LLC*, 2010 U.S. Dist. LEXIS 42200, at *16 (holding that CDO investors failed to state a claim under Section 10(b) and Rule 10b-5 where the offering materials explicitly disclosed the nature of the collateral being selected).

There is also no well-pleaded allegation to support the contention that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS." (Compl. ¶ 94.)  As the Complaint alleges, the ABX Index is "a series of indices, each comprised of twenty underlying constituent RMBS."  (Compl. ¶ 82.)  The Eligibility Criteria disclosed in the Offering Memorandum specified strict concentration limits on the ABX Index and the indices contained therein, not on the constituent RMBS.  (*See* OM at 118 (providing that the aggregate amount of CDS referencing any of the series of indices included in the ABX Index could not exceed 5% of the Pyxis portfolio, and that the aggregate amount of CDS referencing any one series included in the ABX Index could not exceed 2% of the Pyxis portfolio).)  Accordingly, having failed to allege that the Pyxis portfolio violated the ABX Index concentration limits, Intesa's attempt to fashion a claim on the basis of CDS in the Pyxis portfolio allegedly referencing constituent RMBS must be dismissed.  *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

Intesa likewise cannot claim that Putnam failed to disclose the existence of short counterparties like Magnetar who were "poised to profit handsomely at the expense of Pyxis's investors."  (Compl. ¶ 56.)  As Intesa acknowledges, the Offering Memorandum expressly disclosed that 77% ($1.15 billion par value) of the Pyxis portfolio would be comprised of synthetic assets, and it would have been readily apparent to Intesa, a sophisticated investor, that the short counterparties on these CDS would have economic interests diametrically opposed to Intesa and other long investors.  (Compl. ¶¶ 54-55.)  This fundamental aspect of the Pyxis transaction was also depicted in a large diagram in the Investor Presentation on which Intesa claims it relied.  (*See* Investor Presentation at 10 (illustrating CDS between short counterparties

and CA-CIB, with CA-CIB acting as intermediary facing Issuer).)  In sum, as the *Loreley* court previously held, the fact that the Pyxis portfolio needed to be attractive to both long investors and to short counterparties was "transparent" and was part and parcel of "the nature of the structure."  *See Loreley.*, Index No. 650673/2010, at 4-5 ("It is uncontroverted that the plaintiff here who invested in the [Pyxis] CDO . . . was fully aware of this reality.").

### 2.  General Statements Regarding Putnam's Experience And Capabilities Are Not Actionable

Intesa repeatedly alleges that, when choosing to enter into the Swap, it relied upon statements in the offering materials regarding Putnam's experience and capabilities.  (*See* Compl. ¶¶ 65-66, 72, 74, 76-78.)  As a threshold matter, Intesa fails to allege any facts suggesting that Putnam lacked the experience and capabilities described in such materials.  In any event, such general statements regarding Putnam's business practices are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (rejecting allegations of "numerous misrepresentations regarding [defendant's] 'highly disciplined' risk management and its standard-setting reputation for integrity").[11]

### 3.  Putnam Cannot Be Held Liable For Alleged Misstatements It Did Not Make

Intesa also fails to allege that Putnam had any involvement in many of the misstatements alleged in the Complaint, including those allegedly contained in the July 25, 2006

---

[11]     *See also Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 183 (S.D.N.Y. 2010) (holding as inactionable puffery defendant's portrayal of its own "risk management strategies," including assertions of its "cautious stance" and "active management" of risk); *Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 353-54 (S.D.N.Y. 2011) (holding that "Defendants' repeated public declarations of their 'conservative' underwriting standards and credit risk management" fall "into the category of commonplace statements too general to cause reliance by a reasonable investor" and were thus "corporate puffery rather than actionable misrepresentations"); *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495 (RMB), 2010 U.S. Dist. LEXIS 107719, at *25  (S.D.N.Y. Sept. 29, 2010) (holding that "a defendant's statements regarding the efficacy of its risk management systems are no more than puffery" and thus "do not give rise to securities law violations") (internal quotation marks omitted).

spreadsheet setting forth the ramped portfolio, the term sheet dated September 6, 2006, and the March 6, 2007 market valuations.  (Compl. ¶¶ 63, 83-84.)  Putnam does not concede that the Complaint adequately alleges that any of these documents contained any actionable misrepresentations or omissions.  But even if they did, Putnam cannot be held liable as a "maker" of these alleged statements because Putnam did not have "ultimate authority" over such statements, including their "content" and "whether and how to communicate [them]."  *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).  Dismissal of Intesa's claims against Putnam based on such alleged misstatements "accords with the narrow scope" of the implied right of action under Section 10(b) and Rule 10b-5.  *See id.* at 2303 ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").[12]

## IV.   INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS AGAINST PUTNAM SHOULD BE DISMISSED

Having failed to state a claim under Section 10(b) and Rule 10b-5, Intesa cannot allege a cognizable claim against Putnam sounding in common law fraud.  "Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b-5."  *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).  Thus, where "Section 10(b) claims do not survive, plaintiffs' common law fraud claims, based on the same allegations of fact, must be dismissed as well."  *Id.*

---

[12]     Putnam also cannot be held responsible for any statements in the Offering Memorandum outside of the five-page section setting forth limited information about Putnam.  (*See* OM at ii ("No representation or warranty, express or implied, is made by . . . the Collateral Manager . . . except . . . with respect to the information set forth in the section entitled 'The Collateral Manager' (other than information set forth under the subheading 'General' contained therein.").))  The Complaint does not allege that any of the information disclosed in the five-page section regarding Putnam—which principally described Putnam's corporate structure, its experience as an investment management firm, and the biographies of relevant officers and employees—was false in any material way.

As previously discussed, the *Loreley* court has already dismissed a common law fraud claim asserted against Putnam premised on virtually identical allegations.  *See Loreley*, Index No. 650673/2010, at 8-9 ("Despite [plaintiff] alleging the broad fraudulent scheme described above, the complaint, in fact, [had] nothing in any respect in the way of detailed allegations regarding the role of Putnam.").  The same result is warranted here.

## V.    INTESA'S CIVIL CONSPIRACY CLAIM AGAINST PUTNAM SHOULD BE DISMISSED

"[I]n order to state a claim for civil conspiracy, a Plaintiff must have a valid underlying tort claim."  *Brady v. Lynes*, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *9 (S.D.N.Y. June 2, 2008).[13]  Therefore, because Plaintiff's common law fraud claims fail, its civil conspiracy claim must be dismissed as well.

## VI.    CONCLUSION

For the reasons set forth above, Putnam respectfully requests that the Court grant its motion to dismiss the Complaint with prejudice.

Dated:  New York, New York  
          June 1, 2012

MILBANK, TWEED, HADLEY & McCLOY LLP  
1 Chase Manhattan Plaza  
New York, New York  10005  
(212) 530-5000

By:   _/s/ Thomas A. Arena_  
      Thomas A. Arena  
      Sean M. Murphy  
      Justin A. Alfano  
      William P. Gross

      *Attorneys for Defendant*  
      *Putnam Advisory Company LLC*

---

[13]      *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 436-37 (S.D.N.Y. 2010) (Sweet, J.) (first dismissing Section 10(b) claims and common law fraud claims because "[t]he elements of common-law fraud are 'essentially the same' as those for a violation of Section 10(b) of the Exchange Act," and then dismissing civil conspiracy claim, holding that, "[b]ecause Plaintiffs have not stated a claim for fraud, their conspiracy claim also fails as a matter of law."); *Ellan Corp.  v. Dongkwang Int'l Co.*, No. 09 Civ. 414 (LAP), 2011 WL 4343844, at *6 (S.D.N.Y. Aug. 15, 2011).