**OFFICE COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| INTESA SANPAOLO, S.P.A., | 12 Civ. 2683 (RWS) |
| Plaintiff, | |
| -against- | **FIRST AMENDED COMPLAINT** |
| CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CRÉDIT AGRICOLE SECURITIES (U.S.A.) INC., THE PUTNAM ADVISORY COMPANY, LLC, MAGNETAR CAPITAL LLC, MAGNETAR FINANCIAL LLC, AND MAGNETAR CAPITAL FUND, LP, | |
| Defendants. | |



Plaintiff Intesa Sanpaolo, S.p.A. ("Intesa" or "Plaintiff"), by its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, brings this First Amended Complaint against Crédit Agricole Corporate and Investment Bank ("Calyon CIB"), and Crédit Agricole Securities (U.S.A.) Inc. ("Calyon (U.S.A.)") (collectively, "Calyon"); The Putnam Advisory Company, LLC ("Putnam"); Magnetar Capital LLC ("Magnetar Capital"), Magnetar Financial LLC ("Magnetar Financial"), and Magnetar Capital Fund, LP ("Magnetar Capital Fund") (collectively, "Magnetar") (all of the defendants collectively, "Defendants") and alleges as follows:

### Nature of the Case

1.       This action arises out of Defendants' fraudulent scheme to secretly stack the deck against unknowing investors, including Intesa, in favor of the now-infamous hedge fund known as Magnetar. In July 2006, Calyon structured a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis"). Calyon marketed Pyxis to unsuspecting investors as an investment based on residential mortgage-backed securities ("RMBS") which had been chosen

by a respected, putatively independent firm, Putnam, acting diligently and in good faith in the interests of long investors, and using a rigorous selection process that was consistent with the highest industry standards. Based on these representations, Intesa agreed to enter into a credit default swap ("CDS") with Calyon in which Intesa provided protection on the $180 million of putatively super senior, AAA-rated Class A-1 notes issued by Pyxis (the "Pyxis Swap"). However, unbeknownst to long investors like Intesa, Putnam did not select the securities for Pyxis; Magnetar did. In fact, Calyon and Magnetar deliberately structured the Pyxis CDO to *lose* funds invested by those taking a long position. And lose money it did: Less than two years later, Intesa lost $180 million, the full amount of the Pyxis Swap. Unbeknownst to Intesa at the time, its embedded losses on the Pyxis Swap were over $70 million *on the date the transaction closed.* Calyon itself would have borne that loss had it not fraudulently transferred the risk to Intesa through the Pyxis Swap.

2.     Intesa's loss was not the result of impersonal market forces. It was instead the direct and intended result of the Defendants' actions—actions which were materially identical to those for which Goldman, Sachs & Co. recently agreed to pay $550 million to settle claims brought by the Securities and Exchange Commission ("SEC"). *See Securities and Exchange Commission v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 149-50 (S.D.N.Y. 2011). The scheme was designed by Magnetar, which enlisted Calyon and Putnam to construct Pyxis secretly from toxic assets. Magnetar then reaped hundreds of millions of dollars by betting against the credit quality of the Pyxis assets it had surreptitiously selected. Putnam collected higher than normal fees for its purported independent management of Pyxis, which were effectively assured by Magnetar's involvement in the scheme, and also secured additional similarly lucrative deal volume from Magnetar. And Calyon collected fees on the deal, ensured

that it would be able to participate in additional lucrative CDOs with Magnetar, and, through the

Pyxis Swap, shifted losses on the CDO which it would have otherwise borne itself to Intesa.

       3.      Pyxis was not the first transaction in which Magnetar colluded with Calyon and

others to secretly control asset selection for a CDO and then bet against its performance. As is

now widely known, Pyxis was just one of numerous "Constellation CDOs" used by Magnetar to

make billions of dollars at the expense of unsuspecting long investors. J.P. Morgan recently paid

$153.6 million to settle SEC charges that it participated with Magnetar in a similar scheme. And

the SEC is currently investigating Magnetar's role in the creation of several other CDOs. *See*

Marian Wang, "Merrill Lynch Investigated for CDO Including Magnetar," PROPUBLICA, June

15, 2011; Marian Wang, "SEC Investigating Yet Another Magnetar CDO," PROPUBLICA, Sept.

15, 2011; Marian Wang, "In a First, SEC Warns Rating Agency It May Bring Financial Crisis

Lawsuit," PROPUBLICA, Sept. 26, 2011; "SEC Warns Top Banker of Charges Over Magnetar

Deal," PROPUBLICA, Feb. 12, 2012. Indeed, just last month, according to the Wall Street

Journal, the SEC began an investigation of Magnetar itself, not merely of the banks and rating

agencies who dealt with it. *See* "SEC Probes Role of Hedge Fund in CDOs," Wall Street

Journal, May 17, 2012. In addition, the Securities Division of the Commonwealth of

Massachusetts recently imposed a $5 million penalty on State Street Global Advisors for its

failure to disclose Magnetar's involvement in a CDO for which it acted as the investment

manager. *See* Commonwealth of Massachusetts Securities Division Consent Order, *In the*

*Matter of: State Street Global Advisors (Carina CDO, Ltd.)*, Docket No. 2011-0023 (February

28, 2012). Most significantly, perhaps, on information and belief, after incriminating evidence

came to light last year in a lawsuit brought against Calyon and Putnam *by investors in Pyxis*, the

investors' claims were promptly settled by defendants for an undisclosed amount. *See Loreley*

*Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corporate & Inv. Bank*, No. 650673/2010 (Sup. Ct. N.Y. County June 18, 2010).

4.     Calyon was a prolific underwriter of CDOs collateralized by RMBS and other asset-backed securities ("ABS"), churning out more than $75 billion of CDOs in 2006 and 2007 and generating tens of millions of dollars in fees for itself in the process.  It has since become apparent that Magnetar helped fuel Calyon's desire for growth in this market by acting as the crucial equity sponsor in multiple Calyon-arranged CDOs, including Pyxis, and the Calyon deal team worked on more Magnetar CDOs than any other underwriting group.

5.     Time has shown that Calyon valued racking up fees over the quality of its deals, as Calyon's CDOs have performed abysmally.  By December 2008, Calyon's CDO portfolio had the highest default rate of any underwriter, with over 45% of its portfolio defaulting.  The brunt of these losses was borne by unsuspecting investors, like Intesa, who provided protection on Pyxis based on Calyon's false representations and promises.

6.     Calyon and Putnam made numerous misrepresentations attesting that the Pyxis portfolio would be selected by a highly reputable and experienced collateral manager, namely Putnam, which would act independently, diligently and in good faith for the benefit of long investors like Intesa.  They also represented that between the date of the CDO's closing and the time that the parties actually executed the Pyxis Swap, the notes retained their value and were still worth close to par.

7.     As Defendants intended, Intesa relied upon these representations, and others, in deciding to enter into the Pyxis Swap.  The true facts, however, were vastly different.  In fact, unbeknownst to Intesa, but with the full knowledge and collusion of Defendants, Pyxis was actually built to fail, and was designed for the benefit of a net short investor, namely Magnetar.

4

As is confirmed by numerous contemporaneous emails between Defendants and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis), at the behest of Magnetar—one of whose executives, James Prusko, had previously worked at Putnam and had been the superior of the Putnam executive primarily responsible for selecting the Pyxis Portfolio, Carl Bell—Putnam abdicated its responsibilities to act diligently and independently for the benefit of long investors, and allowed Magnetar to hijack the Pyxis portfolio and ensure that it was loaded with toxic assets. For example: (i) Pyxis invested over half of its cash allocated to CDO investments in four other Magnetar CDOs, which in turn invested in yet more Magnetar CDOs, all of which were designed to fail; (ii) there was a remarkably high correlation between the toxic assets contained in the Pyxis portfolio and those held by other Magnetar CDOs; (iii) there were no prime RMBS assets in the Pyxis portfolio (even though two months before closing Putnam had slated $160 million of them for inclusion); and (iv) fully 22% of the assets in the Pyxis portfolio were drawn from ABX Indices (three times the permitted concentration). Moreover, the striking similarity between the conduct of the defendants with respect to Pyxis and the well-publicized conduct of Magnetar and the banks and collateral managers involved in other CDOs that were tailored to benefit Magnetar's shorting strategy at the expense of CDO investors reinforces the conclusion that Pyxis was also a CDO designed to fail for the mutual benefit of Magnetar, Calyon and Putnam. Finally, the valuation of the A-1 notes which was provided by Calyon prior to execution of the Pyxis Swap was egregiously false—far from being worth close to par, the notes had actually lost over 90% of their value by then.

8.      Having created Pyxis, Defendants had exclusive knowledge of the facts rendering their representations false. For instance, only Calyon, Magnetar, and Putnam knew that Magnetar, in collusion with Calyon and Putnam, had corrupted the collateral selection process

for Pyxis so that it could select toxic assets whose performance it could bet against, and only Calyon, Magnetar, and Putnam knew that those assets included other CDOs hijacked by Magnetar. By contrast, Intesa did not know, and could not have known, of these manipulations and the resulting concealment of the true nature of Pyxis. In fact, Intesa did not become aware of these facts, or of the collusion between Calyon, Putnam and Magnetar generally, until some time after April 9, 2010, when some of the critical facts relating to this collusion were first reported in the press. *See* Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going," PROPUBLICA, April 9, 2010.

9.      As Defendants were well aware, had Intesa known the truth about the Pyxis CDO—that the CDO had actually been built to fail by Magnetar, rather than built to succeed by Putnam, and that, if Intesa sold protection on the A-1 notes, it would be facing the loss of over $70 million on the very day it agreed to the transaction—it would never have agreed to enter into the Pyxis Swap.

10.     On April 30, 2008, only 18 months after Pyxis closed, Fitch Ratings Ltd. ("Fitch") downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Pyxis Swap. Intesa thereafter paid $180 million under the Pyxis Swap and received Class A-1 Pyxis notes, which are virtually worthless. Intesa has thus lost $180 million as a result of the Defendants' fraud.

11.     Intesa therefore brings this action for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, fraud, aiding and abetting fraud, and civil conspiracy.

## The Parties

### I.  The Plaintiff

12.     Plaintiff Intesa Sanpaolo S.p.A, formerly known as Banca Intesa S.p.A., is a corporation organized under the laws of Italy, with its principal office located in Torino, Italy.

### II.  The Calyon Defendants

13.     Defendant Calyon CIB is a limited liability company organized under the laws of France.  Calyon CIB is a global and diversified bank, and it has branch offices across the world, including in New York at 1301 Avenue of the Americas, New York, New York 10019.  Calyon CIB's stock is listed on the New York Stock Exchange.  Calyon CIB (formerly known as Calyon) was the protection buyer on the Pyxis Swap.

14.     Defendant Calyon (U.S.A.) is a U.S. broker-dealer incorporated in Delaware, with its principal office located at 1301 Avenue of the Americas, New York, New York 10019.

### III.  The Magnetar Defendants

15.     Defendant Magnetar Capital LLC is a limited liability company formed under the laws of the State of Delaware, with an office located at 623 5th Avenue, New York, New York 10022-6831.

16.     Defendant Magnetar Financial LLC is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.

17.     Defendant Magnetar Capital Fund is a limited partnership formed under the laws of the State of Delaware, with its principal place of business located at 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.  Magnetar Financial and Magnetar Capital Fund (together, the "Magnetar Funds") are controlled by Magnetar.  The Magnetar Funds made CDO-related investments in 2006 and 2007.

IV.   **Defendant Putnam Advisory Company**

18.    Defendant Putnam is a limited liability company organized and existing under the laws of Delaware.  Its principal executive office is located at 1 Post Office Square, Boston, Massachusetts 02109.  It is a registered investment advisor specializing in the management of collateralized debt obligations.

## Jurisdiction and Venue

19.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

20.    Plaintiff's claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and New York common law.

21.    Calyon CIB has a foreign bank branch licensed by the New York Superintendent of Banking to conduct business in New York.

22.    Calyon (U.S.A.) is a corporation organized under the laws of the State of Delaware, with its principal place of business located in New York, New York.

23.    Both Calyon CIB and Calyon (U.S.A.) engage in a continuous and systematic course of business from their shared offices located at 1301 Avenue of the Americas, New York, New York.  Numerous employees integral to the transactions at issue held themselves out to investors and Plaintiffs as representatives of both Calyon CIB in New York and Calyon (U.S.A.).

24.    This Court has jurisdiction over Calyon CIB under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because Calyon CIB maintains offices and regularly conducts business in New York, and because the tortious conduct alleged herein was committed in New York.

25.    This Court has jurisdiction over Calyon (U.S.A.) under F.R.C.P. 4(k)(1)(A) and CPLPR 301 and 302(a)(1) because it maintains offices and transacts business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York.

26.    This Court has jurisdiction over Magnetar Capital under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because, at all times relevant to the allegations of this Complaint, Magnetar Capital regularly transacted business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York using its office located at 623 5th Avenue, New York, New York 10022-6831.

27.    This Court has jurisdiction over Magnetar Financial and Magnetar Capital Fund under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because, at all times relevant to the allegations of this Complaint, they regularly transacted business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York.

28.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  The wrongful acts alleged herein occurred in this District.  Additionally, Calyon CIB maintains an office in this District, and Calyon (U.S.A.)'s principal place of business is located in this District.

## Factual Background

### I.    Collateralized Debt Obligations

29.    A CDO is a special purpose vehicle that purchases, or assumes the risk of, a portfolio of assets (the "portfolio")—such as bonds or loans—and issues securities which then make payments to investors based on the income generated by the assets.  A CDO's portfolio can include a variety of assets, like commercial or residential mortgage-backed securities ("CMBS" and "RMBS," respectively), securities issued by other CDOs, or CDS referencing those types of obligations.  When performing, the assets that form the CDO portfolio generate a stream of cash flows (*e.g.*, from mortgage payments) that the CDO uses to pay its expenses and make interest and principal payments to the CDO's noteholders.  Any remaining cash flows go to the CDO's equity investors, if any.  Whether a CDO's issued securities will be repaid in full depends

primarily on the CDO's structure and the credit quality (and subsequent performance) of the portfolio assets of the CDO.  Thus, for a CDO constructed primarily from RMBS, CDO noteholders will be more likely to receive expected payments of interest and principal if the rate of collection on the underlying individual mortgages is high.

30.     To buy their portfolio of assets, CDOs raise money from investors by issuing multiple classes of notes and equity interests.  A CDO's notes are not all subject to the same level of risk.  Rather, CDO notes are issued in "tranches" representing different levels of risk (and therefore potential reward).  This is achieved by creating a hierarchical structure of noteholders in the CDO.  The senior tranche of a CDO typically receives the highest "AAA" rating.  "Super senior" CDO tranches, which are intended to be even more remote from loss, are senior to another tranche that is also rated AAA.  Because the most senior tranches receive proceeds from the CDO portfolio first, they bear the lowest risk of sustaining losses in the CDO structure.

31.     Correspondingly, CDO notes do not all offer the same level of anticipated return to their purchasers.  The interest on CDO notes is set according to their expected level of risk. More junior tranches generally offer higher interest, but are exposed to a higher risk of shortfalls, because their position in the CDO structure exposes them to losses in the portfolio before the more senior notes.  The more senior tranches, on the other hand, receive lower returns because they benefit from greater subordination and thus carry lower risk.

32.     Putatively independent ratings agencies typically assign ratings to the tranches of a CDO—except for the equity or income tranche (if any).  The ratings agencies also assign ratings to the underlying assets that are either held or referenced by the CDO.  The risk on properly rated AAA tranches issued by a CDO should be remote if: (a) the portfolio includes

only securities of credit quality commensurate with expected loss rates; and (b) the amount of subordination is set properly, according to the quality of the portfolio, to absorb potential losses so that the risk of default affecting the senior tranches is extremely remote. Therefore, one of the most important aspects of a CDO affecting performance is the selection and management of its portfolio.

## II.   Managed CDOs And the Role Of The Collateral Manager

33.     For actively managed, cash-flow CDOs like Pyxis, the CDO's portfolio is supposed to be selected and managed by a collateral manager. Managing a CDO portfolio typically involves, among other things, selecting the assets for inclusion in the initial portfolio, monitoring the credit status of the individual underlying assets, reinvesting payment proceeds from maturing underlying assets, and making substitutions in the portfolio of assets to the extent consistent with the CDO's operative agreements. A collateral manager, therefore, can greatly impact a CDO's performance and either lower—or raise—its risk profile.

34.     As explained by Ian Giddy, Professor of Finance at the Stern School of Business at New York University:

> [T]the manager's expertise with the assets and ability to manage within established constraints is *paramount* to the success of the CDOs. *Market consensus is that the manager is the most important factor in the performance of a CDO.*

"The CDO Product," by Ian Giddy, Professor of Finance at the Stern School of Business at New York University (emphasis added). Or, as Calyon itself stated in the Pyxis offering memorandum, "[b]ecause the composition of the [portfolio] will vary over time, the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]."

35.     Fundamental to its role is that the collateral manager will act independently and serve the interests of the CDO's investors.  As explained by the former Co-Head of Global CDOs at Citigroup in testimony to the U.S. Financial Crisis Inquiry Commission ("FCIC") in April 2010: "The collateral manager's role was to . . . manage and trade the collateral pool for the benefit of the debt and equity issued by the CDO."

36.     Investors rely heavily on the collateral managers' professed sophistication in analyzing and selecting assets for the CDO's portfolio.  This is especially true for investments in other CDOs, whose complex portfolios are themselves comprised of other CDOs and RMBS, which are themselves comprised of underlying loans.  Evaluating such intricate, multilayered deals requires significant expertise.

37.     Collateral managers are paid a fee for their services, typically a percentage of the notional value of the transaction (*i.e.,* the total face amount of all securities issued by the CDO), the cost of which is ultimately paid by the CDO investors.  Putnam was to receive a fixed (or "senior") fee of roughly 0.15% of the outstanding principal of the Pyxis CDO per year. (Calculated on an initial deal value of $1.5 billion, that amount would be $2.25 million for the first year alone.)  Putnam was also to receive an additional incentive (or "subordinated") fee of 0.5%, amounting to $0.75 million for the first year.

38.     Most of a CDO's initial portfolio of assets are selected by the collateral manager in the months prior to the CDO closing.  Since the CDO has not yet raised any capital during that period (which, along with any post-closing period in which the CDO continues to acquire its portfolio, is known as the "ramp up period"), the pre-closing acquisition of assets is funded pursuant to a CDO "warehousing facility" between the collateral manager and the warehousing facility provider, which is usually the bank structuring the transaction (here, Calyon).  If the

CDO fails to close, the warehousing facility provider is usually at risk for assets that had already been acquired for the CDO's portfolio. But upon the CDO's closing, all of the assets that were acquired pursuant to the warehousing facility are transferred to the CDO (so long as they are still eligible), with the warehousing facility provider receiving reimbursement via the funds raised by the CDO through its issuance of notes and equity. After the CDO closes, the collateral manager typically continues to acquire assets for the CDO portfolio until it is fully "ramped up" (*i.e.,* complete). It also manages the acquired underlying assets pursuant to the terms of the CDO's indenture and a collateral management agreement between the CDO and the collateral manager setting forth the collateral manager's responsibilities.

### III.    Calyon's CDO Structuring Business

39.    Calyon was the arranger and underwriter for the Pyxis CDO. Calyon is a global investment bank, and during the relevant time period it was a prolific underwriter of CDOs collateralized by RMBS, underwriting over $75 billion in structured credit transactions that either had already closed or were in progress by mid-2006. Calyon's CDO business was run out of its Structured Credit Group, including from its New York office. As a CDO underwriter, Calyon gained access to non-public information about the RMBS and CDOs included in the portfolios of the CDOs it was structuring. This provided Calyon with significant amounts of additional information about mortgage securities structured by other underwriters as well. Calyon thus had unique access to non-public information about the markets for residential mortgage securities.

40.    By early 2005, the market for CDOs—in particular, CDOs supported with assets concentrated in the U.S. residential mortgage sector—had become an extremely lucrative business line for many of Calyon's competitors in the investment banking world. Though Calyon had made some inroads into this market, it lagged behind those competitors.

Accordingly, in its December 2005 "Strategic Development Plan" for 2006 to 2007, Calyon's parent corporation (Crédit Agricole) set an ambitious goal to become one of the world's top five companies in structured credit and securitizations.

41.     Although not known publicly at the time, crucial to Calyon's plan to grow its CDO business was its relationship with Magnetar. Magnetar was founded in 2005 and grew rapidly, becoming a major, but largely secret, player in structured credit, especially CDOs, within just two years. In fact, from its launch in 2005 through 2007, Magnetar grew 600%, from approximately $1.5 billion under management to approximately $9 billion. That growth occurred largely because Magnetar facilitated the creation of CDOs with portfolios of RMBS and CDO securities ultimately backed by RMBS—for the purpose of heavily shorting these very CDOs.

42.     Specifically, in early 2006, as default rates on subprime mortgages in the United States began to rise, Magnetar sought to bet heavily against securities backed by such mortgages. It did so by shorting subprime RMBS through CDS. That is, Magnetar sought to buy protection through CDS on RMBS, so that, if the underlying RMBS did not perform, Magnetar would receive payments under the CDS. At the time, however, Magnetar found it difficult to buy large amounts of protection on subprime RMBS tranches.

43.     As 2006 progressed into 2007, banks like Calyon also faced a difficulty: finding investors willing to take the most risky, equity stakes in CDOs. Without equity investors, Calyon could not create, market, and sell investments in the CDOs that were earning Calyon millions of dollars in fees.

44.     To solve their respective problems, Magnetar and Calyon secretly joined forces to launch a series of CDOs under the guise of *bona fide* investments for the benefit of CDO

14

noteholders (*i.e.*, "long" investors), which, in reality, were vehicles designed by Magnetar to place short positions on billions of dollars of subprime mortgage bonds at below-market costs. In these CDOs, Magnetar served as the equity investor, making it possible for Calyon to structure and sell investments in the CDOs, and thereby earn its fees. Calyon, in turn, gave Magnetar the opportunity (1) to make massive short bets against the assets being purchased by the CDOs; and (2) to ensure that those shorts would pay out by secretly dictating the asset selection for the CDOs.

45.     Magnetar's collusion with banks such as Calyon has now been reported in multiple media sources. As recounted in a Pulitzer Prize-winning April 9, 2010 investigative report authored by ProPublica, "[u]sually, investment banks had to go out and find buyers of the equity. With Magnetar, the buyer came right to the bank's doorstep. Wall Street was overjoyed." Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going," PROPUBLICA, April 9, 2010. A banker told ProPublica that Magnetar's purchase of equity tranches "seemed like a miracle" because "no one" had been buying the equity.

46.     Unlike an ordinary investor, Magnetar bought the equity in its CDOs not because it believed that the equity was a sound investment. Rather, as Calyon knew, Magnetar's strategy was predicated on the ultimate failure of the very CDOs that it had helped to create. Magnetar used its equity tranches, and in particular the unusually early and substantial payouts that it arranged for those tranches to receive (at the expense of more senior tranches), to fund its short positions on the very same deals, during the (relatively) brief time between closing and the deal's collapse.

47.     As described by one former Goldman Sachs banker:

> Magnetar owns the [CDO's] equity layer, which throws out a lot of
> cash for perhaps a year or two and then starts to decay quickly. They
> bet against the better slices, *short the very same deals they created*[.]
>
> ***
>
> It only works if the deal is so bad that the equity, plus the higher
> layers, are all toast. Magnetar would not make its target returns on
> the equity tranche alone. The deals had to fail for them to succeed.
> It was common for funds like Magnetar to let a trading desk know
> what parameters it wanted, and the traders would in turn line up
> suitable investments with the CDO manager. Magnetar influenced
> the transaction by mandating a certain equity return, which meant
> the CDO would have to hold the 'spreadiest' (i.e., riskiest) crap.

Yves Smith, Econned, at 258-59 (Palgrave MacMillan 2010).

48.    The ratio of Magnetar's short positions to its equity positions varied from deal to

deal, but it was often 6-to-1 or even higher, meaning that when a Magnetar CDO such as Pyxis

failed, the payoff on Magnetar's short positions was at least six times the amount of Magnetar's

original equity investment in that CDO.

49.    Magnetar acted as the equity sponsor in at least five Calyon-arranged CDOs. In

fact, Calyon and Magnetar worked together to create the first of the so-called Constellation

CDOs (*i.e.,* CDOs whose portfolios Magnetar secretly influenced)—Orion 2006-1, which closed

on May 26, 2006. Magnetar then sponsored four additional Constellation CDOs, including

Pyxis, Cetus 2006-3, Orion 2006-2 CDO, and Voltans Funding 2007-1. By the time Intesa and

Calyon executed the Class A-1 CDS in April 2007, but unbeknownst to Intesa, Calyon had

worked with Magnetar on five CDOs totaling over $6 billion in total issuance, making Calyon

the top underwriter of Magnetar-sponsored deals.

50.    As part of these secret arrangements, Magnetar insisted in its deals on having a

"veto" right over any asset that might become part of a CDO's reference portfolio. As Intesa

also did not know, but Calyon was well aware, Magnetar bought cooperation and acquiescence

in this "veto" arrangement from putatively independent collateral managers like Putnam by

16

promising fees and deal volume.  In a September 8, 2006 email to a prospective CDO manager, for example, Magnetar executive James Prusko (formerly of Putnam) stated: "Our goal is to *partner* with managers and do a series of deals, there are two managers with whom we are already on our third deal . . . I think the cumulative business will be worthwhile even if you feel the first deal is too skinny." Magnetar's Prusko wrote to the same collateral manager: "I have attached the target portfolio that I would like for this deal with target spreads that I believe are very achievable in the current market." When that collateral manager refused to assemble such a portfolio, Magnetar declined to work with the manager on any other CDOs.

51. Putnam, however, was more accommodating. Putnam partnered with Magnetar on multiple deals, and was ideally suited to work with Magnetar in constructing CDOs, because the key Magnetar strategist who designed the "Magnetar Trade", Prusko, was a former Putnam employee. Moreover, the principal individual at Putnam responsible for selecting the Pyxis portfolio was Carl Bell, a former subordinate of Prusko's and a member of his team while he was at Putnam. This undisclosed relationship made it easy for Magnetar to secretly hijack the selection of CDO portfolios, including Pyxis, and was the basis for a conspiracy among Calyon, Magnetar, and Putnam.

52. With Magnetar's help, Calyon's CDO business skyrocketed. By September 2006, Calyon claimed to be a leading CDO underwriter, with a trading platform covering the entire structured credit product spectrum. Calyon was ranked third in the Informa Global Markets European CDO league table for the year 2006, and seventh worldwide in ABS/MBS securitizations. In February 2007, Calyon was recognized as the "CDO Arranger of the Year 2006."

53.     What is now clear, however, is that Calyon emphasized quantity over quality and integrity, and speed over diligence.  Calyon's own managing director later likened the CDO structuring business to "cheap sangria," observing that it involved "[a] lot of cheap ingredients repackaged to sell at a premium.  It might taste good for a while, but then you get headaches later and you have no idea what's really inside."  In fact, Calyon-underwritten CDOs were some of the worst performing CDOs in the market, with over 45% of the Calyon CDO portfolio having defaulted by December 2008, the highest percentage of any underwriter.  Calyon also led the league tables of CDO downgrades, ranking number one ahead of all its other competitors, including Wachovia, Deutsche Bank, and Citigroup.  Calyon is reportedly being investigated as part of the New York Attorney General's investigation into wrongdoing in CDO underwriting.

## IV.     Calyon Marketed The Pyxis Swap To Intesa With Affirmative Misrepresentations And Strategic Omissions

### A.     The Pyxis CDO

54.     Pyxis, for which Putnam was the nominal collateral manager, was a "hybrid" CDO, which means that its $1.5 billion portfolio included both "cash" and "synthetic" underlying assets.  Approximately 23% (or $350 million par value) of the Pyxis portfolio was comprised of "cash" assets, that is, investments that Pyxis actually purchased.  The remaining approximately 77% (or $1.15 billion par value) of the Pyxis portfolio was comprised of "synthetic" assets, which were created through CDS that referenced other asset-backed securities not actually owned by Pyxis.  In these CDS, Pyxis sold protection to counterparties (*i.e.,* agreed to make payments in the event of specified credit events, such as failure by the security to make interest or principal payments) in exchange for premium payments.  The performance of these securities supposedly selected by Putnam would thus determine the returns (or losses) to Pyxis under the CDS.  If the referenced obligations performed well, Pyxis would enjoy the premium

payments without having to make any credit protection payments. However, if the referenced obligations performed badly, then Pyxis would have to make credit protection payments to the credit default swap counterparty, potentially up to the full notional amount of the referenced obligation. These payments could exceed by many multiples the premium payments to which Pyxis was entitled under the CDS. Through such swaps, Pyxis was the "long" investor on the referenced securities making up the synthetic portion of its portfolio, while the credit default swap counterparties were "short" the same securities.

55.     Pyxis became long the economic risk—that is, it took the risk that the securities would not perform—through selling protection to Calyon CIB. Calyon CIB performed the role of protection buyer, meaning that Calyon paid the premiums to Pyxis under the CDS in exchange for protection payments in the event that the underlying referenced assets did not perform. For most of the specified reference obligations, Calyon represented that it acted only as an intermediary, meaning that the ultimate short positions were held by other market participants whose identity was never disclosed to Intesa. As explained in the offering materials, this was achieved through a series of "back to back hedging transactions" between Calyon CIB and other counterparties, which referenced the same obligations as the credit default swap between Calyon CIB, in its role as CDS Counterparty, and Pyxis. In this way, Calyon CIB effectively acted as a conduit for parties willing to take a short position on particular assets, with Pyxis acting as the "long" investor. Payments under the credit default swaps would flow between Pyxis and the ultimate short counterparty via Calyon CIB; if the referenced assets performed well, Pyxis would simply receive its premium, which was paid by the short counterparty to Calyon and then passed from Calyon CIB to Pyxis (with Calyon keeping a portion of the premium for itself). But, if the

referenced assets performed badly, Pyxis would be obligated to make loss payments that would ultimately flow to the short party via Calyon CIB.

56.     As explained below, unbeknownst to Intesa at the time, the ultimate short counterparty for many of these back-to-back transactions was Magnetar.  By taking these short positions, Magnetar was able to bet against *the very same assets* that Magnetar was secretly causing to be selected to be part of the Pyxis portfolio.  When these hand-picked obligations performed badly, Magnetar was thus poised to profit handsomely at the expense of Pyxis's investors.

57.     On October 3, 2006, Pyxis issued 6 classes of secured and unsecured notes through the Indenture agreement.  The notes issued by Pyxis, as in most CDOs, were structured in tranches that corresponded to the noteholders' respective rights to receive payment from the CDO's cash flows or, in the case of a liquidation of the CDO's portfolio, from the proceeds of the liquidation.  Pyxis was authorized under the terms of its Indenture to issue the following tranches of notes and preference shares:

- $180 million Class A-1 Senior Secured Floating Rate Variable Funding Notes Due 2046
- $113.5 million Class A-2 Senior Secured Floating Rate Notes Due 2046
- $93.5 million Class B Secured Floating Rate Notes Due 2046
- $89 million Class C Secured Deferrable Floating Notes Due 2046
- $41.5 million Class D Mezzanine Secured Deferred Floating Rate Notes Due 2046
- $61.875 million Class X Subordinate Notes Due 2046

58.     The Class A-1 Notes represented a $180 million funding facility that was available to Pyxis in case it needed cash in excess of the amounts raised through the sale of the other notes.  Calyon CIB and Calyon (U.S.A.) were the initial purchasers of the notes and bought them with the stated intention of reselling them to other investors or purchasing swap protection on those notes.  On information and belief, Magnetar was the purchaser of the Class X Subordinated Notes and at least a portion of the Preference Shares (equity).  As explained *supra*,

20

Defendants' plan was for Magnetar to receive enough income stream on its equity holding to cover its premium payments as swap counterparty. Once Pyxis failed (as Defendants knew and intended that it would), Magnetar would reap the full amount of the swaps, which would far exceed its initial outlay in premium payments.

**B.     The Pyxis Swap Marketed To Intesa**

59.     On July 14, 2006, Calyon contacted Intesa to solicit an investment relating to Pyxis—a CDO Calyon described as managed by Putnam, who would select its portfolio acting independently and in good faith in the interests of long investors like Intesa. Intesa knew nothing of Calyon's or Putnam's relationships with Magnetar, and Defendants made sure that Intesa did not learn of these relationships.

60.     As the arranger and underwriter for the Pyxis CDO, Calyon was responsible for drafting the various marketing materials and agreements relating to Pyxis, as well as marketing the CDO to investors. Members of the Structured Credit Group at Calyon based in New York negotiated the structure of the Pyxis CDO, responded to due diligence questions, and revised the Offering Memorandum, which purported to describe key aspects of the transaction and the accompanying risks. Moreover, Calyon was the warehouse provider for the deal, which meant that it carried the Pyxis portfolio assets on its own books until closing (and if the deal failed to close, it retained that risk). Calyon was also responsible for drafting the Collateral Management Agreement through which Putnam agreed to serve as the collateral manager for Pyxis.

61.     The investment Calyon presented to Intesa was to be structured as a credit default swap, under which Intesa would assume risks of default on the Class A-1 notes, the most senior issued by Pyxis. Calyon, in turn, would fund the Class A-1 notes and hold them on its balance sheet. This swap allowed Calyon to close the CDO without selling the Class A-1 notes and thereby to book its profits and fees from arranging the CDO transaction and to release the capital

charges associated with warehousing of the collateral and ownership of the notes. More significantly, it allowed Calyon to transfer the risks associated with those notes from its balance sheet to Intesa.

62. Over the course of the next few months, Calyon and Intesa exchanged numerous emails regarding the deal, draft documents, responses to Intesa's due diligence questions, and negotiation points on a variety of issues. Intesa's New York office negotiated the Pyxis Swap. The lead negotiator for Intesa on this transaction was also based in New York. All of the Calyon personnel involved in these negotiations were based in New York, including Ivo Almuli, then a Director with the Structured Credit Sales group at Calyon in New York. Almuli was actively involved in marketing the Pyxis CDO and responded to many of Intesa's due diligence questions regarding Pyxis. During this period, Intesa received a number of documents and other communications from Calyon's New York office on which Intesa relied in determining whether to make an investment relating to Pyxis.

63. Among other things, Calyon employees based in New York provided Intesa with: (i) a July 14, 2006 52-page marketing book (the "Pitchbook") that purported to describe, among other things, the structure of the Pyxis CDO, the types of assets that would be selected for inclusion in the portfolio, and the rigorous selection process that would be employed by Putnam to identify and analyze those assets; (ii) a September 6, 2006 summary of key terms outlining the key characteristics of the transaction (the "Term Sheet"); and (iii) a July 25, 2006 spreadsheet setting forth the ramped portfolio for the CDO, which listed 104 assets that had already been acquired for the CDO, purportedly representing 80% of Pyxis' final portfolio.

64. Calyon represented that Putnam had been involved in the preparation of certain information it provided to Intesa, such as the July 14, 2006 Pitchbook. References to the

Collateral Manager appear throughout the Pitchbook, which repeatedly asserts that Putnam was responsible for substantial parts of its preparation, including sections describing Putnam's superior knowledge, expertise, and purportedly rigorous asset selection criteria. *See, e.g.*, Pitchbook at 21 ("All information in this section has been supplied herein by Putnam.").

65.     In order to assess the Pyxis Swap, Intesa performed rigorous due diligence, consistent with industry standards and practice, focusing on an analysis of the deal's structure, the collateral manager, and the assets included in the CDO's portfolio.  In particular, Intesa evaluated the experience and reputation of the collateral manager, as it considered it essential that its investments be entrusted only to highly reputable firms.  Among other things, Intesa noted and relied on the fact that Putnam was one of the largest U.S. mutual fund companies with nearly 70 years of experience managing money, that it was the third largest investment advisor in the United States, that it had $180 billion in assets for nearly 10 million shareholders and approximately 170 institutions, and, most importantly, that it was reputedly a leader in compliance and transparent business practices.

66.     Calyon, as owner of the securities to become the Pyxis portfolio, a broker/dealer in those securities, and a warehouse provider for similar assets, and Putnam, as collateral manager, were uniquely able to value the Pyxis portfolio down to the level of the underlying loans of each RMBS.  Each RMBS contained typically 3,000 underlying loans from across the United States.  Because there were approximately 180 RMBS in the Pyxis portfolio—both directly and indirectly though Pyxis's exposure to CDOs that were themselves exposed to RMBS—there were over 500,000 loans on which the performance of Pyxis depended.  Thus, only Calyon and Putnam could provide an accurate assessment of the value and credit quality of the Pyxis portfolio and notes.  Because of this exclusive knowledge and superior access to

detailed information and data about the transaction and the CDO portfolio, Intesa reasonably relied upon the expertise, diligence, independence and integrity of the collateral manager in assessing the nature and credit quality of the underlying assets and the collateral manager's selection process.

67.     Based on these representations—in particular their representations that the assets in the Pyxis portfolio were selected by Putnam, acting independently and diligently in the interests of long investors—Intesa reasonably believed that the Pyxis Swap was structured to be risk remote, consistent with Intesa's conservative criteria.  In September 2006, Intesa and Calyon came to an understanding that they would enter into a CDS whereby Intesa would provide protection on $180 million of the Class A-1 notes issued by Pyxis and held by Calyon, subject to the satisfaction of particular requirements.  The CDS, however, was not executed by the parties until April 24, 2007, with an effective trade date of October 3, 2006, the CDO's closing date. The contract was executed by Intesa, and Intesa thus became irrevocably committed to the contract, in New York.  The funds paid pursuant to the transaction were exchanged between the New York bank accounts of Intesa and Calyon.

68.     Because of the catastrophic losses it has suffered, Intesa undertook a forensic valuation of the assets in the Pyxis portfolio, using valuations of properties comparable to those in the hundreds of thousands of mortgages underlying the portfolio to generate values for each of the underlying RMBS, including those within the CDOs to which Pyxis was exposed.  This modeling technology and the highly voluminous underlying data upon which it relied were available almost exclusively to structurers of CDOs, such as Calyon, and collateral managers, such as Putnam, at the time the Pyxis Swap was executed.  Shockingly, this intrinsic valuation has revealed that, on October 3, 2006, the closing date of the CDO, the true value of the

underlying portfolio had already dropped by more than 20%. This meant that the subordination had largely been eaten away by losses. As a direct consequence, on "day one," Intesa's position in the Pyxis Swap contained embedded losses of over $70 million.

69.     This valuation further corroborates that, instead of acting diligently, independently and in good faith in the interests of long investors such as Intesa, as they represented, Putnam—in conjunction with Calyon—did the opposite: They used their expertise *against* the interests of Intesa and the Pyxis noteholders. At the behest of Magnetar, Calyon and Putnam exploited the experience and analytics they touted to construct a portfolio that caused Intesa to incur enormous losses on the day Intesa agreed to the Pyxis Swap.

### C.     Calyon And Putnam's Affirmative Misrepresentations To Intesa

70.     To induce Intesa to enter into the Pyxis Swap, Calyon and Putnam made numerous representations about the way the assets would be selected for the Pyxis Portfolio and thus the risks that Intesa would be assuming under the Swap, on which Intesa relied in entering into the Swap. How the collateral would be selected was known exclusively to Calyon and Putnam. Intesa had no means of testing, much less verifying, these representations.

### (a) Pyxis' Assets Were Selected By A Reputable, Independent Collateral Manager

71.     In order to assure Intesa that the Pyxis CDO was a viable investment, Calyon and Putnam represented that Pyxis's assets would be selected by an experienced and reputable collateral manager acting diligently and independently in the interests of investors. This was vitally important to Intesa because, as explained above, one of the most important drivers of a CDO's performance is the performance of the collateral manager in selecting and maintaining the credit quality of its underlying portfolio.

72.     For example, the launch email provided to Intesa by Calyon and Putnam to market Pyxis on July 14, 2006 touted the fact that Putnam was one of the largest U.S. mutual

fund companies with nearly 70 years of managing experience, including CDO collateral management. This email also represented that Putnam had "developed a multi-class CDO capability" and had investment personnel with "an average of 13 years investment experience."

73.     This initial marketing email also stated that "the collateral manager is able to cherry-pick the collateral for this portfolio via the CDS market with the ability to focus on seasoned product." Yet over 60 percent of the Pyxis portfolio was not "seasoned," but rather consisted of new issuance.

74.     These representations as to Putnam's collateral management role were reinforced in August 2006, when Calyon provided the Pitchbook to Intesa for Pyxis. The cover page of this presentation represented that Pyxis was "[m]anaged by the Putnam Advisory Company LLC." In these materials, Putnam again represented itself as "a global leader in asset management" with over $11.4 billion in ABS/MBS holdings, including management of more than $3.5 billion of CDOs across seven different deals.

75.     The Pitchbook represented that Putnam's "[i]investment [p]hilosophy" and "goal is to generate excellent long term investment results." It included extensive representations as to Putnam's "deep, experienced management teams," promising that their "talent pool" included "[s]easoned leaders committed to investment excellence and high fiduciary standards," who would "[f]ocus on achieving client performance objectives." The Pitchbook incorporated detailed biographies of its key personnel, including Carl Bell, the Managing Director and Team Leader for the CDO & Portfolio Credit Team with "15 years of investment experience", whose role was to "lead[] the portfolio construction effort in designing CDOs . . . for institutional investors."

76.     This Pitchbook also included approximately 20 pages that purported to describe, in detail, the rigorous selection process that Putnam, as collateral manager, would use to assemble the Pyxis portfolio.  For example, Calyon and Putnam represented that Putnam analyzes "each transaction . . . to better understand its collateral composition" and conducts a "[s]tructural analysis [that] includes understanding rating levels."  The presentation stated that Putnam "develops multiple scenarios to test the structure's durability," which "involves running multiple stress scenarios by varying inputs such as default frequency vectors, loss severities, prepayments speeds and interest rates."  According to the presentation, "[t]he results of [Putnam's] analysis, combined with the prudent application of judgment, allow Putnam to decide if to invest, what tranche to invest in, how much to invest and at what price in order to achieve acceptable risk-adjusted returns for its clients."  Indeed, it was represented that Putnam offered "best in class CDO management capability."  The Pitchbook also pointed to the relatively low "lifetime impairment rates" for the type of portfolio in which Putnam was planning to invest, representing that these assets had "exhibited greater rating stability and a higher percentage of upgrades" and had a higher "average recovery rate" than other types of similarly rated assets.

77.     Calyon and Putnam further represented in the August 2006 presentation that "Putnam should actively drive the product structure;" that "Putnam seeks to design and undertake transactions that have a high probability of success;" and that Putnam would undertake "rigorous portfolio construction" and "fundamental security selection."

78.     Consistent with these representations, the October 2006 offering memorandum for Pyxis represented that the "Fixed Income Group" of Putnam "will select and manage the Collateral [portfolio]" and "will manage the assets of the Issuer," and that "[d]ay-to-day portfolio management" will "be the joint responsibility of [Putnam's] CDO & Portfolio Credit Team."

The offering memorandum further touted Putnam's vast experience in managing structured assets.

79.     Most importantly, as represented by Calyon and Putnam in the Offering Memorandum, pursuant to the Collateral Management Agreement, Putnam was required to "supervise and direct the investment and reinvestment of the Collateral" and to "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing," a representation that is reiterated in the Collateral Management Agreement.

80.     Calyon and Putnam, in these materials and orally, emphasized that Putnam would act diligently, independently and in good faith in the interests of Intesa in selecting the assets for the Pyxis portfolio.

81.     On July 25, 2006, Calyon sent Intesa a "target portfolio" for Pyxis showing that at least $60 million of the Pyxis portfolio would be prime RMBS assets. Prime RMBS assets are RMBS in which the underlying loans are made to "prime" borrowers, that is, those with high credit scores (typically, 675 or higher from Fair, Isaac & Company) and other characteristics indicating a high likelihood of repayment of the loan. Mid-prime and subprime RMBS, by contrast, consist of loans made to higher risk borrowers.

82.     Calyon and Putnam also promised that the portfolio would include only a limited amount of ABX Index securities. The ABX Index is a series of indices, each comprised of twenty underlying constituent RMBS. This limitation was reflected in the Offering

Memorandum and indenture, which specified a strict concentration limit on Pyxis's ABX Index Securities bucket. The ABX Index is comprised of low-rated RMBS and was often used at the time as a means of shorting the U.S. residential real estate market. Despite these supposedly rigorous selection criteria, Pyxis performed even worse than the ABX did.

### (b)   Calyon Provided False Valuations Prior To Execution

83.     On March 6, 2007, prior to the execution of the Pyxis Swap, Calyon provided Intesa with purported market valuations of the securities issued by Pyxis. Calyon intended these valuations to reassure Intesa that, during the time between the deal's closing on October 3, 2006 and the execution of the Swap, the economics of the deal had not fundamentally changed, that there were no infirmities in the assets that had been selected, and that the transaction was still risk remote.

84.     Calyon sent Intesa "spread" valuations for the Pyxis Class A-1 and Class B notes. Calyon represented that it generated the information in this email based on its knowledge of the market from its trading desk for RMBS and CDO securities.

85.     The valuations that Calyon provided to Intesa purported to represent the price at which protection on the notes could be purchased. Intesa was not a dealer in such securities. In contrast, Calyon had by that time underwritten and marketed many other CDOs. Calyon thus had unique knowledge of the actual prices the Pyxis securities, or securities very similar to those securities, would command for protection.

86.     As Calyon intended, the valuations it provided to Intesa in March 2007 assured Intesa that the Pyxis portfolio, having apparently stood up well to market forces over the preceding five months since closing, had been carefully and responsibly selected by Putnam in the interests of long investors. Indeed, the initial valuation provided on the Class B notes

reflected that, despite the recent changes in the subprime market, these securities would make full payments of interest and principal, nearly five months after the deal closed. Calyon further provided a "spread" valuation of the Pyxis Swap at 35 basis points, which translates to less than half a point off par.

87.    Intesa relied on each of these representations by Calyon and Putnam and would not have agreed to enter into the Pyxis Swap without them.

### D.    Calyon And Putnam's Misrepresentations and Omissions

88.    Calyon and Putnam's representations were egregiously false. Defendants had improperly concealed critical facts regarding Pyxis from Intesa. Had it known the true facts, Intesa would never have agreed to enter into the Pyxis Swap. These misrepresentations and omissions included the following:

### (a)    The Pyxis Portfolio Was Not Selected By Putnam Acting Independently And Diligently In The Interests Of Long Investors Like Intesa

89.    As explained above, it was of central importance to Intesa, as a long investor, that the Pyxis portfolio was selected by Putnam, acting independently and diligently in the interests of long investors. On the contrary, as set forth below, Pyxis was controlled by a net short investor—Magnetar—and was built to fail and to benefit Magnetar at the expense of long investors. Magnetar selected collateral managers for its CDOs based on their willingness to cooperate with Magnetar. Magnetar had an especially close relationship with Putnam through Magnetar executive James Prusko, the former Putnam employee who had been the superior while at Putnam of Carl Bell, the principal Putnam representative responsible for selecting the Pyxis portfolio. Accordingly, while Putnam was the nominal collateral manager for Pyxis, in reality, Magnetar controlled this deal. At Magnetar's direction, assets were selected for inclusion in the Pyxis portfolio through a process that emphasized weaker assets over stronger ones, so as

to benefit Magnetar's short CDS positions at the expense of long investors like Intesa.  Putnam's

abdication of its duty to select assets independently and in good faith for the Pyxis CDO was, as

Calyon and Putnam knew, in blatant contravention of the representations they had made to Intesa

of a careful, rigorous asset selection process.  However, they concealed this information from

Intesa in an effort to transfer the risk of loss associated with the notes.

     **(i)     Documentary Evidence Confirms that Calyon and Putnam Secretly Allowed Magnetar to Corrupt Asset Selection for Pyxis and Short the Portfolio**

90.     A number of email communications between employees of Calyon, Putnam,

Magnetar and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis), relating specifically to

Pyxis, have recently become public.  They confirm the control Magnetar exercised over the

Pyxis asset selection process, at the same time that it was shorting those very assets (and Pyxis

itself), and Calyon's and Putnam's awareness of and complicity in Magnetar's scheme.  The

authenticity of these documents is unquestioned.

91.     From the beginning, Magnetar – and not Putnam – was actually in control of

Pyxis, as these documents demonstrate.  In May 2006, for example, in an exchange of emails

between Carl Bell (Putnam), Alex Rekeda (Calyon), Jim Prusko (Magnetar) and Michael

Henriques (Deutsche Bank), relating to the "cash flow" features of the Orion CDO, Rekeda

noted that Putnam had discovered that the "the IRR is really in excess of 30%," which "shocks

them a little bit," and raised the possibility of "another round of the fee negotiation [sic]" with

respect to Putnam's fee for Pyxis.  Prusko replied:  "Fee not negotiable.  *Take it or leave it,*

*plenty of managers will do this deal.  I want to do it with them for a variety of reasons, but they*

*have to play ball.*"  Henriques responded: "I agree with jim [sic], but I don't think that is the

issue with Putnam. . . . *In the end . . . I think they will likely be helpful . . . .*"

92.     Magnetar and Deutsche Bank made a "behind the scenes" arrangement that Calyon or Putnam would notify them of any proposed acquisition for the Pyxis portfolio and that they would have the right to veto any such acquisition. In June 2006, for example, Benjamin Lee (Calyon), Alex Rekeda, Jim Prusko, Michael Henriques and Kurt Palmer (Deutsche Bank) discussed via email an "Equity Purchase Letter . . . *between CALYON and DB & Magnetar only*" for Pyxis in order to keep their involvement secret from investors. In this exchange, Lee asked Prusko if he "was proposing that we execute the 3 Putnam docs [for Pyxis] in exactly the same way that we did the Orion docs—that is, *DB is the only party in the docs, and any arrangement between DB and Magnetar is done behind the scenes and outside of the docs.*" Subsequently, Lee sent the same group an email attaching "the warehouse side letter *giving DB and Magnetar veto rights over any warehouse asset.*" The attached draft agreement between Calyon, Deutsche Bank and Magnetar provided: "CALYON hereby agrees that each of *Deutsche Bank and Magnetar* (for so long as the respective Equity Purchase Letter has not been terminated) *shall have the right to object to the proposed acquisition of any asset pursuant to the Warehouse Agreement within 24 hours after notification thereof has been sent to Deutsche Bank and Magnetar by CALYON or the Investment Adviser [Putnam] (provided, that one of Calyon or the Investment Adviser will promptly provide such notification) and CALYON as the warehouse provider shall not give its approval to acquire any such asset if it has been objected to by either Deutsche Bank or Magnetar.*"

93.     Putnam did in fact allow Magnetar to exercise this secret control over the Pyxis portfolio. In emails, Magnetar, both directly and through Calyon, provided Putnam with lists of assets acceptable to Magnetar, including Magnetar's own CDOs, and also made clear to Putnam that Magnetar would directly source Pyxis' CDO exposure and that Putnam was not to purchase

any such exposure itself unless Magnetar had closely vetted it beforehand.  In August 2006, for example, in an exchange of emails between Alex Rekeda, Benjamin Lee, Carl Bell, John Van Tassel (Putnam), Jim Prusko, Michael Henriques and Kurt Palmer, among others, Lee asked Bell and Van Tassel to "give a brief description of your ramp up strategy and timing regarding the CDO assets," and also asked if "you have any interest on AA of Lincoln Ave *and 4mln of Orion [Magnetar deal]* that Bill Budd showed?"  Bell responded by providing the group with a summary of the CDO assets Putnam had warehoused so far, to which Prusko replied: "*We [Magnetar] are going to source the CDO exposure synthetically.  We will buy CDO CDS on names of your choosing at mid-market, or bid list +3bp, whatever you prefer.  Any recent mezz abs deal is fine.  I can send you a list of what's in our other deals if it's helpful.*"  Prusko then provided Bell with a list of "*[t]ypical names that we see in other deals a lot,*" including Orion and Cetus (both Magnetar deals).

94.     Subsequently, Prusko sent a private email to Alex Rekeda to confirm that Magnetar would maintain control over asset selection for Pyxis, which stated, "*Please stay on top of Putnam CDO situation, get a little nervous when I hear about Bill Budd peddling desk axes to them, although not too worried about Putnam doing anything rash. . . . If they add any CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look at it first.*"  Rekeda responded: "*Sure—I will ask our trading to forward you any CDO requests.*"  Prusko replied in turn, copying Michael Henriques: "*Don't like that they are buying CDO's without us knowing about it.  At least I don't think I knew about it.  I'll check in with Carl [Bell], just saw him, thought we were on the same page with us buying the cdo cds.*"

95.     At the same time that Magnetar was controlling the selection of assets for the Pyxis portfolio, it was shorting those very same assets, as these documents confirm, and both

Putnam and Calyon knew it.  For example, in a September 2006 exchange of emails between Craig Weiner (Putnam), Alex Rekeda, Mauro Calderon (Calyon), and numerous other employees of Calyon and Putnam, Calderon questioned whether a trade ticket showing Magnetar purchasing *the short side* of a CDS for the Pyxis portfolio was correct.  Weiner confirmed: "*It is definitely Magnetar.*"  Similarly, in a November 2006 exchange of emails between Paolo Torti (Calyon) and Jim Prusko, copying Alex Rekeda and Johnny Srivastava (Calyon), Torti asked whether Prusko still wanted to "*buy protection on PYXIS 06-1A C (A/A2/A) and if you do what level works for you.*"  Prusko responded: "*Actually pretty full on Pyxis A unless super level, have room for AA or BBB.*"

96.    A further, remarkably brazen exchange of emails between many of these same parties, which took place in November 2006 in connection with Orion 2006-2 Ltd. ("Orion 2"), provides further evidence of Magnetar's control of the Pyxis asset selection process and of Putnam's abdication of its responsibilities as collateral manager, by contrasting Putnam's acquiescence in Magnetar's demands with the attempt at independence by Orion 2's collateral manager, NIBC.  This exchange also explains why Putnam agreed to this corrupt scheme:  to earn high fees without the hard work (and risk) of assembling a CDO portfolio itself.  In an email from Michael Henriques to Alex Rekeda (copying Jim Prusko), which complained about the reluctance of NIBC to agree that Magnetar and Deutsche Bank should have the right to terminate the collateral manager if they felt it was performing inadequately, Henriques stated: "We are paying them a 15mm PV fee. . . . *Or perhaps NIB would like to go back to the regular style CDOs with 400mm mezz deals, scrapping for cash bonds, spending 9 months on ramp-up and 3-months marketing, to get 40bps running on a 400mm balance.  In those deals there is no single party that can exercise significant control so that their smaller fee stream is virtually assured.*

*However, the velocity of deals is much lower and the effort to buy those 400mm of bonds will be higher than our 1.5bln. . . . These deals are not CDOs, but they are structured separate accounts. I think Putnam got it.* NIB doesn't."

97.     Rekeda responded (copying Prusko) that "[NIB] disagree[s] with the equity (or SS) right to terminate with no excuse even if they get a compensation for that. . . . As far as the trading opportunities go, [NIB] feel[s] very strongly that the older vintage bonds that they have in the portfolio have *by far superior credit characteristics compared to the bonds they can pick up in the market now.*" Henriques wrote back to Rekeda, Prusko and Arjun Kakar (NIBC), making clear that this sort of independent asset selection was unacceptable in a collateral manager, a problem he had not had with Putnam: "I'm not happy with those responses for a couple of reasons. It's not just that I find them unacceptable, but also that *I don't think they reflect a spirit of partnership that is appropriate for a separate account mandate where the equity is taking substantially all of the execution, credit and manager risk. . . . I feel that we are being treated like a typical 3rd party cdo investor, but does nib have any asset management clients who directly engaged them and pay $5.5mm/yr in fees?  We have provided a precedent with respect to Putnam.  However, I don't think precedent really matters since I don't think there are any other investors offering 100% sponsorship of 1.5bln mezz deals.*"

98.     Thus, Putnam had a clear and compelling motive for acquiescing in Magnetar's control over the selection of the Pyxis portfolio:  to obtain large fees with relatively little effort, which would be "virtually assured" by Magnetar's equity stake in and its "significant control" over the CDO.  Like all of Magnetar's CDOs, Pyxis was substantially larger than a typical CDO and thus generated unusually large fees for the collateral manager.  Moreover, Putnam's fixed management fee on Pyxis was high even by the standards of Magnetar CDOs.  On information

and belief, Putnams's fixed fee of 15 basis points was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26 CDOs, and higher than the total fee—including both fixed and incentive fees—on all but six of Magnetar's CDOs. Indeed, the fixed fee paid to the collateral manager on the vast majority of Magnetar's CDOs was only 10 basis points, and Putnam's fixed fee of 15 basis points was higher than the fixed fee *and the incentive fee combined* on a number of other Magnetar CDOs. In addition, Putnam also received an incentive fee on Pyxis of a further five basis points, which, since it was based on the returns made by the portfolio selected for Pyxis, further encouraged Putnam to acquiesce in the inclusion of assets with a high rate of return and a correspondingly high credit spread (reflecting greater risk that those returns would not materialize).

99.     Magnetar also secured the cooperation of Putnam in Pyxis by promising it additional deal volume, with the prospect of further virtually assured and lucrative fees to be secured with relatively little effort or risk, merely by complying with Magnetar's demands. Ultimately, this promise was realized when Putnam was selected to serve as collateral manager for another Pyxis CDO, Pyxis ABS CDO 2007-1 ("Pyxis 2").

100.     On information and belief, after some of the above information came to light in the *Loreley* case, which was brought by investors in Pyxis and Orion against Calyon, Putnam and NIBC (the collateral manager for Orion), defendants promptly settled the investors' claims for an undisclosed amount and the case was voluntarily discontinued.

### (ii)     Pyxis Invested In Other Magnetar CDOs To Fuel The Magnetar Shorting Scheme

101.     As a further demonstration of Magnetar's influence over portfolio selection, Pyxis invested heavily in other Magnetar CDOs—without informing Intesa—in an undisclosed arrangement designed to fuel Magnetar's broader CDO shorting machine. In fact, Putnam

ultimately invested over half of Pyxis's cash allocated to CDO investments in four other Magnetar CDOs. These four Magnetar CDOs were in turn invested in yet more Magnetar CDOs, meaning that Pyxis ultimately had exposure to at least fifteen Magnetar CDOs, all of which were designed to fail. Intesa was wholly unable to discover this, as Magnetar's shorting scheme was a closely held secret.

102.    Remarkably, three of the Magnetar CDOs in which Pyxis invested did not close until well after Pyxis closed, meaning that Putnam, at Magnetar's behest, had already agreed to purchase tranches of other Magnetar CDOs before these CDOs were finalized. Pyxis's investment in these three CDOs was also not disclosed to Intesa on the portfolio spreadsheet provided by Calyon in August 2006. On information and belief, even on other Magnetar deals, no collateral manager added more Magnetar CDOs to a portfolio after the deal had closed than Putnam, and, after the first five Magnetar CDOs had closed, no collateral manager added *as many* such CDOs post-closing as Putnam. Moreover, also unbeknownst to Intesa, at least six other Magnetar CDOs owned securities issued by Pyxis.

103.    Pyxis was thus a pawn in Magnetar's cross-ownership scheme among the Constellation CDOs to create a market for these CDOs to build Magnetar's shorting positions. As part of this scheme, Magnetar caused Pyxis to invest heavily in numerous other Magnetar CDOs, all of which, like Pyxis, were built to fail, and most of which Magnetar was also shorting. These other CDOs were in turn, at Magnetar's direction, heavily invested in Pyxis and in the other CDOs in the group, creating an extensive web of deception and interrelationships, which is graphically illustrated below:



Constellation CDO Investments in other Constellation CDOs

*Web of Deception*

104.    Calyon and Putnam were thus well aware of Magnetar's scheme and Pyxis's pivotal role in that scheme, and all three knowingly participated in furthering it, and in concealing this scheme from Intesa.

### (iii)    There Was a High Correlation Between the Pyxis Portfolio And the Portfolios of Other Constellation CDOs

105.    Quite apart from its own CDOs, Magnetar had a set of preferred, high-risk assets it instructed collateral managers to include in its CDOs. At Magnetar's behest, Putnam selected many of these assets for Pyxis. This resulted in an undisclosed, remarkably high correlation between the assets selected for Pyxis and the assets held by other Constellation CDOs. For instance: $700 million of the Pyxis portfolio (that is, nearly half) was included in at least three other Magnetar CDOs; $450 million was included in at least four Magnetar CDOs; and $200 million was included in at least six Magnetar CDOs.

### (iv)    Calyon And Putnam Circumvented Limits On The ABX Index

106.    Calyon and Putnam also concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS. Magnetar pushed Calyon and Putnam to circumvent the represented limit on investment in the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and the individual constituent RMBS in the ABX Index. In total, Pyxis sold protection on $240 million of RMBS comprising all 40 constituents included in the ABX 06-1 and ABX BBB-06-2 Indices—more than three times the specified concentration limit.

### (v)    The Pyxis Portfolio Did Not Contain Any Prime RMBS Assets

107.    Although the Pyxis "target portfolio" provided to Intesa by Calyon and Putnam included at least $60 million of prime RMBS assets, the final ramped portfolio did not contain a single prime RMBS asset. This is particularly telling since as of August 2006—two months before the deal's close—Putnam had slated Pyxis to purchase over $160 million of prime RMBS

assets. However, Putnam acquiesced in Magnetar's control over the portfolio selection process and ultimately rejected these relatively risk remote investments in favor of investments in higher risk mid-prime or subprime assets, as well as tranches of Constellation deals that were built to fail.

> **(vi)    Magnetar's Control Over Pyxis, and Calyon and Putnam's Acquiescence in this Control, Was Strikingly Similar to the Process by Which Magnetar's Other CDOs Were Structured**

108.    As more information has come to light about the "Magnetar Trade" and Magnetar's involvement in the CDO business generally, it has become apparent that Pyxis was only one of numerous CDOs over which Magnetar exercised tight control in order to fuel its lucrative shorting scheme, securing the acquiescence of banks and collateral managers with the promise of large, easily realized fees and deal volume. The striking similarity between the conduct of Defendants with respect to Pyxis and the conduct of Magnetar and the banks and collateral managers involved in other CDOs with which Magnetar was also involved further confirms that Magnetar exercised close control over the selection of the Pyxis portfolio, with the knowledge and complicity of Calyon and Putnam, for Defendants' mutual benefit.

109.    ***Orion and Orion 2***    As they did with Pyxis, Magnetar and Deustche Bank also exercised tight control over the collateral manager NIBC's selection of assets for the portfolios of the Orion and Orion 2 CDOs, working closely with NIBC to make sure that the assets included in the portfolio were assets Magnetar wanted to short. For example, in a July 2006 email to Alex Rekeda, Michael Henriques and Kurt Palmer relating to "Orion CDO Trades," Jim Prusko of Magnetar stated: "Arjun Kakar [NIBC] is going to send me a list of CDO's tomorrow. *We will buy protection from the deal on agreed upon names and that will fill the bucket.*" Similarly, Magnetar and Deutsche Bank insisted on the right to terminate NIBC as the collateral manager for Orion 2 if it performed inadequately. When NIBC balked at this, Michael

Henriques of Deustche Bank threatened in a November 2006 email to make NIBC *"go back to the regular style CDOs [where] there is no single party that can exercise significant control so that their. . . fee stream is virtually assured."* Henriques further complained that NIBC's conduct did not *"reflect a spirit of partnership that is appropriate for a separate account mandate where the equity[investor] . . . directly engaged them and pay $5.5mm/yr in fees?"* NIBC appears to have capitulated, given that it did ultimately act as the collateral manager for Orion 2 and that the Orion 2 portfolio was eventually stocked with the usual collection of cross-owned Magnetar and Magnetar-approved CDOs and other Magnetar-approved investments.

110.     ***Squared***          Magnetar also exercised tight control over another CDO, Squared CDO 2007-1 ("Squared"), which was structured and marketed by J.P. Morgan Securities LLC ("JP Morgan") and for which GSCP (NJ) L.P. ("GSC") acted as the collateral manager.  As in its other CDOs, Magnetar purchased the equity in Squared.  However, as an internal Magnetar email from January 2007 confirms, Magnetar regarded its equity position as "basically nothing" and stated that it was *"just doing it [taking the equity position]. . . to buy some protection."* Indeed, by the time the deal closed in May 2007, Magnetar's $600 million short position completely dwarfed its $8.9 million long position.

111.     Magnetar played a significant role in selecting the collateral for Squared.  For example, on February 8, 2007, Magnetar informed GSC via email that it would "like to do a list of names with [them] . . . if [they] have them ready."  The next day, GSC gave Magnetar a list of 12 proposed CDO securities for the Squared portfolio, of which Magnetar agreed to short six. These six securities were subsequently included in the Squared portfolio, and both GSC and JP Morgan were aware that Magnetar was shorting them.

112.    Similarly, in early April 2007, JP Morgan sent Magnetar a list of 28 names for inclusion in the Squared portfolio, which included ten names on which Magnetar had previously decided it did not want to take a short position. A Magnetar employee forwarded this list to GSC and complained: "To be honest, I don't love it, some recent deals I'd like to get in there are missing. Also, think they're missing some of the trades to which we've already agreed. Lets discuss [sic]." In an internal email about the same time, Magnetar characterized JP Morgan's list as "stupid" and explained that it needed to *use GSC to get some decent shorts off on the balance of the portfolio.*" All ten securities to which Magnetar objected were excluded from the final portfolio.

113.    Also in early April 2007, GSC sent Magnetar a list of certain bonds they had discussed for possible inclusion in the Squared portfolio, and "*highlighted the names which [Magnetar] had interest in shorting into the deal.*" A week later, JP Morgan sent GSC a list of CDO securities, on twelve of which Magnetar had agreed to take a short position, and asked GSC if all of these securities had been approved. That same day, Magnetar sent JP Morgan the CDO list and noted that it "*looks like we [Magnetar] are shorting in $168 million.*" Additional lists were exchanged between Magnetar and JP Morgan, and the next day JP Morgan sent GSC an updated Squared portfolio stating:  "*These are the names and levels agreed with Magnetar.*"

114.    In June 2011, JP Morgan paid $153.6 million to settle charges brought against it by the SEC for its role in structuring the Squared CDO.

115.    ***Norma***        Magnetar also exercised tight control over the selection of assets for the portfolio of Norma CDO 1 Ltd ("Norma"), which was structured and marketed by Merrill Lynch ("Merrill") and for which NIR Capital Management, LLC ("NIR") acted as the collateral

manager. Magnetar provided the equity investment in Norma, but also took a much more substantial short position in the very assets it was directing NIR to select for Norma's portfolio.

116.    Magnetar's control of the asset selection process for Norma is demonstrated by various emails that became public in a suit brought against Merrill by an investor in Norma. *See Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") v. Merrill Lynch & Co., Inc.*, Index No. 601832/09 (N.Y. Sup. Ct. N.Y. County Aug. 19, 2009). In an August 2006 email, for example, Magnetar assumed NIR's role in directing Merrill on what purchases to execute for Norma, stating: "Here is the first batch of protection purchases I'm planning for NIR." A November 2006 email stated: "*Apparently NIR allowed Magnetar to do some trading for their [Norma] portfolio (in the area of 600MM). This accounted for a large chunk of trading that NIR originally didn't recognize.*" This prompted a Merrill corporate risk manager to ask: "*Dumb question. Is Magnetar allowed to trade for NIR?*"

117.    Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the selection of each asset. One Magnetar email stated: "*I definitely want to approve any CDO's that go in the deal.*" Another email rejected a NIR request to include TABS 2006-6A cash bonds in the portfolio, stating: "Afraid so, tabs in particular *I don't want the cash in there.*"

118.    By January 2007, Magnetar had already shorted $600 million of synthetic assets which were contained in Norma's portfolio. In an email, Merrill recognized that Magnetar's short positions were much more important to Magnetar than its long investments, noting that Magnetar "is less worried about [its] deal pricings and more worried about where [it] can short paper in the aftermarket." Indeed, Magnetar's equity investment in Norma totaled less than $50 million after receiving undisclosed amounts funded through the loan from Rabobank. This

meant that Magnetar stood to make *ten times* more from its short position of $600 million if Norma failed than it had invested in Norma's equity.

119.     Rabobank's lawsuit against Merrill was also settled in 2010 for an undisclosed amount.

120.     ***Carina***        Magnetar also closely controlled the selection of assets for the portfolio of another CDO, Carina CDO, Ltd. ("Carina"), which was structured by Deutsche Bank and for which State Street Global Advisors ("State Street") acted as the collateral manager. Once again, Magnetar provided the equity investment in Carina, at the same time as it was shorting the very assets it was directing State Street to include in Carina's portfolio.

121.     Magnetar's control of the selection of assets for the Carina portfolio is demonstrated by various emails which recently came to light in a consent order issued against State Street by the Commonwealth of Massachusetts. In an email dated July 7, 2006, for example, the Magnetar Head of Structured Products (the "Magnetar Head") asked the State Street Head of Structured Products (the "State Street Head"): "what's [the] plan of action looking like?" In response, the State Street Head provided Magnetar with an update on the ramping phase of Carina and told him, "I'll keep you posted on my progress." A week later, the Magnetar Head sent the State Street Head another email saying: "*I'd like to establish a bit more of a dialogue between us. Discuss ramping strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing. Just talk briefly a few times a week.*" The State Street Head responded, "*Absolutely.*"

122.     A few weeks later, on August 3, 2006, the State Street Head emailed Deutsche Bank, copying Magnetar, to identify ten ABS CDO tranches on which State Street proposed to sell protection to establish a portion of Carina's synthetic exposure. The Magnetar Head replied:

"*I will buy protection on the four 06 deals at best bid+50bp.*"  A few weeks later still, high level personnel of State Street, Deustche Bank and Magnetar entered into discussions about a possible Carina II CDO transaction.  In one email, the Magnetar Head stated: "*As we did last time, I would like to strategize and discuss names for the CDO bucket before we execute any trades. Thought that worked out well for Carina 1. I will be taking the other side of this first trade as approved such that I am effectively pairing off its risk . . . .*"  The State Street Head responded: "*I'm happy to discuss the CDO bucket with you.*"

123.    In February of this year, State Street agreed to pay the Commonwealth of Massachusetts a $5 million penalty for its conduct with respect to Carina.

124.    ***Class V III***    Just last month, details of Magnetar's potential involvement in yet another CDO as an equity investor and its interest in shorting the same CDO's portfolio came to light, in a case brought by the SEC against Citigroup and one of its executives, Brian Stoker, concerning their role in structuring and marketing the Class V Funding III CDO ("Class V III"). *See SEC v. Citigroup Global Markets Inc.*, 11-CV-7387 (S.D.N.Y. Oct. 19, 2011); *SEC v. Stoker*, 11-CV-7388 (S.D.N.Y. Oct. 19, 2011).  Documents filed last month in support of the SEC's claim include a number of emails from September-October 2006—around the time Pyxis closed—in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals, including Pyxis, which were being considered for inclusion in the Class V III portfolio.  This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko of Magnetar.  In a September 2006 exchange of emails between Prusko and various Citigroup employees, Prusko asked: "Pls have big DQ show them jackson, buchanan and baldwin [CDOs] in synthetic form *so I can buy protection. This is a top priority for me!*"  Subsequent internal emails between Citigroup employees indicated that

Prusko was also seeking shorts with respect to a Constellation CDO, Cetus 2, and stated "*we already created the short for him on Cetus 2.*" The next day, Prusko told Citigroup again, "I would like them to sell me protection on Baldwin, Jackson and Buchanan if possible *as well as any of my deals of course.*" Later that day, he provided a full list of deals against which he wanted to buy protection, again including Pyxis.

125. In late October 2006, internal Citigroup emails focused on the possibility of finding an equity investor in Class V III who would also buy protection on the deal. One email noted: "A lot of people are looking to do *this 'Prusko-like' trade , i.e. go long equity and short mezz in some form or other.*" Two days later, an email from Brian Stoker stated: "*I'm torn on whether to include Prusko. 1) If he doesn't add assets to the deal, and he keeps the equity, he'll bug us about the assets we pick and our structuring fee. 2) If he adds assets and keeps a proportional % of the equity and he agrees to the assets we put in, then I'd include him b/c we get diversity benefit and get more structuring fees.*"

126. The SEC submitted a Consent Judgment along with its Complaint against Citigroup, pursuant to which Citigroup agreed, among other things, to disgorge its $160 million in profits on Class V III, plus $30 million in interest thereon, and to pay a civil penalty of $95 million—a total settlement of $285 million. This Court has refused to approve the Consent Judgment, on the basis that it is inadequate. *SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).

127. Separately, on June 6, 2012, this Court denied Brian Stoker's motion to dismiss the SEC's Complaint against him personally. *SEC v. Stoker*, 11-CV-7388 (S.D.N.Y June 6, 2012). In its opinion, the Court noted, among other things, the SEC's allegation that, "as Citigroup knew, *a significant portion of the market interest in shorting the Constellation CDOs*

*came from the very hedge fund that helped create those CDOs [i.e., Magnetar]." Id.*, Slip Op. at 3.

### (b)   Calyon's March 2007 Valuations Of The Pyxis Notes Were False

128.    The valuations that Calyon provided to Intesa in March 2007, prior to execution of the Pyxis Swap, were egregiously false.  They grossly overstated the contemporaneous value of the Pyxis securities, and thus concealed the substantial deterioration that had occurred in the portfolio since the CDO closed.

129.    Intesa has performed an intrinsic valuation of the Pyxis Swap as of the date of Calyon's valuations.  It revealed that, on the date on which Calyon provided its specious valuation to Intesa, reflecting that the value of the A-1 Notes was almost at par, the true value of notes had dropped by over 90%.

130.    It is not plausible that such a drastic difference in valuation could be the result of legitimately differing opinions.  Rather, Calyon's absurd over-valuation of the A-1 Notes must have resulted from its (well-founded) fear that Intesa would object to providing protection on a portfolio that had already deteriorated.  At the time that Calyon provided those valuations to Intesa, Calyon was well aware that the Pyxis portfolio was composed of deteriorated assets and that the Pyxis portfolio and notes were worth far less than par.  The value of the Pyxis portfolio in fact was actually only $555 million, just 37% of par.  Indeed, Calyon much later disclosed that, for the period from January 1 through June 30, 2007, it had written down hundreds of millions of dollars worth of securities it held, taking impairment charges of 21% for the first quarter of 2007 against the value of CDO securities comparable to those contained in Pyxis and to the Pyxis notes themselves.

131.     In March 2007, however, Calyon had to maintain the illusion that the Pyxis portfolio had been chosen by a reputable collateral manager acting independently, not built to fail at the behest of a net short investor.  Had Calyon disclosed the true value of the Pyxis notes in March 2007, this would have been a red flag for Intesa that something was terribly amiss with the CDO.  If Intesa had known the truth—that the deal was built to fail and, by March 2007, was comprised of toxic assets just as Magnetar intended—it would not have agreed to enter into the Pyxis Swap.  Calyon would then have been left with $180 million of worthless CDO notes instead of passing on these losses to Intesa.

## V.     Calyon, Magnetar And Putnam Benefited From Their Misconduct

132.     Calyon, Magnetar and Putnam all benefited from their fraudulent conduct. Calyon reaped tens of millions of dollars in underwriting fees for its role in structuring Pyxis and other Constellation CDOs for Magnetar.  Calyon also used Pyxis to help achieve its goal of increasing its CDO market share.  Moreover, had Calyon not succeeded in persuading Intesa to provide protection on the Class A-1 notes, Calyon would have been stuck with $180 million in losses.  In addition, Calyon CIB benefited because it was the protection buyer on the credit default swaps that constituted most of the Pyxis CDO's portfolio, for which it received fees.

133.     Magnetar pocketed billions of dollars in profits while the CDOs it sponsored performed extremely poorly, with investors like Intesa losing millions.  Magnetar's strategy of shorting the CDOs it sponsored reportedly helped it achieve massive profits in 2006 and 2007.

134.     Finally, Putnam benefited by receiving unusually large fees—even by Magnetar deal standards—with relatively little effort or risk, for serving as collateral manager for Pyxis. Putnam also benefited from the promise of further deal volume from Magnetar, which was fulfilled when Putnam was chosen to act as collateral manager for Pyxis 2.  Had it not cooperated

with Calyon and Magnetar's scheme, Putnam would not have been chosen as collateral manager for either Pyxis 1 or Pyxis 2.

**VI.    The Class A-1 Notes Were Downgraded To Junk, And Intesa Lost $180 Million**

135.    On April 30, 2008—less than two years after the trade date—Fitch downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Pyxis Swap.  Intesa made $180 million in credit protection payments and, in return, received Class A-1 Pyxis notes, which are virtually worthless.  Intesa has thus lost $180 million as a result of Defendants' fraud.

**VII.   Intesa Did Not Become Aware of Defendants' Misconduct Until Some Time After April 9, 2010**

136.    Defendants continued to conceal their collusion in the sabotage of the Pyxis CDO, and of numerous other CDOs, for almost two years after the execution of the Pyxis Swap.  As a result of this concealment, Intesa did not know and could not reasonably have known of Defendants' misconduct—most importantly, that they had secretly colluded in ensuring that the Pyxis Portfolio was built to fail for the benefit of a net short investor, namely Magnetar, at the expense of long investors like Intesa—until, at the earliest, some time after April 9, 2010, when certain facts relating to Defendants' collusion were first reported in the press.  On April 9, 2010, ProPublica published an article—the result of an extensive seven-month investigation—which disclosed for the first time some critical facts concerning Defendants' misconduct.  *See* Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going," PROPUBLICA, April 9, 2010.  Among other things, this article disclosed for the first time that Magnetar had been involved in the creation of Pyxis.  It also disclosed, for the first time, that a Magnetar executive, Jim Prusko, had previously worked at Putnam and that, working closely with CDO collateral managers, Prusko had played a central role in marketing the CDOs

Magnetar was creating and shorting and in controlling the selection of the portfolios for these

CDOs with a view to increasing their target spreads (*i.e.*, risk). The ProPublica article further

disclosed for the first time the fact that Magnetar put together its very first Constellation CDO,

Orion, working with Alex Rekeda, then an employee of Calyon. This was the first time these

and other material facts relating to Defendants' misconduct were publicly revealed, and Intesa

neither knew nor could reasonably have known the facts concerning Defendants' misconduct

until some time after such disclosure.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

### (Against Calyon and Putnam)

137.    Intesa repeats and realleges the allegations set forth above as though fully set

forth herein.

138.    This is a claim against Calyon and Putnam pursuant to Section 10(b) of the

Exchange Act and SEC Rule 10b-5(b).

139.    Calyon and Putnam made untrue statements of material fact in connection with

Intesa's execution of the Pyxis CDS. In furtherance of their scheme to transfer the risk

associated with the notes to Intesa, Calyon and Putnam represented, among other things, that the

Pyxis Portfolio would be selected by a diligent and independent collateral manager, acting in the

interests of long investors, and that the Pyxis notes maintained their market value between

closing and the execution of the Pyxis Swap. These representations were made in the Pitchbook,

Offering Memorandum, Term Sheet, Collateral Management Agreement, the valuation sent by

Calyon to Intesa on March 6, 2007, other documents, and oral and written representations by

Calyon to Intesa.

140.    Calyon and Putnam also omitted to state material facts necessary to make the statements they had made not materially misleading.  Among other things, Calyon and Putnam knowingly or recklessly failed to disclose that:

- Pyxis was controlled by and designed for the benefit of a net short investor, namely Magnetar;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- In March 2007, far from the near-par value Calyon claimed that the Pyxis portfolio had at the time, it was in fact worth only 37% of par, and the value of the A-1 notes had dropped by over 90%.

141.    All of this information was known to Calyon and Putnam but not known or readily available to Intesa.  Calyon and Putnam had actual knowledge of the falsity of their statements of material fact and their omissions of material fact, or acted with reckless disregard for the truth concerning these facts.  Intesa, by contrast, did not know, and could not have reasonably discovered, that the selection process had been corrupted by Magnetar or that the valuations provided by Calyon and Putnam were false; only Calyon and Putnam knew this.  Calyon and Putnam further knew that Intesa was acting in reliance on their false statements and omissions of material fact, yet made no attempt to update or correct that information.

142.    Calyon and Putnam's misstatements and omissions were material to Intesa's decision to enter into the Pyxis Swap since they bore directly on the performance of the Pyxis Portfolio, the likelihood of a credit event occurring under the Pyxis Swap, and the possibility that the Pyxis notes would default, leaving Intesa to bear any losses.

143.    Intesa reasonably relied on Calyon and Putnam's misstatements and omissions in entering into the Pyxis Swap.  Without these material misstatements and omissions, Intesa would not have entered into the Pyxis Swap.

144.    In connection with their misstatements and omissions, Calyon and Putnam used the means or instrumentalities of interstate commerce and the mails.

145.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

146.    As a direct and proximate result of Calyon's and Putnam's misstatements and omissions, Intesa executed the Pyxis swap, and incurred damages in an amount to be proven at trial.

147.    This Count is brought within the time permitted by law.

## SECOND CAUSE OF ACTION:
## FRAUD

### (Against Calyon and Putnam)

148.    Intesa repeats and realleges the allegations set forth above as though fully set forth herein.

149.    This is a claim for fraud brought against Calyon and Putnam relating to affirmative misrepresentations and material omissions they made concerning the Pyxis Swap.

150.    Calyon and Putnam made material misrepresentations of fact in connection with Intesa's participation in the CDS.  In furtherance of their scheme to transfer the risk associated with the notes to Intesa, Calyon and Putnam represented, among other things, that Pyxis's assets would be selected by a diligent and independent collateral manager, acting in the interests of long investors, and that the Pyxis notes maintained their market value between closing and the execution of the Pyxis Swap.  These representations were made in the Pitchbook, Offering

Memorandum, Term Sheet, Collateral Management Agreement, the valuation sent by Calyon to

Intesa on March 6, 2007, other documents, and oral and written representations by Calyon to

Intesa.

151.   Calyon and Putnam also omitted to disclose material facts necessary to make the

statements they had made not materially misleading.  Among other things, Calyon and Putnam

knowingly or recklessly failed to disclose that:

- Pyxis was controlled by and designed for the benefit of a net short investor, namely Magnetar;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- In March 2007, far from the near-par value Calyon claimed that the Pyxis portfolio had at the time, it was in fact worth only 37% of par, and the value of the A-1 notes had dropped by over 90%.

152.   All of this information was known to Calyon and Putnam but not known or

readily available to Intesa.  Intesa, by contrast, did not know, and could not have reasonably

discovered, that the selection process had been corrupted by Magnetar or that the valuations

provided by Calyon and Putnam were false; only Calyon and Putnam knew this.  Calyon and

Putnam further knew that their statements were false and misleading, and made the statements

with the intent and expectation that Intesa would rely on them in agreeing to provide protection

on the notes.

153.   Calyon and Putnam's misstatements and omissions were material to Intesa's

decision to enter into the Pyxis Swap since they bore directly on the performance of the Pyxis

Portfolio, the likelihood of a credit event occurring under the Pyxis Swap, and the possibility that

the Pyxis notes would default, leaving Intesa to bear any losses.

154.    Intesa reasonably relied on Calyon and Putnam's misstatements and omissions in entering into the Pyxis Swap.  Without these material misstatements and omissions, Intesa would not have entered into the Pyxis Swap.

155.    Calyon and Putnam's conduct, as alleged herein, was willful, malicious, reckless, and without regard to Intesa's interests.  Specifically, Calyon and Putnam engaged in this deceptive conduct in order to earn fees and to avoid losses they knew they would suffer if the Pyxis Swap did not close and in order to transfer those losses to Intesa.

156.    As a direct, proximate, and foreseeable result of Calyon and Putnam's conduct, Intesa has suffered harm.  Accordingly, Intesa should be restored to the status quo ante and Intesa should be awarded damages incurred as a result of its agreement to provide protection on the notes in an amount to be determined at trial.  As a result of Calyon and Putnam's conduct, Intesa is also entitled to punitive damages.

157.    This Count is brought within the time permitted by law.

### THIRD CAUSE OF ACTION:
### AIDING AND ABETTING FRAUD

#### (Against Putnam and Magnetar )

158.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

159.    This is a claim for aiding and abetting fraud brought against Putnam and the Magnetar Defendants, arising from the intentional and substantial assistance they provided to Calyon and each other to perpetrate a fraud on Intesa.

160.    The underlying fraud on Intesa, as detailed above, took the form of misrepresentations and omissions concerning: the asset selection process for Pyxis; Magnetar's involvement in and control over the CDO; Putnam's abdication of its responsibility to select the

Pyxis Portfolio acting diligently and independently in the interests of long investors such as Intesa; and the valuations of the Pyxis notes provided to Intesa in March 2007. These fraudulent statements and omissions were reflected in the Pitchbook, Offering Memorandum, Term Sheet, Collateral Management Agreement, other documents, and oral and written representations by Calyon to Intesa.

161.    Putnam and Magnetar each knew of the fraud being perpetrated on Intesa through their leading and active role in arranging, managing, and/or marketing the Pyxis CDO and their purchase of protection on the notes from Intesa. As a result of these various functions, which gave them unique insight into the asset selection process, the true purpose of the deal, the true value of the assets selected for inclusion in the CDO, the credit quality of the notes and underlying portfolio, and the true levels of subordination which protected the notes against loss, each of the above Defendants knew and learned of, and assisted in conveying, fraudulent statements and omissions to Intesa.

162.    Each of these Defendants assisted in the fraud perpetrated upon Intesa, helped conceal misrepresentations and omissions delivered to Intesa, and failed to correct them, thereby substantially assisting in carrying out the fraud. Putnam's substantial assistance came in the form of, among other conduct, preparation of the Pitchbook to Intesa and its nominal selection and management of portfolio of inferior quality for placement into Pyxis. The Magnetar Defendants' substantial assistance came in the form of, among other conduct, secretly controlling the adverse selection of assets and aspects of the deal's structure, serving as the short counterparty of Calyon CIB's back-to-back hedging transactions and funding Calyon's short position on the synthetic assets in Pyxis's portfolio.

163.     Both Putnam and Magnetar had direct financial stakes in the fraud.  If the Pyxis CDO did not close, or if Magnetar's shorting scheme were revealed before the CDO closed, Putnam would lose its substantial fees as collateral manager, and Magnetar would not realize any gains from its short positions.

164.     Intesa would not have provided protection on the notes had it known the truth about Defendants' fraudulent statements and omissions.  Therefore, Intesa's damages arising from the fraud were proximately caused by Defendants' substantial assistance.

165.     As a direct, proximate and foreseeable result of Defendants' intentional conduct, Intesa has suffered and will continue to suffer harm.  Accordingly, Intesa should be awarded damages incurred as a result of its agreement to provide protection on the notes in an amount to be determined at trial.  As a result of Magnetar and Putnam's conduct, Intesa is also entitled to punitive damages.

166.     This Count is brought within the time permitted by law.

### FOURTH CAUSE OF ACTION:
### CIVIL CONSPIRACY

#### (Against All Defendants)

167.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

168.     This is a claim for civil conspiracy brought against all Defendants arising from their corrupt agreement to defraud Intesa and other unsuspecting investors.

169.     Defendants furthered their corrupt agreement and executed the underlying fraud on Intesa, as detailed above, through several overt acts, including misrepresentations and omissions concerning:  the asset selection process for Pyxis; Magnetar's involvement and control over the CDO; Putnam's abdication of its responsibility to select the Pyxis Portfolio acting

diligently and independently in the interests of long investors such as Intesa; and the valuations of the Pyxis notes provided to Intesa in March 2007. These fraudulent statements and omissions were reflected in the Pitchbook, Offering Memorandum, Term Sheet, Collateral Management Agreement, other documents, and oral and written representations by Calyon and Putnam to Intesa. Defendants undertook further overt acts that made the representations detailed above false and created the material omissions discussed herein. Among other things: Magnetar secretly hijacked the asset selection process, knowing that innocent investors like Intesa would be deceived into believing that Putnam was independently selecting assets; Putnam abdicated asset selection authority to Magnetar, despite representations to the contrary and knowledge that Intesa would be unaware of the secret arrangement; and Calyon structured the deal to give hidden equity holder Magnetar quick cash payouts that Magnetar could use to fuel its short bets against Pyxis, and provided Intesa with false valuations of the Pyxis A-1 notes prior to execution of the Pyxis Swap. The Defendants intentionally took these and other overt acts described herein to further their corrupt agreement and to carry out a common plan.

170.   Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it.

171.   Intesa would not have provided protection on the notes had it known the truth about Defendants' fraudulent statements and omissions. Accordingly, Intesa's damages arising from the fraud were proximately caused by Defendants' intentional, collective participation in furtherance of their common agreement to commit fraud.

172.   As a direct, proximate and foreseeable result of Defendants' intentional conduct, Intesa has suffered tremendous harm. Accordingly, Intesa should be restored to the status quo ante and should be awarded damages incurred as a result of its agreement to provide protection

on the notes in an amount to be determined at trial.  As a result of Defendants' conduct, Intesa is also entitled to punitive damages.

173.    This Count is brought within the time permitted by law.

**Prayer for Relief**

WHEREFORE, Intesa requests the Court enter judgment:

(a)     awarding Intesa damages to restore it to the status quo ante;

(b)     awarding Intesa compensatory damages in amounts to be determined at trial, together

with pre-judgment interest at the maximum rate allowable by law;

(c)     awarding Intesa punitive damages in an amount to be determined at trial;

(d)     awarding Intesa reasonable costs and expenses incurred in this action, including, to

the extent applicable, counsel fees; and

(e)     such other relief as the Court deems just and proper.

Dated: New York, New York
       June 22, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____
    Philippe Z. Selendy
    (philippeselendy@quinnemanuel.com)
    Jonathan E. Pickhardt
    (jonpickhardt@quinnemanuel.com)
    Nicholas F. Joseph
    (nicholasjoseph@quinnemanuel.com)
    Sarah Trombley
    (sarahtrombley@quinnemanuel.com)
    Sean Baldwin
    (seanbaldwin@quinnemanuel.com)

    51 Madison Avenue, 22nd Floor
    New York, New York  10010
    (212) 849-7000

    *Attorneys for Plaintiff Intesa Sanpaolo,*
    *S.p.A.*