UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTESA SANPAOLO, S.P.A.,<br><br>    Plaintiff,<br><br>  -against-<br><br>CRÉDIT AGRICOLE CORPORATE AND<br>INVESTMENT BANK, CRÉDIT<br>AGRICOLE SECURITIES (U.S.A.) INC.,<br>THE PUTNAM ADVISORY COMPANY,<br>LLC, MAGNETAR CAPITAL LLC,<br>MAGNETAR FINANCIAL LLC, AND<br>MAGNETAR CAPITAL FUND, LP,<br><br>    Defendants. | No. 12-cv-2683 (RWS)<br><br><br>**ECF CASE**<br>**Electronically Filed** |

**MEMORANDUM OF LAW IN SUPPORT OF THE PUTNAM ADVISORY
COMPANY LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

MILBANK, TWEED, HADLEY &
M<sup>c</sup>CLOY LLP

Thomas A. Arena
Sean M. Murphy
Robert C. Hora
William P. Gross
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*The Putnam Advisory Company LLC*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    Pyxis ABS CDO 2006-1 ............................................................... 4

    B.    Intesa ............................................................................................. 6

    C.    The Alleged Representations To Intesa Regarding Putnam's Role As Collateral Manager .............................................................. 7

    D.    The Alleged Fraudulent Scheme ................................................... 8

ARGUMENT ............................................................................................................ 9

I.      STANDARD ON A MOTION TO DISMISS ................................................. 9

II.    INTESA'S CLAIMS UNDER SECTION 10(b) OF THE 1934 ACT ARE BARRED BY THE FIVE YEAR STATUTE OF REPOSE ......................... 10

III.   INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ................................. 11

    A.    Intesa Fails To Allege That Putnam Acted With Scienter ................. 12

          1.    Intesa Fails To Allege A Plausible Motive For Putnam's Participation In The Alleged Fraudulent Scheme ................... 12

          2.    Intesa Fails To Allege Circumstantial Evidence Of Conscious Misbehavior Or Recklessness ................................. 14

    B.    Intesa Fails To Plead An Actionable Misrepresentation With The Particularity Required By Rule 9(b) and the PSLRA ......................... 21

          1.    The OM Disclosed The Eligibility Criteria For Asset Selection And The Existence Of Short Counterparties ......................... 21

          2.    General Statements Regarding Putnam's Experience And Capabilities Are Not Actionable .......................................... 23

          3.    Putnam Cannot Be Held Liable For Alleged Misstatements It Did Not Make ............................................................................ 24

IV.   INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS AGAINST PUTNAM SHOULD BE DISMISSED .................................... 24

V.    INTESA'S CIVIL CONSPIRACY CLAIM AGAINST PUTNAM SHOULD BE DISMISSED .......................................................................... 25

VI.   CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................9, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................9

*Boudinot v. Shrader*,
   No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172 (S.D.N.Y. Feb. 15, 2012) ........2, 10

*Brady v. Lynes*,
   No. 05 Civ. 6540 (DAB), 2008 WL 2276518 (S.D.N.Y. June 2, 2008)................................25

*Cada v. Baxter Healthcare Corp.*,
   920 F.2d 446 (7th Cir. 1990) ...........................................................................10

*Cohen v. Stevanovich*,
   722 F. Supp. 2d 416 (S.D.N.Y. 2010) (Sweet, J.)...........................................................14, 25

*Dooner v. Keefe, Bruyette & Woods, Inc.*,
   No. 00 Civ. 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003)....................................14

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...........................................................................12, 23

*Epirus Capital Mgmt., LLC v. Citigroup, Inc.*,
   No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200 (S.D.N.Y. Apr. 28, 2010) .........20, 22

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
   375 F.3d 168 (2d Cir. 2004)...........................................................................9

*Excel Elecs. & Photo Corp v. Aetna Cas. & Sur. Co.*,
   No. 90 Civ. 6508 (JMC), 1991 WL 259257 (S.D.N.Y. Nov. 27, 1991)................................16

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
   No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010).........................10, 16

*G-I Holdings, Inc. v. Baron & Budd*,
   No. 01 Civ. 0216 (RWS), 2004 WL 1277870 (S.D.N.Y. June 10, 2004) (Sweet, J.) .............14

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)...........................................................................9

*Good Hill Partners L.P. v. WM Asset Holdings Corp.,*
 583 F. Supp. 2d 517 (S.D.N.Y. 2008)....................................................................12

*In re Beacon Assoc. Litig.,*
 No. 09 Civ. 777 (LBS), 2012 WL 1123728 (S.D.N.Y. April 4, 2012)....................................11

*In re Bristol-Myers Squibb Sec. Litig.,*
 312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................9

*In re Exxon Mobil Corp. Sec. Litig.,*
 500 F.3d 189 (3d Cir. 2007)....................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
 308 F. Supp. 2d 249 (S.D.N.Y. 2004)....................................................................16

*In re Livent, Inc. Noteholders Sec. Litig.,*
 151 F. Supp. 2d 371 (S.D.N.Y. 2001)....................................................................9

*In re Merrill Lynch Auction Rate Sec. Litig.,*
 No. 09 Civ. 9887 (LAP), 2012 U.S. Dist. LEXIS 19879 (S.D.N.Y. Feb. 15, 2012)..............12

*In re Wachovia Equity Sec. Litig.,*
 753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................................15, 23

*Janus Capital Grp., Inc. v. First Derivative Traders,*
 131 S. Ct. 2296 (2011)....................................................................24

*Loreley Financing (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Investment Bank,*
 Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011)....................................................................passim

*McCann v. Hy-Vee, Inc.,*
 663 F.3d 926 (7th Cir. 2011) ....................................................................10

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.,*
 747 F. Supp. 2d 406 (S.D.N.Y. 2010)....................................................................24

*Miller v. Lazard, Ltd.,*
 473 F. Supp. 2d 571 (S.D.N.Y. 2007)....................................................................16, 17

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
 98 F.3d 2 (2d Cir. 1996)....................................................................22

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,*
 753 F. Supp. 2d 166 (S.D.N.Y. 2010)....................................................................23

*Rapoport v. Asia Elecs. Holding Co.,*
 88 F. Supp. 2d 179 (S.D.N.Y. 2000)....................................................................4, 19

*Stern v. Leucadia Nat'l Corp.,*
 844 F.2d 997 (2d Cir. 1988)....................................................................16

*Tamar v. Mind C.T.I., Ltd.*,
    723 F. Supp. 2d 546 (S.D.N.Y. 2010)...................................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) ..........10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................12, 13, 21

**STATUTES**

15 U.S.C. § 78j(b) ............................................................................................... passim

15 U.S.C. § 78u-4(b) ............................................................................................10, 12

**RULES**

17 C.F.R. 240.10b-5(b) ......................................................................................... passim

C.P.L.R. § 3016(b) ................................................................................................16

Federal Rule of Civil Procedure 9(b) .................................................................... passim

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1, 4

The Putnam Advisory Company, LLC ("Putnam"), respectfully submits this memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the First Amended Complaint ("FAC") filed by Intesa Sanpaolo, S.p.A. ("Plaintiff" or "Intesa") with prejudice.[1]

## PRELIMINARY STATEMENT

Unwilling to accept the consequences of its investment decision to purchase a financial instrument tied to risky subprime mortgages, Intesa seeks to recoup its losses by alleging a broad scheme to defraud involving a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis CDO" or "Pyxis").  Intesa alleges that Putnam, the collateral manager of the Pyxis CDO, intentionally selected "toxic assets" for inclusion in the CDO's portfolio for the express purpose of causing the $1.5 billion CDO to fail.  Intesa alleges that Putnam engaged in this conduct to enable Magnetar—not Putnam—to reap "hundreds of millions of dollars" on short positions referencing such "toxic assets."  (FAC ¶ 2.)  There are no well-pleaded allegations, however, supporting this sensational claim.  The FAC does not allege that Putnam selected any assets that violated any of the "Eligibility Criteria" set forth in the confidential offering memorandum for the Pyxis CDO dated October 2, 2006 (the "Offering Memorandum" or "OM"), or that any of the assets selected for the Pyxis portfolio had received lower credit ratings than required by these Eligibility Criteria.  Nor does the FAC allege that anyone from Putnam ever spoke directly to Intesa or that, as collateral manager, Putnam owed a fiduciary duty to Intesa or to any prospective investors in the CDO.

Putting aside the dearth of any plausible allegations tying Putnam to such a

---

[1] Putnam incorporates by reference the arguments set forth in the memoranda of law in support of the motions to dismiss pursuant to Rules 9(b) and 12(b)(6) filed by co-defendants Crédit Agricole Corporate and Investment Bank and Crédit Agricole Securities (U.S.A.) Inc. (together "CA-CIB"), and Magnetar Capital LLC, Magnetar Financial LLC, and Magnetar Capital Fund, LP (collectively "Magnetar") in this action.

scheme, the FAC attempts to sidestep the fact that Intesa was not even an investor in the Pyxis

CDO.  Instead, the FAC alleges that Intesa entered into a credit default swap ("CDS") in which it

made a sizeable bet that the Class A notes issued by the Pyxis CDO would not fail (the "Swap").

Putnam, however, was not the counterparty to this transaction, and the FAC does not allege that

Putnam had any involvement in Intesa's investment.  The sole basis on which Intesa seeks to link

Putnam to its investment decision is that, before the effective date of the Swap, Intesa received

copies of the Pyxis offering materials which referenced Putnam's role as the CDO's collateral

manager.  As discussed below, nothing in those offering materials even remotely supports a

claim sounding in fraud against Putnam.

The New York Supreme Court previously rejected the same core allegations

underlying the FAC.  In *Loreley Financing (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate &

Investment Bank*, Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) (Schweitzer, J.)

("*Loreley*"), the court dismissed fraud claims brought by a Pyxis noteholder against Putnam,

holding that the same types of allegations asserted by Intesa here were not sufficient to plead

with the requisite particularity that Putnam had abdicated its responsibility for selecting assets

for the Pyxis portfolio or had otherwise engaged in fraudulent conduct.

The FAC fails to state a claim against Putnam on three separate and independent

grounds.  First, Intesa's federal securities law claims are time-barred because the five-year period

of repose applicable to such claims expired before the commencement of this action.  That period

of repose began to run, at the latest, as of the date of the last misrepresentation alleged in the

FAC.  *See, e.g., Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172,

at *14-15 (S.D.N.Y. Feb. 15, 2012).  Intesa does not allege any misrepresentations, by any

defendant, occurring on or after April 6, 2007 (*i.e.*, five years prior to the filing of the original

Complaint).  Accordingly, its federal securities law claims must be dismissed.

    Second, the FAC does not allege a theory of motive sufficient to support a plausible theory of scienter.  Intesa alleges that Putnam, a large and respected financial institution, knowingly engaged in a billion dollar fraud to earn collateral manager fees that Plaintiff now baldly alleges were "higher than normal" (FAC ¶ 2), an allegation absent from the original Complaint.  Yet, the fees disclosed in the new emails cited in the FAC show that Putnam's fees were **well below** the normal rate for a CDO collateral manager.  Further, a significant portion of Putnam's fee was subordinated to the payments owed by Pyxis to noteholders.  And, the remainder of Putnam's fee was to be calculated on the basis of a monthly portfolio asset amount that ***excluded*** defaulted securities.  In other words, if the CDO failed in whole or even in part, Putnam would not receive its full fee.  The FAC's allegations fall well short of establishing motive.

    Nor does the FAC allege any conscious misbehavior sufficient to establish scienter.  The FAC, like the original Complaint, relies upon a number of press reports and other sources to support its theory of fraud, but none of these sources makes any particularized allegations about the Pyxis CDO or about Putnam's purported selection of "toxic assets" in the Pyxis CDO.  In an attempt to support its fraud claim, Intesa has added references to a number of emails mentioning Putnam (and a number referencing entirely unrelated parties and deals) to the FAC, yet these emails, all of which were also before Judge Schweitzer when he dismissed the *Loreley* claims against Putnam, do not evidence any abdication of responsibility by Putnam.

    Third, the FAC fails to allege any actionable misrepresentations or omissions by Putnam.  Putnam was not responsible for the vast majority of the information in the OM.  In any event, even if Putnam bore such responsibility, Intesa cannot point to anything in the offering

materials that was inaccurate.  The OM described at great length the composition of the securities that would be collateralizing the CDO (the vast majority of which were subprime and mid-prime residential mortgage backed securities ("RMBS")), the relatively low credit rating of those securities (many of which were rated "BBB"), and all structural features of the CDO.  In page after page of carefully-drafted disclosures, the OM detailed the very risks relating to the assets Intesa claims were misrepresented.  Intesa does not identify any assets selected by Putnam for the Pyxis portfolio that violated any of the detailed Eligibility Criteria set forth in the OM.

Like the original Complaint, the FAC also alleges that Putnam should have disclosed that co-defendant Magnetar was taking a short position against the Pyxis CDO.  But the OM, which Intesa acknowledges it read, fully disclosed that more than 75% of the portfolio—with a notional value well in excess of $1 billion—would consist of CDS and that third parties would be taking the short position on those securities.  Accordingly, a sophisticated investor like Intesa was fully aware that an enormous number of "short" bets were being made with respect to the Pyxis CDO, directly contrary to Intesa's long position.

## BACKGROUND[2]

### A.    Pyxis ABS CDO 2006-1

Pyxis, which closed on October 3, 2006, was a "hybrid" CDO, meaning that its $1.5 billion collateral portfolio included both "cash" and "synthetic" assets.  (FAC ¶¶ 54, 57.) As fully disclosed in the OM, approximately 23% (or $350 million par value) of the Pyxis portfolio was comprised of "cash" assets—that is, RMBS bonds, CDO notes, and other securities purchased by Pyxis.  The remaining approximately 77% (or $1.15 billion par value) of the

---

[2]  Where a complaint relies on statements contained in documents, the Court may consider those documents in ruling on a motion to dismiss even if they were not attached to the complaint.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.").

portfolio was comprised of "synthetic" assets, created through CDS referencing RMBS bonds, CDO notes, and other securities that were not actually owned by Pyxis. (FAC ¶ 54.)  Pyxis was the protection seller or "long" counterparty for such CDS; it received a "premium" from the "short counterparty" in exchange for the obligation "to make loss payments" to the short counterparty if the referenced assets performed poorly.  (*Id*. ¶ 55.)  Accordingly, investors in the Pyxis CDO were on notice that sophisticated institutional investors, in the aggregate, were making enormous bets that the collateral underlying the Pyxis CDO would perform poorly.

The FAC alleges that CA-CIB was the arranger of the CDO and the initial purchaser of the note securities issued by the Pyxis CDO.  As alleged in the FAC, Magnetar was an investor in the CDO, purchasing the Class X notes and the equity issued by Pyxis and also taking short positions on unspecified CDS in the Pyxis portfolio.  (FAC ¶ 58.)

According to the FAC, Putnam served as the collateral manager for the Pyxis CDO.  Under the collateral management agreement between Putnam and the Pyxis CDO dated October 3, 2006 (the "CMA"), Putnam agreed to acquire collateral and manage the Pyxis portfolio according to the terms of the CDO's Indenture, including the Eligibility Criteria set forth in the OM.  (FAC ¶ 79.)  The OM disclosed that Putnam was entitled to (i) a monthly senior collateral management fee in an amount equal to 0.15% *per annum* of the portfolio's Monthly Asset Amount on each Monthly Distribution Date, and (ii) a quarterly subordinated collateral management fee in an amount equal to 0.05% *per annum* of the portfolio's Monthly Asset Amount on each Quarterly Distribution Date.  (OM, Kuck Decl. Ex. A, at 191-92.)[3]

Significantly, Putnam's right to receive the subordinated collateral management

---

[3] To avoid burdening the Court with unnecessary duplication, all exhibit cites herein, other than to the CMA and the correspondence discussed in Point III.A.2, *infra*, refer to the Declaration of Lea Haber Kuck in support of CA-CIB's Motion to Dismiss the Amended Complaint, dated July 20, 2012 (the "Kuck Decl.").  The remaining exhibits are attachments to the Declaration of Robert C. Hora, dated July 20, 2012 (the "Hora Decl.").

fee was junior to the noteholders' rights to receive interest payments on their securities. (*See id.* at 70-74.) As stated in the OM, Putnam would receive its subordinated collateral management fee only ***after*** all six classes of noteholders (starting with Class A-1 and ending with Class X) received the amount each such class was entitled to receive per distribution date. (*Id.* at 74.) Putnam's senior collateral management fee was also contingent on the CDO's performance: under the CMA, the senior fee was to be calculated on the basis of a Monthly Asset Amount for the portfolio that expressly ***excluded*** defaulted securities. (CMA, Hora Decl. Ex. A, § 8(a)).

### B.  Intesa

Intesa, formerly known as Banca Intesa S.p.A, is a large and sophisticated financial institution organized under the laws of Italy. (FAC ¶ 12.) Intesa was not an investor in the Pyxis CDO; it did not purchase any notes or equity issued by the Pyxis CDO, and it did not enter into any CDS that were to be included in the Pyxis CDO portfolio. Instead, according to the FAC, in September 2006, Intesa and CA-CIB allegedly "came to an understanding" that they would enter into the Swap, whereby Intesa would be the protection seller (*i.e.*, the long counterparty) and CA-CIB would be the protection purchaser (*i.e.*, the short counterparty) on $180 million of the Class A-1 notes issued by Pyxis. (FAC ¶ 67.) Intesa performed "rigorous due diligence" prior to entering into the Swap, including "an analysis of the deal's structure . . . and the assets included in the CDO's portfolio." (*Id.* ¶ 65.)

Unmentioned in the FAC is that Intesa simultaneously entered into a second CDS with CA-CIB, in which Intesa *bought protection* (*i.e.*, took a short position) on the Class B notes issued by Pyxis.[4] Thus, Intesa engaged in precisely the type of short trade that it alleges the Defendants should have disclosed that Magnetar had made against the Pyxis collateral portfolio.

---

[4] This short position is reflected in documents referred to in the FAC. (*See* Kuck Decl. Ex. D (email attaching the Term Sheet referenced at FAC ¶¶ 63, 139 and reflecting the September 2006 understanding referenced at FAC ¶ 67); *see also* FAC ¶ 84 ("Calyon sent Intesa 'spread' valuations for the Pyxis Class A-1 and Class B notes.").)

On April 30, 2008, more than 18 months after the Pyxis CDO closed, Fitch Ratings Ltd. downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Swap.  Intesa thereafter paid $180 million under the Swap and received Class A-1 Pyxis notes in return, which it alleges are "virtually worthless".  (FAC ¶ 10.)

### C.    The Alleged Representations To Intesa Regarding Putnam's Role As Collateral Manager

The FAC does not allege that Putnam participated in any direct communications with Intesa in connection with its investment decision.  As alleged in the FAC, the only information purportedly relayed to Intesa about Putnam's role as collateral manager was set forth in offering documents sent to prospective investors in the Pyxis CDO.

The FAC alleges that in August 2006, CA-CIB provided Intesa with a 52-page set of investor presentation materials, which the FAC refers to as the "Pitchbook" (Kuck Decl. Ex. G (the "Investor Presentation")).  (FAC ¶ 74.)  Intesa alleges that the Investor Presentation "purported to describe, among other things, the structure of the Pyxis CDO, the types of assets that would be selected for inclusion in the portfolio, and the rigorous selection process that would be employed by Putnam to identify and analyze those assets . . . ."  (*Id*. ¶ 63.)  Intesa further alleges that CA-CIB represented that Putnam was involved in the preparation of certain sections of the Pitchbook, including the "sections describing Putnam's superior knowledge, expertise, and purportedly rigorous asset selection criteria."  (*Id*. ¶ 64.)  The FAC alleges that these statements were false because Putnam purportedly ceded control over asset selection to Magnetar, which, according to the FAC, enabled Magnetar to pick "toxic" assets for the Pyxis portfolio.  (*Id*. ¶ 7.)[5]

---

[5] Notably, under the heading "Important Information," investors in the Pyxis CDO were explicitly informed that the Investor Presentation was "prepared solely for informational purposes," that "the information contained [t]herein does not purport to contain all of the information that may be required to evaluate the securities that may be issued,"

The FAC also alleges that Intesa received and reviewed the OM (Kuck Decl. Ex. A).  (*See* FAC ¶¶ 78-79, 82, 139, 150, 160, 169.)  The OM expressly disclosed that Putnam was not responsible for any information contained therein, except for a five-page section setting forth limited information regarding Putnam.  This section simply described Putnam's corporate structure and investment management experience, and included biographies of employees expected to provide collateral management services to the Pyxis CDO.  (*See* OM at 187-91.) Intesa alleges that this section "further touted Putnam's vast experience in managing structured assets" and disclosed that Putnam would select and manage the assets in the Pyxis portfolio. (FAC ¶ 78.)  According to the FAC, these statements were also purportedly false because Magnetar, not Putnam, allegedly selected the collateral for the Pyxis portfolio.  (FAC ¶ 7.)

### D.   The Alleged Fraudulent Scheme

The FAC purports to describe a broad scheme in which defendants "secretly joined forces to launch a series of CDOs" for the benefit of CDO noteholders, "which, in reality, were vehicles designed by Magnetar to place short positions on billions of dollars of subprime mortgage bonds at below-market costs."  (FAC ¶ 44.)  In support of this alleged scheme, Intesa cites (i) an article published by the non-profit news service ProPublica (FAC ¶¶ 3, 8, 45, 136); (ii) a book by a financial journalist (FAC ¶ 47); (iii) regulatory proceedings concerning other CDOs in which Putnam was not involved (FAC ¶ 3); (iv) a series of emails, all of which were before the *Lorelely* Court, that either do not concern Putnam or actually disprove that Putnam abandoned its collateral selection responsibilities (FAC ¶¶ 90-97, 108-125), and (v) the alleged correlation between the assets in the Pyxis portfolio and assets selected for other CDOs in which

---

and that any recipient should "read the Offering Memorandum" and "conduct its own independent analysis of the data referred to [t]herein."  (Investor Presentation at 2.)  The materials disclosed that 72% of the securities selected for the Pyxis portfolio would be rated on the border between speculative grade and investment grade, with 39% rated "BBB-" (the lowest possible investment grade), 20% rated "BBB," and 13% rated "BBB+."  (*Id.* at 14.)

Putnam had no role (FAC ¶¶ 101, 105).  As discussed below, none of these sources, standing alone or in combination, provides any support for the broad conspiracy alleged in the FAC.

## ARGUMENT

## I.      STANDARD ON A MOTION TO DISMISS

In deciding a motion to dismiss, a court must accept as true well-pleaded allegations in a complaint.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  This Court, however, "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001).  In addition, the Court should not credit factual assertions or characterizations that are refuted by the objective record.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).  The law no longer requires a moving defendant to show that the plaintiff can prove "no set of facts" entitling it to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007).  Instead, a plaintiff must allege facts that render their claim not merely "conceivable," but truly "plausible."  *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (*Twombly* applies to "all civil actions").

To satisfy the Rule 9(b) pleading requirements, a fraud claim alleging material misstatements or omissions must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).  A plaintiff pleading securities fraud claims also must meet the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA requires, among other things, that a complaint specify each allegedly misleading statement and why it is misleading; if an allegation

is made on information and belief, the complaint must also state with particularity all facts on which the belief is formed.  15 U.S.C. § 78u-4(b)(1); *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *7 (S.D.N.Y. Sept. 28, 2010).

## II.      INTESA'S CLAIMS UNDER SECTION 10(b) OF THE 1934 ACT ARE BARRED BY THE FIVE YEAR STATUTE OF REPOSE

"Section 804(a)(2) of the Sarbanes-Oxley Act [of 2002] is a statute of repose which requires that a plaintiff bring a section 10(b) or Rule 10b-5 claim within five years of the violation of the securities laws, regardless of when the plaintiff discovered the violation." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005) (citing 28 U.S.C. § 1658(b)).  As the Seventh Circuit recently explained, the five-year statute of repose is "strong medicine" warranted because, among other reasons, "business planning is impeded by contingent liabilities that linger indefinitely."  *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011) (Posner, J.); *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (Equitable tolling doctrines do not apply to statutes of repose because "their very purpose is to set an outer limit unaffected by what the plaintiff knows.") (internal citations omitted).

In determining when the violation occurred for the purpose of calculating the repose period, courts in the Southern District of New York have "consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made."  *Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172, at *14 (S.D.N.Y. Feb. 15, 2012).  The two Circuit Courts that have construed Section 804(a)(2) have likewise held that the "violation" occurs at the time of the alleged misrepresentation, not when the securities at issue were purchased or sold.  *See McCann*, 663 F.3d at 932 ("The violation in this case, defined as it should be—as the misrepresentation—occurred in August 2002, more

10

than five years before the suit was filed."); *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 200 (3d Cir. 2007) (repose period "begins to run on the date of the alleged misrepresentation").

Where, as here, the FAC purports to allege multiple misrepresentations, courts have held that the repose period "begins when the last alleged misrepresentation was made." *Teamsters Local 445 Freight Div. Pension Fund*, 2005 U.S. Dist. LEXIS 19506, at *19 (collecting cases); *In re Beacon Assoc. Litig.*, No. 09 Civ. 777 (LBS), 2012 WL 1123728, at *5 (S.D.N.Y. April 4, 2012) (same).  Accordingly, for Intesa's claims to be timely, the last misrepresentation alleged in the FAC must have been made on or after April 6, 2007 (*i.e.*, five years prior to the filing of the original Complaint on April 6, 2012).

The FAC, however, does not allege any misrepresentations to have been made after that date.  The purported misrepresentations attributed to Putnam relate to the adequacy of the disclosures in the Investor Presentation and OM, both of which Intesa concedes that it received before April 6, 2007.  And the last purported misrepresentation or omission identified in the FAC attributed to any defendant relates to market valuations allegedly provided to Intesa in March 2007.  (*See* FAC ¶ 83.)  Even assuming *arguendo* that these valuations were false and misleading and that Putnam had a role in their preparation—neither of which the FAC adequately alleges—Intesa received these materials more than five years before filing this action. Accordingly, the FAC fails to allege a misrepresentation within the five-year repose period, and Intesa's federal securities law claims should be dismissed on this ground alone.

## III.   INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

To state a misrepresentation claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b) (2012), "Plaintiffs must 'allege that the defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff[s'] reliance was the proximate cause of its injury.'" *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 Civ. 9887 (LAP), 2012 U.S. Dist. LEXIS 19879, at *18 (S.D.N.Y. Feb. 15, 2012). A failure to plead any of these elements with the requisite particularity necessitates dismissal. *See, e.g., Good Hill Partners L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517, 520-21 (S.D.N.Y. 2008). Because Intesa fails to adequately allege scienter or, in the alternative, actionable misrepresentations or omissions by Putnam with the particularity required by Rule 9(b) and the PSLRA, Intesa's Section 10(b) and Rule 10b-5 claims must be dismissed.

**A.  Intesa Fails To Allege That Putnam Acted With Scienter**

A plaintiff alleging securities fraud can establish scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The heightened pleading standards of the PSLRA require that a plaintiff state with particularity facts evidencing scienter and that those allegations give rise to a "strong inference" that the defendant acted with the requisite state of mind. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007); *see* 15 U.S.C. § 78u-4(b)(1), (2). In determining whether the facts alleged in a complaint give rise to a strong inference of scienter, courts must consider "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

**1.  Intesa Fails To Allege A Plausible Motive For Putnam's Participation In The Alleged Fraudulent Scheme**

Intesa's theory of motive does not support a compelling inference of scienter. On

the one hand, Intesa admits that Putnam "was one of the largest U.S. mutual funds companies with nearly 70 years of experience managing money, that it had $180 billion in assets for nearly 10 million shareholders and approximately 170 institutions, and . . . was reputedly a leader in compliance and transparent business practices." (FAC ¶ 65.) Yet Intesa alleges that Magnetar somehow "bought" Putnam's "cooperation and acquiescence" in a multi-billion dollar fraud with the promise of "skinny" collateral management fees and "cumulative business." (*Id*. ¶ 50.)

To begin with, Intesa fails to acknowledge that a significant portion of Putnam's collateral management fee was junior to the interest payments to be made to Pyxis noteholders. (*See* OM at 70-74.) In other words, Putnam would receive the subordinated portion of its collateral management fee (0.05% of Monthly Asset Amount) only if the Pyxis CDO performed well enough to first pay all six classes of noteholders the maximum amount they were entitled to receive on each applicable distribution date. Accordingly, the FAC's allegation that the subordinated fee "encouraged" Putnam to design a CDO that would fail (FAC ¶ 98) makes no sense whatsoever. Moreover, under the terms of the CMA, the senior portion of Putnam's collateral management fee (0.15% of the Monthly Asset Amount) was dependent on a calculation of the underlying collateral assets that specifically excluded defaulted securities. *See supra* at 6. Thus, Putnam had no incentive to design a CDO that would fail.

The FAC's new allegation that Putnam's collateral management fees were purportedly "higher than normal" (FAC ¶ 2) is squarely contradicted by the new correspondence cited in the FAC, and likewise fails adequately to allege motive. The new correspondence cited in the FAC shows that Putnam's 0.15% senior and 0.05% subordinated fee rates were in fact much less than the 0.40% rate on so-called "regular style," $400 million CDOs.[6] (FAC ¶ 96.)

---

[6] The dollar difference between what a collateral manager would earn on a "regular style" $400 million CDO (*see* FAC ¶ 96) ($1,600,000) and the maximum fixed fee that Putnam could earn on the $1.5 billion Pyxis CDO

The desire to earn ordinary fees is not a permissible basis for inferring scienter.  *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.) ("[T]he desire to earn management fees is a motive generally possessed by . . . managers, and as such, does not suffic[iently] allege a 'concrete and personal benefit' resulting from fraud.").  This principle applies with even greater force to less than ordinary fees.[7]

       The bald allegation that Magnetar "promis[ed]" Putnam additional "lucrative" deal volume (*see* FAC ¶ 99) also does not suffice to allege motive.  The FAC contains no particularized facts regarding this supposed "promise," and alleges just one additional Magnetar-sponsored CDO for which Putnam served as collateral manager.  Moreover, it lacks all plausibility to suggest that a large and respected financial institution would have a motive to commit a billion dollar fraud to benefit another entity, design a toxic CDO, and damage its reputation as a collateral manager, all to secure a few million dollars in fees and guarantee a role in future CDOs also allegedly designed to spectacularly fail.  *See Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572 (JGK), 2003 WL 135706, at *3 (S.D.N.Y. Jan. 17, 2003) (rejecting theory of motive that was "clearly self-defeating, if not irrational").

### 2.  Intesa Fails To Allege Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

       Having failed to allege a plausible motive for Putnam's participation in the

---

($2,250,000) likewise does not raise an inference of fraudulent intent which is at least as cogent and compelling as opposing nonfraudulent inferences.  A larger CDO, by its nature, involves more assets.  Further, it defies logic to suggest that Putnam would risk its reputation by managing a failed CDO, threaten its future business and income, and engage in a multi-billion dollar fraud for the benefit of Magnetar, all for a mere additional $650,000 in fees.

[7] In an effort to buttress its motive allegations, Intesa alleges, solely on information and belief, that Putnam's fixed fee on the Pyxis CDO was higher (by apparently a mere five basis points) than the fixed fee paid to the collateral manager in all but three Magnetar-sponsored CDOs and higher than the total fee on all but six Magnetar-sponsored CDOs.  (FAC ¶ 98.)  The FAC, however, fails to identify the sources upon which these information and belief allegations are based, as required by Rule 9(b).  *See G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216 (RWS), 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (Sweet, J.).  These allegations, moreover, say nothing about whether the fixed percentage fee was high for so-called "typical", non-Magnetar CDOs.  Indeed, the correspondence cited in the FAC, discussed above, shows that it was not.

alleged fraud, Intesa must satisfy the heightened pleading standard for scienter through circumstantial evidence of conscious misbehavior or recklessness.  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011) ("Where motive is not apparent, a plaintiff may also raise a strong inference of scienter by showing circumstantial evidence of conscious misbehavior or recklessness, although 'the strength of the circumstantial allegations must be correspondingly greater.'").  ***None*** of the sources cited in the FAC contains ***any*** facts suggesting that Putnam knowingly or recklessly made any material misstatements or omissions.

First, Intesa claims that it learned of the alleged fraudulent scheme "when some of the critical facts relating to this collusion were first reported" in a ProPublica article.  (FAC ¶ 8.) Relying on anonymous sources, ProPublica reported that, beginning in 2005 and continuing through 2007, Magnetar invested in at least 28 subprime mezzanine CDOs, sold by at least 10 different banks, and managed by at least 16 different collateral managers.  *See* Jesse Eisinger and Jake Bernstein, *The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going*, ProPublica, Apr. 9, 2010 (Kuck Decl. Ex. E).  Putnam, however, is reported to have been collateral manager for only two of these CDOs, one of which was the Pyxis CDO.

Significantly, the ProPublica article ***does not*** implicate Putnam in any way or even discuss the Pyxis CDO.  The only mention of Putnam in the ProPublica article is a single reference to the employment history of the Magnetar employee Jim Prusko, who is reported to have previously worked at Putnam.  *Id.* at 7.  Based solely on this innocuous fact, Intesa makes the speculative leap, unadorned with any factual support, that "the principal individual at Putnam responsible for selecting the Pyxis portfolio" had an "especially close" relationship with Prusko, which "made it easy for Magnetar to secretly hijack" the asset selection process for the Pyxis portfolio. (FAC ¶¶ 51, 89.)  The alleged fact of Mr. Prusko's prior employment at Putnam is not

15

sufficient to support an inference of the broad misconduct alleged in the FAC.

In *Loreley*, the New York Supreme Court dismissed a fraud claim against Putnam premised on essentially identical allegations. *Loreley*, Index No. 650673/2010, at 8-9. There, as here, the plaintiff's theory was that "since Magnetar hired a former employee of Putnam, and the press has speculated on the basis of unnamed sources that Magnetar ran a scam, Putnam must be at the heart of it." *Id*. at 9-10. The *Loreley* court rejected this theory, stating that the ProPublica article "makes no particularized allegations about Pyxis 2006-1 or about Putnam itself" and thus the plaintiff's "assertion that Magnetar colluded with the arranger and collateral manager of Pyxis 2006-1 to cherry-pick unsuitable collateral for that CDO is simply speculation."[8] *Id*. at 10. The same result is warranted here.[9]

The ProPublica article contains nothing more than broad assertions from anonymous sources, often contradictory, that are not particularized to Putnam or the Pyxis CDO. Intesa's allegations premised on the ProPublica article thus cannot survive a motion to dismiss. *See Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives and press reports of other occasions . . . .").[10]

<u>Second</u>, Intesa cites a book entitled *Econned* written by a financial journalist[11]

---

[8] The purported settlement in *Loreley* referenced in the FAC (*see* FAC ¶¶ 3, 100), is entirely irrelevant as to Putnam. All claims against Putnam in the *Loreley* action were dismissed by Judge Schweitzer on June 9, 2011. *See Loreley*, Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) Dkt. No. 78.

[9] *See Excel Elecs. & Photo Corp v. Aetna Cas. & Sur. Co.*, No. 90 Civ. 6508 (JMC), 1991 WL 259257, at *6 (S.D.N.Y. Nov. 27, 1991) ("C.P.L.R. § 3016(b) is apparently intended to correspond to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.").

[10] *See also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *17, 19-20 (S.D.N.Y. Sept. 28, 2010) (dismissing fraud claims as a matter of law where general reports about mortgage originator were not tied to specific security purchased by plaintiff); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (reliance on media reports does not relieve plaintiff of burden of identifying and linking sources with particularized allegations of misconduct); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (rejecting "guilt by association" theory of securities fraud).

[11] Although the FAC misleadingly refers to *Econned*'s author, Susan Webber (who uses the pen name Yves Smith), as a "former Goldman Sachs banker" (FAC ¶ 47), the book makes clear that the author had not worked at Goldman Sachs for years and had no first-hand information relating to the structuring of CDOs in general, or the Pyxis CDO

which discusses Magnetar's role in certain CDOs, but notably fails to mention either Putnam or

Pyxis.  (*See* FAC ¶ 47.)  This attempt to cobble together support for its fraud allegations also

fails, as allegations based on non-particularized reports fail to plead fraud with the requisite

particularity.  *See Miller*, 473 F. Supp. 2d at 586; *Loreley*, Index No. 650673/2010, at 9

(including *Econned* among "anecdotal print reports citing unidentified or confidential sources,

none of which tie Putnam to the alleged scam.").

     <u>Third</u>, in an attempt to dress-up its conclusory allegations by way of analogy,

Intesa alleges that the Pyxis transaction "was not the first transaction in which Magnetar colluded

with [CA-CIB] and others," citing certain regulatory proceedings commenced by the U.S.

Securities and Exchange Commission and the Securities Division of the Commonwealth of

Massachusetts.  (FAC ¶ 3.)  Putnam is not alleged to have had any involvement in the CDOs at

issue in the cited regulatory proceedings, and thus Intesa's "broad brush" allegations cannot

serve as a basis for inferring that Putnam intentionally participated in the alleged fraudulent

scheme.  *See Loreley*, Index No. 650673/2010, at 9 ("It is a compilation of anecdotal behavior

which relates to the story of a grand financial scam, but, with respect to Putnam, its allegations

are conclusory and lack the specificity necessary to state a cause of action for fraud.").

     <u>Fourth</u>, the FAC cites to a number of emails, which it claims "confirm the control

Magnetar exercised over the Pyxis asset selection process, at the same time that it was shorting

those very assets (and Pyxis itself), and [CA-CIB's] and Putnam's awareness of and complicity

in Magnetar's scheme."  (FAC ¶ 90.)  But an examination of these emails reveals no evidence of

such control, and instead shows that Putnam independently selected Pyxis's collateral.  Indeed,

Judge Schweitzer had these very same emails before him in *Loreley* when he dismissed the

---

in particular.  Indeed, Ms. Webber's biography on the website of Aurora Advisors Inc., the management consulting firm she founded, reveals that she last worked at Goldman Sachs **29 years ago** as a corporate finance associate in 1983.  *See* http://www.auroraadvisors.com/resume_webber.html (last visited July 19, 2012).

plaintiff's claims against Putnam.  *See* Affirmation of Stephen M. Plotnick in Opp'n to Defs.'

Mot. to Dismiss, *Loreley*, Index No. 650673/2010 (N.Y. Sup. Ct. Apr. 28, 2011), Dkt. No. 54.

The first email string, from May 2006, among Deutsche Bank, CA-CIB, and

Magnetar, *but not Putnam*, does not aid Plaintiff's allegations.  (FAC ¶ 91; *see* Hora Decl. Ex.

B.)  These emails were sent before Putnam entered into its engagement letter to serve as

collateral manager, and before CA-CIB agreed to provide warehouse financing for Pyxis 2006-1.

In the emails, Mr. Prusko of Magnetar discussed the equity investors' desired internal rate of

return on Pyxis, and referenced the fact that Putnam had purportedly learned of that desired rate.

The emails say absolutely nothing to indicate that, if selected as collateral manager, Putnam

would participate in a fraud whereby it would abdicate its role as collateral manager to Magnetar.

Citing a string of June 2006 emails, Intesa next alleges a "'behind the scenes'

arrangement" whereby "[CA-CIB] or Putnam" granted Magnetar veto rights over any proposed

Pyxis assets.  (FAC ¶ 92.)  Even accepting as true Plaintiff's allegations that an "Equity Purchase

Letter" was entered into "between [CA-CIB] and DB & Magnetar only," and that a "warehouse

side letter [gave] DB and Magnetar veto rights over any warehouse asset," the June 2006 emails

cited by Plaintiff copy *no Putnam employees*, and both the emails and the alleged "side letter"

indicate that Putnam would not be a party to such an agreement, which was instead solely

"between [CA-CIB], DB, and Magnetar."  (*See id.*;  Hora Decl. Ex. C at 3, Ex. D.)  These emails

cannot support Intesa's fraud claim against Putnam.[12]

The August 2006 email exchange cited next in paragraph 93 of the FAC actually

*disproves* Plaintiff's main thesis.  Rather than evidencing that "Putnam did in fact allow

Magnetar to exercise . . . secret control over the Pyxis portfolio," as Intesa claims (*see* FAC

---

[12] In any event, these emails show only that Magnetar and Deutsche Bank, as equity investors, expressed a desire to have input into the selection of warehouse collateral because they both had "first loss exposure" as the most junior long investors in the CDO.  (Hora Decl. Ex. C at 3.)

¶ 93), these emails show just the opposite:  Putnam reported that the "collateral pool" it was buying "score[d] well on [Putnam's] risk scoring model," and that only after it finished a "benchmarking" analysis which involved doing "preliminary work across a range of deals" would Putnam pursue additional trades.  (Hora Decl. Ex. E at 2-3.)  In response, Mr. Prusko replied that Magnetar "[would] buy CDO CDS on names of [Putnam's] *choosing* at mid-market, or bid list +3bp, whatever you prefer."  (*Id.* at 2 (emphasis added).)  Thus, not only was Putnam performing the analyses that one would expect of a collateral manager, it was receiving offers from Magnetar to purchase specific CDS on competitive terms, and on names of Putnam's choosing.  Later emails in the chain are even more damaging to Plaintiff's claim, as Mr. Prusko asked Alexander Rekeda of CA-CIB to "stay on top of Putnam CDO situation," and stated that he "[didn't] like that [Putnam] [was] buying CDS's without us knowing about it," illustrating Putnam's independent collateral selection.  (*See id.* at 1; FAC ¶ 94.)  Given this direct conflict between Plaintiff's allegations and the documents cited in support, the Court "need not accept as true the allegations in" the FAC.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179 184 (S.D.N.Y. 2000).

The remaining emails cited by Plaintiff similarly fail to support Plaintiff's baseless claims.  The cited September 2006 exchange between Putnam and CA-CIB indicates the unremarkable fact that Putnam became aware at that time of a short position taken by Magnetar in Pyxis.  As discussed above, the OM disclosed that investors would be taking short positions in Pyxis.  The email exchange does nothing to indicate that Putnam had previous knowledge of any intention to take this position, that Putnam arranged for it in any way, or that Magnetar controlled Putnam's selection of any collateral.  (*See* FAC ¶ 95; Hora Decl. Ex. F.)

The November 2006 exchange between CA-CIB and Magnetar, in which CA-CIB

asks Mr. Prusko if he wanted to purchase protection on Pyxis, again *does not include any Putnam personnel*.  (*See* FAC ¶ 95; Hora Decl. Ex. G.)  And the last email chain Plaintiff cites, claiming that it "provides further evidence of Magnetar's control of the Pyxis asset selection," consists of a discussion between CA-CIB, Deutsche Bank, and Magnetar (but again, *not Putnam*) of an entirely separate CDO and collateral manager.  Moreover, this email simply addresses the benign issue of whether the collateral manager in an unrelated deal should give equity holders, whose long investment is subject to the collateral manager's performance, a right to terminate the collateral manager.  (*See* FAC ¶¶ 96-97; Hora Decl. Ex. H.)[13]  There is no discussion of any alleged abdication of the responsibilities of a collateral manager, let alone by Putnam. (*See id.*)[14]

Finally, Plaintiff alleges that Putnam invested "over half of Pyxis's cash allocated to CDO investments in four other Magnetar CDOs,"[15] (FAC ¶ 101) and that there was an "undisclosed, remarkably high correlation" between the assets selected for Pyxis and the portfolios of other CDOs in which Magnetar allegedly invested.  (FAC ¶ 105.)  The FAC, however, does not allege that any of the assets in the Pyxis portfolio did not meet any of the detailed Eligibility Criteria set forth in the OM or otherwise explain why any overlap in collateral securities with other CDOs for which Putnam did not act as collateral manager was improper.  *See Epirus Capital Mgmt., LLC v. Citigroup, Inc.*, No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200, at *15 (S.D.N.Y. Apr. 28, 2010) ("Plaintiff[] ha[s] not pled any facts to suggest that the performance or selection process for the allegedly worthless assets for [the

---

[13] Plaintiff also claims that this email chain illustrates "the attempt at independence by [the CDO's] collateral manager, NIBC," (*see* FAC ¶ 96), which directly contradicts Plaintiff's later assertion that "Magnetar and Deutsche Bank . . . exercised tight control over . . . NIBC's selection of assets . . . ." (*See* FAC ¶ 109.)

[14] Plaintiff has also added a number of emails to the FAC regarding other CDOs and collateral managers, which it claims "further confirm[] that Magnetar exercised close control over the selection of the Pyxis portfolio . . . ." (FAC ¶¶ 108-25.)  These additional emails, about other CDOs and collateral managers, are entirely irrelevant to any claims against Putnam.

[15] The FAC seeks to inflate the significance of this purported correlation.  The FAC fails to disclose that the Eligibility Criteria limited the inclusion of "CDO Securities" in the Pyxis portfolio to a maximum of 15% of the $1.5 billion portfolio.  (OM at 121.)  The vast majority of assets in the portfolio were not CDOs, but RMBS.

CDO] was materially different from the performance or selection process for the other assets in [the CDO's] portfolio.").

In view of the foregoing, Intesa has failed to allege facts sufficient to give rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *See Tellabs*, 551 U.S. at 314.

**B.**   **Intesa Fails To Plead An Actionable Misrepresentation With The Particularity Required By Rule 9(b) and the PSLRA**

**1.**   **The OM Disclosed The Eligibility Criteria For Asset Selection And The Existence Of Short Counterparties**

Intesa alleges that Putnam somehow ceded control over the asset selection process to Magnetar, and thereby allowed the collateral portfolio to be assigned "weaker assets over stronger ones".  (FAC ¶ 89.)  But Intesa does not allege which particular assets Magnetar selected or that any of these assets violated the OM's Eligibility Criteria.  The OM contained numerous detailed disclosures setting forth the composition of the securities collateralizing the CDO (mostly subprime and mid-prime RMBS) and the low minimum credit rating of those securities (at least "BBB-" by S&P and "Baa3" by Moody's).  (OM at 112-69.)  Over the course of 35 pages of "Risk Factors," the OM repeatedly warned potential investors about the risks associated with the notes and the underlying portfolio of assets, including that a "substantial portion" of the Pyxis portfolio—at least 80% according to the Eligibility Criteria—would consist of RMBS securities (OM at 31, 124), and that as much as 50% of the portfolio would consist of subprime RMBS, with weighted average FICO scores of 625 or lower (OM at 31, 124, 140).  Similarly, the Investor Presentation warned that approximately 72% of the assets in the final portfolio would be rated on the border between speculative grade and investment grade, with 39% rated "BBB-," 20% rated "BBB," and 13% rated "BBB+."  (Investor Presentation at 14.)  In short, no investor reading these disclosures could have been misled into believing, as Intesa now

asserts, that the portfolio would consist of "prime RMBS" assets.  (FAC ¶ 7.)  *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir. 1996) (dismissing Rule 10b-5 and common law fraud claims where plaintiffs failed to proffer a "reasoned basis to dismiss as boilerplate the disclosure of risk contained throughout the prospectuses."); *Epirus Capital Mgmt., LLC*, 2010 U.S. Dist. LEXIS 42200, at *16 (holding that CDO investors failed to state a claim under Section 10(b) and Rule 10b-5 where the offering materials explicitly disclosed the nature of the collateral being selected).

There is also no well-pleaded allegation to support the contention that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS." (FAC ¶ 106.)  As the FAC alleges, the ABX Index is "a series of indices, each comprised of twenty underlying constituent RMBS."  (FAC ¶ 82.)  The Eligibility Criteria disclosed in the OM specified strict concentration limits on the ABX Index and the indices contained therein, not on the constituent RMBS.  (*See* OM at 118 (providing that the aggregate amount of CDS referencing any of the series of indices included in the ABX Index could not exceed 5% of the Pyxis portfolio, and that the aggregate amount of CDS referencing any one series included in the ABX Index could not exceed 2% of the Pyxis portfolio).)  Accordingly, having failed to allege that the Pyxis portfolio violated the ABX Index concentration limits, Intesa's attempt to fashion a claim on the basis of CDS in the Pyxis portfolio allegedly referencing constituent RMBS must be dismissed.  *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

Intesa likewise cannot claim that Putnam failed to disclose the existence of short counterparties like Magnetar.  (FAC ¶ 56.)  As Intesa acknowledges, the OM expressly disclosed that 77% ($1.15 billion par value) of the Pyxis portfolio would be comprised of synthetic assets,

and it would have been readily apparent to Intesa, a sophisticated investor, that the short

counterparties on these CDS would have economic interests diametrically opposed to Intesa and

other long investors.  (FAC ¶¶ 54-55.)  This fundamental aspect of the Pyxis transaction was also

depicted in a large diagram in the Investor Presentation on which Intesa claims it relied.  (*See*

Investor Presentation at 10 (illustrating CDS between short counterparties and CA-CIB, with

CA-CIB acting as intermediary facing Issuer).)  In sum, as the *Loreley* court previously held, the

fact that the Pyxis portfolio needed to be attractive to both long investors and to short

counterparties was "transparent" and was part and parcel of "the nature of the structure."  *See*

*Loreley.*, Index No. 650673/2010, at 4-5 ("It is uncontroverted that the plaintiff here who

invested in the [Pyxis] CDO . . . was fully aware of this reality.").

### 2.      General Statements Regarding Putnam's Experience And Capabilities Are Not Actionable

Intesa repeatedly alleges that, when choosing to enter into the Swap, it relied upon

statements in the offering materials regarding Putnam's experience and capabilities.  (*See* FAC

¶¶ 65-66, 72, 74, 76-78.)  As a threshold matter, Intesa fails to allege any facts suggesting that

Putnam lacked the experience and capabilities described in such materials.  In any event, such

general statements regarding Putnam's business practices are "precisely the type of 'puffery' that

this and other circuits have consistently held to be inactionable."  *ECA & Local 134 IBEW Joint*

*Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (rejecting

allegations of "numerous misrepresentations regarding [defendant's] 'highly disciplined' risk

management and its standard-setting reputation for integrity").[16]

---

[16] *See also Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 183 (S.D.N.Y. 2010) (defendant's portrayal of its "risk management strategies," including assertions of its "cautious stance" and "active management" of risk, was inactionable puffery); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353-54 (S.D.N.Y. 2011) (defendants' "declarations of their 'conservative' underwriting standards and credit risk management" fell "into the category of commonplace statements too general to cause reliance by a reasonable investor" and were thus "corporate puffery rather than actionable misrepresentations").

### 3.    Putnam Cannot Be Held Liable For Alleged Misstatements It Did Not Make

Intesa also fails to allege that Putnam had any involvement in many of the misstatements alleged in the FAC, including those allegedly contained in the July 25, 2006 spreadsheet setting forth the ramped portfolio, the term sheet dated September 6, 2006, and the March 6, 2007 market valuations.  (FAC ¶¶ 63, 83-84.)  Putnam does not concede that the FAC adequately alleges that any of these documents contained any actionable misrepresentations or omissions.  But even if they did, Putnam cannot be held liable as a "maker" of these alleged statements because Putnam did not have "ultimate authority" over such statements, including their "content" and "whether and how to communicate [them]."  *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *see also id.* at 2303 ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").[17]

## IV.    INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS AGAINST PUTNAM SHOULD BE DISMISSED

Having failed to state a claim under Section 10(b) and Rule 10b-5, Intesa cannot allege a cognizable claim against Putnam sounding in common law fraud.  "Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b-5."  *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).  Thus, where "Section 10(b) claims do not survive, plaintiffs' common law fraud claims, based on the same allegations of fact, must be dismissed as well."  *Id.*

---

[17] Putnam also cannot be held responsible for any statements in the OM outside of the five-page section setting forth limited information about Putnam.  (*See* OM at ii ("No representation or warranty, express or implied, is made by . . . the Collateral Manager . . . except . . . with respect to the information set forth in the section entitled 'The Collateral Manager' (other than information set forth under the subheading 'General' contained therein.").))  The FAC does not allege that any of the information disclosed in the five-page section regarding Putnam—which principally described Putnam's corporate structure, its experience as an investment management firm, and the biographies of relevant officers and employees—was false in any material way.

As previously discussed, the *Loreley* court has already dismissed a common law fraud claim asserted against Putnam premised on virtually identical allegations.  *See Loreley*, Index No. 650673/2010, at 8-9 ("Despite [plaintiff] alleging the broad fraudulent scheme described above, the complaint, in fact, [had] nothing in any respect in the way of detailed allegations regarding the role of Putnam.").  The same result is warranted here.

## V.     INTESA'S CIVIL CONSPIRACY CLAIM AGAINST PUTNAM SHOULD BE DISMISSED

"[I]n order to state a claim for civil conspiracy, a Plaintiff must have a valid underlying tort claim."  *Brady v. Lynes*, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *9 (S.D.N.Y. June 2, 2008).  Therefore, because Plaintiff's common law fraud claims fail, its civil conspiracy claim must be dismissed as well.[18]

## VI.    CONCLUSION

For the reasons set forth above, Putnam respectfully requests that the Court grant its motion to dismiss the FAC with prejudice.[19]

Dated:  New York, New York
        July 20, 2012

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000


By:   /s/ *Sean M. Murphy*
       Sean M. Murphy
       Thomas A. Arena
       Robert C. Hora
       William P. Gross
       *Attorneys for Defendant*
       *The Putnam Advisory Company LLC*

---

[18] *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 436-37 (S.D.N.Y. 2010) (Sweet, J.) (first dismissing Section 10(b) claims and common law fraud claims, and then dismissing civil conspiracy claim).

[19] A court has discretion to dismiss a claim with prejudice where the plaintiff was put on notice of the deficiencies in the claim and yet failed to cure those defects in an amended complaint.  *See Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 559 (S.D.N.Y. 2010).  Here, Intesa was put on notice of the deficiencies in its claims by Defendants' original motion to dismiss, but has failed to cure those defects in the FAC.  Accordingly, Intesa should not be permitted to replead its claims again, and the claims should be dismissed with prejudice.