UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTESA SANPAOLO, S.P.A.,

          Plaintiff,

-against-

CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK, CRÉDIT
AGRICOLE SECURITIES (U.S.A.) INC.,
THE PUTNAM ADVISORY COMPANY,
LLC, MAGNETAR CAPITAL LLC,
MAGNETAR FINANCIAL LLC, AND
MAGNETAR CAPITAL FUND, LP,

          Defendants.

12 Civ. 2683 (RWS)

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO
DISMISS THE AMENDED
COMPLAINT**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Philippe Z. Selendy
Jonathan E. Pickhardt
Nicholas F. Joseph
Sarah Trombley
Sean Baldwin

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Facsimile: 212-849-7100

*Attorneys for Plaintiff Intesa Sanpaolo,
S.p.A.*

August 17, 2012

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND ...........................................................................7

    A.    The Pyxis Swap...........................................................................7

    B.    The Pyxis CDO ..........................................................................8

    C.    The Marketing of Pyxis to Intesa.............................................13

    D.    Calyon and Putnam's Misrepresentations and Omissions ....................................15

        1.    The Pyxis Documents ................................................15

        2.    Close Relationship between Pyxis and Other Magnetar CDOs................22

        3.    High Concentration of Low-Rated ABX Index RMBS ..........................23

        4.    "Dummy" RMBS Assets ...........................................23

        5.    The March 2007 Valuation .......................................24

        6.    Magnetar's Control of Its Other CDOs.....................24

    E.    Defendants Profited from Their Fraud.......................................27

    F.    Intesa's Losses .........................................................................28

ARGUMENT ...............................................................................................28

I.    INTESA HAS ADEQUATELY ALLEGED THAT BOTH CALYON AND PUTNAM COMMITTED SECURITIES FRAUD AND COMMON LAW FRAUD ......................................................................................29

    A.    Intesa Has Adequately Alleged that Both Calyon and Putnam Represented that the Pyxis Portfolio Would Be Selected by Putnam, Acting Independently, Diligently and in Good Faith ..........................30

        1.    Calyon and Putnam Are Equally Responsible For The Misrepresentations and Omissions In The Offering Materials .................30

        2.    General Boilerplate Disclaimers Do Not Prevent Intesa from Making a Fraudulent Inducement Claim Based on Calyon's Misrepresentations ................................................31

i

B.      Intesa Has Adequately Alleged that the Pyxis Portfolio Was Selected by
        Magnetar, Not Putnam, and that Calyon's and Putnam's Representations
        and Omissions Were Therefore False and Misleading ...........................................34

C.      Intesa Has Adequately Alleged Scienter against Both Calyon and Putnam..........37

II.     INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR AIDED AND
        ABETTED FRAUD...........................................................................................................40

A.      Intesa Has Adequately Alleged that Magnetar Had Actual Knowledge of
        the Pyxis Fraud. ........................................................................................................40

B.      Intesa Has Adequately Alleged that Magnetar Provided Substantial
        Assistance to the Pyxis Fraud ..................................................................................41

III.    INTESA HAS ADEQUATELY ALLEGED LOSS CAUSATION .................................42

IV.     INTESA'S SECURITIES FRAUD CLAIMS ARE TIMELY .........................................43

A.      Intesa's claims were filed before the statute of repose had run ..............................43

B.      Intesa's claims were filed before the statute of limitations had run ......................45

V.      INTESA'S CDS WAS NOT A FOREIGN TRANSACTION ..........................................46

VI.     INTESA HAS ADEQUATELY ALLEGED CIVIL CONSPIRACY ..............................47

VII.    THE AMENDED COMPLAINT SUPPORTS A PUNITIVE DAMAGES
        AWARD ..........................................................................................................................47

CONCLUSION................................................................................................................................48

# TABLE OF AUTHORITIES

**Page**

## Cases

*Absolute Activist Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)..............................................................................46, 47

*Ambac Assur. Corp. v. EMC Mortg. Corp.*,
   No. 08 Civ. 9464, 2009 U.S. Dist. LEXIS 26456 (S.D.N.Y. Mar. 16, 2009).........48

*In re Ann Taylor Stores Sec. Litig.*,
   807 F. Supp. 990 (S.D.N.Y. 1992)....................................................................40

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010)...............................................................44

*Arnold v. KPMG LLP*,
   334 F. App'x 349, 351 (2d Cir. 2009)...............................................................44

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).....................................................................................28

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011).............................................................................29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...............................................................................28

*Burns v. Del. Charter Guarantee & Trust Co.*,
   805 F. Supp. 2d 12 (S.D.N.Y. 2011)............................................................40, 41

*Calyon v. Mizuho Securities USA Inc.*,
   No. 07-CV-2241 (S.D.N.Y. Mar. 15, 2007) .......................................................5, 9

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
   637 F.3d 169 (2d Cir. 2011).............................................................................45

*Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Merrill Lynch & Co., Inc.*,
   Index No. 601832/09 (N.Y. Sup. Ct. N.Y. County Aug. 19, 2009) ......................26

*Danann Realty Corp. v. Harris*,
   5 N.Y.2d 317 (1959) .......................................................................................32

*In re Exxon Mobil Corp. Securities Lit.*,
   500 F.3d 189 (3d Cir. 2007).............................................................................44

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)....................................................38

*Grondahl v. Merritt & Harris, Inc.*,
   964 F.2d 1290 (2d Cir. 1992)......................................................................43, 44

*Grumman Allied Indus.,Inc. v. Rohr Indus., Inc.*,
  748 F.2d 729 (2d Cir. 1984)...................................................................32, 42

*Holmes v. Grubman*,
  568 F.3d 329 (2d Cir. 2009)...........................................................................28

*HSH Nordbank AG v. UBS AG*,
  95 A.D.3d 185 (1st Dep't 2012)................................................................34, 36

*Kwon v. Yun*,
  606 F. Supp. 2d 344 (S.D.N.Y. 2009)...........................................................32

*Lattanzia v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007)...........................................................................43

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)...........................................................................40

*Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corp. & Inv. Bank*,
  No. 650673/2010 (Sup. Ct. N.Y. County June 18, 2010)...............3, 11, 16, 19, 25, 35, 36, 39

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986).............................................................................40

*MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*
  911 N.Y.S.2d 694 (N.Y. Sup. Ct. 2010).......................................................33

*MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  81 A.D.3d 419 (1st Dep't 2011).....................................................................33

*McCann v. Hy-Vee, Inc.*,
  663 F.3d 926 (7th Cir. 2011) .........................................................................44

*Mfrs. Hanover Trust Co. v. Yanakas*,
  7 F.3d 310 (2d Cir. 1993) .........................................................................32, 33

*Morin v. Trupin*,
  711 F. Supp. 97 (S.D.N.Y. 1993)..................................................................42

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2884 (2010)..............................................................................46, 47

*Naughright v. Weiss*,
  __ F. Supp. 2d __, 2012 WL 760185 (S.D.N.Y. Mar. 8, 2012).................28

*NL Group v. Eccelston Properties, Ltd.*,
  178 A.D.2d 308 (1st Dep't 1991)..................................................................47

*Pellman v. Cinerama, Inc.*,
  503 F. Supp. 107 (S.D.N.Y. 1980)................................................................29

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010)...........................................................46

*Pro Bono Investments, Inc. v. Gerry*,
   2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005)...................................................44

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*,
   645 F.3d 1307 (11th Cir. 2011) .........................................................................44

*Rocanova v. Equitable Life Assurance Soc'y*,
   83 N.Y.2d 603 (1994)..................................................................................47, 48

*Rosner v. Bank of China*,
   528 F. Supp. 2d 419 (S.D.N.Y. 2007).................................................................41

*Ross v. A.H. Robins Co., Inc.*,
   607 F.2d 545 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980) ......................29

*SEC v. Citigroup Global Markets Inc.*,
   827 F. Supp. 2d 328 (S.D.N.Y. 2011).................................................................21

*SEC v. Goldman, Sachs & Co.*,
   790 F. Supp. 2d 147 (S.D.N.Y. 2011).................................................................46

*SEC v. Mizuho Securities USA Inc.*,
   Index No. 12-CV-5550 (S.D.N.Y. July 18, 2012) ................................................9

*Selevan v. N.Y. Thruway Auth.*,
   584 F.3d 82 (2d Cir. 2009)..................................................................................28

*Small v. Lorillard Tobacco Co.*,
   94 N.Y.2d 43 (1999) ...........................................................................................29

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ..............................................................44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................37, 38, 41

## **Statutes/Rules**

15 U.S.C. § 78u-4(b)(1),(2) ........................................................................................28

17 C.F.R. 240.10b-5..............................................................................28, 29, 43, 46, 47

28 U.S.C. § 1658(b) ..............................................................................................43, 44

Fed. R. Civ. P. 8 ............................................................................................................29

Fed. R. Civ. P. 9(b) ................................................................................................28, 29

Fed. R. Civ. P. 12(b)(6)................................................................................................28

Plaintiff Intesa Sanpaolo, S.p.A. ("Intesa") respectfully submits this memorandum of law in opposition to the motions to dismiss the First Amended Complaint ("FAC") by Defendants Crédit Agricole Corporate and Investment Bank ("Calyon CIB") and Crédit Agricole Securities (U.S.A.) Inc. ("Calyon (U.S.A.)") (collectively, "Calyon"); The Putnam Advisory Company, LLC ("Putnam"); Magnetar Capital LLC ("Magnetar Capital"), Magnetar Financial LLC ("Magnetar Financial"), and Magnetar Capital Fund, LP ("Magnetar Capital Fund") (collectively, "Magnetar") (all of the defendants collectively, "Defendants").

## PRELIMINARY STATEMENT

Defendants' motions to dismiss do not even address the fundamental allegations in this lawsuit, let alone identify any insufficiency in the pleading of Intesa's claims.  The Amended Complaint alleges that: (1) in order to persuade Intesa to enter into a credit default swap transaction ("CDS" or "swap") relating to the Class A-1 notes of a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis"), Calyon and Putnam represented to Intesa that the assets in the Pyxis portfolio had been chosen by a respected, putatively independent firm—namely, Putnam—acting diligently and in good faith and using a rigorous selection process consistent with the highest industry standards; (2) Defendants concealed from Intesa— and indeed from all Pyxis investors—the fact that the Pyxis portfolio was actually selected not by Putnam, but by Magnetar, which deliberately built Pyxis to fail so that it could benefit from the huge net short positions it took against it; and (3) had Intesa known that the Pyxis portfolio was not selected by Putnam—much less that it was selected by a party who had taken a huge net short position against the CDO—Intesa would not have entered into the Pyxis Swap and would thus not have incurred the $180 million in losses which it suffered when the portfolio collapsed as Magnetar had intended it to do.

Rather than addressing these core allegations directly, Defendants resort to a variety of feints and misdirections, blatant misstatements of law, and willful distortion of Intesa's allegations, to manufacture specious arguments for dismissal.

*First,* Calyon and Putnam assert that the misrepresentations contained in the various Pyxis offering materials were not sufficiently specific to support Intesa's fraud claims. This is contradicted by the detailed language in those documents cited by Intesa, which state, among other things, that Putnam "will select and manage the Collateral," and will do so "with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and [will] carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing." Such statements are plainly sufficiently detailed to support fraud claims. Calyon's further attempt to shift responsibility onto Putnam for these misrepresentations by arguing that the Collateral Manager sections of the Pyxis Pitchbook and Offering Memorandum were prepared by Putnam, ignores the fact that Calyon shared responsibility for large portions of these documents—including portions of the Collateral Manager sections—which contained the same misrepresentations, and that Calyon bore sole responsibility for the Pyxis launch email, which also contained these misrepresentations. Calyon's additional argument that boilerplate general disclaimers in certain deal documents prevent Intesa from relying on its misrepresentations is contradicted by controlling authority in this Circuit and New York, which holds that such disclaimers do not preclude a claim for fraud in the inducement unless they contain specific disclaimers of the misrepresentations that form the basis of that claim, which Calyon's do not. In any event, the chief disclaimer on which Calyon relies does not apply to the

2

alleged misrepresentations or omissions that occurred after the Pyxis trade date (October 2006) and prior to execution of the Pyxis Swap (April 2007), and thus do not provide a basis for dismissal.

*Second*, Calyon's and Putnam's assertion that Intesa has not adequately pled that their representations and omissions were false and misleading is without merit. Defendants attempt to deflect attention from the detailed allegations set forth in the Amended Complaint with citation to mountains of factual support by arguing, irrelevantly, that Intesa does not allege that the assets in the Pyxis portfolio failed to meet the eligibility requirements for Pyxis. This is not only highly misleading (among other things, the Amended Complaint alleges that Defendants circumvented the Pyxis portfolio's concentration limits on low-rated residential mortgage-backed securities ("RMBS") sold on the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and its individual constituent RMBS), but entirely beside the point. Intesa's claim is predicated not on non-compliance with the Pyxis eligibility requirements, but rather on the fact that the Pyxis portfolio was selected by Magnetar, not Putnam as the Defendants represented, and that Intesa would never have entered into the Pyxis Swap if this had been disclosed to it.

Defendants' attempt to play down certain of Intesa's allegations as based solely on "news reports" ignores the Amended Complaints' citation to a wealth of factual support for its allegations, including (1) emails and other documents that came to light last year in litigation by Pyxis investors against Calyon and Putnam, which was settled promptly after this evidence emerged (the "*Loreley* litigation"); (2) a remarkably close interrelationship between Pyxis and other CDOs created by Magnetar; (3) the Pyxis portfolio contained three times the permitted concentration of low-rated ABX Index RMBS assets; (4) $60 million of "dummy" prime RMBS assets were included in the Pyxis target portfolio to make it more attractive to investors; (5) an

egregiously false March 2007 valuation of the Pyxis portfolio by Calyon was plainly designed to lull Intesa into believing that Putnam had done its job well in selecting the portfolio; and (6) e-mails and other evidence adduced in numerous lawsuits involving other Magnetar CDOs, shows that Magnetar exercised tight control over the portfolios of its CDOs generally in order to protect its short positions on those CDOs, rendering it even less plausible that Magnetar might have allowed Putnam to select the assets for the Pyxis portfolio.

Indeed, even after the Amended Complaint in this case was filed, on July 18, 2012, still more relevant misconduct by Defendants came to light when Mizuho Securities USA agreed to pay $127.5 million to settle charges brought against it by the SEC relating to yet another Magnetar deal, Delphinus 2007-1 ("Delphinus"), which was arranged just a few months after Pyxis closed *by the same team of former Calyon bankers who had arranged the Pyxis deal* (and then moved en masse to Mizuho), and which involved some of the very same misconduct (inclusion of "dummy" assets in the CDO's target portfolio) alleged against these individuals with respect to Pyxis.

In any event, Intesa need not plead "evidence" at this stage of the proceedings, and its allegations, which must be taken as true for purposes of this motion, are more than sufficient to demonstrate the false statements and omissions necessary to support its claims.

*Third,* Calyon's and Putnam's argument that Intesa has failed to allege facts creating a strong inference of scienter is also without merit.  The Amended Complaint contains numerous particularized allegations showing not only that both Calyon and Putnam had motive and opportunity to commit fraud, but that they engaged in conscious misbehavior—for example, by entering into a secret side agreement that gave Magnetar and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis) "veto power" over the assets to be included in the Pyxis portfolio,

4

which was deliberately executed "behind the scenes" between Calyon, Magnetar and Deutsche Bank (and in which Putnam was necessarily complicit, since it imposed disclosure obligations on Putnam) in order to keep Magnetar's involvement secret.  The specific factual allegations demonstrating each Defendant's substantial motive include the following:

*Calyon* reaped tens of millions of dollars in fees for its role in structuring Pyxis and other CDOs for Magnetar, and in arranging Pyxis' sale of protection on other CDOs.  Calyon also passed off onto Intesa through the Pyxis Swap $180 million in losses on the Class A-1 Pyxis notes which it would otherwise have borne itself.  Calyon's assertion that it could not have had a motive to defraud Intesa because it was the largest shareholder in Intesa is both factually wrong and facially absurd: first, Calyon's shareholding in Intesa dropped from 17.8% to 5.4% in January 2007, just three months after Pyxis closed, and Calyon was no longer Intesa's largest shareholder at the time the Pyxis Swap was actually executed, in April 2007; second, Calyon stood to make far more from its fraud than it might lose from any diminution in Intesa's stock price resulting from that fraud; and third, Calyon's argument assumes that everyone within its huge organization was aware of what everyone else was doing and, more importantly, that their interests were all aligned—which, given the defection of Alex Rekeda's group to Mizuho shortly after Pyxis closed, was clearly not the case.

*Putnam* secured unusually large fees—even by Magnetar's lucrative deal standards— with relatively little effort or risk, by serving as the putative collateral manager for Pyxis. Putnam's assertion that its fees on Pyxis were not large focuses solely on the rate of its fee (20 basis points rather than the customary 40 basis points for CDO collateral managers), but ignores the fact that (1) Pyxis, like all of Magnetar's CDOs, was almost four times larger than a typical CDO, so even at 20 basis points its total fees would be twice as much as a typical CDO's; that

75% of its fee was fixed (15 basis points, larger than the collateral management fees on most Magnetar CDOs); and that its "incentive fee" of 5 basis points was, as emails between Magnetar, Deutsche Bank and Calyon attest, "virtually assured" by Magnetar's "significant control" over Pyxis.  Moreover, Putnam secured additional lucrative deal volume from its cooperation with Magnetar by being chosen as the collateral manager on a second Pyxis deal a few months after Pyxis closed.

*Fourth,* Magnetar's attempt to avoid liability for aiding and abetting Calyon's and Putnam's fraud by arguing that Intesa has not alleged that it had actual knowledge of the Pyxis fraud nor that it provided substantial assistance to advance the fraud is absurd.  The Amended Complaint alleges with particularity that the entire scheme was *devised by* Magnetar; that Magnetar was well aware that Pyxis investors, including Intesa, believed that Putnam was selecting the Pyxis portfolio; that Magnetar in fact controlled the selection of the portfolio and built Pyxis to fail; and that Magnetar stayed "behind the scenes" and concealed its control of Pyxis, like its other CDOs, from investors like Intesa so that those investors would be lured into taking the long positions without which the entire scheme would have foundered.  The Amended Complaint also adequately alleges Magnetar's motive—to make huge profits from its short positions on Pyxis.  Magnetar fails in its attempt to equate its short positions with a $10 million hedge Intesa took against its $180 million long position on Pyxis.  The allegations in the Amended Complaint and in the documents incorporated by reference confirm that Magnetar's true long position on Pyxis was around $20 million, while its short positions, conservatively, totaled more than $100 million.  In other words, Magnetar had a net short position of *at least* $80 million, compared to Intesa's net *long* position of $170 million.

*Fifth*, Defendants' argument that Intesa has failed to plead loss causation ignores Intesa's allegation that it would not have entered into the Pyxis Swap had it known of Defendants' fraud, and thus would not have incurred *any* losses.  Moreover, Pyxis, like all of Magnetar's CDOs, was built to fail and thus defaulted far more quickly than typical CDOs (indeed, by the end of 2008, 96% of Magnetar's CDOs, including Pyxis, had defaulted, compared with 68% of comparable CDOs).

*Finally,* Defendants' other efforts to avoid liability for their fraud are unavailing.  Their argument that the five year statute of repose for securities fraud claims has run on Intesa's claims is directly contradicted by controlling authority in this Circuit, which makes clear that the repose period on a fraud claim based on defendants' misrepresentations and omissions to disclose material facts does not begin to run until plaintiff has committed itself in reliance on those misrepresentations and omissions (which, in this case, was not until the Pyxis Swap was executed on April 24, 2007).  Defendants' further contention that the two year statute of limitations has run on Intesa's securities fraud claims ignores the fact that Intesa could not have known of many of the critical elements of its claims until at least some time after April 9, 2010.  And Defendants' contention that the Pyxis Swap, which was negotiated in New York and executed there by Intesa, was a foreign transaction beyond the reach of federal securities laws is, again, contradicted by controlling authority in this Circuit.  Defendants' other arguments are makeweight and do not support dismissal.

## FACTUAL BACKGROUND

### A.    The Pyxis Swap

This action arises out of a CDS between Intesa and Calyon relating to the Class A-1 notes of the Pyxis CDO (the "Pyxis Swap").  A CDO is a special purpose vehicle that purchases, or enters into a CDS referencing, a portfolio of assets—such as bonds or loans—and issues

securities which then make payments to investors based on the income generated by the assets. FAC ¶ 29.  A CDS, in turn, is a transaction in which one party sells protection to a counterparty in respect of a security (*i.e.*, agrees to make payments to the counterparty in the event of certain specified events, such as non-payment of amounts due on the security) in exchange for premium payments.  FAC ¶ 54.  In the Pyxis Swap, Intesa sold Calyon protection on the $180 million of Class A-1 notes issued by the Pyxis CDO, thus effectively transferring the risk of non-performance of these notes from Calyon to Intesa in exchange for Calyon's premium payments. FAC ¶ 67.

### B.    The Pyxis CDO

Pyxis was one of at least 26 "Constellation CDOs" created by Magnetar.  As revealed in numerous lawsuits, press reports, and its own letter to investors dated April 19, 2010,[1] Magnetar took an equity position in the Constellation CDOs, but a much larger short position in the same CDOs, and controlled the selection of their portfolios to ensure that they would fail.  FAC ¶¶ 3, 48.  And fail they did, resulting in huge profits for Magnetar.  According to ProPublica, about 96% of Magnetar's deals were in default by the end of 2008, compared with 68% for comparable CDOs.  *See* Kuck Decl. Ex. E, p. 3.  The benefit to Magnetar was stark: from its launch in 2005 through 2007, Magnetar grew 600%, from approximately $1.5 billion under management to approximately $9 billion.  FAC ¶ 41.

Pyxis was structured and marketed by Calyon.  FAC ¶ 1.  It was one of five Constellation CDOs arranged by Calyon, making Calyon—despite its attempt to play down its relationship with Magnetar (Cal. Br. 6)—the top underwriter of Magnetar CDOs.  FAC ¶ 49.  Calyon received substantial structuring fees for its work on these CDOs, including Pyxis, as well as fees

---

[1]    *See* Declaration of Jonathan E. Pickhardt in Opposition to Defendants' Motions to Dismiss the Amended Complaint ("Pickhardt Decl."), Ex. E.

for arranging the CDSs by which the CDOs sold protection on other CDOs.  FAC ¶ 132.  Thus, Calyon profited greatly from its relationship with Magnetar, and from its work structuring CDOs generally, but it sacrificed quality to quantity and speed over diligence and integrity.  Calyon's own managing director likened the CDO structuring business to "cheap sangria," observing that it involved "[a] lot of cheap ingredients repackaged to sell at a premium.  It might taste good for a while, but then you get headaches later and you have no idea what's really inside."  FAC ¶ 53. Calyon-underwritten CDOs were some of the worst-performing CDOs in the market, with over 45% of the Calyon CDO portfolio having defaulted by Dec. 2008, the highest percentage of any underwriter.  *Id.*

The Calyon executive primarily responsible for arranging Pyxis, Alex Rekeda, had worked with Magnetar on its very first Constellation CDO, Orion 2006-1 ("Orion"), and thereafter worked on all subsequent Constellation CDOs arranged by Calyon.  FAC ¶ 136. Subsequently, Rekeda continued to arrange CDOs for Magnetar at Mizuho, where his team moved en masse in late 2006, shortly after Pyxis closed (resulting in bitter litigation with Calyon).[2]  On July 18, 2012, the SEC announced that Mizuho had agreed to pay $127.5 million to settle claims for securities fraud by Rekeda's team relating to another Magnetar CDO, Delphinus 2007-1, involving the creation of "dummy assets" in a target portfolio which were designed to mislead ratings agencies—misconduct very similar to conduct in which Rekeda's team also engaged on Pyxis with a view to misleading investors.  *SEC v. Mizuho Securities USA Inc.*, Index No. 12-CV-5550 (S.D.N.Y. July 18, 2012); Pickhardt Decl. Exs. I, L.  As part of the SEC settlement against Mizuho, Rekeda and another member of his team each agreed to pay

---

[2]  *See Calyon v. Mizuho Securities USA Inc.*, No. 07-CV-2241 (S.D.N.Y. Mar. 15, 2007).

$125,000 in fines, and they and a third team member were suspended from working in the securities industry for a year.  Pickhardt Decl.  Exs. J, K.

Pyxis, like Magnetar's other CDOs, was a "hybrid" CDO, meaning that part of its $1.5 billion portfolio (23%) consisted of "cash" assets (*i.e.*, asset-backed debt securities that Pyxis actually purchased) and the rest of the portfolio (77%) consisted of "synthetic" assets, which were created through CDSs in which Pyxis mimicked the economics of purchasing asset-backed debt securities through selling protection to counterparties on those debt securities in exchange for premium payments that were akin to the coupon payments Pyxis would have received had they purchased the referenced security itself.  FAC ¶ 54.  The performance of these synthetic assets—77% of Pyxis' portfolio—depended on the performance of the securities they referenced, which, if the referenced securities were themselves hybrid CDOs and also contained synthetic assets, in turn depended on the performance of the CDOs  referenced by their synthetic assets. *Id*. This made it extremely difficult for an investor to obtain full information about the quality of all the assets underlying a CDO like Pyxis, which meant that investors were heavily dependent on the experience, diligence, independence and integrity of the collateral manager, who was tasked with selecting the assets for the portfolio.  FAC ¶ 36.  As Calyon itself stated in the Pyxis Offering Memorandum, "the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]."  FAC ¶ 34.

The putative collateral manager for Pyxis was Putnam.  FAC ¶ 54.  Magnetar and Putnam had a very close relationship, largely because the Magnetar executive chiefly responsible for putting together the Constellation CDOs, Jim Prusko, had previously worked at Putnam, and had supervised Carl Bell, the Putnam employee primarily responsible for selecting the Pyxis portfolio.  FAC ¶ 51.  Like all of Magnetar's CDOs, Pyxis was substantially larger than a typical

CDO and thus generated unusually large fees for the collateral manager.  FAC ¶ 98.  Moreover,

Putnam's fixed management fee of 15 basis points was higher than the fixed fee paid to the

collateral manager in all but three of Magnetar's 26 CDOs, and higher than the *total* fee—

including both fixed and incentive fees—on all but six of Magnetar's CDOs.  *Id.*  In addition,

Putnam also received an "incentive fee" on Pyxis of a further five basis points.  *Id.*  Contrary to

Putnam's assertion (Putnam Br. 6), as emails between Magnetar, Deutsche Bank and Calyon

attest, this "incentive fee" was not in reality dependent on Pyxis's performance, but was

"virtually assured" by Magnetar's "significant control" of Pyxis.  FAC ¶ 96.

    After Pyxis closed, Putnam worked with Magnetar on a second Pyxis CDO, Pyxis 2007-1

("Pyxis 2"), which closed in early 2007.  FAC ¶ 99.  This further confirms Putnam's complicity

in Magnetar's scheme.  If Putnam had not cooperated with Magnetar on Pyxis, Magnetar would

have refused to work with it on any other CDOs—as it in fact did with a collateral manager who

refused to cooperate with it on another CDO.  FAC ¶ 50.

    Magnetar and Deutsche Bank were co-equity investors in Pyxis.  They each held half of

Pyxis' preference share cash investment ($10,312,500 each) and half of its Class X notes

($30,937,500 each), for a total long position of $41,250,000.[3]  Moreover, Pyxis, like Magnetar's

other CDOs, was structured in such a way that, as long as it avoided default, the preference

---

[3]   The Amended Complaint incorrectly alleges that Magnetar held all of the Class X
notes.  FAC ¶ 58.  In fact, Magnetar and Deutsche Bank each held half of both the Preference
Shares and the Class X notes.  This is apparent from the June 20, 2006 side letter between
Calyon, Magnetar and Deutsche Bank (*see* Ex. B to the *Loreley* plaintiffs' proposed Amended
Complaint, attached to Pickhardt Decl. Ex. G), which refers to Magnetar and Deutsche Bank as
the purchasers of the equity tranche.  At that time, the equity tranche was slated to be
$82,500,000.  *See* Pickhardt Decl. Ex. B at 5.  Subsequently, the equity tranche was effectively
reduced to $20,625,000 (it had a nominal value of $82,500,000, but was actually sold to the
equity investors at a 75% discount) and the Class X notes were added to Pyxis' capital, with a
par value of $61,875,000, so that the preference shares and Class X notes together still totaled
$82,500,000.  *See* Pickhardt Decl. Ex. C at 111.

shares and Class X notes would receive much larger payments of principal and interest than the senior noteholders during the first five years of its existence, by which time they would both be fully paid out—and that they would receive a large portion of their investment back within just over a year if Intesa avoided default for that long, which it did.  FAC ¶ 46; *see also* Pickhardt Decl. Ex. C, Schedule G (schedule for repayment of Class X noteholders).  This structure could only be altered with the consent of the preference shareholders—*i.e.*, Magnetar and Deutsche Bank[4]—and was described by Magnetar as "triggerless,"[5] because it effectively removed the typical CDO triggers which would have redirected funds to senior noteholders in the event of certain events reflecting deterioration in the performance of the portfolio .  Thus, contrary to Defendants' claim that Magnetar, as the equity investor in Pyxis, took the greatest share of the risk, Magnetar's risk, and eventual losses, were in fact much lower than those of senior noteholders.  Indeed, a review of the Pyxis monthly investor reports reveals that, pursuant to the "triggerless" structure, the preference shareholders and Class X noteholders received payments of principal and interest of *$36,364,897* prior to Pyxis' eventual default in December 2008 (including a payment of over $7 million within a few months of closing, and one payment even *after* Pyxis defaulted), while, during this same period, senior noteholders only received payments totaling *$7,450,377*.  See Pickhardt Decl. Ex. D.  Even when the Pyxis portfolio began failing collateral quality tests as early as August 2007, and Notes started to be downgraded by the rating agencies as early as September 2007, principal distributions could not be reallocated to senior noteholders without the consent of Magnetar.  Pickhardt Decl. Ex. C, p. 89.

In addition, in a publicly available letter to the Financial Crisis Inquiry Commission (whose report is referenced in the Amended Complaint), Magnetar conceded that it negotiated

---

[4]  Pickhardt Decl. Ex. C, p. 89 (definition of "Reinvestment Period").

[5]  Pickhardt Decl. Ex. E (Magnetar's April 19, 2012 letter to investors), p. 7.

with each of its CDOs an upfront payment "as a rebate to the purchase price of long positions

taken by the Magnetar funds," amounting to 30 basis points of the notional amount of the CDO,

which in Pyxis' case would have been $4.5 million.  Pickhardt Decl. Ex. H, p.1.  Taking

Magnetar's share of this upfront payment into account, along with Magnetar's share of the

payments made by Pyxis to preference shareholders and Class X noteholders ($18,182,448),

Magnetar's long position on Pyxis by the time Pyxis defaulted was effectively only *$21

million*—far less than the $71 million Magnetar claims in its brief.  (Mag. Br. p. 17 n. 8.)

### C.      The Marketing of Pyxis to Intesa

In July 2006, Calyon began to market Pyxis to investors, including Intesa.  FAC ¶ 59.  In

order to assure Intesa of the quality of the Pyxis portfolio, both Calyon and Putnam represented

that Putnam would select the assets for the portfolio, acting independently, diligently and in good

faith in the interests of long investors like Intesa.  *Id.*  For example, the Pyxis launch email dated

July 14, 2006 introduced Pyxis as a mezzanine ABS CDO "managed by The Putnam Advisory

Company, LLC" (Pickhardt Decl. Ex. A).  This launch email attached a Pitchbook prepared and

presented jointly by Calyon and Putnam, the cover page and Executive Summary of which

highlighted the fact that "The Putnam Advisory Company, LLC will serve as Collateral

Manager."  Pickhardt Decl. Ex. B, pp. 1, 6.  Similarly, the October 2, 2006 Offering

Memorandum for Pyxis, again prepared by Calyon and Putnam, represented that the "Fixed

Income Group" of Putnam "will select and manage the Collateral" (FAC ¶ 78), and that,

pursuant to the Pyxis Collateral Management Agreement, Putnam was required to "supervise and

direct the investment and reinvestment of the Collateral" and to "perform its obligations

hereunder and under the Indenture with reasonable care and in good faith using a degree of skill

and attention no less than that which the Collateral Manager exercises with respect to

comparable assets that it manages for others with similar objectives and policies, and to carry out

its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing."  FAC ¶ 79.

Further confirming the importance of Putnam's role to Pyxis' performance, extensive portions of the Pitchbook and the Offering Memorandum related specifically to Putnam's duties in selecting the Pyxis portfolio.  The Pitchbook alone represented, among other things, that:

- Putnam is "[o]ne of the largest U.S. mutual fund companies with nearly 70 years of experience managing money" (Pickhardt Decl. Ex. B at 6, 22)
- Putnam has "deep, experienced management teams," and its "[i]nvestment personnel has an average of 13 years of investment experience" (*Id.* at 6)
- Carl Bell, the Managing Director and Team Leader for the CDO & Portfolio Credit Team, has "15 years of investment experience . . . lead[ing] the portfolio construction effort in designing CDOs . . . for institutional investors" (*Id.* at 46)
- Putnam's "Investment Philosophy—CDOs" is that "Putnam should actively drive the product structure" (*Id.* at 38)
- Putnam believes that "CDO management" requires "[r]igorous portfolio construction" (*Id.*)
- "Each CDO [managed by Putnam] leverages Putnam's expertise and presence in the structured product market and the full capabilities and resources of Putnam's CDO Management platform" (*Id.* at 40)
- Putnam is the "only 14-time recipient of the DALBAR Service Award" (*Id.* at 22)
- Putnam is a "[l]eader in compliance and transparent business practices" (*Id.*)
- Putnam has "[s]easoned leaders committed to investment excellence and high fiduciary standards" (*Id.* at 23)
- Putnam's "goal is to generate excellent long term investment results" (*Id.* at 25)
- "The key to long term investment success is **modest outperformance** achieved consistently over shorter time periods" (*Id.*) (emphasis in original)
- "Putnam has made a strategic commitment to offering a 'best in class' CDO management capability" (*Id.* at 39)
- Putnam has "a high degree of expertise in both the design of a conservative and stable CDO structure and the management of the underlying fixed income collateral" (*Id.* at 37)
- "Putnam seeks to design and undertake transactions that have a high probability of success" (*Id.* at 38)

Calyon and Putnam made similar oral representations to Intesa during the negotiations for the Pyxis Swap.  FAC ¶ 80.  At no point during these negotiations did Calyon or Putnam disclose Magnetar's involvement in Pyxis, much less the fact that Magnetar was a huge net short investor in Pyxis and that it, not Putnam, would control the selection of the Pyxis portfolio.  FAC ¶ 89.

The representations and omissions concerning Putnam's management role were crucially important to Intesa, and it relied on them heavily in entering into the Pyxis Swap, because, among other things, the synthetic nature of 77% of the Pyxis portfolio, and of many of the assets referenced in that portfolio, made it difficult if not impossible for any investor to determine the quality of the assets underlying the Pyxis portfolio.  *Id*.

>           **D.      Calyon and Putnam's Misrepresentations and Omissions**

Calyon's and Putnam's representations were egregiously false.  Most importantly, as Defendants deliberately concealed from Intesa, the Pyxis portfolio was not in fact selected by Putnam, acting diligently and independently in the interests of long investors like Intesa, but was instead selected by a net short investor, Magnetar.  *Id.*  Had Intesa known this, it would never have entered into the Pyxis Swap.  FAC ¶ 131.

Contrary to Defendants' assertions, the basis for Intesa's allegations is not "an article published by ProPublica on April 9, 2010" (Cal. Br. 9) or "news reports" (*id.*).  Rather, Intesa's allegations are based on a wealth of documentary evidence disclosed in numerous lawsuits relating to Magnetar's CDOs—including, most notably, documents specifically relating to Pyxis, which came to light in *Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corp. & Inv. Bank*, No. 650673/2010 (Sup. Ct. N.Y. County June 18, 2010) after the defendants in that case had moved to dismiss the plaintiffs' claims—and on substantial other evidentiary sources set forth below.

>           **1.      The Pyxis Documents**

Contrary to Defendants' assertions, it is clear that the documentary evidence that emerged in *Loreley* after the defendants in that case filed motions to dismiss was not taken into account by the court in dismissing the plaintiffs' claims against Putnam and NIBC (the collateral

manager on Orion 2006-1 ("Orion")).[6]  As the *Loreley* plaintiffs stated in their motion for leave to amend the complaint to include allegations based on this evidence: "The emails and other evidence that Plaintiffs submitted with their opposition papers [on defendants' motions to dismiss] were not referenced in, or part of, the Court's decision, which simply held that the four corners of [the] First Amended Complaint as crafted lacked sufficiently detailed allegations as to the roles and involvement of NIBC and Putnam in the fraud alleged."  Pickhardt Decl. Ex. F, p. 3.  In fact, as Calyon now concedes (Cal. Br. 8), after plaintiffs moved to include this new evidence in an amended complaint, Calyon promptly settled the claims for an undisclosed amount.

A review of the *Loreley* evidence makes clear why Calyon settled.  This evidence demonstrates that from the beginning, Magnetar, with the full knowledge and collusion of both Calyon and Putnam, controlled the selection of the Pyxis portfolio and sought to ensure that it was built to fail, to enable Magnetar to profit from its net short positions on Pyxis.  For example, at the beginning of the collateral selection process, in May 2006, in response to an indication that Putnam might want to negotiate a higher management fee, Jim Prusko (Magnetar) told Alex Rekeda (Calyon) and Michael Henriques (Deutsche Bank, Magnetar's co-equity sponsor on Pyxis) that "plenty of managers will do this deal.  I want to do it with [Putnam] for a variety of reasons, but *they have to play ball*."  FAC ¶ 91.  Henriques responded: "I think they will likely be helpful."  *Id.*

A month later, Calyon, Magnetar and Deutsche Bank executed a "warehouse side letter giving DB and Magnetar *veto rights over any warehouse asset.*"  FAC ¶ 92.  This side letter

---

[6]  The *Loreley* evidence is attached to the *Loreley* plaintiffs' proposed Second Amended Complaint, which is attached to the Affirmation of Stephen M. Plotnick in Support of Plaintiffs' Motion for Leave to Amend, which in turn is attached to the Pickhardt Decl. as Ex. ___.

provided that Deutsche Bank and Magnetar "shall have the right to object to the proposed acquisition of any asset pursuant to the Warehouse Agreement within 24 hours after notification thereof has been sent to Deutsche Bank and Magnetar by CALYON or the Investment Adviser [Putnam] (provided, that one of Calyon or the Investment Adviser will promptly provide such notification) and CALYON as the warehouse provider shall not give its approval to acquire any such asset if it has been objected to by either Deutsche Bank or Magnetar." *Id.* This agreement was, in Calyon's words, made "behind the scenes"—"between CALYON and DB & Magnetar only"—plainly in order to keep Magnetar's involvement secret from investors. *Id.*[7]

Subsequently, it is clear that Putnam did in fact allow Magnetar to exercise secret control over the Pyxis portfolio. Magnetar, both directly and through Calyon, exchanged lists of assets acceptable to Magnetar with Putnam (specifically, with Carl Bell), which included Magnetar's own CDOs (such as Orion and Cetus). FAC ¶ 93. Moreover, Magnetar made clear to Putnam that it was itself "*going to source the CDO exposure synthetically. We will buy CDO CDS* on names of your choosing at mid-market, or bid list +3bp, whatever you prefer. *Any recent mezz abs deal is fine. I can send you a list of what's in our other deals if it's helpful.*" *Id.* Prusko then provided Carl Bell with a list of "*[t]ypical names that we see in other deals a lot*," including Orion and Cetus (both Magnetar deals). *Id.*

Prusko also sent a private email to Alex Rekeda, stating that, athough he was "*not too worried about Putnam doing anything rash . . ., [i]f they add any CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look at it first.*" FAC ¶ 94.

---

[7]   Putnam was clearly also aware of this agreement, since the agreement required "Calyon or the Investment Adviser [Putnam]" to "promptly provide . . . notification" of any proposed asset purchases for Pyxis. FAC ¶ 92. Moreover, Magnetar's claim that Prusko said "No, not at all" in response to an email proposing that this agreement be made "behind the scenes" (Mag. Br. 10) ignores the fact that the final "veto" arrangement was exactly as this email described, as Defendants' subsequent conduct confirmed.

After Rekeda agreed to this, Prusko reiterated that he did not want Putnam "buying CDO's without us knowing about it," and that he would "*check in with Carl [Bell], just saw him, thought we were on the same page with us buying the cdo cds.*" *Id.*

Defendants assert that the fact that Prusko told Bell he would buy CDO CDS "on names of your choosing," and that he was concerned that Putnam might be buying CDOs without his knowledge, indicates Putnam's independence (*see, e.g.,* Put. Br. 19). However, Defendants ignore the fact that Prusko made quite clear which limited list of names he expected Putnam to "choose" from—in precisely the same disingenuous manner he adopted on numerous other Magnetar deals, which resulted in litigation that defendants were forced to settle for large amounts—and that Prusko made clear that he did not believe Putnam "would do anything rash," that he intended to stamp out any sign of such independence, that he believed he and Carl Bell "were on the same page with [Magnetar] buying the cdo cds," and that he would "check in with Carl" to confirm this. FAC ¶ 94. The fact that Putnam not only continued to act as the collateral manager but was also selected to act as the collateral manager for Pyxis 2 confirms that Putnam satisfied Magnetar on this score, since Magnetar had no compunction about excluding collateral managers from other deals when they failed to comply with its demands. FAC ¶ 50.

Putnam's cooperation with Magnetar is still further confirmed by a remarkably brazen exchange of emails between Magnetar and Deutsche Bank with respect to Orion 2006-2 Ltd. ("Orion 2"), the successor to Orion. In this exchange, Michael Henriques (Deutsche Bank) specifically contrasted Putnam's acquiescence on Pyxis with NIBC's recalcitrance on Orion 2 (on which NIBC was slated to act as collateral manager). When NIBC balked at Magnetar's and Deutsche Bank's insistence that they have the right to terminate NIBC without cause, Henriques asked if NIBC wanted to "go back to the regular style CDOs with 400mm mezz deals, scrapping

18

for cash bonds, spending 9 months on ramp-up and 3-months marketing, to get 40bps running on a 400mm balance."  FAC ¶ 96.  Henriques pointed out that "[i]n those deals there is no single party that can exercise significant control so that their smaller fee stream is virtually assured," and that "the velocity of deals is much lower and the effort to buy those 400mm of bonds will be higher than our 1.5bln."  *Id.*  Remarkably, he went so far as to say that "*[t]hese deals are not CDOs, but they are structured separate accounts*."  *Id.*  Most significantly, for present purposes, he concluded: "*I think Putnam got it.*  NIB doesn't."  *Id.*

Later in the same exchange, Henriques reiterated that "I don't think [NIBC's responses] reflect a spirit of partnership that is appropriate for a *separate account mandate*," and complained that "we are being treated like a typical 3rd party cdo investor, but does nib have any asset management clients *who directly engaged them and pay $5.5mm/yr in fees*?"  FAC ¶ 97.  Again, he drew a telling comparison to Putnam:  "*We have provided a precedent with respect to Putnam.*"  *Id.*  Thus, in seeking to convince NIBC to accede to Magnetar's and Deutsche Bank's demands to exercise control over the CDO, Henriques pointed to Putnam as an example or "precedent" of a firm willing to manage CDOs as structured accounts for the benefit of Magnetar and Deutsche Bank, understanding that they were far more than "typical 3d party cdo investor[s]."

The *Loreley* emails also confirm that, at the same time Magnetar was controlling the selection of assets for the Pyxis portfolio, it was also shorting that very portfolio, and both Calyon and Putnam knew this.  In September 2006, for example, when a Calyon employee questioned whether a trade ticket showing Magnetar purchasing the short side of a CDS for the Pyxis portfolio was correct (since he had understood it was supposed to be Citigroup), Putnam

confirmed: "*It is definitely Magnetar.*"  FAC ¶ 95.[8]  Magnetar argues disingenuously that this

short was not as large as Intesa's hedge against Pyxis (Mag. Br. 10), but, as Magnetar well

knows, this trade was merely the tip of the iceberg.  In November 2006, when Calyon asked

Prusko whether he still wanted to "buy protection on PYXIS 06-1A C (A/A2/A)," Prusko

responded—in an email which Defendants ignore—that he was "*actually pretty full on Pyxis A

unless super level, have room for AA or BBB.*"  *Id.*  In other words, according to Prusko,

Magnetar had already taken a substantial short position on Pyxis A notes, but still wanted to buy

more protection on other classes of Pyxis notes.

Indeed, even according to Magnetar's self-serving letter to investors in response to

ProPublica's April 9, 2010 article discussing its CDO program, Magnetar's short positions on the

CDOs in which it invested averaged approximately 7% of the aggregate assets of those CDOs.

*See* Pickhardt Decl. Ex. E, p. 5.  Thus, even assuming the accuracy of that statement, if Pyxis

was merely an *average* Magnetar CDO, Magnetar's short positions on Pyxis—with Pyxis'

aggregate assets of $1.5 billion—would have totaled $105 million.  Moreover, a review of the

publicly available information for the Constellation CDOs alone reveals that Magnetar bought

protection on Pyxis from dealers who offset their exposure by buying protection from at least the

---

[8]  This trade ticket provides still further support for the inference that Putnam abdicated its portfolio selection responsibilities to Magnetar.  Despite Putnam's confirmation that the trade should be booked to Magnetar, the CDS premium and amount of the trade do not correspond to any trade in the Pyxis portfolio.  They do, however, correspond to a trade in the portfolio of a separate Magnetar CDO, Octans III, which was managed by Harding Advisory and underwritten by Citigroup, and in which Putnam was not involved.  Thus, it appears that Calyon executed a trade for Pyxis that Magnetar actually intended for Octans III.  (Moreover, this particular trade was an unusual "offset trade" of the type common in several Magnetar CDOs with large ABX Index exposures.)  The most plausible explanation for this is that Magnetar got the trading orders for two of its deals mixed up, that Putnam instructed Calyon to execute the trade for Pyxis at Magnetar's direction, and that Putnam then reversed the instruction when it discovered that Magnetar in fact wanted the trade to be made for Octans III.  In other words, Putnam was following Magnetar's orders, not exercising its own independent judgment.

following Magnetar CDOs: Draco ($10 million), Cetus 2006-4 ($10 million), Octans 2006-2 ($10 million), Cetus 6-2 ($10 million), Volans ($6.888 million), and Delphinus ($13.3 million)— a total of more than $60 million.[9]  In addition, Magnetar appears to have bought protection on Pyxis from dealers who offset their exposure by buying protection from numerous other non-Constellation CDOs, possibly totaling far more than $60 million.[10]  In May 2012, for example, details emerged of Magnetar's involvement in Class V Funding III CDO ("Class V III"), in claims brought by the SEC against Citigroup concerning their role in structuring and marketing Class V III.  FAC ¶ 124.  The Citigroup claims were settled for *$285 million*—a settlement the Court rejected as *inadequate*.  *See SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).  FAC ¶ 126.  Documents filed in support of the SEC's claims include a number of emails from September and October 2006—around the time Pyxis closed—in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals— including Pyxis—which were being considered for inclusion in the Class V III portfolio.  This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko.  FAC ¶ 125.  In September 2006, Prusko told Citigroup that

---

[9]   The sales of protection by these Magnetar CDOs to the dealers in question are shown in the publicly available Intex files for these deals.  (Intex is a service that monitors the performance of CDOs and RMBS securities.)  It is reasonable to assume that these sales resulted from sales of protection by these dealers to Magnetar, given that Magnetar used all of these dealers regularly and that, in its investor letter, Magnetar conceded that it was plausible that "all of Magnetar's protection instruments became assets of the various CDOs in which we held equity, to the extent that the assets in the CDOs' warehouses corresponded to the protection instruments held by Magnetar."  Pickhardt Decl. Ex. E, p. 5.

[10]   It appears from Intex files that these CDOs included: 888 Tactical, Class V III, Grand Avenue, GSC ABS 2006-3, Jupiter HG 6, Lex Capital V, Octonion, Plettenburg Square, Raffles, Tricadia 6-7, Tricadia 7-8, West Trade 2, West Trade 3, Cookson 2007-36 and Cookson 2007-37.  Again, given that Magnetar regularly used most of the underwriters of these CDOs and that most of the dealers also underwrote Magnetar CDOs, it is reasonable to assume that many of the CDOs' sales of protection to these dealers resulted from sales of protection by the dealers to Magnetar.

buying protection on various CDOs in the Class V III portfolio "is a top priority for me!"  *Id.*
Subsequently, he said he would like Class V III to sell him protection on various CDOs "*as well
as any of my deals of course*."  *Id.*  He then provided Citigroup with a full list of deals against
which he wanted to buy protection, which again specifically included Pyxis.  *Id.*

### 2.    Close Relationship between Pyxis and Other Magnetar CDOs

Calyon's and Putnam's acquiescence in Magnetar's control of the Pyxis portfolio is
further confirmed by Pyxis' heavy investment in Magnetar's preferred assets.  Indeed, Putnam
ultimately invested over half of Pyxis's cash allocated to CDO investments in four other
Magnetar CDOs, which in turn were invested in yet more Magnetar CDOs, meaning that Pyxis
ultimately had exposure to at least fifteen Magnetar CDOs, all of which were designed to fail.
None of this was disclosed to Intesa before closing.  FAC ¶ 101.[11]

Remarkably, three of the Magnetar CDOs in which Pyxis invested did not close until well
after Pyxis closed, meaning that Putnam, at Magnetar's behest, had already agreed to purchase
tranches of other Magnetar CDOs before these CDOs were issued.  FAC ¶ 102.  Pyxis's
investment in these three CDOs was also not disclosed to Intesa on the portfolio spreadsheet
provided by Calyon in August 2006.  *Id.*  Even on other Magnetar deals, no collateral manager
added more Magnetar CDOs to a portfolio after the deal had closed than Putnam, and, after the
first five Magnetar CDOs had closed, no collateral manager added *as many* such CDOs post-
closing as Putnam.  *Id.*  Moreover, also unbeknownst to Intesa, at least six other Magnetar CDOs
owned securities issued by Pyxis.  *Id.*

---

[11]    Magnetar tries to make something of the fact that these were only four of the 125
assets in which Pyxis was required to invest (Mag. Br. 12), but it ignores the fact that these four
assets accounted for half of Pyxis' cash allocated to CDO investments.

Pyxis was thus a pawn in Magnetar's cross-ownership scheme among the Constellation CDOs to create a market for these CDOs to build Magnetar's shorting positions. The extensive web of deception and interrelationships between the Magnetar CDOs, including Pyxis, is graphically illustrated on p. 38 of the Amended Complaint (in an exhibit which is reproduced in color as Exhibit M to the Pickhardt Decl.). In addition, there was an undisclosed, remarkably high correlation between the assets selected for Pyxis and the assets held by other Constellation CDOs. For instance, $700 million of the Pyxis portfolio (that is, nearly half) was included in at least three other Magnetar CDOs; $450 million was included in at least four Magnetar CDOs; and $200 million was included in at least six Magnetar CDOs. FAC ¶ 105.

### 3.    High Concentration of Low-Rated ABX Index RMBS

Further demonstrating Magnetar's control over the Pyxis portfolio to ensure that it was built to fail, Calyon and Putnam concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS, by causing Pyxis to sell protection against both the ABX Index itself and the individual constituent RMBS in the ABX Index. FAC ¶ 106. In total, Pyxis sold protection on $240 million of RMBS comprising constituents included in the ABX BBB- 06-1 and ABX BBB- 06-2 Indices—more than three times the specified concentration limit for Pyxis. *Id.* By dramatically increasing the risk profile of the Pyxis portfolio, this deception worked in favor of a net short investor like Magnetar, at the expense of long investors like Intesa.

### 4.    "Dummy" RMBS Assets

In addition, although the Pyxis "target portfolio" provided to Intesa by Calyon and Putnam included at least $60 million of prime RMBS assets, the final ramped portfolio did not contain a single prime RMBS asset. FAC ¶ 107. This is particularly telling since as of August 2006—two months before the deal's close—Putnam had actually slated Pyxis to purchase over $160 million of prime RMBS assets. *Id.* In effect, these purported prime RMBS assets were

merely "dummy" assets which were included on the target portfolio to induce investors to invest in Pyxis notes, but which neither Calyon nor Putnam ever had any intention of actually purchasing.  This behavior closely mirrored the behavior of Alex Rekeda's team a few months after Pyxis closed when—working now for Mizuho—they included "dummy assets" in a target portfolio to secure more attractive ratings for the Delphinus portfolio, resulting in claims brought by the SEC which Mizuho settled for $127.5 million in July 2012.  *See* Pickhardt Decl. Ex. L.

### 5.     The March 2007 Valuation

Moreover, in March 2007, just a month before the Pyxis Swap was executed, Calyon provided Intesa with a valuation of the Pyxis portfolio which Intesa's subsequent valuation of the portfolio as of the date of Calyon's valuation has revealed to be egregiously false (overstating the value of the portfolio by over 60%).  FAC ¶¶ 128-129.  It is not plausible that such a drastic difference in valuation could be the result of legitimately differing opinions.  Rather, it is clear that Calyon's absurd over-valuation must have resulted from its desire to continue to conceal the fact that the Pyxis portfolio had not been chosen by a reputable collateral manager acting independently and in good faith in the interests of long investors, but had been built to fail at the behest of a net short investor.  FAC ¶ 130.

### 6.     Magnetar's Control of Its Other CDOs

In addition, documentary evidence which has come to light in litigation relating to numerous other Magnetar CDOs makes clear that Magnetar exercised tight control over the selection of the portfolio for all of its CDOs to ensure that they were loaded with lower quality assets that would result in the portfolio's failure.  Contrary to Defendants' assertions, these documents are highly relevant, since they reveal that Magnetar engaged in a strikingly similar course of conduct for all of its deals, rendering all the more plausible Intesa's allegations that Putnam allowed Magnetar to control the selection of the Pyxis portfolio.

***Orion and Orion* 2**      Evidence from the *Loreley* litigation, for example, shows that during the warehousing process for Orion, Jim Prusko told Alex Rekeda and Michael Henriques that "Arjun Kakar [NIBC] is going to send me a list of CDO's [for Orion] tomorrow.  *We will buy protection from the deal on agreed upon names and that will fill the bucket*."  FAC ¶ 109. With respect to Orion 2, Magnetar and Deutsche Bank insisted on the right to terminate NIBC as the collateral manager without cause, and threatened to remove it from the deal if it did not cooperate.  *Id.*  NIBC appears to have capitulated, since it did ultimately act as the collateral manager for that deal.  *Id.*

The *Loreley* plaintiffs' claims against Calyon and Putnam with respect to Orion were settled for an undisclosed amount.  FAC ¶ 100.

***Squared***      Similarly, emails disclosed by the SEC in a lawsuit it brought against J.P. Morgan Securities LLC with respect to its structuring and marketing of Squared CDO 2007-1 ("Squared") reveal that Magnetar regarded its equity position in Squared as "basically nothing," that Magnetar was "*just doing it [i.e., taking the equity position]. . . to buy some protection,*" and that, by the time the deal closed in May 2007, Magnetar's $600 million short position completely dwarfed its $8.9 million long position.  FAC ¶ 110.  This evidence also shows that Magnetar exchanged lists of proposed CDO securities for the Squared portfolio with the collateral manager (GSC) and J.P. Morgan, indicating which securities it wanted to short, and that its recommendations were all complied with.  FAC ¶¶ 111-12.  After Magnetar characterized one list of names sent by J.P. Morgan, which included ten names Magnetar did not want, as "stupid," and stated that it needed to "*use GSC to get some decent shorts off on the balance of the portfolio,*" all ten securities to which Magnetar objected were excluded from the portfolio.  FAC ¶ 112.  Similarly, after GSC sent Magnetar a list of bonds they had discussed for the portfolio,

"*highlight[ing] the names which [Magnetar] had interest in shorting into the deal,*" additional

lists were exchanged between Magnetar and J.P. Morgan.  JP Morgan eventually sent GSC an

updated portfolio stating: "*These are the names and levels agreed with Magnetar.*"  FAC ¶ 113.

The SEC's claims against J.P. Morgan were settled for $153.6 million.  FAC ¶ 114.

*Norma*          Various emails that became public in an investor lawsuit brought against

Merrill Lynch for its role in structuring and marketing Norma CDO 1 ("Norma")[12]  reveal, for

example, that, just as it did on Pyxis, Magnetar blatantly usurped the role of the collateral

manager (NIR) in directing Merrill on what purchases to execute for Norma, stating: "Here is the

first batch of protection purchases I'm planning for NIR."  FAC ¶ 116.  This led to a Merrill

email stating that "*[a]pparently NIR allowed Magnetar to do some trading for their [Norma]*

*portfolio (in the area of 600MM).  This accounted for a large chunk of trading that NIR*

*originally didn't recognize.*"  *Id.*  Magnetar's behavior was so extreme that it prompted a Merrill

corporate risk manager to ask: "*Dumb question.  Is Magnetar allowed to trade for NIR?*"  *Id.*

Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the

selection of the assets.  One Magnetar email stated, echoing Jim Prusko's statement to Alex

Rekeda just two months earlier with respect to Pyxis: "*I definitely want to approve any CDO's*

*that go in the deal*."  FAC ¶ 117.  Another Magnetar email rejected a NIR request to include

TABS 2006-6A cash bonds in the portfolio, stating: "Afraid so, tabs in particular *I don't want the*

*cash in there.*"  *Id.*

Merrill settled the claims against it for an undisclosed amount.  FAC ¶ 119.

*Carina*          Emails that came to light in a proceeding brought by the Commonwealth

of Massachusetts against State Street Global Advisors ("State Street") for its role as the collateral

---

[12]   *See Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") v. Merrill Lynch & Co., Inc.*, Index No. 601832/09 (N.Y. Sup. Ct. N.Y. County Aug. 19, 2009).

manager on Carina CDO ("Carina") show, for example, that Magnetar discussed the Carina portfolio selection process with State Street, saying that it wanted, among other things, to "[d]iscuss ramping strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing.  Just talk briefly a few times a week."  FAC ¶ 121. State Street responded, "*Absolutely.*"  *Id.*  When, a few weeks later, State Street listed ten ABS CDO tranches on which State Street proposed to sell protection to establish a portion of Carina's synthetic exposure, Magnetar replied that it would "*buy protection on the four 06 deals at best bid+50bp.*"  FAC ¶ 122.

State Street settled the claims against it for $5 million.  FAC ¶ 123.

*Class V III*     As noted above, emails disclosed in the SEC's lawsuit against Citigroup with respect to their role in structuring the Class V III CDO indicate Magnetar's involvement in Class V III, including its exploration of the possibility of taking both an equity position and a more substantial short position on the CDO.  FAC ¶ 124.  Citigroup agreed to settle the SEC's claims for $285 million—a settlement the Court rejected as *inadequate.*  FAC ¶ 126.

### E.    Defendants Profited from Their Fraud

Calyon, Magnetar and Putnam all benefited from their fraudulent conduct with respect to Pyxis.  Calyon reaped tens of millions of dollars in underwriting fees for its role in structuring Pyxis and other Constellation CDOs for Magnetar, as well as fees for acting as the protection buyer on the credit default swaps that constituted most of Pyxis' portfolio.  FAC ¶ 132. Moreover, had Calyon not succeeded in persuading Intesa to provide protection on the Class A-1 notes, it would have been stuck with $180 million in losses on those notes.  *Id.*  Similarly, Putnam earned larger than usual fees with relatively little risk or effort for serving as the collateral manager on both Pyxis and Pyxis 2 (neither of which positions it would have secured had it not cooperated with Magnetar).  FAC ¶ 134.  And Magnetar pocketed a huge sum on Pyxis

when the portfolio it had selected collapsed as planned (FAC ¶ 133)—conservatively, at least

$80 million.  *See* p. 20 above.

> **F.     Intesa's Losses**

By contrast, when Pyxis defaulted, Intesa was obliged to make $180 million in credit

protection payments under the Pyxis Swap.  FAC ¶ 135.  In return, Intesa received Class A-1

Pyxis notes from Calyon, which are virtually worthless.  *Id*.  Intesa has thus lost $180 million as

the result of Defendants' fraud.

## ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), the Court must "assume all 'well-

pleaded allegations' to be true, and 'determine whether they plausibly give rise to an entitlement

to relief.'"  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v.

Iqbal*, 129 S. Ct. 1937, 1950 (2009)).  The Court must "construe plaintiff's complaint liberally,

accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in

plaintiff's favor."  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation

marks omitted).

In addition, "the Court may consider documents that are referenced in the complaint,

documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's

possession or that the plaintiff knew of and relied on when bringing suit, or matters of which

judicial notice may be taken."  *Naughright v. Weiss*, __ F. Supp. 2d __, 2012 WL 760185, *4

(S.D.N.Y. Mar. 8, 2012); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d

Cir. 2007).

Although, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a

securities fraud claim under Rule 10b-5 must be pled with particularity, 15 U.S.C. § 78u-

4(b)(1),(2), on a common law fraud claim under Fed. R. Civ. P. 9(b), "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."  Moreover, neither the PSLRA nor Rule 9(b) can be read in a vacuum.  "The requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives … of Rule 8 that the pleadings contain 'a short and plain' statement of the claims or defense and (that) each averment should be 'simple, concise and direct."  *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557-58 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980).  As this Court held, in a case decided before the PSLRA but in words which remain directly applicable here: "The Complaint here satisfies the requirements of Rule 9(b).  It does not simply assert fraudulent or deceptive conduct, but instead reasonably details the bases for these allegations.  What defendants seem to demand is a pre-trial memorandum containing all the evidentiary support for plaintiffs' case."  *Pellman v. Cinerama, Inc.*, 503 F. Supp. 107, 110 (S.D.N.Y. 1980).  Despite Defendants' attempts to obscure the true basis of Intesa's claims, raise factual disputes regarding its allegations, and introduce wholly new allegations outside the four corners of the Amended Complaint, Intesa has more than met its pleading obligations under Rule 8, Rule 9(b) and the PSLRA.

## I.  INTESA HAS ADEQUATELY ALLEGED THAT BOTH CALYON AND PUTNAM COMMITTED SECURITIES FRAUD AND COMMON LAW FRAUD

To state a claim for securities fraud under Rule 10b-5, the plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011) (citation omitted).

To state a claim for common law fraud under New York law, "the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance and injury."  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999).

The particularized allegations in the Amended Complaint more than satisfy the pleading requirements for both securities fraud and common law fraud.

> **A.** **Intesa Has Adequately Alleged that Both Calyon and Putnam Represented that the Pyxis Portfolio Would Be Selected by Putnam, Acting Independently, Diligently and in Good Faith**
>
> **1.** **Calyon and Putnam Are Equally Responsible For The Misrepresentations and Omissions In The Offering Materials**

As set forth above, the Amended Complaint alleges numerous specific representations and omissions of material fact made by Calyon and Putnam in marketing Pyxis to Intesa.  The July 2006 launch email and Pitchbook, and the October 2006 Offering Memorandum, prepared by Calyon and Putnam, represented that Putnam would act as the Collateral Manager for Pyxis; that it would "select and manage the Collateral"; that it would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing"; that it was highly experienced and a "[l]eader in compliance and transparent business practices"; and that its "goal is to generate excellent long term investment results."  (*See* pp. 13-15 above.)[13]

Calyon's attempt to shift responsibility onto Putnam for these representations by arguing that the Collateral Manager sections of the Pyxis Pitchbook and Offering Memorandum were prepared by Putnam, ignores Calyon's shared responsibility for large portions of these

---

[13]   Putnam's attempt to play down some of these misrepresentations as "puffery" (Put. Br. 23) ignores the fact that Defendants specifically represented that Putnam would select the Pyxis collateral, acting diligently, independently and in good faith, and that their further misrepresentations were all clearly intended to—and did—reinforce this core misrepresentation.

documents—including portions of the Collateral Manager sections[14]—which contained the same representations, and that Calyon bore joint responsibility with Putnam for the entire Pyxis launch email, which also contained these representations.  Calyon and Putnam made similar oral representations to Intesa during the negotiations for the Pyxis Swap.  FAC ¶ 80.  And at no point during these negotiations did either Calyon or Putnam disclose Magnetar's involvement in Pyxis, much less the fact that Magnetar, not Putnam, would control the selection of the Pyxis portfolio and that Magnetar was also taking a large net short position on Pyxis.  These representations and omissions were crucially important to Intesa; had Intesa known the true facts, it would never have entered into the Pyxis Swap.[15]

These allegations are more than sufficient to meet Intesa's burden to plead both Calyon's and Putnam's alleged misrepresentations and omissions with particularity.

### 2. General Boilerplate Disclaimers Do Not Prevent Intesa from Making a Fraudulent Inducement Claim Based on Calyon's Misrepresentations

Calyon's attempt to avoid liability for its misrepresentations and omissions by referencing general boilerplate disclaimers, including that Intesa was not relying on any representation by Calyon as of the trade date (Cal. Br. 11-12) and that investors must rely on their own examination of the co-issuers and the terms of the offering, including the merits and

---

[14]  *See, e.g.*, Pickhardt Decl. Ex. C (Offering Memorandum), p. 187 ("The Collateral Manager has provided the information contained in this section relating to the Collateral Manager (*other than the information contained under the subheading 'General'*)").  (Emphasis added).

[15]  Defendants' assertion (Cal. Br. 15) that Intesa was aware that some party must necessarily be taking short positions on Pyxis is irrelevant.  Intesa did not know, and could not have known, that the party taking those positions was the same party that was selecting the Pyxis portfolio.  Moreover, the fact, relied on by Magnetar (Mag. Br. 11), that the Offering Memorandum disclosed that "it is possible that Putnam could sell a security short that was held in other clients' portfolios" (Kuck Decl. Appx. A at 8) is also beside the point.  This disclosure falls far short of indicating that the party selecting the Pyxis portfolio might be taking a huge net short position on Pyxis on its own account.

risks involved (Cal. Br. 13 n. 13), are without merit because the disclaimers do not specifically

apply to the misrepresentations alleged by Intesa.  It is well established in this Circuit that

general disclaimers are "ineffective … to preclude parol evidence that a party was induced to

enter the contract by means of fraud….  Thus, even when the contract contains 'an omnibus

statement that the written instrument embodies the whole agreement, *or that no representations*

*have been made*,' a party may escape liability under the contract by establishing that he was

induced to enter the contract by fraud."  *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315

(2d Cir. 1993).

      "The only exception to this rule is where 'a contract … contains explicit disclaimers of

the specific representations that form the basis of the claim for fraudulent inducement.'" *Kwon v.*

*Yun*, 606 F. Supp. 2d 344, 358 (S.D.N.Y. 2009) (internal citations omitted); *see also Danann*

*Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959); *Mfrs. Hanover*, 7 F.3d at 315.  "[T]he

touchstone is specificity."  *Mfrs. Hanover*, 7 F.3d at 316.  Thus, this exception only applies

"where the substance of the disclaimer provisions tracks the substance of the alleged

misrepresentations."  *Grumman Allied Indus.,Inc. v. Rohr Indus., Inc.* 748 F.2d 729, 735 (2d Cir.

1984).

      In *Mfrs. Hanover,* the guarantee at issue was held not to bar a fraudulent inducement

claim because, among other things, (1) "there is no indication that [the disclaimer] is anything

but a generalized boilerplate exclusion," which was "apparently used routinely," and "[t]here

was no evidence that the scope or character of the [disclaimer] was the product of any

negotiations between the parties"; (2) "[m]ore importantly, the [disclaimer] does not purport to

waive any defenses to its own validity"; and (3) the guarantee "does not, in words or substance,

contain disclaimers of the representations that formed the basis of the claim of fraudulent inducement." *Id.* at 317-18.[16]

Similarly here, the disclaimers on which Calyon relies are boilerplate general disclaimers which (1) were obviously not negotiated between the parties (the "no representation" disclaimer is not even contained in the Pyxis Swap confirmation, but rather in the ISDA Credit Derivatives Definitions); (2) do not waive a fraudulent inducement claim or any other defense to their own validity; and (3) do not specifically exclude Intesa's reliance on any misrepresentation by Calyon relating to Putnam's role as collateral manager to found a fraudulent inducement claim.  Thus, under the reasoning of *Mfrs. Hanover*, these disclaimers do not bar any of Intesa's claims against Calyon.

Moreover, even if the "no representations" disclaimer were effective, on its face it would only bar Intesa's reliance on misrepresentations by Calyon up to the Pyxis trade date (October 2006), not on any of the alleged misrepresentations or omissions which occurred after that date and before execution of the Pyxis Swap (April 2007).

---

[16]   By contrast, in *MBIA Ins. Corp. v. Merrill Lynch*, *Pierce, Fenner & Smith Inc.*, 81 A.D.3d 419 (1ˢᵗ Dep't 2011), the case on which Calyon relies (Cal. Br. 12), the disclaimers at issue were held to be sufficiently specific to bar plaintiffs' fraud claims because the alleged misrepresentations related to the credit quality of the collateral in the CDOs at issue (*see* lower court decision, 911 N.Y.S.2d 694, 694 (N.Y. Sup. Ct. 2010)) and the disclaimers specifically provided "that plaintiff Lacrosse would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that it understood and accepted the risks."  81 A.D.3d at 419.  In addition, the court held that MBIA had waived its defenses to payment under its guaranties (81 A.D.3d at 420); among other things, MBIA's policy expressly provided that MBIA "'unconditionally and irrevocably guarantees to Merrill Lynch International [full payment on behalf of Lacrosse of any insured amount] without the assertion of any defenses to payment, *including fraud in the inducement or fact*."  911 N.Y.S.2d at 695 (emphasis added).

**B.      Intesa Has Adequately Alleged that the Pyxis Portfolio Was Selected by Magnetar, Not Putnam, and that Calyon's and Putnam's Representations and Omissions Were Therefore False and Misleading**

As set forth above, the Amended Complaint also contains a wealth of allegations supporting its claims that, with the full knowledge and collusion of all Defendants, the Pyxis Portfolio was selected not by Putnam, but by Magnetar.

Defendants attempt to deflect attention from these allegations by asserting that Intesa has not alleged that the Pyxis Portfolio failed to comply with the eligibility requirements for Pyxis and that Pyxis has no claim based on the composition of the Pyxis portfolio.  (Cal. Br. 14)  This is pure misdirection.  In the first place, the Amended Complaint alleges that Defendants circumvented the Pyxis portfolio's concentration limits on low-rated RMBS sold on the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and its individual constituent RMBS.  These investments—which created far greater effective exposure for Pyxis to the ABX Index than was contemplated or permitted—plainly contravened the spirit if not the letter of the Pyxis eligibility requirements.  But, far more importantly, Defendants' argument willfully misconstrues Intesa's allegations.  Intesa's claims are not predicated on any misrepresentations by Defendants concerning the eligibility requirements, but rather on Defendants' misrepresentations and omissions concerning *who selected* the Pyxis portfolio, and specifically their concealment of the fact that Magnetar, not Putnam, controlled the selection process at the same time as it was taking a huge net short position against Pyxis.[17]

---

[17]   Thus, *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012)—relied on by Calyon (Cal. Br. 14) is irrelevant.  In that case, HSH alleged that UBS induced it to enter into a CDS by misrepresenting the risk involved, which HSH could have discovered by ordinary due diligence, and with respect to which the disclaimers in the various deal documents precluded HSH from relying on defendants' representations.  By contrast, since Intesa's claims are predicated on representations concerning not portfolio risk, but rather who selected that portfolio, the disclaimers in the relevant documents are inapplicable.  *See* Part I.A.2 above.

When they do address Intesa's actual allegations, Defendants can do little but carp that a few pieces of the voluminous evidence referred to in the Amended Complaint, taken in isolation, might be open to differing interpretations. However, taken as a whole, the import of this evidence is quite clear. The *Loreley* evidence alone—which related specifically to Pyxis and which appears to have prompted Calyon to settle the investors' claims shortly after it came to light—shows that:

- Jim Prusko (Magnetar) insisted that Putnam would "*have to play ball*" on Pyxis, and Michael Henriques (Deutsche Bank) responded: "*I think they will likely be helpful.*"

- Calyon, Magnetar and Deutsche Bank executed a "*behind the scenes*" "warehouse side letter giving DB and Magnetar *veto rights over any warehouse asset.*"

- Magnetar, both directly and through Calyon, exchanged lists of assets acceptable to Magnetar with Putnam (specifically, Carl Bell, Prusko's former subordinate at Putnam), which included Magnetar's own CDOs (*e.g.,* Orion).

- Magnetar made clear to Putnam that it would "source the CDO exposure" for Pyxis itself, and that it would "buy CDO CDS," nominally on names of Putnam's choosing, but with clear limitations on the assets Putnam could choose from: "*I can send you a list of what's in our other deals if it's helpful*;" "*Typical names that we see in other deals a lot*" (including Orion and Cetus—both Magnetar deals).

- Prusko told Alex Rekeda (Calyon) that he was "*not too worried about Putnam doing anything rash . . . . If they add any CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look at it first.*" After Rekeda agreed to this, Prusko reiterated that he did not want Putnam "buying CDO's without us knowing about it," and that he would "*check in with Carl [Bell], just saw him, thought we were on the same page with us buying the cdo cds.*"

- An email showing that Putnam asked Calyon to execute a trade for Pyxis, with Magnetar as the short counterparty, on a security which actually ended up not in Pyxis but in Octans III—another Magnetar deal—indicates that Putnam instructed Calyon to execute the trade for Pyxis *at Magnetar's direction*, and then reversed the instruction when it discovered that Magnetar wanted the trade to be made for Octans III. (*See* p. 20 n. 8 above.)

- Michael Henriques (Deutsche Bank) specifically contrasted Putnam's acquiescence on Pyxis with NIBC's recalcitrance on Orion 2, saying: "*These deals are not CDOs, but they are structured separate accounts . . . I think Putnam got it. NIB doesn't.*"

- Putnam was selected to act as the collateral manager on Pyxis 2, further confirming that Magnetar was satisfied with its level of cooperation.

*See* pp. 15-20 above.  In addition to the *Loreley* evidence, the Amended Complaint sets forth detailed allegations that (1) there was a remarkably close interrelationship between Pyxis and other Magnetar CDOs (*see* p. 22 above); (2) the Pyxis portfolio contained three times the permitted concentration of low-rated ABX Index RMBS assets (making it more likely to fail) (*see* p. 23 above); (3) $60 million of "dummy" prime RMBS assets were included in the Pyxis target portfolio to make it more attractive to investors (*see* p. 23 above); (4) Calyon provided an egregiously false March 2007 valuation of the Pyxis portfolio, which was plainly designed to lull Intesa into believing that Putnam had done its job in diligently selecting a strong portfolio (*see* p. 24 above);[18] and (5) Magnetar exercised tight control over the portfolios of its CDOs generally in order to protect its short positions on those CDOs, rendering it even less plausible that Magnetar might have allowed Putnam to select the assets for the Pyxis portfolio (*see* pp. 24-27 above).

Taken together, the allegations predicated upon this evidence amply support the reasonable inference —far more than is needed to survive a motion to dismiss—that, with the full knowledge and collusion of Calyon and Putnam, Magnetar controlled the selection of the Pyxis portfolio, and that Calyon and Putnam's representations and omissions concerning this selection process were therefore false and misleading.

---

[18]   This false valuation further distinguishes this case from *HSH v. Nordbank,* where, as Calyon notes (Cal. Br. 14), one of the grounds for the court's decision was that HSH never asked UBS to provide any alternative analysis of the transaction in its possession.  95 A.D.3d at 197-98.  Calyon in fact provided Intesa with its purported analysis of Pyxis, which was simply false.

###### C.     Intesa Has Adequately Alleged Scienter against Both Calyon and Putnam

Contrary to Calyon's and Putnam's assertions, Intesa has adequately alleged facts creating a "strong inference" of scienter against both Calyon and Putnam.  A plaintiff alleging securities fraud can establish scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, *or even the most plausible of competing inferences* . . . , [but merely] cogent and *at least as compelling* as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007) (emphasis added).  Moreover, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (emphasis in original).

The Amended Complaint's particularized factual allegations more than meet this standard, alleging both conscious misbehavior *and* motive and opportunity against Calyon and Putnam, and creating an inference of fraudulent intent that is substantially *more* compelling than any opposing inference.  Calyon's and Putnam's conscious misbehavior is adequately pled by, among other things, allegations of (1) their complicity in the secret side letter between Calyon, Magnetar and Deustche Bank granting Magnetar "veto power" over any assets proposed for inclusion in the Pyxis portfolio (of which Putnam must also have been aware, since the letter required "Calyon *or the Investment Adviser [Putnam]*" to "promptly provide . . . notification" of any proposed asset purchases); (2) Putnam's knowing abdication to Magnetar of its responsibility to select the Pyxis portfolio; and (3) Calyon and Putnam's conscious acquiescence in Magnetar's shorting of Pyxis at the same time as it selected the portfolio.

In addition, the Amended Complaint provides compelling allegations of Calyon's and Putnam's motive.  Contrary to Defendants' assertion (*see, e.g.,* Cal. Br. 19), "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 551 U.S. at 325.[19]  The Amended Complaint alleges that Calyon's motive was to reap tens of millions of dollars in fees for structuring Pyxis and other CDOs for Magnetar, and for arranging the transactions by which Intesa sold protection other CDOs (including Magnetar CDOs).  Calyon also passed off onto Intesa through the Pyxis Swap $180 million in losses on the Class A-1 Pyxis notes which it would otherwise have borne itself.  Moreover, Calyon's assertion that it was Intesa's largest shareholder at the time of the Intesa Swap and that it therefore had no motive to defraud Intesa (Cal. Br. 19) is not only outside the four corners of the complaint but both factually wrong and irrational.  Calyon's total shareholding in Pyxis dropped from 17.8% when Pyxis closed (in October 2006) to only 5.4% just three months later, so that by the time the Pyxis Swap was executed, on April 24, 2006, Calyon was no longer Intesa's largest shareholder.  Moreover, the amount Calyon would have lost on its 5.4% shareholding as the result of any loss sustained by Intesa on the Pyxis Swap would have been minimal, and obviously far less than the amount Calyon stood to gain by its fraud.  Moreover, Calyon's argument assumes not only that everyone at Calyon knew what everyone else was doing, but that their interests were all aligned, which is plainly not true.  Indeed, this is confirmed by the wholesale departure of Alex Rekeda's team to Mizuho shortly after Pyxis closed (resulting in bitter litigation with Calyon), which suggests that

---

[19]   The cases cited by Defendants merely hold that a generalized profit motive, without more, is not sufficient to provide a compelling inference of scienter.  *See, e..g.*, *Footbridge Ltd. v. Countrywide Home Loans, Inc.,* 2010 WL 3790810, *20 (S.D.N.Y. Sept. 28, 2010).

at least those Calyon employees who worked on the Pyxis deal did not have Calyon's larger interests at heart, nor indeed any interests other than their own.[20]

The Amended Complaint also alleges that Putnam had a compelling motive to commit fraud, namely to secure unusually large fees, even by Magnetar's lucrative deal standards, with relatively little effort or risk, by serving as the putative collateral manager for Pyxis.  This is confirmed by the emails in the *Loreley* litigation attesting to the benefits of acting as the collateral manager on a Magnetar CDO as opposed to a typical CDO.  *See* p. 17 above. Putnam's assertion that its fees on Pyxis were not unusually large focuses solely on its fee percentage (20 basis points rather than the customary 40 basis points for CDO collateral managers), and ignores the fact that (1) Pyxis, like all of Magnetar's CDOs, was almost four times larger than a typical CDO, so the dollar value of Putnam's fees would be twice as high as a typical CDO manager's; (2) 75% of its fee (15 basis points) was fixed (higher than the fixed fee on most Magnetar CDOs); and (3) its "incentive fee" of  was, as emails between Magnetar, Deutsche Bank and Calyon attest, "virtually assured" by Magnetar's "significant control" over Pyxis.  *See* p. 17 above.  Moreover, Putnam secured additional lucrative deal volume from its cooperation with Magnetar when it was chosen as the collateral manager for Pyxis 2 a few months after Pyxis closed—which would certainly not have happened had it not cooperated with Magnetar on Pyxis.  *See* FAC ¶ 50.

---

[20]   Calyon's further argument that it would have been irrational for it to attempt to become an industry leader by arranging CDOs designed to lose money (Cal. Br. 20) is unfounded for the same reason, and also because Calyon could perfectly rationally believe (as Magnetar did) that the entire CDO business was destined to crash eventually, and there was little to lose by building CDOs to fail if Magnetar made it worth its while to do so and the market was likely to be short-lived in any event.

## II.      INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR AIDED AND ABETTED FRAUD

As set forth above, Intesa has adequately alleged fraud against Calyon and Putnam.[21]  In order to establish that Magnetar aided and abetted that fraud, Intesa need only allege facts showing that (1) Magnetar had actual knowledge of the fraud; and (2) that it provided substantial assistance to advance the fraud.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006).  Intesa has met both of these requirements.

### A.      Intesa Has Adequately Alleged that Magnetar Had Actual Knowledge of the Pyxis Fraud.

Contrary to Magnetar's assertion (Mag. Br. 15), Intesa has alleged numerous specific facts giving rise to a strong inference that Magnetar not only had actual knowledge of, but *directed*, the Pyxis fraud.  "Actual knowledge" may be pled by alleging "circumstances indicating conscious behavior by the defendant, or a clear opportunity and a motive to aid the fraud."  *Burns v. Del. Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 30 (S.D.N.Y. 2011).  Intesa alleges that Magnetar was well aware that investors believed that Putnam, as the putative collateral manager, was selecting the Pyxis portfolio; that Magnetar was in fact selecting that

---

[21]      Magnetar's argument that the claims against it must be dismissed because Intesa has failed to identify which of the Magnetar defendants committed which fraudulent acts (Magnetar Br. 13) is without merit.  None of the cases cited by Magnetar involved defendants under common control, like the Magnetar Defendants.  *See* FAC ¶ 17 ("Magnetar Financial and Magnetar Capital Fund ... are controlled by Magnetar.").  In an analogous context, the Second Circuit has held that "no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders *or affiliates* participating in the offer of the securities in question."  *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) (emphasis added); *see also In re Ann Taylor Stores Sec. Litig.*, 807 F. Supp. 990, 1005 (S.D.N.Y. 1992) ("group pleading doctrine" allows plaintiff to leave "development of individual liability questions until some discovery has been undertaken, rather than to dismiss the plaintiff because he does not have what may be concealed information.")  On precisely the same basis, Intesa should be permitted to allege its claims against the Magnetar Defendants generally at this stage of the litigation, especially given that the Magnetar Defendants are privately-owned and their internal operations are notoriously opaque.

portfolio itself; and that Magnetar knowingly helped conceal its role in the selection process (for example, by executing a side letter "behind the scenes" granting it veto rights over the portfolio) in order to lure investors, including Intesa, into Pyxis and to secure the long investments without which its fraudulent scheme would founder.  These allegations clearly indicate conscious misbehavior by Magnetar.

Moreover, Intesa has also adequately alleged that Magnetar had both the motive and opportunity to commit fraud.  Again, contrary to Magnetar's assertion (Mag. Br. 15), "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 551 U.S. at 325.[22] Intesa has alleged numerous specific facts showing that Magnetar's long position on Pyxis was effectively no more than $19 million, while its short positions totaled, conservatively, in excess of $100 million, resulting in a net short position of over $80 million—obviously, a compelling motive to ensure that Pyxis failed.  *See* p. 20 above.

### B.    Intesa Has Adequately Alleged that Magnetar Provided Substantial Assistance to the Pyxis Fraud

As Magnetar concedes (Magnetar Br. 18), "[g]enerally, 'substantial assistance' exists where: (1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed,' and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'"  *Rosner v. Bank of China*, 528 F. Supp.2d 419, 426 (S.D.N.Y. 2007) (internal citations omitted).  Intesa has alleged numerous facts demonstrating that Magnetar not only affirmatively assisted but *directed* the Pyxis fraud, and that it helped conceal the fraud by staying "behind the scenes" and keeping its activities secret.  Intesa has also alleged facts showing that Magnetar failed to disclose its role in

[22]   *Burns*, like the decisions on which Calyon and Putnam relied in their scienter argument, merely holds that "ordinary economic motive," without more, is insufficient to show motive.  *Id.* at 30.

41

the selection of the Pyxis portfolio when it was required to do so.  According to the case on which Magnetar relies, a duty to disclose arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Morin v. Trupin*, 711 F. Supp. 97, 103 (S.D.N.Y. 1993) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 738-39 (2d Cir. 1984)).  Here, Magnetar, and indeed all Defendants, clearly had superior knowledge to Intesa—namely that Magnetar, not Putnam, was selecting the Pyxis portfolio and was building it to fail—and clearly knew that Intesa was acting on the basis of a mistaken belief—namely, that Putnam was selecting the portfolio.

Based on these allegations, Intesa has more than satisfied the requirements for pleading that Magnetar substantially assisted in advancing the Pyxis fraud.[23]

## III.   INTESA HAS ADEQUATELY ALLEGED LOSS CAUSATION

Defendants' argument that Intesa has not adequately alleged loss causation (Cal. Br. 22) ignores Intesa's allegation that, had it known the Pyxis portfolio was selected by Magnetar, not Putnam, and that Magnetar had taken a huge net short position on Pyxis, it would never have entered into the Pyxis Swap and would therefore have suffered no losses when Pyxis defaulted.

Moreover, to the extent that, contrary to this allegation (and common sense), Intesa might have entered into the Pyxis Swap even with this knowledge, Intesa has plainly alleged "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendants']

_____

[23]   Magnetar's reliance on *Morin* is plainly misplaced.  *Morin* merely held that "where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself." *Id.* at 113.  Here, the violation consists not only of (1) misrepresentations in the Pyxis marketing documents, but also (2) Putnam's abdication of its portfolio selection responsibilities to Magnetar, and (3) Defendants' concealment of Magnetar's control of the selection process.  Magnetar obviously provided substantial assistance with respect to both the second and third of these factors.

misstatements." *Lattanzia v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).  Intesa

has alleged that Pyxis, like all of Magnetar's CDOs, was built to fail, and thus that it was far

more likely to default than typical CDOs, even in the event of marketwide losses.  This is indeed

borne out by the evidence (set forth in the ProPublica article incorporated by reference in the

Amended Complaint, and verifiable from publicly available investor reports and Intex files) that

96% of Magnetar's deals—including Pyxis—were in default by the end of 2008, compared with

68% for comparable CDOs.  *See* p. __ above.  Thus, Intesa has adequately alleged loss

causation.[24]

## IV.   INTESA'S SECURITIES FRAUD CLAIMS ARE TIMELY

In order to be timely under 28 U.S.C. § 1658(b)(2), a Rule 10b-5 claim must be brought

before "the earlier of (1) 2 years after the discovery of the facts constituting the violation or (2) 5

years after such violation."  Intesa's Complaint was filed before either of these periods had run,

and is therefore timely.

### A.   Intesa's claims were filed before the statute of repose had run

Contrary to Defendants' argument that the five-year statute of repose began running on

the date of the last alleged misrepresentation, in March 2007 (Cal. Br. 22),[25] in fact, this period

did not begin to run until Intesa was irrevocably committed to the Pyxis Swap on April 24, 2007.

Thus, Intesa's Complaint, filed on April 6, 2012, was timely.

The Second Circuit has long held that any Section 10(b) limitations period "starts to run

on the date that the parties have committed themselves to complete the purchase or sale

transaction."  *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1294 (2d Cir. 1992).  With

---

[24]   There is also a substantial question about how much of the housing crisis and the
marketwide losses that resulted from it can be attributed to the activities of fraudulent investors
like Magnetar.

[25]   Magnetar and Putnam have adopted Calyon's arguments on this point by reference.

respect to the statute of repose, in a 2009 unpublished decision, the court rejected the position

that "the period of repose begins to run at the time of the last alleged misrepresentation" by the

defendant. *Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009) (applying pre-Sarbanes-

Oxley reform three-year period).  Instead, citing *Grondahl*, the court reiterated that "[t]he . . .

statute of repose in federal securities law claims 'starts to run on the date the parties have

committed themselves to complete the purchase or sale transaction.'"  *Id.*  District courts,

following *Arnold*, have held that the five-year period "begins to run on the date that a plaintiff

bought or sold the securities at issue," "regardless of when the last misrepresentation occurred."

*Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010); *see also Stichting

Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011);

*Pro Bono Investments, Inc. v. Gerry*, 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005) (applying

pre-Sarbanes-Oxley reform three-year period).

        In any event, the Court need not decide this question because Intesa alleges both

affirmative misrepresentations by Defendants (that Putnam would select the Pyxis portfolio) and

omissions of material facts (that Magnetar in fact controlled the selection process).  Obviously,

Defendants' fraudulent concealment continued up to (and well beyond) the date that Intesa

became irrevocably committed to the Pyxis Swap, and the result is therefore the same whichever

test is applied—that is, the repose period did not begin running until April 24, 2007.[26]

_____

[26]  The claims in *Boudinot*, like Intesa's, were predicated on both affirmative
misrepresentations and omissions of material facts, and the date on which the court held the
repose period began to run was (as it must always be in a case predicated on omissions) both the
date on which the last omission was made and the date when plaintiffs committed themselves to
the action that crystallized their losses (retirement).  Defendants also cite to two cases from other
circuits, *In re Exxon Mobil Corp. Securities Lit.*, 500 F.3d 189 (3d Cir. 2007) and *McCann v. Hy-
Vee, Inc.*, 663 F.3d 926 (7th Cir. 2011).  However, in both of these cases, the court admitted that
interpreting Section 1685(b) to begin the five-year period at the time of the misrepresentation
rather than the securities transaction plunged it into a textual "thicket," because it was difficult to

### B.     Intesa's claims were filed before the statute of limitations had run

Defendants also argue that Intesa's claims are barred by the two-year statute of limitations because some of the facts alleged by Intesa "were widely publicly available long before" April 9, 2010, the date of ProPublica's expose of Magnetar's CDO program.  (Cal. Br. 23)  However, the facts Defendants assert were publicly available—that "(i) 'Magnetar had been involved in the creation of Pyxis;' (ii) Magnetar put together its first Constellation CDO, Orion, with CA-CIB; and (iii) Jim Prusko of Magnetar previously worked at Putnam and he played a central role in marketing CDOs for Magnetar" (*id.*)—were not only buried in a few scattered items in various obscure sources (and thus hardly "widely publicly available"), but, more importantly, would not, standing alone, be sufficient to support a claim of fraud.  As Defendants' own authority makes clear, "[u]ntil the plaintiff has uncovered . . . enough information about the defendant's knowledge or intent to satisfy [the] pleading standard, he has not 'discovered' the fact of scienter, and the statute of limitations cannot begin to run."  *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).  The facts Defendants point to—little more than a vague "involvement" of Magnetar, Calyon, and a Putnam employee—would not give rise to a "cogent and compelling" inference of scienter.  And Defendants simply ignore the mass of additional evidence set forth in the Amended Complaint which makes that inference compelling and which was not available prior to April 2010— including that Magnetar had, with the collusion of its issuers and collateral managers, systematically controlled the selection of its CDOs' portfolios and built those portfolios to fail so that it could make huge profits from the net short positions it took against the CDOs; and that banks and collateral managers have subsequently paid huge sums to settle litigation arising out of

---

square that interpretation of "violation" with its use elsewhere in the statute.  *See Exxon*, 500 F.3d at 201 n. 15; *McCann*, 663 F.3d at 932.

their conduct with respect to Constellation CDOs—specifically including Calyon with respect to its structuring of Pyxis—or of the voluminous and compelling documentary evidence of fraud that has come to light in those litigations.

Accordingly, Intesa's claim is not time-barred under the two-year statute of limitations.

## V.    INTESA'S CDS WAS NOT A FOREIGN TRANSACTION

Defendants make an even more half-hearted attempt to argue that the Pyxis Swap was an extraterritorial transaction outside the reach of Section 10b and Rule 10b-5.  (Cal. Br. 24-25)  In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2884 (2010), the Supreme Court held that Section 10(b) only applies to "transactions in securities listed on domestic exchanges . . . and domestic transactions in other securities."  *Id.* at 2886.  Defendants ignores the "domestic transaction" prong of this test.  The Second Circuit has recently concluded that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or title transferred in the United States." *Absolute Activist Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 60 (2d Cir. 2012).  A plaintiff may satisfy the "irrevocable liability" test by alleging *either* "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, *or* that the seller incurred irrevocable liability within the United States to deliver a security."  *Id.* at *20 (emphasis added); *see also SEC v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 159 (S.D.N.Y. 2011); *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176 (S.D.N.Y. 2010).  In addition, *Absolute Activist* held, "we do not believe this is the only way to locate a securities transaction. . . .  Thus, a sale of securities can be understood to take place at the location in which title is transferred."  *Id.* at *21 (citing *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011)).  In determining where title was transferred, the Court may consider, among other things, "facts

concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money . . . ."  Id. at *27 (emphasis added).

The Amended Complaint alleges that "[t]he contract was executed by Intesa in New York" and that "[t]he funds paid pursuant to the transaction were exchanged between the New York bank accounts of Intesa and Calyon." (FAC ¶ 67)  These allegations are more than sufficient to satisfy the *Morrison* test, as interpreted by *Absolute Activist*. Thus, the Pyxis Swap was a "domestic transaction," and Section 10(b) and Rule 10b-5 apply.

## VI.     INTESA HAS ADEQUATELY ALLEGED CIVIL CONSPIRACY

The primary ground on which Defendants seek to dismiss Intesa's civil conspiracy claim is that Intesa has not adequately pled the underlying fraud.  (Mag. Br. 22)  Since, contrary to Defendants' arguments, the Amended Complaint more than adequately alleges (1) a "corrupt agreement" among Defendants to defraud long investors in Pyxis, including Intesa; (2) numerous overt acts by each Defendant in furtherance of this agreement; (3) each Defendant's intentional participation in the furtherance of the agreement; and (4) Intesa's resulting damages, Intesa has adequately alleged conspiracy to commit fraud.  *See NL Group v. Eccelston Properties, Ltd*., 178 A.D.2d 308 (1st Dep't 1991).

## VII.    THE AMENDED COMPLAINT SUPPORTS A PUNITIVE DAMAGES AWARD

Defendants claim, without support, that Intesa may not seek punitive damages because it has not adequately alleged that defendants' conduct rose to the level of "moral turpitude" and "wanton dishonesty."  *See Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613 (1994).  To the contrary, Intesa has alleged that, through the Constellation CDOs, including Pyxis, Calyon and Magnetar engaged in a spectacular series of frauds on investors, and that, specifically through Pyxis, all Defendants willfully and fraudulently inflicted huge losses on Pyxis investors, including Intesa, in order to secure enormous profits and fees for themselves.

47

These allegations support a prayer for punitive damages.  *Id.*  At a minimum, it is premature to strike this prayer for relief at the pleadings stage.  *Ambac Assur. Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464, 2009 U.S. Dist. LEXIS 26456, at *4-5 (S.D.N.Y. Mar. 16, 2009) (motion to strike prayer for relief at pleadings stage was premature because "[t]he relief provided for [Plaintiff's] claims will be determined if any entitlement to remedies is proved.") (citation omitted).

## CONCLUSION

For the foregoing reasons, Intesa respectfully requests that Defendants' Motions to Dismiss be denied.

Dated: New York, New York
August 17, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:      /s/Jonathan E. Pickhardt
        Philippe Z. Selendy
        (philippeselendy@quinnemanuel.com)
        Jonathan E. Pickhardt
        (jonpickhardt@quinnemanuel.com)
        Nicholas F. Joseph
        (nicholasjoseph@quinnemanuel.com)
        Sarah Trombley
        (sarahtrombley@quinnemanuel.com)
        Sean Baldwin
        (seanbaldwin@quinnemanuel.com)
        51 Madison Avenue, 22nd Floor
        New York, New York  10010
        (212) 849-7000
        *Attorneys for Plaintiff Intesa Sanpaolo, S.p.A.*