


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTESA SANPAOLO, S.P.A.,<br><br>　　　　Plaintiff,<br><br>　-against-<br><br>CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CRÉDIT AGRICOLE SECURITIES (U.S.A.) INC., THE PUTNAM ADVISORY COMPANY, LLC, MAGNETAR CAPITAL LLC, MAGNETAR FINANCIAL LLC, AND MAGNETAR CAPITAL FUND, LP,<br><br>　　　　Defendants. | No. 12-cv-2683 (RWS)<br><br>**ECF CASE**<br>**Electronically Filed** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE PUTNAM ADVISORY COMPANY LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**


MILBANK, TWEED, HADLEY &
　Mc CLOY LLP

Thomas A. Arena
Sean M. Murphy
Robert C. Hora
William P. Gross
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*The Putnam Advisory Company LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii
PRELIMINARY STATEMENT ............................................................................................... 1
ARGUMENT ............................................................................................................................ 3
I.   PLAINTIFF'S SECTION 10(B) CLAIM IS BARRED BY THE FIVE-YEAR
     STATUTE OF REPOSE .................................................................................................. 3
II.  THE FAC DOES NOT ALLEGE A "COGENT AND COMPELLING"
     THEORY OF SCIENTER WITH RESPECT TO PUTNAM ........................................... 6
     A.   The FAC Fails to Allege a Plausible Motive to Defraud ....................................... 6
     B.   The FAC Fails to Allege Conscious Misbehavior or Recklessness ....................... 9
CONCLUSION ....................................................................................................................... 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anwar v. Fairfield Greenwich, Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................................................................5

*Arnold v. KPMG LLP*,
  334 F. App'x 349 (2d Cir. 2009) ..........................................................................................5

*Boudinot v. Shrader*,
  No. 09 Civ. 10163 (LAK),
  2012 U.S. Dist. LEXIS 19172 (S.D.N.Y. Feb. 15, 2012) ..............................................3, 4, 5

*Brecher v. Citigroup Inc.*,
  797 F. Supp. 2d 354 (S.D.N.Y. 2011), *vacated on other grounds*,
  No. 09 Civ. 7359 (SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) ...............................7

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) ..................................................................................7

*Defer LP v. Raymond James Fin., Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009) ..................................................................................7

*Grondahl v. Merritt & Harris, Inc.*,
  964 F.2d 1290 (2d Cir. 1992) ...............................................................................................5

*Herman v. Berson*,
  No. 07 Civ. 10263 (SCR),
  2010 U.S. Dist. LEXIS 144386 (S.D.N.Y. Jan. 28, 2010) ....................................................3

*In re Exxon Mobil Corp. Sec. Litig.*,
  500 F.3d 189 (3d Cir. 2007) .................................................................................................3

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  975 F. Supp. 584 (D.N.J. 1996) ...........................................................................................5

*Loreley Financing (Jersey) No. 7 Ltd. v. Credit Agricole Corporate & Inv. Bank*,
  Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) ...............................................1, 9, 11

*Malhotra v. Equitable Life Assurance Soc'y of the U.S.*,
  364 F. Supp. 2d 299 (E.D.N.Y. 2005) ..................................................................................5

*McCann v. Hy-Vee, Inc.*,
  663 F.3d 926 (7th Cir. 2011) ................................................................................................3

*Pro Bono Investments, Inc. v. Gerry*,
    No. 03 Civ. 4347 (JGK), 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005) ................................. 5

*SEC v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992) ....................................................................................... 8

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) ................................................................................. 5

*Stryker v. Stelmak*,
    No. 06 Civ. 13232 (DC),
    2006 U.S. Dist. LEXIS 83218 (S.D.N.Y. Nov. 14, 2006) ..................................................... 3

*United States v. Lloyds TSB Bank PLC*,
    639 F. Supp. 2d 326 (S.D.N.Y. 2009) ................................................................................... 7

**STATUTES**

28 U.S.C. § 1658(b) .................................................................................................................. 3, 6

PSLRA ........................................................................................................................................ 2, 9

**RULES**

Federal Rule of Civil Procedure 9(b) .................................................................................... 1, 2, 9

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................... 1

The Putnam Advisory Company, LLC ("Putnam"), respectfully submits this reply memorandum of law in further support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the First Amended Complaint ("FAC") filed by Intesa Sanpaolo, S.p.A. ("Plaintiff" or "Intesa") with prejudice.[1]

## PRELIMINARY STATEMENT

Plaintiff's claims against Putnam are a reiteration of the same deficient claims brought against Putnam nearly two years ago by the plaintiff in the *Loreley* action.[2] When faced with the same claims and allegations against Putnam, Justice Schweitzer of the New York County Supreme Court granted Putnam's motion to dismiss in full, holding that the *Loreley* plaintiff's allegations that Putnam purportedly abdicated its collateral selection responsibilities for the Pyxis CDO to Magnetar failed to state a claim for fraud against Putnam. Intesa's assertion that the *Loreley* action "settled promptly" after "emails and other documents" were raised in *Loreley* (Opp. at 3, 16, 25)[3] is simply false with respect to Putnam: Putnam was dismissed in full from *Loreley* prior to the alleged settlement.[4] In granting Putnam's motion to dismiss, Justice Schweitzer had the very same emails and documents before him to which Plaintiff now ascribes significance. None of those emails demonstrates any abdication of Putnam's role as collateral manager.

Intesa's securities fraud claim against Putnam is, in addition, barred by the five-year

---

[1] Putnam incorporates by reference the arguments set forth in the reply memoranda of law in further support of the motions to dismiss filed by co-defendants Crédit Agricole Corporate and Investment Bank and Crédit Agricole Securities (U.S.A.) Inc. (together "CA-CIB"), and Magnetar Capital LLC, Magnetar Financial LLC, and Magnetar Capital Fund, LP (collectively "Magnetar") in this action.

[2] Capitalized terms not specifically defined herein have the meanings ascribed to them in Putnam's Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint, dated July 20, 2012 ("Putnam Mem."), ECF No. 35.

[3] "Opp." or "Opposition" refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint, dated August 17, 2012, ECF No. 45.

[4] *See* Decision and Order, *Loreley Financing (Jersey) No. 7 Ltd. v. Credit Agricole Corporate & Inv. Bank*, Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011), attached to Compendium of Unreported Cases dated July 20, 2012, ECF No. 40.

1

statute of repose applicable to Section 10(b) claims. The Opposition acknowledges that the last misrepresentation alleged in the FAC occurred more than five years before Plaintiff commenced this litigation. This alone is fatal to Plaintiff's claim: the only circuit courts to have directly considered whether the repose period begins on the date of the last misrepresentation alleged or on some later date, and a long line of respected authority in this district, have held that the statute of repose period begins on the date of the last alleged misrepresentation. Even if the repose period begins when the plaintiff commits itself to a securities transaction, as Intesa asserts, Intesa's claim is still barred: the facts alleged in the FAC show that Intesa agreed to enter into the Pyxis swap more than five years before it filed this action.

      Plaintiff, moreover, fails to allege a cogent and compelling theory of scienter with respect to Putnam. The Opposition focuses on Putnam's fees, but those fees provided Putnam with no rational motive to assist in the fraudulent design of a billion-dollar CDO that would fail: Putnam's senior fee and subordinated fee were both dependent on Pyxis performing well and making payments to noteholders. In fact, the Opposition concedes that Putnam's maximum 20-basis point fee was half that of a typical CDO. That the Pyxis CDO was larger than a typical CDO is immaterial: if Pyxis's underlying assets did not perform, Putnam would not receive its fees. The FAC's bare allegation that Magnetar "promised" Putnam additional lucrative deal volume if it cooperated in the alleged fraud is likewise unavailing—the FAC supplies no particularized facts, as it must under Rule 9(b) and the PSLRA, regarding this alleged "promise."

      For the reasons stated herein and in Putnam's opening brief, and because Plaintiff has already had one opportunity to amend the complaint after reviewing Defendants' motions to dismiss the original complaint, Plaintiff's claims against Putnam should be dismissed with prejudice.

**ARGUMENT**

I. **PLAINTIFF'S SECTION 10(B) CLAIM IS BARRED BY THE FIVE-YEAR STATUTE OF REPOSE**

Intesa concedes that the last misrepresentation alleged in the FAC occurred no later than March 2007, more than five years before it filed this lawsuit on April 6, 2012, but argues that the five-year statue of repose on its Section 10(b) claim did not begin to run until April 24, 2007, the date of CA-CIB's confirmation of Intesa's Pyxis swap. (*See* Opp. at 43.) The cases holding that the statute of repose begins to run at the time of the last alleged misrepresentation, however, are legion. *See, e.g.*, *Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 U.S. Dist. LEXIS 19172, at *14-15 (S.D.N.Y. Feb. 15, 2012) ("Courts in this district have . . . consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made."); *Herman v. Berson*, No. 07 Civ. 10263 (SCR), 2010 U.S. Dist. LEXIS 144386, at *18 (S.D.N.Y. Jan. 28, 2010) ("[T]he applicable five-year statute of repose begins to run on the date of the alleged misrepresentation, rather than the date on which the securities at issue are *exchanged*.") (emphasis in original); *Stryker v. Stelmak*, No. 06 Civ. 13232 (DC), 2006 U.S. Dist. LEXIS 83218, at *12 (S.D.N.Y. Nov. 14, 2006) (holding that the statute of repose under 28 U.S.C. § 1658(b)(2) is "five years after the actual violation," which occurred "when defendants . . . allegedly lied to [Plaintiff] . . . ."); .

Most recently, in *Boudinot*, Judge Kaplan agreed with "the two circuits that have addressed this issue directly," both of which "have treated Section 1658(b)(2) as a statute of repose and held that 'the repose period applicable to . . . [Section] 1658(b)(2) begins to run on the date of the alleged misrepresentation.'" 2012 U.S. Dist. LEXIS 19172, at *14-15 (citing *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 200-01 (3d Cir. 2007) and *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930-32 (7th Cir. 2011) (Posner, J.) (rejecting plaintiff's argument that "there

3

was no 'violation' to trigger the statute of repose until [after alleged misrepresentations], when the defendant agreed to buy [stock in which plaintiff had an interest]")).

In an effort to avoid the application of the *Boudinot* line of authority, Plaintiff argues that the statute of repose period cannot begin on the date of the last alleged misrepresentation because the FAC also purports to allege omissions of material facts, which purportedly continued until the time Plaintiff consummated its Pyxis swap. (Opp. at 44.) But Putnam is not a fiduciary of Intesa, and the FAC nowhere alleges that Putnam was under any duty to disclose material information to Intesa. Nor could Intesa allege that Putnam, as the collateral manager for the Pyxis CDO, had any fiduciary obligations to Intesa, was in contractual privity with Intesa, or had any interactions with Intesa on the swap Intesa entered into with CA-CIB.

Instead, Intesa alleges that small sections of the Offering Memorandum and Investor Presentation purportedly authored by Putnam and allegedly distributed to Intesa by CA-CIB, which stated that Putnam would select the collateral for the Pyxis CDO, were false because Putnam allowed Magnetar to select the collateral. (*See* FAC ¶¶ 63-64, 76, 78-80.) Because the FAC purports to assert liability against Putnam only on the basis of this alleged affirmative misrepresentation, the statute of repose period cannot be extended to a later date, to account for purported omissions that cannot serve as a basis of liability against Putnam.[5] Moreover, even if Intesa could recast its affirmative misrepresentation claim as a failure to disclose allegedly true and accurate facts, this would not save Intesa's claim: "[I]n the case of an omission," the statute of repose period begins to run "upon the date a duty to disclose the withheld information arises."

---

[5] To the extent Plaintiff can be said to address *Boudinot*, it attempts to distinguish that case by arguing that the statue of repose in that matter did not begin to run until the plaintiffs "committed themselves to the action that crystallized their losses (retirement)" (Opp. at 44 n.26.) But *Boudinot* does not say this, nor did it hold, as Intesa suggests, that the triggering of the statue of repose was delayed by some sort of continuing omission until plaintiffs commenced their retirement (Opp. at 44 n.26). *Boudinot* articulates a simple, clear rule for determining the commencement of the statute of repose:  the date of the last misstatement alleged. *Boudinot*, 2012 U.S. Dist. LEXIS 19172, at *14-15. Here, as in *Boudinot*, that occurred more than five years before Plaintiff filed this action.

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 605 (D.N.J. 1996), *cited with approval in Malhotra v. Equitable Life Assurance Soc'y of the U.S.*, 364 F. Supp. 2d 299, 305 (E.D.N.Y. 2005).  Such a duty could have arisen no later than the date of the last misrepresentation alleged in the FAC—a March 2007 valuation in which Putnam is notably not alleged to have been involved.  (*See* FAC ¶¶ 83, 86, 128.)

Plaintiff further attempts to evade *Boudinot* and the last-misrepresentation rule by invoking an unpublished Second Circuit decision, *Arnold v. KPMG LLP*, 334 F. App'x 349 (2d Cir. 2009), for the proposition that the five-year statute of repose period for Section 10(b) claims purportedly begins to run on "the date that the parties have committed themselves to complete the purchase or sale transaction."  (Opp. at 43.)  But Plaintiff's reliance on *Arnold* does not work.  In *Arnold*, unlike here, the plaintiff executed his last securities transaction *before* the last misrepresentation alleged in the complaint.  *Id.* at 351.  It would not be logical in such a case, nor would it serve the goal of finality that statutes of repose are designed to address, to begin the statute of repose period on the date of a misrepresentation on which a plaintiff did not rely in purchasing securities.  Nothing in *Arnold* suggests that the Second Circuit was endeavoring, in an unpublished decision, to promulgate a rule that the statute of repose period begins when a plaintiff commits itself to a transaction even where, as here, the transaction is claimed to occur after the last misrepresentation alleged in the complaint.[6]

Even if the statute of repose period did not begin to run until Intesa "committed itself" to

---

[6] The other cases cited by Plaintiff—*Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1292 (2d Cir. 1992), *Pro Bono Investments, Inc. v. Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 2429787, at *7 n.5 (S.D.N.Y. Sept. 30, 2005), *Anwar v. Fairfield Greenwich, Ltd.,* 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010), and *Stichting Pensioenfonds ABP v. Countrywide Financial Corporation*, 802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011)—are likewise unconvincing.  None of these cases turned on whether statute of repose period began on the date of the last misrepresentation or the date the parties committed themselves to a securities transaction.  And as stated in *Boudinot*, 2012 U.S. Dist. LEXIS 19172, at *14-15, the only two circuits that have addressed directly whether the repose period begins on the date of the last alleged misrepresentation or some later date have held that the period begins on date of the last misrepresentation alleged.

5

its swap with CA-CIB, for the reasons stated in CA-CIB's reply memorandum of law, the FAC's allegations show that Intesa committed itself to the swap more than five years before the complaint was filed on April 6, 2012.  (*See* FAC ¶ 67 (alleging that the parties reached "an understanding that they would enter into a CDS" in *September 2006*); Kuck Decl. Ex. B at § 9(e)(ii) ("The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise)."), ECF No. 39.)  Accordingly, under either trigger date, the Section 10(b) claim is barred by 28 U.S.C. § 1658(b)'s five-year statute of repose.

## II.  THE FAC DOES NOT ALLEGE A "COGENT AND COMPELLING" THEORY OF SCIENTER WITH RESPECT TO PUTNAM

### A.  The FAC Fails to Allege a Plausible Motive to Defraud

Try as it might, Plaintiff cannot articulate a plausible theory of motive to defraud on the part of Putnam.  According to Plaintiff, Putnam engaged in a billion-dollar fraud, risked its reputation and business, abdicated its duties as collateral manager, and intentionally assisted in the creation of a CDO designed to fail, all to put hundreds of millions of dollars in the pocket of another defendant, and to earn, at best, roughly $3 million in collateral management fees that were expressly dependent on the Pyxis CDO not failing, but instead performing well and meeting its payment obligations.  In alleging that Putnam's fees demonstrate a motive to defraud, Intesa ignores that, pursuant to the terms of the Collateral Management Agreement referenced in the FAC, Putnam's 15-basis point annual senior fee was to be calculated on the basis of a Monthly Asset Amount that specifically excluded defaulted securities, and that Putnam would receive its five-basis point subordinated fee only after all six classes of noteholders were first paid the amounts to which they were entitled.  (Putnam Mem. at 5-6.)  For Putnam intentionally to design Pyxis to fail defies logic, as it would *deprive* Putnam of its fees, rather than guarantee

6

or increase them.

Ignoring the flawed logic of its own allegations, Plaintiff repeatedly asserts that Putnam had a "compelling motive" to defraud because it would purportedly earn "unusually large fees . . . with relatively little effort or risk." (Opp. at 5, 27, 39.) But the Opposition concedes that 40 basis points, double Putnam's maximum 20 basis-point fee (which assumes that the CDO's underlying collateral actually performed), is the "customary" fee for collateral managers. (Opp. at 39.) It is well-settled that allegations of a desire to earn typical management fees do not give rise to a plausible theory of a motive to defraud. *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.)[7] The same necessarily holds true for less than customary fees. The fact that the asset size of the Pyxis CDO is larger than the "typical" RMBS transaction does not evidence that Putnam had a motive to defraud. Putnam earned its fee only if the underlying collateral performed well and generated sufficient cash flow to allow Pyxis to meet its payment obligations to noteholders. If, as Intesa alleges, Putnam purportedly had a motive to select collateral that would fail, it would not earn any fee on any under-performing collateral, no matter how large the Pyxis CDO was.

Intesa's allegation that the Pyxis deal involved "relatively little effort or risk" (Opp. at 5, 27, 39) also runs counter to common sense: Putnam's alleged participation in a billion-dollar fraud and creation of a toxic CDO would involve tremendous risk to Putnam's reputation and business. *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 326, 342 (S.D.N.Y. 2009) (stating that "common sense" indicated that a "substantial international bank" would not risk its

---

[7] *See, e.g.*, *Brecher v. Citigroup Inc.*, 797 F. Supp. 2d 354, 370 (S.D.N.Y. 2011), *vacated on other grounds,* No. 09 Civ. 7359 (SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) ("[T]he bare desire to earn management fees is too general to support a strong inference of scienter."); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient. This Circuit has repeatedly held that similar allegations of a generalized motive that could be imputed to any for-profit endeavor therefore are not sufficiently concrete for purposes of inferring *scienter*.").

reputation by engaging in securities fraud when it had "no financial incentive other than to maintain the patronage of a fee-generating client"); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees."). Further, if the Pyxis CDO failed, as Intesa claims it was designed to, it would be of no benefit to Putnam to expend "relatively little effort" in selecting collateral: Putnam would not receive its fees.

Plaintiff's assertion that Putnam's subordinated fee was "virtually assured" by Magnetar's alleged "significant control" over the Pyxis portfolio also has no basis. (Opp. at 39.) In support of this assertion, Plaintiff quotes a November 2006 email between Deutsche Bank and CA-CIB that includes no Putnam personnel, discusses an unrelated collateral manager (NIBC), concerns a different CDO in which Putnam is not alleged to have participated (Orion 2), mentions nothing about subordinated fees, and addresses the irrelevant issue of whether Orion 2's long (not short) investors should be given a right to terminate NIBC as collateral manager. (*See* Hora Decl. Ex. H, ECF No. 36; Putnam Mem. at 19-20.) Nothing in this email even remotely supports Intesa's contention that Putnam's subordinated fee in Pyxis 2006-1 would be "virtually assured." In any event, Plaintiff's claim that Putnam's subordinated fee, which would only be paid if the Pyxis CDO performed well, was somehow guaranteed by Magnetar's alleged selection of the Pyxis portfolio makes no sense: If Pyxis was designed to fail, as Intesa alleges, then Putnam would be sacrificing its subordinated fee, not assuring it.

Finally, citing a September 2006 email between Magnetar and a different collateral manager, regarding a different CDO and the potential for cumulative business with that different manager, Intesa claims that Magnetar promised and Putnam secured "additional lucrative deal

volume from its cooperation with Magnetar." (Opp. at 6, 39 (citing FAC ¶ 50).) But this email has nothing to do with Putnam, and the allegation that Putnam acted as collateral manager on a second CDO in which Magnetar invested one year later does not raise a cogent and compelling inference of fraudulent intent: There are no well-pled facts tying Putnam's selection as collateral manager for that CDO to any fraudulent conduct with respect to the Pyxis CDO. The bare allegation that Magnetar "promised" Putnam additional deal volume if it cooperated in the purported fraud (*see* FAC ¶ 99) is not enough under the PSLRA or Rule 9(b). The FAC does not and cannot supply any particularized facts, as required by Rule 9(b) and the PSLRA, regarding who made the alleged promise, when it was made, to whom it was made, or what was said. In short, the FAC contains no well-pled facts establishing a motive to defraud on Putnam's part.

    **B.  The FAC Fails to Allege Conscious Misbehavior or Recklessness**

    The Opposition's assertion that Putnam knowingly abdicated to Magnetar "its responsibility to select the Pyxis portfolio" (Opp. at 37) continues to rely on the same deficient emails submitted by the plaintiff in *Loreley*—most of which do not copy Putnam and many of which do not even concern Pyxis. In an effort to characterize these otherwise innocuous emails as harmful to Putnam, Intesa claims that *Loreley* "was settled promptly" after these "emails and other documents . . . came to light[.]" (Opp. at 3, 15.) This is misleading. Intesa fails to disclose that Justice Schweitzer granted in full Putnam's motion to dismiss the *Loreley* action prior to this alleged settlement, and with the very same emails before him. (Putnam Mem. at 17-18.)

    Intesa's effort to resurrect these emails in this action fails. Citing a June 2006 email exchange solely between Magnetar, CA-CIB, and Deutsche Bank, Plaintiff asserts that Putnam was complicit in a "secret side letter [among] CA-CIB, Magnetar, and Deutsche Bank" allegedly giving Magnetar "veto power" over Pyxis portfolio assets. (*See* Opp. at 16-17, 37; *see also* Hora Decl. Ex. C (email from CA-CIB to Magnetar attaching draft agreement)). Plaintiff concedes

9

that Putnam was neither a party to any such side letter, if one was ever executed, nor copied on the communications concerning it, but speculates that Putnam "must . . . have been aware" of the letter because the draft agreement required "Calyon or the Investment Adviser" to provide notification of asset purchases to Deutsche Bank and Magnetar. (Opp. at 17, 37.) Putnam, however, could not possibly be bound to language in an agreement to which it was not a party, and there are no well-pled allegations that Putnam consented to or was ever informed of such an arrangement, or ever honored any request by Deutsche Bank or Magnetar to remove collateral from the Pyxis CDO. The draft agreement, moreover, refers to Magnetar's and Deutsche Bank's "equity tranche" (*see* Hora Decl. Ex C (June 20, 2006 draft letter)). There is nothing unusual or improper about an equity investor seeking input on the content of a CDO's portfolio.

Intesa's reliance on an August 2006 email exchange between Putnam and Magnetar regarding the Pyxis CDO ramp up also does not help Intesa. Far from evidencing that "Putnam did in fact allow Magnetar to exercise secret control over the Pyxis portfolio" (Opp. at 17), the email illustrates the opposite: that Putnam independently selected the collateral. In the email, Putnam stated it was undertaking a "benchmarking" analysis on the Pyxis collateral pool, that the pool performed "well on [its] risk scoring model," that it was doing "preliminary work across a range of deals," and that "once this benchmarking is finished" it would "be able to pursue a couple of synthetic trades [for the Pyxis portfolio]." (Hora Decl. Ex. E at 2-3.) James Prusko of Magnetar responded that he was willing "buy CDO CDS on *names of [Putnam's] choosing*"—not at Magnetar's or Deutsche Bank's choosing—"at mid-market, or bid list +3bp, whatever [Putnam] prefer[s]." (*Id*. at 2 (emphasis added).) Nothing in the email indicates that Magnetar was directing the selection of the collateral or that Putnam "abdicated" portfolio selection to Magnetar.

Plaintiff's emphasis on what it concedes to be "a private email" between Mr. Prusko of Magnetar and Alex Rekeda of CA-CIB, in which Mr. Prusko states he is "not too worried about Putnam doing anything rash" and that he wanted Michael Henriques of Deutsche Bank (the other equity investor) to look at additional CDO exposure added to Pyxis by Putnam (Opp. at 17-18) similarly does not support its allegations of Putnam's scienter. The email copies no Putnam personnel, and is not alleged to have ever been distributed to Putnam. Mr. Prusko's comment that Putnam was "buying CDO's without [Magnetar] knowing about it," moreover, is directly at odds with Plaintiff's claim that Putnam abdicated portfolio selection to Magnetar. (Hora Decl. Ex. E at 1; *see also* Putnam Mem. at 18-19.) And Magnetar and Deutsche Bank had reason to be concerned about the asset selection: they both had substantial equity stakes in Pyxis.

Plaintiff's reliance on the November 2006 "exchange of emails between Magnetar and Deutsche Bank with respect to Orion 2006-2 Ltd" (Opp. at 18-19) also does not help Plaintiff for the reasons already discussed in Section IIA: The email exchange deals with a different CDO (Orion 2006-2 Ltd) and a different collateral manager (NIBC); it copies *no one* from Putnam; and it concerns whether equity investors (not short investors) in Orion 2006-2 Ltd., a CDO in which Putnam is not alleged to have been involved, will have a right to terminate NIBC as collateral manager. (Hora Decl. Ex. H; *see also* Putnam Mem. at 19-20.) None of this supports a fraud claim against Putnam with respect to its selection of assets for Pyxis.

Plaintiff's assertion that the *Loreley* emails "confirm that, at the same time Magnetar was controlling the selection of assets for the Pyxis portfolio, it was also shorting that very portfolio," and that "Putnam knew this," is similarly unsupported by the cited email exchanges. (Opp. at 19-20.) The first email exchange, a September 2006 email string between Putnam and CA-CIB attaching a trade ticket showing that Magnetar purchased a small amount of protection on Pyxis,

11

says nothing about Magnetar controlling asset selection for Pyxis.  (Putnam Mem. at 19; Hora Decl. Ex. F.)[8]  And as stated in Putnam's opening brief, the Offering Memorandum disclosed that investors would be taking short positions in Pyxis.  (Putnam Mem. at 19.)  The second cited exchange, a November 2006 email exchange between Magnetar and Putnam, which Plaintiff mistakenly complains "Defendants ignore" (*compare* Opp. at 20, *with* Putnam Mem. at 19-20, *and* Hora Decl. Ex. G), in which Magnetar and CA-CIB discuss purchasing protection on Pyxis, includes no Putnam personnel, and likewise says nothing about Magnetar controlling asset selection for Pyxis.  (*Id.*)

Plaintiff's allegations regarding the content of the Pyxis portfolio also do not evidence any conscious misbehavior by Putnam or any other Defendant.  Plaintiff alleges that the "Defendants circumvented the Pyxis portfolio's concentration limits on low-rated residential mortgage-backed securities ('RMBS') sold on the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and its individual constituent RMBS," but concedes that Putnam did not contravene any asset eligibility requirements set forth in the Pyxis Offering Memorandum.  (Opp. at 34.)  No inference of fraudulent intent can be drawn from Putnam's compliance with the Offering Memorandum's eligibility requirements.  Plaintiff alleges no facts showing that selling protection on components of the ABS index was impermissible, or that the composition of the Pyxis CDO was unknown to it or other investors in Pyxis or securities tied to Pyxis prior to their investment.

---

[8] Plaintiff claims in a footnote that the "CDS premium and amount of the trade do not correspond to any trade in the Pyxis portfolio," but do correspond to a trade in the portfolio of another CDO, Octans III, in which Magnetar, but not Putnam, was involved. (Opp. at 20 n. 8.)  Based on these alleged facts alone (none of which appears in the FAC), Intesa makes the imaginative leap that "[t]he most plausible explanation for this is that Magnetar got the trading orders for two of its deals mixed up, that Putnam instructed Calyon to execute the trade for Pyxis at Magnetar's direction, . . . that Putnam then reversed the instruction when it discovered that Magnetar in fact wanted the trade to be made for Octans III," and that "[i]n other words, Putnam was following Magnetar's orders, not exercising its own independent judgment."  (*Id.*)  But this is a story wholly of Intesa's own making:  neither the FAC nor the email contains any facts supporting these speculative assertions.

## **CONCLUSION**

For the reasons set forth above and in Putnam's opening brief, Putnam respectfully requests that the Court grant its motion to dismiss the FAC with prejudice.

Dated:  New York, New York
        September 7, 2012

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000


By:  /s/ *Sean M. Murphy*
    Sean M. Murphy
    Thomas A. Arena
    Robert C. Hora
    William P. Gross

    *Attorneys for Defendant*
    *The Putnam Advisory Company LLC*