UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

INTESA SANPAOLO, S.P.A.,

               Plaintiff,

   - against -

CREDIT AGRICOLE CORPORATE AND INVESTMENT
BANK, ET AL.,

               Defendants.

------------------------------------X

12 Civ. 2683 (RWS)

OPINION

A P P E A R A N C E S:


      Attorneys for Plaintiff Intesa Sanpaolo, S.p.A.

      QUINN EMANUEL URQUHART & SULLIVAN, LLP
      51 Madison Avenue, 22nd Floor
      New York, NY  10010
      By:  Philip Z. Selendy
          Jonathan E. Pickhardt
          Nicholas F. Joseph
          Sarah E. Trombley
          Sean P. Baldwin


      Attorneys for Defendants Credit Agricole Corporate and
      Investment Bank and Credit Agricole Securities
      (U.S.A.) Inc.

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      Four Times Square, 42nd Floor
      New York, NY  10036
      By:  Lea H. Kuck
          Gregory A. Litt

Attorneys for Defendant The Putnam Advisory Co., LLC
MILBANK, TWEED, HADLEY & MCCLOY LLP
One Chase Manhattan Plaza
New York, NY  10005
By:  Sean M. Murphy
     Thomas A. Arena
     Justin A. Alfano
     Robert C. Hora


Attorneys for Defendants Magnetar Capital LLC,
Magnetar Capital Fund, LP and Magnetar Financial LLC

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY
By:  Joseph Serino, Jr.
     John P. Del Monaco
     Nathaniel J. Kritzer

**Sweet, D.J.**

Plaintiff Intesa Sanpaolo, S.p.A., ("Intesa" or "Plaintiff") filed an amended complaint on June 22, 2012, (the "FAC") asserting federal securities fraud claims and state law claims for fraud, aiding and abetting fraud and civil conspiracy against the following defendants: (i) Credit Agricole Corporate and Investment Bank and Credit Agricole Securities (U.S.A.) Inc. (collectively, "Calyon"[1]); (ii) The Putnam Advisory Company, LLC ("Putnam"); and (iii) Magnetar Capital LLC, Magnetar Financial LLC and Magnetar Capital Fund, LP (collectively, "Magnetar", and along with Calyon and Putnam, "Defendants").

The Defendants now move, pursuant to Fed. R. Civ. P. 9(b) ("9(b)") and 12(b)(6) ("12(b)(6)"), to dismiss the FAC. Upon the conclusions set forth below, the Defendants' motions to dismiss are granted with leave to replead within 20 days.

---

[1] On February 6, 2010, Calyon changed its name to Credit Agricole.  See Calyon to Become Credit Agricole Corporate and Investment Bank on February 6, 2010, Jan. 27, 2010, http://www.credit-agricole.com/en/News/Press-releases/Financial-press-releases/Calyon-to-become-Credit-Agricole-Corporate-and-Investment-Bank2.  Since the events at issue in this case occurred prior to the change, Credit Agricole will be referred to by its former name.

## BACKGROUND

This action arises, like a host of others in recent years, from the ashes of a failed collateralized debt obligation ("CDO") that was backed by residential mortgage-backed securities ("RMBS") and their synthetic equivalents.  Actions of this type frequently have involved claims that investors were misled as to the probability of a CDO's failure.  In this case, however, the allegation is not that the chances of success were less than promised, but rather that there was simply no chance of success whatsoever.

Intesa alleges that a CDO named Pyxis ABS CDO 2006-1 ("Pyxis")—in which Intesa made what was effectively a $180 million investment—was purposefully designed to fail.  According to Intesa, the defendants conspired to fill Pyxis' portfolio with assets that were certain to default, thereby sealing Pyxis' fate from the moment of its inception.  Intesa contends that the defendants conspired to mislead prospective investors such as Intesa into believing that Pyxis' collateral would be selected by an independent collateral manager acting in good faith in the best interests of those betting on Pyxis' success.  The reality, according to Intesa, is that collateral was being selected by a

4

secretive hedge fund called Magnetar that was betting heavily against Pyxis' success, and therefore had every incentive to design Pyxis to fail.

Shortly after Intesa invested in Pxyis, the CDO's constituent collateral began to falter, which in turn caused Pyxis to default on payments to its noteholders.  As a result, Intesa lost the entirety of its $180 million investment.

## PRIOR PROCEEDINGS

Intesa filed its initial complaint on April 6, 2012. The Defendants filed motions to dismiss on June 1, 2012, after which Intesa voluntarily withdrew its complaint.  On June 22, 2012, Intesa filed the FAC, which asserted the same causes of action against virtually the same set of defendants,[2] but contained additional allegations and documentary evidence in support of Intesa's claims.

---

[2] The one exception is Magnetar Constellation Fund, LP, which was named as a defendant in the initial complaint but not in the FAC.

**THE FAC**

The allegations in the FAC are presumed to be true for
the purpose of ruling on the motions to dismiss, see USAA Cas.
Ins. Co. v. Permanent Mission of Republic of Namibia, 681 F.3d
103, 105 n. 4 (2d Cir. 2012), and are described below.

In early 2005, the market for CDOs, and in particular
for CDOs backed by RMBS, was booming.[3]  FAC ¶ 40.  The demand for
CDOs produced an extremely lucrative revenue stream for
investment banks who acted as the arrangers and underwriters,
essentially coordinating the CDOs' creation and getting paid
handsomely to do so.  Id.  At that time, Calyon, a French
investment bank, found itself lagging behind its competitors in

---

[3] "A CDO is a special purpose vehicle that purchases, or assumes
the risk of, a portfolio of assets (the "portfolio")—such as
bonds or loans—and issues securities which then make payments to
investors based on the income generated by the assets.  A CDO's
portfolio can include a variety of assets, like commercial or
residential mortgage-backed securities . . . securities issued
by other CDOs, or [credit default swaps] referencing those types
of obligations.  When performing, the assets that form the CDO
portfolio generate a stream of cash flows (e.g., from mortgage
payments) that the CDO uses to pay its expenses and make
interest and principal payments to the CDO's noteholders.  Any
remaining cash flows go to the CDO's equity investors, if any.
Whether a CDO's issued securities will be repaid in full depends
primarily . . . [on the] performance [] of the portfolio assets
of the CDO."  FAC ¶ 29.

terms of CDO market share, and Calyon's management set a
corporate goal to erase this disparity and rise to the top of
the CDO market. Id. ¶¶ 40-41.

Calyon's goal proved difficult to achieve, however, as
2006 saw default rates on subprime mortgages begin to rise,
which in turn made potential investors skittish about purchasing
the lowest tranches and equity tranches of CDOs, which were the
most subordinate and therefore riskiest.[4] Id. ¶ 43.  Without
investors willing to gamble on the risky tranches, opportunities
for CDO production quickly dried up, and Calyon's efforts to
make headway in the CDO market were frustrated.  Id.

There was, however, a notable exception to the overall
lack of desire to purchase the riskiest CDO securities—Magnetar,
a new but rapidly growing hedge fund. Id. ¶¶ 41-48.  In 2006
and 2007, while the rest of the investment world turned its back
on these investments, Magnetar invested in the low tranches
and/or equity for CDO after CDO.  Id.  While this behavior may
have appeared on its face to be a significant gamble, according

---

[4] The lowest tranche of a CDO were the most risky type of CDO
security because the noteholders of the lower tranches and/or
the equity tranche were paid only after all other noteholders
had been fully compensated.  See FAC ¶ 43.

to Intesa it was anything but.  See id.  In fact, Magnetar's
willingness to invest in securities that the rest of world
viewed as toxic was a crucial piece of a scheme (the "Magnetar
Scheme") through which Magnetar increased its assets under
management by 600% (from $1.5 billion to $9 billion) in the span
of just two years.  Id.

      The Magnetar Scheme operated as follows: (1) Magnetar
would approach an investment bank and propose the creation of a
CDO, and would offer to purchase the riskiest tranche itself,
and also to pay above-market fees to both the investment bank
(who would be the CDO's "arranger") and the CDO's collateral
manager for their services; (2) in return, Magnetar would demand
that the arranger and collateral manager permit Magnetar to
secretly control the collateral selection process for the CDO's
portfolio, while publicly representing that the collateral was
being selected by the putatively independent collateral manager
in the best interests of the CDO's investors; (3) Magnetar would
use its control over the collateral selection to fill the CDO
with assets that it knew were on their way to defaulting
(oftentimes these were securities from other built-to-fail CDOs
orchestrated by Magnetar, as was the case with Pyxis, see FAC ¶
101); (4) at the same time, Magnetar would accumulate short

positions on the CDO (essentially bets against the CDO's success) by engaging in credit-default swaps ("CDS") that referenced the CDO's various tranches of securities, eventually ending up with a net short position on the CDO that was several multiples the size of its equity investment; (5) the CDO's assets, hand-picked by Magnetar, would quickly begin to fail as intended, and within a short period even the supposedly safe tranches of notes would experience credit events (*i.e.*, would default on their payments to the noteholders), and the CDO would soon collapse entirely; (6) though Magnetar would lose much, if not all, of its equity investment, it would earn many times that amount through its bets against the CDO; (7) Magnetar would walk away with a massive profit and the arranger and collateral manager would earn healthy fees, while those who had invested in the CDO would be left empty-handed. See FAC ¶¶ 44-53.

Pyxis was one of the CDOs that Magnetar used as a vehicle to perpetrate the Magnetar Scheme. Magnetar found a willing arranger in Calyon, which grasped the opportunity to grow its underperforming CDO business and earn the generous fees proposed by Magnetar. Id. Putnam signed on to act as the putative collateral manager, expecting to earn unusually large

fees in exchange for relatively little work.[5]  Magnetar and
Putnam had a close relationship since the Magnetar executive in
charge of Pyxis, James Prusko, was a former Putnam employee, and
Prusko's contact at Putnam for Pyxis-related business was Carl
Bell, who had worked directly beneath Prusko before Prusko left
Putnam for Magnetar.  Id.

        To supports its allegations regarding the Defendants'
participation in the Magnetar Scheme, Intesa cites to a number
of emails sent over the course of 2006 (the "Emails") that make
reference to Pyxis and—Intesa contends—prove that the Defendants
were all knowing participants in the conspiracy.  See FAC ¶¶ 90-
98.  According to Intesa, the Emails establish, inter alia, (i)
the existence of a secret "side letter" granting Magnetar the
power to control which assets were included in the Pyxis
portfolio; (ii) that Putnam did in fact permit Magnetar to
exercise this power over Pyxis and that Calyon was aware of
this; and (iii) that Putnam and Calyon knew that Magnetar was
betting against Pyxis' success.  Id.

_____

[5] The large fees were the result of Pyxis' size, which, like all
Magnetar CDOs, was substantially larger than the average CDO by
a factor of 3-1 or more.  FAC ¶¶ 97-98.  Moreover, Putnam would
be required to do relatively little to earn those fees because
Magnetar would in fact be selecting the collateral, which is
ordinarily one of the primary responsibilities of the collateral
manager.  Id. ¶ 38.

On July 14, 2006, Calyon contacted Intesa and proposed a CDS transaction under which Intesa would effectively provide insurance to Calyon on the $180 million of Class A-1 notes ("A-1 Notes") that were being issued by Pyxis.  FAC ¶¶ 59-61.  The A-1 Notes were the most senior notes being issued by Pyxis and therefore carried the smallest risk of default, since the holders of the A-1 Notes would be paid before any other noteholders.  Id.  Calyon needed Intesa to provide protection on the A-1 Notes (and thereby accept the Notes' risk of default) so that Calyon could personally fund the notes, which would allow Calyon to close Pyxis and thereby immediately realize its profits and fees from its arrangement services, rather than having wait to be paid until it was able to find investors for the entire $180 million worth of notes to investors.  Id.

Over the course of the ensuing months, Calyon and Intesa had numerous oral communications about the proposed swap ("Pyxis Swap"), and Calyon also sent Intesa a number of documents on which Intesa relied in determining whether to engage in the Swap.  FAC ¶¶ 62-63.  These documents include various Pyxis marketing materials such as: a launch email, a pitchbook (i.e., an investor presentation), a target portfolio,

11

a termsheet, a preliminary offering memorandum, a final offering memorandum and a valuation.  See FAC ¶¶ 63, 70-87.

Intesa alleges that, based on these representations, it came to believe that the assets in Pyxis' portfolio were being selected by Putnam, and furthermore that Putnam was acting independently, diligently and in the interests of Pyxis' noteholders.  FAC ¶ 67.  In reliance upon that belief, Intesa decided to proceed with the Pyxis Swap.  In September 2006, Intesa and Calyon came to an understanding that they would enter into a CDS whereby Intesa would provide protection on $180 million of the Class A-1 Notes, subject to the satisfaction of particular requirements.  The Pyxis Swap was executed on April 24, 2007 in New York, and the funds paid pursuant to the transaction were exchanged between the New York bank accounts of Calyon and Intesa.  Id.

The Magnetar Scheme proceeded, and on October 3, 2006, Pyxis issued six classes of notes, including $180 million of Class A-1 notes.  In accordance with its plan, Magnetar purchased the lowest tranche of Pyxis' notes and at least a portion of the equity, and via a series of CDS transactions, also accumulated short positions of an amount far exceeding the

value of its purchases of Pyxis' notes and equity. Id. ¶¶ 56-58. In this way, Magnetar was able to effectively wager against the very same assets that it caused to be included in the Pyxis portfolio.  Id.

On April 30, 2008, less than two years after Pyxis' trade date, the Fitch ratings agency downgraded the credit rating of the A-1 Notes from their original AAA rating to a rating of C.  FAC ¶ 135.  Pursuant to the provisions of the Pyxis Swap, this downgrade constituted a "credit event" which forced Intesa to make $180 million in credit protection payments, receiving in return the virtually worthless A-1 Notes, and therefore effectively losing the entirety of its $180 million investment.

Based on these allegations, the FAC asserted the following causes of action: (i) federal securities fraud pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5(b) (hereinafter "§ 10(b)") against Calyon and Putnam; (ii) common law fraud against Calyon and Putnam; (iii) aiding and abetting fraud against Putnam and Magnetar; and (iv) civil conspiracy against all of the Defendants.

13

The instant motions to dismiss were heard and marked fully submitted on September 19, 2012.

**APPLICABLE STANDARDS**

On a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." County of Suffolk, New York v. First Am. Real Estate Solutions, 261 F.3d 179, 187 (2d Cir. 2001) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808 (1996)).

To survive a motion to dismiss pursuant to 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege

14

facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

In addition, since the asserted claims all sound in fraud, the complaint "must satisfy the heightened pleading requirements set forth in Rule 9(b), as well as the pleading standard mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)." Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012). Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state when and where the statements were made, and (4) explain why the statements were fraudulent." Id. (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)) (quotation marks omitted). Under the PSLRA, a plaintiff must (1) "specify each misleading statement," (2) "set forth facts on which a belief that a statement is misleading was formed," and (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005)) (quotation marks and brackets omitted).

## INTESA'S § 10(b) CLAIMS ARE TIME-BARRED

Calyon and Putnam contend that Intesa's § 10(b) claims against them are time-barred, and therefore should be dismissed. The temporal limitations governing Intesa's § 10(b) claims are set forth in 28 U.S.C. § 1658(b) ("1658(b)"), which states:

> [A] private right of action that involved a claim of fraud, deceit, manipulation, or contrivance in contravention of regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

Thus, in order to determine whether Intesa's § 10(b) claims were timely, it must be determined (1) when Intesa can be said to have discovered the facts constituting the violation, and (2) when the violation itself occurred.

*Intesa Asserted Its 10(b) Claims within Two Years of Discovering the Facts Constituting the Violation*

A fact is deemed "discovered" for 1658(b) purposes at the point at which "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in

a complaint." City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011). Thus, with respect to the facts showing scienter—which are "among those facts that 'constitut[e] the violation" under 1658(b), Merck & Co., Inc. v. Reynolds, 130 S.Ct. 1784, 1796 (2010)—they are deemed "discovered" for 1658(b) purposes when the plaintiff has uncovered (or when a reasonably diligent plaintiff *would have* uncovered) enough information about the defendant's knowledge or intent "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind such that it is at least as likely as not that the defendant acted with the relevant knowledge or intent." Pontiac, 637 F.3d at 175

As such, pursuant to 1658(b), Intesa was required to have asserted its § 10(b) claims within two years of the date upon which it possessed sufficient information regarding Calyon's and Putnam's intent in order to allege particular facts giving rise to a strong inference that it is more likely than not that Calyon and Putnam acted with the requisite scienter.

A plaintiff can establish the requisite strong inference of fraud "by alleging facts to show either (1) that

17

defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

Calyon contends that facts sufficient to establish a strong inference of fraud were "widely publicly available" long before April 6, 2010, and therefore that Intesa should be considered to have "discovered" those facts prior to April 6, 2010 (i.e., more than two years before Intesa first asserted its 10(b) claim) for the purposes of calculating the statute of limitations under 1658(b). See Memorandum of Law in Support of Motion by Credit Agricole Corporate and Investment Bank and Credit Agricole Securities (USA) Inc. to Dismiss the Amended Complaint ("Calyon Mem.") at 23-24. In support of this contention, Calyon cites to a number of articles, all published prior to April 6, 2010, which reveal that "(i) Magnetar had been involved in the creation of Pyxis; (ii) Magnetar put together its first Constellation CDO, Orion, with CA-CIB; and (iii) Jim Prusko of Magnetar previously worked at Putnam and he played a central role in marketing CDOs for Magnetar." Id. at 24. Calyon notes that Intesa itself identified these as "critical

facts" with respect to its fraud claims, see id. (quoting FAC ¶ 104), and argues that the revelation of these "critical facts" in articles published prior to April 6, 2010, means that discovery of the alleged fraud should be imputed to Intesa prior to April 6, 2010.

While the identified facts may indeed be critical in the sense that they are *necessary* in order to set forth a coherent and sufficiently cogent scienter narrative, they are not *sufficient* to do so via either of the paths to scienter that were laid out by the Second Circuit in ECA, 553 F.3d at 198. The articles are bereft of numerous pieces of information found in the Emails with respect to the scienter element of Intesa's § 10(b) claims against Calyon and Putnam, such as the existence of a secret agreement of which Putnam and Calyon were aware that granted Magnetar power to control the content of the Pyxis portfolio, see FAC ¶¶ 92-94. The Emails became available to Intesa only after they were cited in and attached to a submission made on March 3, 2011, in an action in the Northern District of New York. See Affirmation of Stephen M. Plotnick in Opposition to Defendants' Motions to Dismiss, Loreley Financing (Jersey) No. 7, Ltd. V. Credit Agricole Corporate and Investment Bank, Index No. 650673 (N.Y. Sup. Ct. Apr. 28, 2011) (citing and

19

attaching emails that were made public in filing in <u>In re
Application of IKB Deutsche Industriebank AG</u>, No. 11-cv-237
(N.D.N.Y. Mar. 3, 2011)).[6]

Since certain facts relevant to scienter were first
revealed in this Emails, Intesa cannot be said to have
discovered "the facts constituting the violation" until July 21,
2011, meaning that 1658(b)'s two-year post-discovery deadline on
Intesa's § 10(b) claims has not yet expired (and will not until
July 21, 2013). <u>See</u> <u>Merck</u>, 130 S.Ct. at 1996. Accordingly,
Intesa's § 10(b) claims are not untimely with respect to
1658(b)'s two-year post-discovery deadline.

---

[6] Defendants contend that The Honorable Justice Schweitzer of the
Supreme Court of the State of New York considered the 2006
Emails in the course of arriving at his decision to grant
Putnam's motion to dismiss in the <u>Loreley</u> action. <u>See, e.g.</u>,
Calyon Mem. at 7; Memorandum of Law in Support of the Putnam
Advisory Company LLC's Motion to Dismiss the First Amended
Complaint at 2; Memorandum of Law in Support of Magnetar
Capital LLC, Magnetar Financial LLC, and Magnetar Capital Fund,
LP's Motion to Dismiss the First Amended Complaint Pursuant to
Fed. R. Civ. P. 12(b)(6) and 9(b) at 1 n. 1. However, Justice
Schweitzer's opinion expressly states that his decision to grant
the motion to dismiss in that case was based solely on the
material contained in the complaint (which did *not* contain the
Emails). <u>See</u> Decision and Order, <u>Loreley</u>, No. 650673/2010 (N.Y.
Sup. Ct. June 13, 2011).

*Intesa Asserted Its 10(b) Claims More than Five Years After the Violation Occurred*

For the purposes of 1658(b), the violation that serves as the premise for a § 10(b) claims is deemed to have occurred on the date upon which the last alleged misrepresentation or omission was made. See Boudinot v. Shrader, No. 09 Civ. 10163 (LAK), 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012); Herman v. Berson, No. 07 Civ. 10263 (SCR), 2010 U.S. Dist. LEXIS 144386, at **18-22 (S.D.N.Y. Jan. 28, 2010); Stryker v. Stelmak, No. 06 Civ. 1322 (DC), 2006 WL 3292457, at *5 (S.D.N.Y. Nov. 14, 2006); see also In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 200-01 (3d Cir. 2007); McCann v. Hy-Vee, Inc., 663 F.3d 926, 930-32 (7th Cir. 2011). Accord City of Pontiac Gen. Employees' Ret. Sys., 637 F.3d 169, 176 (2d Cir. 2011) (holding that 1658(b)'s two-year post-discovery deadline begins to run at the time of purchase, thereby implying that the five-year post-violation deadline must be triggered by some other event). Given that the latest misrepresentation alleged by Intesa occurred on March 6, 2007, see FAC ¶¶ 128-31; Valuation Email, 1658(b)'s post-violation deadline expired on March 6, 2012. As such, Intesa's § 10(b) claims against Calyon and Putnam, first asserted in the

complaint filed April 6, 2012, were made exactly one month too late.

Intesa contends that its § 10(b) claims are not time-barred under the five-year deadline because a "violation" for 1658(b) purposes is the transaction that forms the basis of the § 10(b) claim at issue (rather than the alleged misrepresentation), and the § 10(b) claims were asserted less than five years following the transaction at issue in the instant case—*i.e.*, the Pyxis Swap—which Intesa alleges to have occurred on April 24, 2012.  See FAC ¶ 67.  In support for this proposition, Intesa cites to Arnold v. KPMG LLP, 334 Fed. Appx. 349 (2d Cir. 2009).  Although Arnold holds that 1658(b)'s five-year deadline is triggered by the transaction rather than the misrepresentation, see 334 Fed. Appx. at 351, Arnold is inapposite to the instant case because it addresses a scenario where the alleged misrepresentation was made *after* the purchase. Id.  Here, the last alleged misrepresentation occurred in March 2007, see FAC ¶¶ 128-31, more than a month *prior* to the Pyxis Swap, which Intesa alleges to have occurred on April 24, 2007, see id. ¶ 67.  Moreover, Arnold is an unpublished summary order, and therefore does not constitute binding precedent.  See Local Rules of the Second Circuit § 32.1.1 (stating that unpublished

22

summary orders "do not constitute formal opinions of the court
and . . . shall not be cited or otherwise used in unrelated
cases before this or any other court"). Accordingly, Intesa's
argument is unavailing.[7]


      Intesa alternatively contends that even if a
"violation" for 1658(b) purposes is indeed the misrepresentation
or omission, its § 10(b) claims are still timely, because
"Defendants' fraudulent concealment continued up to (and well
beyond) the date that Intesa became irrevocably committed to the
Pyxis Swap . . . [and therefore] the repose period did not begin
running until April 24, 2007 [i.e., less than five years after
the initial complaint was filed]." Intesa Opp. at 44. Intesa,
however, does not cite to any authority expressly supporting the
concept of a "continuing omission" as applied to the 1658(b)'s
five-year deadline, and indeed it does not appear that any such

---

[7] It should be noted that there is also a case from this District
supporting the position that 1658(b)'s five-year deadline begins
running at the time of the transaction. See Anwar v. Fairfield
Greenwich Ltd., 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010).
However, Anwar's holding on this issue is solely premised upon
Arnold, and given the distinguishing factual pattern in Arnold
combined with the fact that Arnold is unpublished, Anwar does
not outweigh the considerable authority concluding that the
clock begins ticking on 1658(b)'s five-year deadline on the date
of the alleged misrepresentation or omission, rather than the
date of the transaction at issue. See Boudinot, 2012 WL 489215,
at *4 & nn. 42, 43, 45 (collecting cases).

opinion exists.[8]  That is likely because applying the concept of

a continuing omission to the five-year deadline would

essentially render that element of 1658(b) a nullity with

respect to any securities fraud case that does not involve a

corrective disclosure.


For example, if it is assumed that an individual

purchased a company's stock in February 2007 in reliance upon an

offering memorandum that contained a material omission that was

never subsequently acknowledged or corrected, under the

continuing omission theory urged by Intesa, not only would a

claim based on that omission be timely even today, six years

after the omission, despite 1658(b)'s five-year deadline, but

the five-year deadline *would not have even begun running on the*

*claim*.  This could not have been the intention of Congress in

drafting 1658(b)'s five-year deadline, which was meant to be "an

unqualified bar on actions" that "giv[es] defendants total

repose after five years," Merck & Co., Inc. v. Reynolds, 130

---

[8] There are, however, a number of cases impliedly rejecting the
application of the concept of continuing omission to 1658(b)'s
five-year deadline.  See, e.g., In re J.P. Jeanneret Assocs.,
Inc., 769 F. Supp. 2d 340, 355 (S.D.N.Y. 2011) (holding that a
Madoff-related securities action filed in April 2009 was time
barred pursuant to 1658(b)'s five-year deadline to the extent
that it was based on omissions made prior to April 2004, even
though such omissions had continued until at least December
2008, when the Madoff scheme was first revealed).

S.Ct 1784, 1797 (2010), and thereby eliminates the possibility that defendants will be "subject[ed] to liability for acts taken long ago." Id.

Accordingly, the "violation" in this case for 1658(b) purposes is considered to have occurred on the date of the latest misrepresentation or omission alleged.  With respect to Calyon, this date is March 6, 2007, which is when the Calyon sent Intesa an allegedly fraudulent valuation of Pyxis.  See FAC ¶¶ 128-31; Declaration of Lea Haber Kuck in Support of Motion to Dismiss the Amended Complaint ("Kuck Decl."), Ex. J.  With respect to Putnam, this date is October 2, 2006, which is the date of publication of the Offering Memorandum, which incorporated by reference the Collateral Management Agreement. See FAC ¶ 78-79; Declaration of Jonathan E. Pickhardt in Opposition to Defendants' Motions to Dismiss the Amended Complaint, Ex. C.  Accordingly, 1658(b)'s five-year post-violation deadline expired on March 6, 2012 with respect to Calyon, and on October 6, 2011 with respect to Putnam.[9]  Given

---

[9] It bears noting that the contract memorializing the Pyxis Swap incorporates by reference a set of documents referred to as the "Underlying Documents," which are defined as "the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation."  See Kuck Decl. Ex. C ("Swap Contract") at 1, 27.

that Intesa's § 10(b) claims were asserted for the first time in the complaint dated April 6, 2012, those claims are untimely pursuant to 1658(b)(2) with respect to both Calyon and Putnam.

Pursuant to 1658(b), a plaintiff's § 10(b) claim is untimely if it is asserted subsequent to the expiration of the *earlier* of the two-year post-discovery deadline and five-year post-violation deadline.  28 U.S.C. § 1658(b).  As set forth above and given Intesa's allegations in the FAC, the two-year deadline has not yet run, but the five-year deadline ran in October 2011 for Putnam and in March 2012 for Calyon. Accordingly, Intesa's § 10(b) claims against Calyon and Putnam, which were asserted for the first time on April 6, 2012, are untimely pursuant to 28 U.S.C. § 1658(b)(2).[10]

---

Since Intesa alleges that the Swap Contract was executed by Calyon on April 24, 2007, see FAC ¶ 67, if any of the documents considered to be "Underlying Documents" for purposes of the Swap Contract contained misrepresentations regarding Putnam's role as collateral manager, Intesa's § 10(b) claims against Calyon and Putnam may possibly be timely with respect to 1658(b)'s five-year post-violation deadline.  However, Intesa does not make any allegations in the FAC regarding misrepresentations or omissions in the Swap Contract with respect to the timeliness of Intesa's § 10(b) claims.

[10] Because Intesa's § 10(b) claims are time-barred pursuant to 28 U.S.C. § 1658(b), it is not necessary to reach the Defendants' alternative arguments for dismissal of those claims.  See Texas E. Transmission Corp. v. Gen. Electric Co., 601 F. Supp. 627, 629 (S.D.N.Y. 1985).

## INTESA'S STATE LAW CLAIMS ARE DISMISSED

Because Intesa's federal claims are dismissed as time-barred pursuant to 28 U.S.C. § 1658(b), supplemental jurisdiction will not be exercised over the remaining state law claims. Although there is an option to exercise supplemental jurisdiction over these non-federal claims, "in general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." Olle v. Columbia Univ., 332 F. Supp. 2d 599, 620 (S.D.N.Y. 2004) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998)). "As this case is still at the pleading stage and no discovery has yet taken place, with due consideration of concerns of judicial economy, convenience and fairness, Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191 (2d Cir.1996), it is appropriate to follow that practice in this instance." GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 334 (S.D.N.Y. 2008).

CONCLUSION

The Defendants' motions to dismiss Intesa's federal claims as time-barred pursuant to 28 U.S.C. § 1658(b) are granted with leave to amend within 20 days, and supplemental jurisdiction over Intesa's state law claims is declined.

It is so ordered.

New York, NY
February /2, 2013

ROBERT W. SWEET
U.S.D.J.

28