UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTESA SANPAOLO, S.P.A.,

                     Plaintiff,

-against-

CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK, CRÉDIT
AGRICOLE SECURITIES (U.S.A.) INC.,
THE PUTNAM ADVISORY COMPANY,
LLC, MAGNETAR CAPITAL LLC,
MAGNETAR FINANCIAL LLC, AND
MAGNETAR CAPITAL FUND, LP,

                     Defendants.

---

RECEIVED

2013 MAR -4  P 4 03

DISTRICT COURT SDNY

12 Civ. 2683 (RWS)

## SECOND AMENDED COMPLAINT

Plaintiff Intesa Sanpaolo, S.p.A. ("Intesa" or "Plaintiff"), by its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, brings this Second Amended Complaint against Crédit Agricole Corporate and Investment Bank ("Calyon CIB"), and Crédit Agricole Securities (U.S.A.) Inc. ("Calyon (U.S.A.)") (collectively, "Calyon"); The Putnam Advisory Company, LLC ("Putnam"); Magnetar Capital LLC ("Magnetar Capital"), Magnetar Financial LLC ("Magnetar Financial"), and Magnetar Capital Fund, LP ("Magnetar Capital Fund") (collectively, "Magnetar") (all of the defendants collectively, "Defendants") and alleges as follows:

### Nature of the Case

1.      This action arises out of Defendants' fraudulent scheme to secretly stack the deck against unknowing investors, including Intesa, in favor of the now-infamous hedge fund known as Magnetar. In July 2006, Calyon structured a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis"). Calyon marketed Pyxis to unsuspecting investors as an investment based on residential mortgage-backed securities ("RMBS") chosen by a respected,

putatively independent firm, Putnam, acting diligently and in good faith in the interests of long investors, and using a rigorous selection process that was consistent with the highest industry standards. Based on these representations, Intesa agreed to enter into a credit default swap ("CDS") with Calyon in which Intesa provided protection on $180 million of putatively super senior, AAA-rated Class A-1 notes issued by Pyxis (the "Pyxis Swap"). However, unbeknownst to long investors like Intesa, Putnam did not select the securities for Pyxis; Magnetar did. In fact, Calyon, Putnam and Magnetar deliberately structured the Pyxis CDO to *lose* funds invested by those taking a long position. And lose money it did: less than two years later, Intesa lost $180 million, the full amount of the Pyxis Swap. Unbeknownst to Intesa at the time, its embedded losses on the Pyxis Swap were over $70 million *on the date the transaction closed*. Calyon itself would have borne that loss had it not fraudulently transferred the risk to Intesa through the Pyxis Swap.

2.     Intesa's loss was not the result of impersonal market forces. Instead, it was the direct and intended result of the Defendants' actions—actions which were materially identical to those for which Goldman, Sachs & Co. agreed to pay $550 million in order to settle claims brought by the Securities and Exchange Commission ("SEC"). *See Securities and Exchange Commission v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 149-50 (S.D.N.Y. 2011). The scheme was designed by Magnetar, which enlisted Calyon and Putnam to secretly construct Pyxis from toxic assets. Magnetar then reaped almost a hundred million dollars in profits by betting against the credit quality of the Pyxis assets it had surreptitiously selected. Putnam collected higher than normal fees for its purported independent management of Pyxis, which were effectively assured by Magnetar's involvement in the scheme, and also secured additional similarly lucrative deal volume from Magnetar. Calyon collected fees on the deal, ensured that it

would be able to participate in additional lucrative CDOs with Magnetar, and, through the Pyxis Swap, shifted losses on the CDO which it would have otherwise borne itself to Intesa.

3.       Pyxis was not the first transaction in which Magnetar colluded with Calyon and others to secretly control asset selection for a CDO and then bet against its performance. As is now widely known, Pyxis was just one of numerous "Constellation CDOs" used by Magnetar to make billions of dollars at the expense of unsuspecting long investors. J.P. Morgan recently paid $153.6 million to settle SEC charges that it participated with Magnetar in a similar scheme. And the SEC is currently investigating Magnetar's role in the creation of several other CDOs. *See* Marian Wang, "Merrill Lynch Investigated for CDO Including Magnetar," PROPUBLICA, June 15, 2011; Marian Wang, "SEC Investigating Yet Another Magnetar CDO," PROPUBLICA, Sept. 15, 2011; Marian Wang, "In a First, SEC Warns Rating Agency It May Bring Financial Crisis Lawsuit," PROPUBLICA, Sept. 26, 2011; "SEC Warns Top Banker of Charges Over Magnetar Deal," PROPUBLICA, Feb. 12, 2012. Indeed, according to the Wall Street Journal, the SEC has begun an investigation of Magnetar itself, not merely of the banks and rating agencies who dealt with it. *See* "SEC Probes Role of Hedge Fund in CDOs," Wall Street Journal, May 17, 2012. In addition, the Securities Division of the Commonwealth of Massachusetts recently imposed a $5 million penalty on State Street Global Advisors for its failure to disclose Magnetar's involvement in a CDO for which it acted as the investment manager. *See* Commonwealth of Massachusetts Securities Division Consent Order, *In the Matter of: State Street Global Advisors (Carina CDO, Ltd.)*, Docket No. 2011-0023 (February 28, 2012). Most significantly: (1) after incriminating evidence came to light in July 2011 in a lawsuit brought against Calyon and Putnam *by investors in Pyxis*, the investors' claims were promptly settled for an undisclosed amount (*see Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corporate & Inv. Bank*, No.

650673/2010 (Sup. Ct. N.Y. County June 18, 2010)); and (2) late last year, the Securities

Division of the Commonwealth of Massachusetts filed a complaint against Putnam for its role in

Pyxis.

        4.      In addition, on July 18, 2012, still more relevant misconduct by Defendants came

to light when Mizuho Securities USA agreed to pay $127.5 million to settle charges brought

against it by the SEC relating to another Magnetar deal, Delphinus 2007-1 ("Delphinus"), which

was arranged just a few months after Pyxis closed *by the same team of former Calyon bankers*

*who had arranged the Pyxis deal* (and then moved en masse to Mizuho), and which involved

some of the very same misconduct (inclusion of "dummy" assets in the CDO's target portfolio)

alleged against these individuals with respect to Pyxis.

        5.      Calyon was a prolific underwriter of CDOs collateralized by RMBS and other

asset-backed securities ("ABS"), churning out more than $75 billion of CDOs in 2006 and 2007

and generating tens of millions of dollars in fees for itself in the process.  It has since become

apparent that Magnetar helped fuel Calyon's desire for growth in this market by acting as the

crucial equity sponsor in multiple Calyon-arranged CDOs, including Pyxis, and that the Calyon

deal team worked on more Magnetar CDOs than any other underwriting group.

        6.      Time has shown that Calyon valued racking up fees over the quality of its deals,

as Calyon's CDOs have performed abysmally.  By December 2008, Calyon's CDO portfolio had

the highest default rate of any underwriter's, with over 45% of its portfolio defaulting.  The brunt

of these losses was borne by unsuspecting investors, like Intesa, who provided protection on

Pyxis based on Calyon's false representations and promises.

        7.      Calyon and Putnam made numerous misrepresentations attesting that the Pyxis

portfolio would be selected by a highly reputable and experienced collateral manager, namely

Putnam, which would act independently, diligently and in good faith for the benefit of long investors like Intesa. These representations were made, among other things, in the Pyxis Offering Memorandum and Collateral Management Agreement, both of which were incorporated by reference in the Pyxis Swap executed on April 24, 2007. Calyon also represented on at least March 6, 2007, April 2, 2007 and May 2, 2007—in other words, both before and after execution of the Pyxis Swap—that, between the date of the CDO's closing and the time when the parties actually executed the Pyxis Swap, the notes retained their value and were still worth close to par. On April 20, 2007, just four days before the Pyxis Swap closed, Putnam sought to further reassure Intesa that the Pyxis portfolio had performed satisfactorily by representing that, despite the recent spate of delinquencies in the mortgage market, total losses on the portfolio should not be high.

8.     As Defendants intended, Intesa relied upon these representations, and others, in deciding to enter into the Pyxis Swap. The true facts, however, were vastly different. In fact, unbeknownst to Intesa, but with the full knowledge and collusion of Defendants, Pyxis was actually built to fail, and was designed for the benefit of a net short investor, namely Magnetar. As confirmed by numerous contemporaneous emails between Defendants and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis), at the behest of Magnetar—one of whose executives, James Prusko, had previously worked at Putnam and had been the superior of the Putnam executive primarily responsible for selecting the Pyxis Portfolio, Carl Bell—Putnam abdicated its responsibilities to act diligently and independently for the benefit of long investors, and allowed Magnetar to hijack the Pyxis portfolio and ensure that it was loaded with toxic assets. For example: (i) Pyxis invested over half of its cash allocated to CDO investments in four other Magnetar CDOs, which in turn invested in yet more Magnetar CDOs, all of which were designed

to fail; (ii) there was a remarkably high correlation between the toxic assets contained in the Pyxis portfolio and those held by other Magnetar CDOs; (iii) there were no prime RMBS assets in the Pyxis portfolio, even though the Pyxis target portfolio provided to Intesa had slated $60 million of them for inclusion; and (iv) fully 22% of the assets in the Pyxis portfolio were drawn from ABX Indices (which was more than three times the permitted concentration of such assets, and thus constituted a breach of the Pyxis eligibility guidelines set forth in the indenture and other transaction documents). Moreover, the striking similarity between the conduct of the Defendants with respect to Pyxis and the well-publicized conduct of Magnetar and the banks and collateral managers involved in other CDOs tailored to benefit Magnetar's shorting strategy at the expense of CDO investors reinforces the conclusion that Pyxis portfolio selection was also controlled by Magnetar and that Pyxis was designed to fail to further Magnetar's shorting strategy. Finally, the valuations of the Class A-1 notes provided by Calyon both prior to and after execution of the Pyxis Swap were egregiously false—far from being worth close to par, the notes had actually lost over 90% of their value by then.

9. Having created Pyxis, Defendants had exclusive knowledge of the facts rendering their representations false. For instance, only Defendants knew that Magnetar, in collusion with Calyon and Putnam, had corrupted the collateral selection process for Pyxis so that it could select toxic assets whose performance it could bet against, and only Defendants knew that those assets included other CDOs hijacked by Magnetar. By contrast, Intesa did not know, and could not have known, of these manipulations and the resulting concealment of the true nature of Pyxis. In fact, Intesa did not become aware of these facts, or of the collusion between Calyon, Putnam and Magnetar generally, until some time after April 9, 2010, when some of the critical facts relating to this collusion were first reported in the press. *See* Jesse Eisinger and Jake Bernstein, "The

Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going," PROPUBLICA, April 9, 2010.

10.    As Defendants were well aware, had Intesa known the truth about the Pyxis CDO—that the CDO had actually been built to fail by Magnetar, rather than built to succeed by Putnam, and that, if Intesa sold protection on the A-1 notes, it would be facing the loss of over $70 million on the very day it agreed to the transaction—Intesa would never have agreed to enter into the Pyxis Swap.

11.    On April 30, 2008, only 18 months after Pyxis closed, Fitch Ratings Ltd. ("Fitch") downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Pyxis Swap. Intesa thereafter paid $180 million under the Pyxis Swap and received Class A-1 Pyxis notes, which are virtually worthless. Intesa has thus lost $180 million as a result of the Defendants' fraud.

12.    Intesa therefore brings this action for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5; fraud; and aiding and abetting fraud.

### The Parties

## I.    The Plaintiff

13.    Plaintiff Intesa Sanpaolo S.p.A, formerly known as Banca Intesa S.p.A., is a corporation organized under the laws of Italy, with its principal office located in Torino, Italy.

## II.    The Calyon Defendants

14.    Defendant Calyon CIB is a limited liability company organized under the laws of France. Calyon CIB is a global and diversified bank, and it has branch offices across the world, including in New York at 1301 Avenue of the Americas, New York, New York 10019. Calyon CIB's stock is listed on the New York Stock Exchange. Calyon CIB (formerly known as Calyon) was the protection buyer on the Pyxis Swap.

15.     Defendant Calyon (U.S.A.) is a U.S. broker-dealer incorporated in Delaware, with its principal office located at 1301 Avenue of the Americas, New York, New York 10019.

## III.   The Magnetar Defendants

16.     Defendant Magnetar Capital LLC is a limited liability company formed under the laws of the State of Delaware, with an office located at 623 5th Avenue, New York, New York 10022-6831.

17.     Defendant Magnetar Financial LLC is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.

18.     Defendant Magnetar Capital Fund is a limited partnership formed under the laws of the State of Delaware, with its principal place of business located at 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.  Magnetar Financial and Magnetar Capital Fund (together, the "Magnetar Funds") are controlled by Magnetar.  The Magnetar Funds made CDO-related investments in 2006 and 2007.

## IV.   Defendant Putnam Advisory Company

19.     Defendant Putnam is a limited liability company organized and existing under the laws of Delaware.  Its principal executive office is located at 1 Post Office Square, Boston, Massachusetts 02109.  It is a registered investment advisor specializing in the management of collateralized debt obligations.

### Jurisdiction and Venue

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

21.     Plaintiff's claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and New York common law.

22.     Calyon CIB has a foreign bank branch licensed by the New York Superintendent of Banking to conduct business in New York.

23.     Calyon (U.S.A.) is a corporation organized under the laws of the State of Delaware, with its principal place of business located in New York, New York.

24.     Both Calyon CIB and Calyon (U.S.A.) engage in a continuous and systematic course of business from their shared offices located at 1301 Avenue of the Americas, New York, New York.  Numerous employees integral to the transactions at issue held themselves out to investors and Plaintiffs as representatives of both Calyon CIB in New York and Calyon (U.S.A.).

25.     This Court has jurisdiction over Calyon CIB under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because Calyon CIB maintains offices and regularly conducts business in New York, and because the tortious conduct alleged herein was committed in New York.

26.     This Court has jurisdiction over Calyon (U.S.A.) under F.R.C.P. 4(k)(1)(A) and CPLPR 301 and 302(a)(1) because it maintains offices and transacts business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York.

27.     This Court has jurisdiction over Magnetar Capital under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because, at all times relevant to the allegations of this Complaint, Magnetar Capital regularly transacted business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York using its office located at 623 5th Avenue, New York, New York 10022-6831.

28.     This Court has jurisdiction over Magnetar Financial and Magnetar Capital Fund under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because, at all times relevant to the allegations of this Complaint, they regularly transacted business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York.

29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  The wrongful acts alleged herein occurred in this District.  Additionally, Calyon CIB maintains an office in this District, and Calyon (U.S.A.)'s principal place of business is located in this District.

## Factual Background

## I.     Collateralized Debt Obligations

30.     A CDO is a special purpose vehicle that purchases, or assumes the risk of, a portfolio of assets (the "portfolio")—such as bonds or loans—and issues securities which then make payments to investors based on the income generated by the assets.  A CDO's portfolio can include a variety of assets, such as commercial or residential mortgage-backed securities ("CMBS" and "RMBS," respectively), securities issued by other CDOs, or CDS referencing those types of obligations.  When properly performing, the assets that form the CDO portfolio generate a stream of cash flows (*e.g.*, from mortgage payments) that the CDO uses to pay its expenses and make interest and principal payments to the CDO's noteholders.  Any remaining cash flows go to the CDO's equity investors, if any.  Whether a CDO's issued securities will be repaid in full depends primarily on the CDO's structure and the credit quality (and subsequent performance) of the portfolio assets of the CDO.  Thus, for a CDO constructed primarily from RMBS, CDO noteholders will be more likely to receive expected payments of interest and principal if the rate of collection on the underlying individual mortgages is high.

31.     To buy their portfolio of assets, CDOs raise money from investors by issuing multiple classes of notes and equity interests.  A CDO's notes are not all subject to the same level of risk.  Rather, CDO notes are issued in "tranches" representing different levels of risk (and therefore potential reward).  This is achieved by creating a hierarchical structure of noteholders in the CDO.  The senior tranche of a CDO typically receives the highest "AAA"

rating. "Super senior" CDO tranches, which are intended to be even more remote from loss, are senior to another tranche that is also rated AAA. Because the most senior tranches receive proceeds from the CDO portfolio first, they bear the lowest risk of sustaining losses in the CDO structure.

32.     Correspondingly, CDO notes do not all offer the same level of anticipated return to their purchasers. The interest on CDO notes is set according to their expected level of risk. More junior tranches generally offer higher interest, but are exposed to a higher risk of shortfalls, because their position in the CDO structure exposes them to losses in the portfolio before the more senior notes. The more senior tranches, on the other hand, receive lower returns because they benefit from greater subordination and thus carry lower risk.

33.     Putatively independent ratings agencies typically assign ratings to the tranches of a CDO—except for the equity or income tranche (if any). The ratings agencies also assign ratings to the underlying assets that are either held or referenced by the CDO. The risk on properly rated AAA tranches issued by a CDO should be remote if: (a) the portfolio includes only securities of credit quality commensurate with expected loss rates; and (b) the amount of subordination is set properly, according to the quality of the portfolio, to absorb potential losses so that the risk of default affecting the senior tranches is extremely remote. Therefore, one of the most important determinants of a CDO's performance is the selection and management of its portfolio.

## II.     Managed CDOs And the Role Of The Collateral Manager

34.     For actively managed, cash-flow CDOs like Pyxis, the CDO's portfolio is supposed to be selected and managed by a collateral manager. Managing a CDO portfolio typically involves, among other things, selecting the assets for inclusion in the initial portfolio, monitoring the credit status of the individual underlying assets, reinvesting payment proceeds

from maturing underlying assets, and making substitutions in the portfolio of assets to the extent consistent with the CDO's operative agreements. A collateral manager, therefore, can greatly impact a CDO's performance and either lower—or raise—its risk profile.

35.     As explained by Ian Giddy, Professor of Finance at the Stern School of Business at New York University:

> [T]the manager's expertise with the assets and ability to manage within established constraints is *paramount* to the success of the CDOs. *Market consensus is that the manager is the most important factor in the performance of a CDO*.

"The CDO Product," by Ian Giddy, Professor of Finance at the Stern School of Business at New York University (emphasis added). Or, as Calyon and Putnam themselves stated in the Pyxis offering memorandum, "[b]ecause the composition of the [portfolio] will vary over time, **the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]**."

36.     Fundamental to the collateral manager's role is the assumption that it will act independently and serve the interests of the CDO's investors. As explained by the former Co-Head of Global CDOs at Citigroup in testimony to the U.S. Financial Crisis Inquiry Commission ("FCIC") in April 2010: "The collateral manager's role was to . . . manage and trade the collateral pool for the benefit of the debt and equity issued by the CDO."

37.     Investors rely heavily on the collateral managers' professed sophistication in analyzing and selecting assets for the CDO's portfolio. This is especially true for investments in other CDOs, whose complex portfolios are composed of other CDOs and RMBS, which are themselves composed of underlying loans. Evaluating such intricate, multilayered deals requires significant expertise.

38.     Collateral managers are paid a fee for their services, typically a percentage of the notional value of the transaction (*i.e.,* the total face amount of all securities issued by the CDO), the cost of which is ultimately paid by the CDO investors.

39.     Most of a CDO's initial portfolio of assets are selected by the collateral manager in the months prior to the CDO closing. Since the CDO has not yet raised any capital during that period (along with any post-closing period in which the CDO continues to acquire its portfolio, this is known as the "ramp up period"), the pre-closing acquisition of assets is funded pursuant to a CDO "warehousing facility" between the collateral manager and the warehousing facility provider, which is usually the bank structuring the transaction—here, Calyon. If the CDO fails to close, the warehousing facility provider is usually at risk for assets that have already been acquired for the CDO's portfolio. But upon the CDO's closing, all of the assets acquired pursuant to the warehousing facility are transferred to the CDO (so long as they are still eligible), with the warehousing facility provider receiving reimbursement via the funds raised by the CDO through its issuance of notes and equity. After the CDO closes, the collateral manager typically continues to acquire assets for the CDO portfolio until it is fully "ramped up," *i.e.,* complete. It also manages the acquired underlying assets pursuant to the terms of the CDO's indenture and a collateral management agreement between the CDO and the collateral manager that sets forth the collateral manager's responsibilities.

## III.    Calyon's CDO Structuring Business

40.     Calyon was the arranger and underwriter for the Pyxis CDO. Calyon is a global investment bank, and during the relevant time period it was a prolific underwriter of CDOs collateralized by RMBS, underwriting over $75 billion in structured credit transactions that either had already closed or were in progress by mid-2006. Calyon's CDO business was run out of its Structured Credit Group, including from its New York office. As a CDO underwriter,

Calyon gained access to non-public information about the RMBS and CDOs included in the portfolios of the CDOs it was structuring. This provided Calyon with significant amounts of additional information about mortgage securities structured by other underwriters as well. Calyon thus had unique access to non-public information about the markets for residential mortgage securities.

41.     By early 2005, the market for CDOs—in particular, CDOs supported by assets concentrated in the U.S. residential mortgage sector—had become an extremely lucrative business line for many of Calyon's competitors in the investment banking world. Though Calyon had made some inroads into this market, it lagged behind those competitors. Accordingly, in its December 2005 "Strategic Development Plan" for 2006 to 2007, Calyon's parent corporation (Crédit Agricole) set an ambitious goal to become one of the world's top five companies in structured credit and securitizations.

42.     Although this was not known publicly at the time, Calyon's relationship with Magnetar was crucial to its plan to grow its CDO business. Magnetar was founded in 2005 and grew rapidly, becoming a major, but largely secret, player in structured credit, especially CDOs, within just two years. In fact, from its launch in 2005 through 2007, Magnetar grew 600%, from approximately $1.5 billion under management to approximately $9 billion. That growth occurred largely because Magnetar facilitated the creation of CDOs with portfolios of RMBS and CDO securities ultimately backed by RMBS—for the purpose of heavily shorting these very CDOs.

43.     Specifically, in early 2006, as default rates on subprime mortgages in the United States began to rise, Magnetar sought to bet heavily against securities backed by such mortgages. It did so by shorting subprime RMBS through CDS. That is, Magnetar sought to buy protection

through CDS on RMBS, so that, if the underlying RMBS did not perform, Magnetar would receive payments under the CDS. At the time, however, Magnetar found it difficult to buy large amounts of protection on subprime RMBS tranches.

44.     As 2006 progressed into 2007, banks like Calyon also faced a difficulty: finding investors willing to take on the most risky, equity stakes in CDOs. Without equity investors, Calyon could not create, market, and sell investments in the CDOs that were earning Calyon millions of dollars in fees.

45.     To solve their respective problems, Magnetar and Calyon secretly joined forces to launch a series of CDOs under the guise of *bona fide* investments for the benefit of CDO noteholders, *i.e.*, "long" investors. In reality, these were vehicles designed by Magnetar to place short positions on billions of dollars of subprime mortgage bonds at below-market costs. In these CDOs, Magnetar served as the equity investor, making it possible for Calyon to structure and sell investments in the CDOs, and thereby earn its fees. Calyon, in turn, gave Magnetar the opportunity to (1) make massive short bets against the assets being purchased by the CDOs; and (2) ensure that those shorts would pay out by secretly dictating the asset selection for the CDOs.

46.     Magnetar's collusion with banks such as Calyon has now been reported in multiple media sources. As recounted in a Pulitzer Prize-winning April 9, 2010 investigative report authored by ProPublica, "[u]sually, investment banks had to go out and find buyers of the equity. With Magnetar, the buyer came right to the bank's doorstep. Wall Street was overjoyed." Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going," PROPUBLICA, April 9, 2010. A banker told ProPublica that Magnetar's purchase of equity tranches "seemed like a miracle" because "no one" had been buying the equity.

47.     Unlike an ordinary investor, Magnetar did not buy the equity in its CDOs because it believed it was a sound investment. Rather, as Calyon knew, Magnetar's strategy was predicated on the ultimate failure of the very CDOs it had helped to create. Magnetar used its equity tranches, in particular the unusually early and substantial payouts that it arranged for those tranches to receive (at the expense of more senior tranches), to fund its short positions on the very same deals, during the (relatively) brief time between closing and the deal's collapse.

48.     As described by one former Goldman Sachs banker:

> Magnetar owns the [CDO's] equity layer, which throws out a lot of cash for perhaps a year or two and then starts to decay quickly. They bet against the better slices, *short the very same deals they created*[.]
>
> ***
>
> It only works if the deal is so bad that the equity, plus the higher layers, are all toast. Magnetar would not make its target returns on the equity tranche alone. The deals had to fail for them to succeed. It was common for funds like Magnetar to let a trading desk know what parameters it wanted, and the traders would in turn line up suitable investments with the CDO manager. Magnetar influenced the transaction by mandating a certain equity return, which meant the CDO would have to hold the 'spreadiest' (i.e., riskiest) crap.

Yves Smith, ECONNED, at 258-59 (Palgrave MacMillan 2010).

49.     The ratio of Magnetar's short positions to its equity positions varied from deal to deal, but it was often 6-to-1 or higher, meaning that when a Magnetar CDO such as Pyxis failed, the payoff on Magnetar's short positions was at least six times the amount of Magnetar's original equity investment in that CDO.

50.     Magnetar acted as the equity sponsor in at least five Calyon-arranged CDOs. In fact, Calyon and Magnetar worked together to create the first of the so-called Constellation CDOs (*i.e.,* CDOs whose portfolios Magnetar secretly influenced)—Orion 2006-1 ("Orion"), which closed on May 26, 2006. Magnetar then sponsored four additional Constellation CDOs, including Pyxis, Cetus 2006-3, Orion 2006-2 CDO, and Voltans Funding 2007-1. By the time

Intesa and Calyon executed the Class A-1 CDS in April 2007, unbeknownst to Intesa, Calyon had worked with Magnetar on five CDOs totaling over $6 billion in total issuance, making Calyon the top underwriter of Magnetar-sponsored deals.

51.     The Calyon executive primarily responsible for arranging Pyxis, Alex Rekeda, had worked with Magnetar on Orion, and thereafter worked on all Constellation CDOs arranged by Calyon.  Subsequently, Rekeda continued to arrange CDOs for Magnetar at Mizuho, where his team moved en masse in late 2006, shortly after Pyxis closed (resulting in bitter litigation with Calyon).  On July 18, 2012, the SEC announced that Mizuho had agreed to pay $127.5 million to settle claims for securities fraud by Rekeda's team relating to another Magnetar CDO, Delphinus 2007-1, involving the creation of "dummy assets" in a target portfolio which were designed to mislead ratings agencies—misconduct very similar to the behavior in which Rekeda's team also engaged on Pyxis with a view to misleading investors. *See SEC v. Mizuho Securities USA Inc.*, Index No. 12-CV-5550 (S.D.N.Y. July 18, 2012).  As part of the SEC settlement against Mizuho, Rekeda and another member of his team each agreed to pay $125,000 in fines.  They and a third team member were also suspended from working in the securities industry for a year.

52.     As part of its secret arrangements with Calyon, Magnetar insisted in its deals on having a "veto" right over any asset that might become part of a CDO's reference portfolio.  As Intesa also did not know, but Calyon was well aware, Magnetar bought cooperation and acquiescence in this "veto" arrangement from putatively independent collateral managers like Putnam by promising fees and deal volume.  In a September 8, 2006 email to a prospective CDO manager, for example, Magnetar executive James Prusko (formerly of Putnam) stated: "Our goal is to ***partner*** with managers and do a series of deals, there are two managers with whom we

are already on our third deal . . . I think the cumulative business will be worthwhile even if you feel the first deal is too skinny." Magnetar's Prusko wrote to the same collateral manager: "I have attached the target portfolio that I would like for this deal with target spreads that I believe are very achievable in the current market." When that collateral manager refused to assemble such a portfolio, Magnetar declined to work with the manager on any other CDOs.

53.     Putnam, however, was more accommodating. Putnam worked with Magnetar on both Pyxis and a second Pyxis deal, Pyxis 2007-1 ("Pyxis 2"), which closed six months after Pyxis. On both deals, as detailed below, Putnam knowingly allowed Magnetar to control collateral selection to further its shorting strategy with respect to the CDO's collateral.

54.     With Magnetar's help, Calyon's CDO business skyrocketed. By September 2006, Calyon claimed to be a leading CDO underwriter, with a trading platform covering the entire structured credit product spectrum. Calyon was ranked third in the Informa Global Markets European CDO league table for the year 2006, and seventh worldwide in ABS/MBS securitizations. In February 2007, Calyon was recognized as the "CDO Arranger of the Year 2006."

55.     What is now clear, however, is that Calyon emphasized quantity over quality and integrity, and speed over diligence. Calyon's own managing director later likened the CDO structuring business to "cheap sangria," observing that it involved "[a] lot of cheap ingredients repackaged to sell at a premium. It might taste good for a while, but then you get headaches later and you have no idea what's really inside." In fact, Calyon-underwritten CDOs were some of the worst performing CDOs in the market, with over 45% of the Calyon CDO portfolio having defaulted by December 2008, the highest percentage of any underwriter. Calyon also led the league tables of CDO downgrades, ranking number one ahead of all its other competitors,

including Wachovia, Deutsche Bank, and Citigroup. Calyon is reportedly being investigated as part of the New York Attorney General's investigation into wrongdoing in CDO underwriting.

56.    Similarly, Magnetar's Constellation CDOs, which were built to fail and to further Magnetar's shorting scheme, failed at staggering rates, resulting in huge profits for Magnetar. According to ProPublica, about 96% of Magnetar's deals were in default by the end of 2008, compared with 68% for comparable CDOs—as a direct result of Magnetar's control and adverse selection of the portfolios of these CDOs.

## IV.    Calyon Marketed The Pyxis Swap To Intesa With Affirmative Misrepresentations And Strategic Omissions

### A.    The Pyxis CDO

57.    Pyxis, which was structured by Calyon (for which Calyon reaped tens of millions of dollars in fees), was a "hybrid" CDO. This meant that its $1.5 billion portfolio included both "cash" and "synthetic" underlying assets. Approximately 23% (or $350 million par value) of the Pyxis portfolio was comprised of "cash" assets, that is, investments that Pyxis actually purchased. The remaining approximately 77% (or $1.15 billion par value) of the Pyxis portfolio was comprised of "synthetic" assets, which were created through CDS that referenced other asset-backed securities not actually owned by Pyxis. In these CDS, in exchange for premium payments, Pyxis sold protection to counterparties, *i.e.,* it agreed to make payments in the event of specified credit events, such as failure by the security to make interest or principal payments. The performance of these securities supposedly selected by Putnam would thus determine the returns (or losses) to Pyxis under the CDS. If the referenced obligations performed well, Pyxis would enjoy the premium payments without having to make any credit protection payments. However, if the referenced obligations performed badly, then Pyxis would have to make credit protection payments to the credit default swap counterparty, potentially up to the full notional

amount of the referenced obligation. These payments could exceed by many multiples the premium payments to which Pyxis was entitled under the CDS. Through such swaps, Pyxis was the "long" investor on the referenced securities making up the synthetic portion of its portfolio, while the credit default swap counterparties were "short" the same securities.

58.    Pyxis became long the economic risk—that is, it took the risk that the securities would not perform—through selling protection to Calyon CIB. Calyon CIB performed the role of protection buyer, meaning that Calyon paid the premiums to Pyxis under the CDS in exchange for protection payments in the event that the underlying referenced assets did not perform. For most of the specified reference obligations, Calyon represented that it acted only as an intermediary, meaning that the ultimate short positions were held by other market participants whose identity was never disclosed to Intesa. As explained in the offering materials, this was achieved through a series of "back to back hedging transactions" between Calyon CIB and other counterparties, which referenced the same obligations as the credit default swap between Calyon CIB, in its role as CDS Counterparty, and Pyxis. In this way, Calyon CIB effectively acted as a conduit for parties willing to take a short position on particular assets, with Pyxis acting as the "long" investor. Payments under the credit default swaps would flow between Pyxis and the ultimate short counterparty via Calyon CIB. If the referenced assets performed well, Pyxis would simply receive its premium, which was paid by the short counterparty to Calyon and then passed from Calyon CIB to Pyxis, with Calyon keeping a portion of the premium for itself. But, if the referenced assets performed badly, Pyxis would be obligated to make loss payments that would ultimately flow to the short party via Calyon CIB.

59.    As explained below, unbeknownst to Intesa at the time, the ultimate short counterparty for many of these back-to-back transactions was Magnetar. By taking these short

positions, Magnetar was able to bet against *the very same assets* that it was secretly causing to be selected as part of the Pyxis portfolio. When these hand-picked obligations performed badly, Magnetar was thus poised to profit handsomely at the expense of Pyxis's investors.

60.    Putnam acted as the putative collateral manager on Pyxis. For its role as collateral manager, Putnam was to receive a fixed (or "senior") fee of fifteen basis points, or 0.15% of the outstanding principal of the Pyxis CDO per year. Because of the size of Pyxis—which, like all Constellation CDOs, was far larger than a typical CDO (with an initial deal volume of $1.5 billion)—Putnam's fixed fee would be $2.25 million for the first year alone. This was almost twice what the manager of a typical CDO (with an initial deal volume of $400 million) would earn. Indeed, Putnam's fixed management fee on Pyxis was high even by the standards of Magnetar CDOs. On information and belief, Putnam's fixed fee of 15 basis points was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26 CDOs, and higher than the total fee—including both fixed and incentive fees—on all but six of Magnetar's CDOs. In fact, the fixed fee paid to the collateral manager on the vast majority of Magnetar's CDOs was only 10 basis points, and Putnam's fixed fee of 15 basis points was higher than the fixed fee *and the incentive fee combined* on a number of other Magnetar CDOs. Thus, Magnetar was willing to pay extra for Putnam's cooperation in the scheme.

61.    In addition to its fixed fee, Putnam was also to receive an additional "incentive" (or "subordinated") fee of five basis points, amounting to $0.75 million for the first year. Although this was described as an incentive fee, payment of this fee was dependent not on Pyxis performing well, but rather on Magnetar receiving its target return, which in turn was effectively guaranteed by certain provisions favoring the equity investors in the Pyxis governing documents

(set forth in ¶ 52 below).   Thus, as Magnetar's co-equity sponsor on Pyxis, Deutsche Bank,

stated, Putnam's fees were "virtually assured" by Magnetar's control over Pyxis.

      62.    This is demonstrated by the fact that, according to the Pyxis Trustee Reports

provided to Pyxis investors, Putnam continued to be paid both its fixed and subordinated fees

long after Pyxis began to fail, as shown in the table below:

| Date | Event | Cumulative senior fees | Cumulative subordinated fees | Cumulative total fees |
|---|---|---|---|---|
| Feb. 12, 2007 | First payment to Putnam | $807,407 | $269,136 | $1,076,543 |
| Aug. 10, 2007 | First Pyxis collateral quality test failures | $1,934,363 | $640,505 | $2,574,868 |
| Sept. 10, 2007 | First Pyxis ratings downgrades | $2,122,134 | $640,505 | $2,762,639 |
| Dec. 10, 2007 | Pyxis A-1 notes (referenced by Pyxis Swap) downgraded | $2,655,584 | $833,238 | $3,488,822 |
| Dec. 10, 2008 | Pyxis Event of Default | $4,092,742 | $1,331,647 | $5,424,389 |
| Feb. 11, 2012 | Latest payment to Putnam | $4,380,053 | $1,331,647 | $5,711,700 |

      63.    Thus, Putnam kept getting paid both its senior and subordinated fees until Pyxis

suffered an Event of Default in December 2008—sixteen months after Pyxis suffered its first

collateral quality test failures—and it was still receiving part of its fixed fee from Pyxis as

recently as February 11, 2013.

64.    In a sworn statement to the Securities Division of the Commonwealth of Massachusetts, Putnam confirmed that it has been paid approximately $5,707,429 in collateral management fees for Pyxis 2006.

65.    Putnam was further motivated to cooperate with Magnetar on Pyxis because Pyxis was Putnam's first structured finance CDO since 2003, and its first ever CDO primarily backed by subprime RMBS. Putnam saw Magnetar as the key to its gaining a foothold in this highly lucrative market. The promise of additional, similarly lucrative deal volume from Magnetar was quickly realized when Putnam was selected to serve as collateral manager for a second Pyxis CDO, Pyxis ABS CDO 2007-1 ("Pyxis 2"), which closed just a few months after Pyxis.

66.    In a sworn statement to the Securities Division of the Commonwealth of Massachusetts, Putnam confirmed that it has been paid approximately $3,107,627.91 in collateral management fees for Pyxis 2.

67.    The equity ("Preference Shares") and the lowest tranche of notes ("Class X Subordinated Notes") issued by Pyxis were held equally by Magnetar and Deutsche Bank. Although the Preference Shares had a nominal value of $82.5 million, Magnetar and Deutsche Bank bought them at a 75% discount, for a total payment of $20.625 million. In addition, Magnetar and Deutsche Bank paid a total of $61.875 million for their Class X Subordinated Notes, meaning that they each paid a total of $41.25 million for the shares and notes they held in Pyxis.

68.    The structure of Pyxis was unusual in another respect—which was once again designed for Magnetar to profit at the expense of other note holders. In most CDOs, the more senior the note, the more likely it will be paid in the event the CDO does not receive enough cash flows from the portfolio to make all payments to note holders. Pyxis was different. Like

Magnetar's other CDOs, Pyxis was structured in such a way that, as long as it avoided default, the preference shares and Class X notes would receive much larger payments of principal and interest than the senior notes during the first five years of its existence, by which time they would both be fully paid out. Indeed, they would receive a large portion of their investment back within just over a year if Pyxis avoided default for that long, which it did. To protect this windfall, this structure could only be altered with the consent of the preference shareholders—*i.e.*, Magnetar and Deutsche Bank. It was described by Magnetar as "triggerless," because it effectively removed the typical CDO triggers which would have redirected funds away from the holdings of Magnetar and Deutsche Bank to senior note holders in the event of certain events reflecting deterioration in the performance of the portfolio. Thus, despite owning the equity and the *lowest* (usually most risky) tranche of notes in Pyxis, Magnetar's risk, and eventual losses, were in fact much lower than those of senior noteholders. Indeed, a review of the Pyxis monthly investor reports reveals that, pursuant to the "triggerless" structure, the preference shareholders and Class X note holders received payments of principal and interest of $36,364,897 before Pyxis' eventual default in December 2008. This included a payment of over $7 million within a few months of closing, and one payment even *after* Pyxis defaulted. By contrast, during this same period, senior noteholders only received payments totaling $7,450,377. Even when the Pyxis Portfolio began failing collateral quality tests as early as August 2007 and notes started to be downgraded by the rating agencies as early as September 2007 (which in a typical CDO would have triggered a redirection of funds from the equity holders and Class X noteholders to senior noteholders), principal distributions could not be reallocated to senior noteholders without the consent of Magnetar (which was, not surprisingly, not forthcoming).

69.     In addition, as Magnetar itself stated in a letter to the Financial Crisis Inquiry Commission, Magnetar negotiated an upfront payment with each of its CDOs "as a rebate to the purchase price of long positions taken by the Magnetar funds." This amounted to 30 basis points (0.30%) of the notional amount of the CDO, which in Pyxis' case was $4.5 million. Taking Magnetar's share of this upfront payment into account, along with Magnetar's share of the payments made by Pyxis to preference shareholders and Class X note holders ($18,182,448), Magnetar's long position on Pyxis by the time Pyxis defaulted was effectively only $21 million.

70.     However, once Pyxis defaulted, Magnetar reaped the full amount of the credit protection it had purchased on Pyxis, which—as Putnam was aware—far exceeded Magnetar's long position. Magnetar achieved its huge net short position because, unbeknownst to Intesa, the ultimate short counterparty for many of the so-called "back-to-back hedging transactions" described in the Pyxis offering materials was in fact Magnetar. This is demonstrated by documents that have come to light in the *Loreley* litigation brought by Pyxis investors against Putnam and Calyon, which settled shortly after these documents emerged. In September 2006, for example, when a Calyon employee questioned whether a trade ticket showing Magnetar purchasing the short side of a CDS for the Pyxis Portfolio was correct (since he had understood it was supposed to be Citigroup), Putnam confirmed: "*It is definitely Magnetar.*" (Emphasis added.) Moreover, this trade was merely the tip of the iceberg. In November 2006, when Calyon asked Magnetar's Jim Prusko whether he still wanted to "buy protection on PYXIS 06-1A C (A/A2/A)," Prusko responded that he was "*actually pretty full on Pyxis A unless super level, have room for AA or BBB.*" (Emphasis added.) In other words, Magnetar had already taken a substantial short position on Pyxis A notes, but still wanted to buy more protection on other classes of Pyxis notes.

71.     Indeed, according to Magnetar's own letter to investors in response to ProPublica's April 9, 2010 article discussing its CDO shorting strategy, Magnetar's short positions on the CDOs in which it invested averaged approximately 7% of the aggregate assets of those CDOs.  Thus, even assuming the accuracy of that statement, if Pyxis was merely an *average* Magnetar CDO, Magnetar's short positions on Pyxis would have totaled $105 million, given Pyxis' aggregate assets of $1.5 billion.  This dwarfed Magnetar's $21 million long position.

72.     Moreover, a review of the publicly available Intex files for the Constellation CDOs alone reveals that Magnetar bought protection on Pyxis from dealers who offset their exposure by buying protection in turn from the following Magnetar CDOs: Draco ($10 million), Cetus 2006-4 ($10 million), Octans 2006-2 ($10 million), Cetus 6-2 ($10 million), Volans ($6.888 million), and Delphinus ($13.3 million)—a total of more than $60 million.  It is reasonable to assume that these sales resulted from sales of protection by these dealers to Magnetar, given that Magnetar used all of these dealers regularly and that, in its investor letter, Magnetar conceded that it was plausible that "all of Magnetar's protection instruments became assets of the various CDOs in which we held equity, to the extent that the assets in the CDOs' warehouses corresponded to the protection instruments held by Magnetar."

73.     In addition, a review of Intex files for other non-Constellation CDOs indicates that Magnetar bought protection on Pyxis from dealers who offset their exposure by buying protection in turn, possibly totaling far more than $60 million, from at least the following CDOs: 888 Tactical, Class V III, Grand Avenue II, GSC ABS 2006-3 G, Jupiter HG 6, Lexington Capital V, Octonion, Plettenburg Square, Raffles, Tricadia 6-7, Tricadia 7-8, West Trade II, West Trade III, Cookson 2007-36, Cookson 2007-37, and Ridgeway Court 1.  Again, given that

Magnetar regularly used most of the underwriters of these CDOs and that most of the dealers also underwrote Magnetar CDOs, it is reasonable to assume that many of the CDOs' sales of protection to these dealers resulted from sales of protection by the dealers to Magnetar.

74.    In May 2012, for example, details emerged of Magnetar's involvement in Class V Funding III CDO ("Class V III"), in claims brought by the SEC against Citigroup concerning their role in structuring and marketing Class V III.  The Citigroup claims were settled for *$285 million*—a settlement the Court rejected as *inadequate*. *See SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).  Documents filed in support of the SEC's claims include a number of emails from September and October 2006—around the time Pyxis closed— in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals—including Pyxis—which were being considered for inclusion in the Class V III portfolio. This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko of Magnetar.  In September 2006, Prusko told Citigroup that buying protection on various CDOs in the Class V III portfolio "is a top priority for me!" Subsequently, he said he would like Class V III to sell him protection on various CDOs "*as well as any of my deals of course*." (Emphasis added.)  He then provided Citigroup with a full list of deals against which he wanted to buy protection, which again specifically included Pyxis.

75.    Taking all of this evidence into account, conservatively, Magnetar's short positions on Pyxis totaled approximately $100 million, compared to its long positions of approximately $21 million.  In other words, Magnetar stood to make huge profits from Pyxis' failure.  Putnam in turn stood to gain large fees with relatively little effort or risk, along with the promise of additional similarly lucrative and stable deal volume, for helping Magnetar in its secret shorting scheme.

76.     On October 3, 2006, Pyxis issued 6 classes of secured and unsecured notes through the Indenture agreement. The notes issued by Pyxis, as in most CDOs, were structured in tranches that corresponded to the noteholders' respective rights to receive payment from the CDO's cash flows or, in the case of a liquidation of the CDO's portfolio, from the proceeds of the liquidation. Pyxis was authorized under the terms of its Indenture to issue the following tranches of notes and preference shares:

- $180 million Class A-1 Senior Secured Floating Rate Variable Funding Notes Due 2046
- $113.5 million Class A-2 Senior Secured Floating Rate Notes Due 2046
- $93.5 million Class B Secured Floating Rate Notes Due 2046
- $89 million Class C Secured Deferrable Floating Rate Notes Due 2046
- $41.5 million Class D Mezzanine Secured Deferred Floating Rate Notes Due 2046
- $61.875 million Class X Subordinate Notes Due 2046

77.     The Class A-1 Notes represented a $180 million funding facility that was available to Pyxis in case it needed cash in excess of the amounts raised through the sale of the other notes. Calyon CIB and Calyon (U.S.A.) were the initial purchasers of the notes and bought them with the stated intention of reselling them to other investors or purchasing swap protection on those notes. On information and belief, Magnetar was the purchaser of the Class X Subordinated Notes and at least a portion of the Preference Shares (equity). As explained *supra*, Defendants' plan was for Magnetar to receive enough income stream on its equity holding to cover its premium payments as swap counterparty. Once Pyxis failed (as Defendants knew and intended that it would), Magnetar would reap the full amount of the swaps, which would far exceed its initial outlay in premium payments.

### B.     The Pyxis Swap Marketed To Intesa

78.     On July 14, 2006, Calyon contacted Intesa to solicit an investment relating to Pyxis—a CDO Calyon described as managed by Putnam, who would select its portfolio acting independently and in good faith in the interests of long investors like Intesa. Intesa knew

nothing of Calyon's or Putnam's relationships with Magnetar, and Defendants made sure that Intesa did not learn of these relationships.

79.     As the arranger and underwriter for the Pyxis CDO, Calyon was responsible for drafting the various marketing materials and agreements relating to Pyxis, as well as marketing the CDO to investors. New York-based members of the Structured Credit Group at Calyon negotiated the structure of the Pyxis CDO, responded to due diligence questions, and revised the Offering Memorandum, which purported to describe key aspects of the transaction and the accompanying risks. Moreover, Calyon was the warehouse provider for the deal, which meant that it carried the Pyxis portfolio assets on its own books until closing (and if the deal failed to close, it retained that risk). Calyon was also responsible for drafting the Collateral Management Agreement through which Putnam agreed to serve as the collateral manager for Pyxis.

80.     The investment Calyon presented to Intesa was to be structured as a credit default swap, under which Intesa would assume risks of default on the Class A-1 notes, the most senior issued by Pyxis. Calyon, in turn, would fund the Class A-1 notes and hold them on its balance sheet. This swap allowed Calyon to close the CDO without selling the Class A-1 notes and thereby to book its profits and fees from arranging the CDO transaction and to release the capital charges associated with warehousing of the collateral and ownership of the notes. More significantly, it allowed Calyon to transfer the risks associated with those notes from its balance sheet to Intesa.

81.     Over the course of the next few months, Calyon and Intesa exchanged numerous emails regarding the deal, draft documents, responses to Intesa's due diligence questions, and negotiation points on a variety of issues. Intesa's New York office negotiated the Pyxis Swap. The lead negotiator for Intesa on this transaction was also based in New York. All of the Calyon

personnel involved in these negotiations were based in New York, including Ivo Almuli, then a Director with the Structured Credit Sales group at Calyon in New York. Almuli was actively involved in marketing the Pyxis CDO and responded to many of Intesa's due diligence questions regarding Pyxis. During this period, Intesa received a number of documents and other communications from Calyon's New York office on which Intesa relied in determining whether to make an investment relating to Pyxis.

82.     Among other things, Calyon's New York-based employees provided Intesa with: (i) a July 14, 2006 52-page marketing book (the "Pitchbook") that purported to describe, among other things, the structure of the Pyxis CDO, the types of assets that would be selected for inclusion in the portfolio, and the rigorous selection process that would be employed by Putnam to identify and analyze those assets; (ii) a September 6, 2006 summary of key terms outlining the key characteristics of the transaction (the "Term Sheet"); and (iii) a July 25, 2006 spreadsheet setting forth the ramped portfolio for the CDO, which listed 104 assets that had already been acquired for the CDO, purportedly representing 80% of Pyxis' final portfolio.

83.     Calyon represented that Putnam had been involved in the preparation of certain information it provided to Intesa, such as the July 14, 2006 Pitchbook. References to the Collateral Manager appear throughout the Pitchbook, which repeatedly asserts that Putnam was responsible for substantial parts of its preparation, including sections describing Putnam's superior knowledge, expertise, and purportedly rigorous asset selection criteria. *See, e.g.,* Pitchbook at 21 ("All information in this section has been supplied herein by Putnam.").

84.     In order to assess the Pyxis Swap, Intesa performed rigorous due diligence, consistent with industry standards and practice, focusing on an analysis of the deal's structure, the collateral manager, and the assets included in the CDO's portfolio. In particular, Intesa

evaluated the experience and reputation of the collateral manager, as it considered it essential that its investments be entrusted only to highly reputable firms. Among other things, Intesa noted and relied on the fact that Putnam was one of the largest U.S. mutual fund companies with nearly 70 years of experience managing money, that it was the third largest investment advisor in the United States, that it had $180 billion in assets for nearly 10 million shareholders and approximately 170 institutions, and, most importantly, that it was reputedly a leader in compliance and transparent business practices.

85.   Calyon, as owner of the securities which were to become the Pyxis portfolio, a broker/dealer in those securities, and a warehouse provider for similar assets, and Putnam, as collateral manager, were uniquely able to value the Pyxis portfolio down to the level of the underlying loans of each RMBS. Each RMBS contained typically 3,000 underlying loans from across the United States. Because there were approximately 180 RMBS in the Pyxis portfolio—both directly and indirectly though Pyxis's exposure to CDOs that were themselves exposed to RMBS—there were over 500,000 loans on which the performance of Pyxis depended. Thus, only Calyon and Putnam could provide an accurate assessment of the value and credit quality of the Pyxis portfolio and notes. Because of this exclusive knowledge and superior access to detailed information and data about the transaction and the CDO portfolio, Intesa reasonably relied upon the expertise, diligence, independence and integrity of the collateral manager in assessing the nature and credit quality of the underlying assets and the collateral manager's selection process.

86.   Based on these representations—in particular, the representation that the assets in the Pyxis portfolio were selected by Putnam, acting independently and diligently in the interests of long investors—Intesa reasonably believed that the Pyxis Swap was structured to be risk

remote, consistent with Intesa's conservative criteria. In September 2006, Intesa and Calyon came to an understanding that they would enter into a CDS whereby Intesa would provide protection on $180 million of the Class A-1 notes issued by Pyxis and held by Calyon, subject to the satisfaction of particular requirements. The CDS, however, was not executed by the parties until April 24, 2007, with an effective trade date of October 3, 2006, the CDO's closing date. The contract was executed by Intesa in New York, and Intesa thus became irrevocably committed to the contract in New York. The funds paid pursuant to the transaction were exchanged between the New York bank accounts of Intesa and Calyon.

87.    The Pyxis Swap incorporated certain "Underlying Instruments" by reference. Specifically, the Pyxis Swap stated (at p. 1) that "[r]eferences in this Confirmation to the 'Reference Obligation' shall have the meaning and/or shall be subject to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) ...." The "Underlying Instruments" were defined (at p. 27) to include "the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation." The "Reference Obligation" was defined (at p. 3) as the Pyxis Class A-1 notes.

88.    The Collateral Management Agreement was both incorporated by reference in the indenture and was itself one of the "relevant agreements setting forth the terms of" the Pyxis Class A-1 notes. Article XV of the indenture, titled "Assignment of Collateral Management Agreement," provided:

> The Issuer [Pyxis], ... hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Collateral Management Agreement ....

"Secured Parties" were defined in the Preliminary Statement to include "the Noteholders." Since Pyxis' "estate, right, title and interest in, to and under the Collateral Management Agreement"

was assigned to the Trustee for the benefit of the Noteholders, including the Class A-1

Noteholders, it follows that the Collateral Management Agreement was an agreement "setting

forth the terms of" the Class A-1 notes. Thus, it also follows that misrepresentations as to

Putnam's role contained in the Collateral Management Agreement (set forth below in ¶ 101)

were incorporated in the Pyxis Swap executed on April 24, 2007.

89.     In addition, the Pyxis Offering Memorandum was incorporated by reference in the

Pyxis indenture. Section 1.01 of the indenture defined the Offering Memorandum as "the final

Offering Memorandum, prepared and delivered in connection with the offer and sale of the

Notes and the Preference Shares ...." Section 2.5(j) of the indenture provided that "[n]o transfer

of a Note may be made to a Flow Through Investment Vehicle other than a Qualifying

Investment Vehicle," which was in turn defined as "a Flow-Through Investment Vehicle as to

which all of the beneficial owners of any securities ... have made ... each of the representations

set forth herein and in ... the Offering Memorandum ...." Sections 7.16 and 14.14 of the

indenture further limited certain rights of amendment and confidentiality by reference to

provisions of the Offering Memorandum. Thus, misrepresentations as to Putnam's role

contained in the Offering Memorandum (set forth below in ¶¶ 100-101) were also incorporated

in the Pyxis Swap.

90.     Because of the catastrophic losses it has suffered, Intesa undertook a forensic

valuation of the assets in the Pyxis portfolio, using valuations of properties comparable to those

in the hundreds of thousands of mortgages underlying the portfolio to generate values for each of

the underlying RMBS, including those within the CDOs to which Pyxis was exposed. This

modeling technology and the highly voluminous underlying data upon which it relied were

available almost exclusively to structurers of CDOs, such as Calyon, and collateral managers,

such as Putnam, at the time the Pyxis Swap was executed. Shockingly, this intrinsic valuation has revealed that, on October 3, 2006, the closing date of the CDO, the true value of the underlying portfolio had already dropped by more than 20%. This meant that the subordination for the Class A-1 notes had largely been eaten away by losses. As a direct consequence, on "day one," Intesa's position in the Pyxis Swap contained embedded losses of over $70 million.

91.    These valuations further corroborate that, instead of acting diligently, independently and in good faith in the interests of long investors such as Intesa, Putnam—in conjunction with Calyon—did the opposite: they used their expertise *against* the interests of Intesa and the Pyxis noteholders. At the behest of Magnetar, Calyon and Putnam exploited the experience and analytics they touted to construct a portfolio that caused Intesa to incur enormous losses on the very day Intesa agreed to the Pyxis Swap.

### C.    Calyon And Putnam's Affirmative Misrepresentations To Intesa

92.    To induce Intesa to enter into the Pyxis Swap, Calyon and Putnam made numerous representations about the way the assets would be selected for the Pyxis Portfolio and thus the risks that Intesa would be assuming under the Swap. Intesa relied on these representations in entering into the Swap. How the collateral would be selected was known exclusively to Calyon, Putnam, Magnetar and Deutsche Bank. Intesa had no means of testing, much less verifying, these representations.

### (a) Pyxis' Assets Were Selected By A Reputable, Independent Collateral Manager

93.    In order to assure Intesa that the Pyxis CDO was a viable investment, Calyon and Putnam represented that Pyxis's assets would be selected by an experienced and reputable collateral manager acting diligently and independently in the interests of long investors. This was vitally important to Intesa because, as explained above, one of the most important drivers of

a CDO's performance is the performance of the collateral manager in selecting and maintaining the credit quality of its underlying portfolio.

94.     For example, the launch email provided to Intesa by Calyon and Putnam to market Pyxis on July 14, 2006 touted the fact that Putnam was one of the largest U.S. mutual fund companies with nearly 70 years of managing experience, including CDO collateral management. This email also represented that Putnam had "developed a multi-class CDO capability" and had investment personnel with "an average of 13 years investment experience."

95.     This initial launch email also stated that "the collateral manager [Putnam] is able to cherry-pick the collateral for this portfolio via the CDS market with the ability to focus on **seasoned** product." At that time, seasoned products were believed to be less risky than new issues. Yet it was later discovered that over 60 percent of the Pyxis Portfolio was not "seasoned," but rather consisted of new issuances.

96.     These representations as to Putnam's collateral management role were reinforced by the 52-page marketing Pitchbook for Pyxis, which was provided to Intesa along with the launch email. The cover page of this presentation represented that Pyxis was "[m]anaged by the Putnam Advisory Company LLC." In these materials, Putnam again represented itself as "a global leader in asset management" with over $11.4 billion in ABS/MBS holdings, including management of more than $3.5 billion of CDOs across seven different deals.

97.     The Pitchbook represented that Putnam's "[i]investment [p]hilosophy" and "goal is to generate excellent long term investment results." It included extensive representations as to Putnam's "deep, experienced management teams," promising that their "talent pool" included "[s]easoned leaders committed to investment excellence and high fiduciary standards," who would "[f]ocus on achieving client performance objectives." The Pitchbook incorporated

detailed biographies of its key personnel, including Carl Bell, the Managing Director and Team Leader for the CDO & Portfolio Credit Team with "15 years of investment experience", whose role was to "lead[] the portfolio construction effort in designing CDOs . . . for institutional investors."

98.     This Pitchbook also included approximately 20 pages that purported to describe, in detail, the rigorous selection process that Putnam, as collateral manager, would use to assemble the Pyxis portfolio.  For example, Calyon and Putnam represented that Putnam analyzes "each transaction . . . to better understand its collateral composition" and conducts a "[s]tructural analysis [that] includes understanding rating levels."  The presentation stated that Putnam "develops multiple scenarios to test the structure's durability," which "involves running multiple stress scenarios by varying inputs such as default frequency vectors, loss severities, prepayments speeds and interest rates."  According to the presentation, "[t]he results of [Putnam's] analysis, combined with the prudent application of judgment, allow Putnam to decide if to invest, what tranche to invest in, how much to invest and at what price in order to achieve acceptable risk-adjusted returns for its clients."  Indeed, it was represented that Putnam offered "best in class CDO management capability."  The Pitchbook also pointed to the relatively low "lifetime impairment rates" for the type of portfolio in which Putnam was planning to invest, representing that these assets had "exhibited greater rating stability and a higher percentage of upgrades" and had a higher "average recovery rate" than other types of similarly rated assets.

99.     Calyon and Putnam further represented in the August 2006 presentation that "Putnam should actively drive the product structure;" that "Putnam seeks to design and undertake transactions that have a high probability of success;" and that Putnam would undertake "rigorous portfolio construction" and "fundamental security selection."

100.    Consistent with these representations, the October 2006 Offering Memorandum for Pyxis—which was incorporated by reference in the Pyxis Swap executed on April 24, 2007—represented that the "Fixed Income Group" of Putnam "will select and manage the Collateral [portfolio]" and "will manage the assets of the Issuer," and that "[d]ay-to-day portfolio management" will "be the joint responsibility of [Putnam's] CDO & Portfolio Credit Team." The Offering Memorandum further touted Putnam's vast experience in managing structured assets.

101.    Most importantly, as represented by Calyon and Putnam in both the Offering Memorandum and the Collateral Management Agreement, which were both incorporated by reference in the Pyxis Swap executed on April 24, 2007, Putnam would "supervise and direct the investment and reinvestment of the Collateral" and would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing."

102.    Calyon and Putnam, in these materials and orally, emphasized that Putnam would act diligently, independently and in good faith in the interests of Intesa in selecting the assets for the Pyxis portfolio.

103.    On July 25, 2006, Calyon sent Intesa a "target portfolio" for Pyxis showing that at least $60 million of the Pyxis portfolio would be prime RMBS assets. Prime RMBS assets are RMBS in which the underlying loans are made to "prime" borrowers, that is, those with high credit scores (typically, 675 or higher from Fair, Isaac & Company) and other characteristics

indicating a high likelihood of repayment of the loan. Mid-prime and subprime RMBS, by contrast, consist of loans made to higher risk borrowers.

104.    Calyon and Putnam also promised that the portfolio would include only a limited amount of ABX Index securities. The ABX Index is a series of indices, each comprised of twenty underlying constituent RMBS. This limitation was reflected in the Offering Memorandum and indenture, which specified a strict concentration limit on Pyxis's ABX Index Securities bucket. The ABX Index is comprised of low-rated RMBS and was often used at the time as a means of shorting the U.S. residential real estate market. Despite these supposedly rigorous selection criteria, Pyxis performed even worse than the ABX Index.

### (b)    Calyon and Putnam Provided False Information as to the Value of the Pyxis Swap Prior To Execution.

105.    On March 6, 2007 and April 2, 2007, prior to the execution of the Pyxis Swap, and again on May 2, 2007, shortly after execution of the Pyxis Swap, Calyon provided Intesa with purported market valuations of the securities issued by Pyxis. Calyon intended these valuations to reassure Intesa that, during the time between Pyxis' closing on October 3, 2006 and the execution of the Pyxis Swap on April 24, 2007, the economics of the deal had not fundamentally changed, that there were no infirmities in the assets that had been selected, and that the transaction was still risk remote.

106.    The valuations Calyon sent Intesa were "spread" valuations for the Pyxis Class A-1 and Class B notes. Calyon represented that it generated the information in these valuations based on its knowledge of the market from its trading desk for RMBS and CDO securities.

107.    The valuations that Calyon provided to Intesa purported to represent the price at which protection on the notes could be purchased. Intesa was not a dealer in such securities. By contrast, Calyon had by that time underwritten and marketed many other CDOs. Calyon thus

had unique knowledge of the actual prices the Pyxis securities, or securities very similar to those securities, would command for protection.

108.    As Calyon intended, the valuations it provided to Intesa in March, April and May 2007 assured Intesa that the Pyxis portfolio, having apparently stood up well to market forces over the preceding months since closing, had been carefully and responsibly selected by Putnam in the interests of long investors.  Indeed, these valuations reflected that, despite the recent changes in the subprime market, these securities would make full payments of interest and principal, many months after the deal closed.  Calyon further provided a "spread" valuation of the Pyxis Swap at 35 basis points, which translates to less than half a point off par.

109.    In addition, on April 20, 2007—four days before the execution of the Pyxis Swap—Intesa's lead negotiator on the Pyxis Swap, Angelo Brizi, had a telephone conversation with John Van Tassel of Putnam about the Pyxis portfolio.  In the course of this conversation, Mr. Van Tassel sought to further  reassure Mr. Brizi that the Pyxis portfolio was performing satisfactorily despite the recent spate of delinquencies in the mortgage market.  Among other things, as Mr. Brizi recorded immediately after this call in an email describing the conversation to a colleague, Mr. Van Tassel represented that "[n]otwithstanding the spike in delinquencies the total losses [on the Intesa portfolio] should not be high."

110.    Intesa relied on each of these representations by Calyon and Putnam and would not have agreed to enter into the Pyxis Swap without them.  Moreover, had Intesa learned of Calyon's and Putnam's misrepresentations prior to the occurrence of Pyxis suffering an Event of Default in Decmber 2008, which constituted a credit event under the Pyxis Swap, triggering Intesa's obligations to make payments to Calyon under the Pyxis Swap, Intesa would never have made any such payments under the Pyxis Swap.

### D.   Calyon And Putnam's Misrepresentations and Omissions

111.   Calyon and Putnam's representations were egregiously false.  Defendants had improperly concealed critical facts regarding Pyxis from Intesa.  Had it known the true facts, Intesa would never have agreed to enter into the Pyxis Swap, and would never have made any payments to Calyon under the Pyxis Swap.  These misrepresentations and omissions included the following:

### (a)   The Pyxis Portfolio Was Not Selected By Putnam Acting Independently And Diligently In The Interests Of Long Investors Like Intesa

112.   As explained above, it was of central importance to Intesa, as a long investor, that the Pyxis portfolio was selected by Putnam, acting independently and diligently in the interests of long investors.  On the contrary, as set forth below, Pyxis was controlled by a net short investor—Magnetar—and was built to fail and to benefit Magnetar at the expense of long investors.

113.   Magnetar selected collateral managers for its CDOs based on their willingness to cooperate with Magnetar.  Magnetar had an especially close relationship with Putnam through Magnetar executive James Prusko, the former Putnam employee who had been the superior while at Putnam of Carl Bell, the Putnam employee putatively responsible for selecting the Pyxis Portfolio.  Prusko had actually been terminated for cause by Putnam in 2003 for excessive trading of growth mutual funds in his personal brokerage account.  However, this did not stop Putnam, in particular Bell, from working closely with and taking direction from him on Pyxis.  Thus, while Putnam was the nominal collateral manager for Pyxis, in reality, Magnetar controlled collateral selection for this deal.  Putnam's abdication of its duty to select assets independently and in good faith for the Pyxis CDO was, as Putnam knew, in blatant contravention of the representations Defendants had made to Intesa of a careful, rigorous asset

selection process. At Magnetar's direction, assets were selected for inclusion in the Pyxis

portfolio through a process that emphasized weaker assets over stronger ones, so as to benefit

Magnetar's short CDS positions at the expense of long investors like Intesa. However,

Defendants concealed this information from Intesa to ensure that the Pyxis Swap closed. As a

result of Defendants' fraud, Calyon reaped substantial fees for arranging Pyxis and transferred

the risk of loss associated with the Class A-1 securities to Intesa; Putnam obtained substantial

fees for its putative management of Pyxis and secured additional deal volume from Magnetar;

and Magnetar reaped substantial profits from its net short position on Pyxis.

         1.      **Documentary Evidence Confirms that Calyon and Putnam Secretly Allowed Magnetar to Corrupt Asset Selection for Pyxis and Short the Portfolio.**

      114.    A number of email communications between employees of Calyon, Putnam,

Magnetar, and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis), relating specifically to

Pyxis, became public in 2011 in the *Loreley* litigation brought by Pyxis investors against Calyon

and Putnam. Further email communications, as well as testimony from various Putnam

employees, became public late last year in the lawsuit filed by the Securities Division of the

Commonwealth of Massachusetts against Putnam relating to its management of both Pyxis and

Pyxis 2. This evidence confirms the control that Magnetar exercised over the Pyxis asset

selection process, at the same time as it was shorting those very assets, and Putnam's abdication

of responsibility for selecting the Pyxis collateral. It also confirms Putnam's and Calyon's

awareness of and complicity in Magnetar's scheme, and Defendants' joint understanding that

they would have to conceal their actions in order for the scheme to succeed. The authenticity of

this evidence is unquestioned.

      115.    From the beginning, Magnetar – and not Putnam – was actually in control of

Pyxis, as these documents demonstrate. Magnetar conceived and organized the Pyxis

transaction, and set the initial investment goals. According to the testimony of both the Putnam
Head of Investments at Putnam and Carl Bell, in early 2006, Jim Prusko approached Putnam to
ask it if it would act as the collateral manager for Pyxis. Prusko made clear to Bell that Pyxis
would have a hybrid structure focused on "subordinate … BBB rated residential bonds." Prusko
also recommended that Calyon serve as the structurer for Pyxis, and introduced Calyon's Head
of CDOs, Alex Rekeda, to Carl Bell and others at Putnam.

116.    Prusko made clear that he expected Putnam to cooperate with Magnetar on Pyxis.
In May 2006, for example, in an exchange of emails between Carl Bell (Putnam), Alex Rekeda
(Calyon), Jim Prusko (Magnetar) and Michael Henriques (Deutsche Bank), relating to the "cash
flow" features of the Orion CDO, Rekeda noted that Putnam had discovered that the "the IRR is
really in excess of 30%," which "shocks them a little bit," and raised the possibility of "another
round of the fee negotiation [sic]" with respect to Putnam's fee for Pyxis. Prusko replied: "Fee
not negotiable. *Take it or leave it, plenty of managers will do this deal. I want to do it with them
for a variety of reasons, but they have to play ball.*" Henriques responded: "I agree with jim
[sic], but I don't think that is the issue with Putnam. . . . *In the end . . . I think they will likely be
helpful . . . .*"

117.    Putnam was also well aware that Magnetar had a conflict of interest. Magnetar
made clear to Putnam from the beginning of discussions concerning Pyxis that it would be taking
a substantial short position on Pyxis. According to Bell, Prusko told him that Pyxis was one of a
number of CDOs on which Magnetar and Deustehe Bank were pursuing a "hedged equity
strategy." Bell understood this to mean that Magnetar "really had both sides, so the deal itself
would have one side where [Pyxis 2006] would be selling protection, and [Prusko's] hedge
would be on the other side where he'd be buying protection." Bell testified that "the one thing

42

[Prusko] definitely wanted to do was if we were going to go out, which we had to do, and sell protection, [Prusko] wanted to have … access to that because it was the supply he needed." Confirming this, in a June 2006 email, Bell told Henriques: "Hedged equity should do very well in a general economic based loss environment[] (which I believe is your investment thesis)." Henriques replied, "yes, that is the thesis."  Id. ¶ 64 (emphases added).

118.    According to Bell, Magnetar and Deutsche Bank also dictated the terms of the engagement letter and warehouse agreement governing Pyxis.  Michael Henriques told Bell that Magnetar and Deutsche Bank "[w]ant[ed] a constraint that minimum 90% is sub-prime or mid-prime collateral …."  Magnetar and Deutsche Bank then made a "behind the scenes" arrangement with Calyon, of which Putnam was fully aware, that Calyon or Putnam would notify them of any proposed acquisition for the Pyxis portfolio and that they would have the right to veto any such acquisition.  In June 2006, for example, Benjamin Lee (Calyon), Alex Rekeda, Jim Prusko, Michael Henriques and Kurt Palmer (Deutsche Bank)  discussed via email an "Equity Purchase Letter . . . *between CALYON and DB & Magnetar only*" for Pyxis in order to keep their involvement secret from investors.  In this exchange, Lee asked Prusko if he "was proposing that we execute the 3 Putnam docs [for Pyxis] in exactly the same way that we did the Orion docs— that is, *DB is the only party in the docs, and any arrangement between DB and Magnetar is done behind the scenes and outside of the docs.*"  Subsequently, Lee sent the same group an email attaching "the warehouse side letter *giving DB and Magnetar veto rights over any warehouse asset.*"  The attached draft agreement between Calyon, Deutsche Bank and Magnetar provided: "CALYON hereby agrees that each of *Deutsche Bank and Magnetar* (for so long as the respective Equity Purchase Letter has not been terminated) *shall have the right to object to the proposed acquisition of any asset pursuant to the Warehouse Agreement within 24 hours after*

43

*notification thereof has been sent to Deutsche Bank and Magnetar by CALYON or the Investment Adviser [Putnam] (provided, that one of Calyon or the Investment Adviser will promptly provide such notification) and CALYON as the warehouse provider shall not give its approval to acquire any such asset if it has been objected to by either Deutsche Bank or Magnetar."*

119.    Putnam was fully aware of this agreement, as the agreement required Putnam to provide notice of proposed Pyxis CDO investments to Magnetar.  Moreover, Putnam did in fact allow Magnetar to exercise this secret control over the Pyxis Portfolio.  Prusko, Bell and Alex Rekeda had numerous communications in which Prusko made clear what collateral he wanted to include in the Pyxis portfolio and his desire to short both this collateral and the entire portfolio. Bell testified that during the collateral selection phase for Pyxis, "Magnetar put forward model portfolios that they liked.  They put forward example portfolios from other deals.  They put forward examples of assets they bought at other deals, so Magnetar actively put forward their investment views."  Magnetar also made clear to Putnam that it would directly source Pyxis' CDO exposure itself and that Putnam was not to purchase any such exposure itself unless Magnetar had closely vetted it beforehand.

120.    Putnam acquiesced in all of this.  Indeed, it actively invited Magnetar's direction. For example, in late June 2006, Bell emailed Prusko and Henriques: "I want to get your incremental profile constraints (minimum subprime) into the marketing book today.  Have you sent these to Calyon?  We need these constraints before we see the debt investors on Thursday. [Rekeda] will be calling."  Around the same time, Prusko emailed Putnam's Head of Investments to comment on Putnam's first asset purchases for the Pyxis warehouse: "Looks like the fellahs came out of the gate strong today.  I'm very excited!"  Putnam's Head of Investments replied:

"Was banging on them to get it on. Good start. [Bell] talking about a big chunk of [ABX Index, an Index of low-rated RMBS] to lock ... [i]n w[]ider spreads."

121.    Also around this time, Prusko emailed Bell to ask him to send him a trade log each night of what collateral had been purchased for the warehouse, which Bell agreed to do. Id. ¶ 101. Prusko commented on these logs as he received them. For example, in early July 2006, he emailed Bell: "List results look very good."

122.    Shortly after the July 4, 2006 holiday, Prusko emailed Bell to suggest that Putnam have Pyxis enter into CDS related to the ABX Index of low-rated RMBS, and that the synthetic portion of Pyxis be increased, to allow Magnetar to short more of the assets referenced by the ABX Index. Prusko explained: "*It's very hard to get off sizable CDO CDS trades unless they're done against a deal, and this is a natural delta hedge against our equity.*" Bell replied: "*Got it. So when we find a deal we want to buy, we shouldn't put in an order with the syndicate desk but have Calyon broker a synthetic trade between you and [Pyxis] at an agreed upon level?*" Prusko responded: "*That would be preferable ....*" (emphases added)

123.    Putnam and Magnetar continued to act together in discussing and selecting specific assets for Pyxis (and for Magnetar's short portfolio). Indeed, selecting assets favored by Magnetar and facilitating Magnetar's short strategy appears to have been one of Putnam's primary goals in connection with Pyxis. Thus, on July 27, 2006, Prusko met with Bell to discuss Magnetar's experience purchasing CDS on collateral within the Orion CDO with a view to executing the same types of trades in Pyxis.

124.    In early August 2006, in an exchange of emails between Alex Rekeda, Benjamin Lee, Carl Bell, John Van Tassel (Putnam), Jim Prusko, Michael Henriques and Kurt Palmer, among others, Lee asked Bell and Van Tassel to "give a brief description of your ramp up

strategy and timing regarding the CDO assets," and also asked if "you have any interest on AA

of Lincoln Ave *and 4mln of Orion [Magnetar deal]* that Bill Budd showed?" Bell responded by

providing the group with a summary of the CDO assets Putnam had warehoused so far, to which

Prusko replied: "*We [Magnetar] are going to source the CDO exposure synthetically. We will*

*buy CDO CDS on names of your choosing at mid-market, or bid list +3bp, whatever you prefer.*

*Any recent mezz abs deal is fine. I can send you a list of what's in our other deals if it's helpful.*"

Prusko then provided Bell with a list of "*[t]ypical names that we see in other deals a lot,*"

including Orion and Cetus (both Magnetar deals).

      125.    Subsequently, Prusko sent a private email to Alex Rekeda to confirm that

Magnetar would maintain control over asset selection for Pyxis, which stated, "*Please stay on*

*top of Putnam CDO situation*, get a little nervous when I hear about Bill Budd peddling desk

axes to them, *although not too worried about Putnam doing anything rash. . . . If they add any*

*CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look*

*at it first.*" Rekeda responded: "*Sure—I will ask our trading to forward you any CDO requests.*"

Prusko replied in turn, copying Michael Henriques: "*Don't like that they are buying CDO's*

*without us knowing about it. At least I don't think I knew about it. I'll check in with Carl [Bell],*

*just saw him, thought we were on the same page with us buying the cdo cds.*"

      126.    On August 10, 2006, Prusko emailed two members of Putnam's CDO team: "I

need to buy protection on abx1 ffml and sasc and abx2 arsi [RMBS in the ABX Indexes]. If u

have any ability to add these to [the] portfolio [it] would really help me out." One of the Putnam

employees replied that they already had $8 million of SASC and $12 million of ARSI in the

warehouse in CDS form, and that "[i]f we can live with the spread give up, we can easily add the

FFML." Id. ¶ 106 (emphases added).

127.     In mid-August 2006, Prusko emailed Bell to suggest including as many ABX assets as possible in Pyxis: "*What I need from you guys is a complete list, of the 40 names in ABX [Index] 1 and 2, how many can you approve to go into the deal?*" On August 23, 2006, a Putnam employee emailed Prusko to tell him which ABX assets Putnam was interested in including in Pyxis, and asked where they could obtain these assets. Prusko replied by listing twelve assets and estimated bids for the assets that he could "fill in" for Pyxis. Bell forwarded the list to a Putnam mortgage specialist responsible for asset acquisition and told him, "we can/should do the ones 100+ that you like." Id. ¶ 110 (emphasis added). The Putnam mortgage specialist agreed to have Pyxis sell Magnetar protection on the first three assets on Prusko's list. Id. ¶ 111. Calyon approved two of the trades but balked at the third due to its low spread relative to its lower rating. Bell emailed Calyon: "*It is counter to the interests of the equity investors in this deal to cherry pick what we find at this stage of the process.* I request that you reconsider on this asset." This email was forwarded to Prusko, who wrote to Putnam and Calyon: "*Please approve this one*, then we can review structure [with] [P]utnam." Calyon replied: "*Ok.*" (emphases added)

128.     On August 29, 2006, Prusko forwarded to Putnam a bid list for four FFML bonds and asked: "You guys like this name?" Two hours later, a member of the Putnam CDO team submitted a request to Calyon to purchase two of these bonds for Pyxis.

129.     On September 5, 2006, Putnam emailed Calyon seeking approval to acquire four CDOs for Pyxis, including Jackson 2006-1 and Buchanan 2006-1, which Calyon granted. Putnam forwarded this list to Prusko, who replied: "*I would prefer we do these synthetically and we buy the protection.* I have been trying to buy protection on Jackson and Buchanan." (emphasis added)

130.    A few days later, Putnam emailed Prusko that it was considering acquiring $5 million of a CDO through a CDS and asked if he would like to buy protection on the asset. Prusko said he would, and Calyon approved the transaction.

131.    In mid-September 2006, Putnam emailed Prusko to ask if he was interested in buying protection on any Gemstone CDOs.  Prusko replied: "Would prefer to do [Gemstone] 6 at this time, kind of full on the others.  I can do your full size."  Putnam requested Calyon's approval to sell protection on Gemstone 6 to Magnetar, which Calyon granted.  Id. ¶ 117.

132.    In a September 2006 exchange of emails between Craig Weiner (Putnam), Alex Rekeda, Mauro Calderon (Calyon), and numerous other employees of Calyon and Putnam, Calderon questioned whether a trade ticket showing Magnetar purchasing *the short side* of a CDS for the Pyxis Portfolio was correct.  Weiner confirmed: "*It is definitely Magnetar.*" (Emphasis added.)

133.    This trade ticket provides further confirmation not only that Putnam knew Magnetar was shorting Pyxis collateral, but that Putnam abdicated its portfolio selection responsibilities to Magnetar.  Despite Putnam's confirmation that the trade should be booked to Magnetar, the CDS premium and amount of the trade do not correspond to any trade in the Pyxis Portfolio.  They do, however, correspond to a trade in the portfolio of a separate Magnetar CDO, Octans III, which was managed by Harding Advisory and underwritten by Citigroup, and in which Putnam was not involved.  Thus, it appears that Calyon executed a trade for Pyxis that Magnetar actually intended for Octans III.  (Moreover, this particular trade was an unusual "offset trade" of the type common in several Magnetar CDOs with large ABX Index exposures.) The most plausible explanation for this is that Magnetar got the trading orders for two of its deals mixed up, that Putnam instructed Calyon to execute the trade for Pyxis at Magnetar's direction,

and that Putnam then reversed the instruction when it discovered that Magnetar in fact wanted the trade to be made for Octans III. In other words, Putnam was following Magnetar's orders, not exercising its own independent judgment.

134.   Putnam's abdication of its collateral selection responsibilities to Magnetar is further confirmed by a remarkably brazen exchange of emails between Magnetar, Deutsche Bank and Calyon with respect to Orion 2006-2 Ltd. ("Orion 2"), the successor to Orion. In this exchange, Michael Henriques (Deutsche Bank) specifically contrasted Putnam's acquiescence on Pyxis with the recalcitrance of NIBC Credit Management, Inc. ("NIBC" or "NIB"), the collateral manager slated for Orion 2. When NIBC balked at Magnetar's and Deutsche Bank's insistence that they have the right to terminate NIBC without cause, Henriques asked if NIBC wanted to "*go back to the regular style CDOs with 400mm mezz deals, scrapping for cash bonds, spending 9 months on ramp-up and 3-months marketing, to get 40bps running on a 400mm balance.*" (Emphasis added.) Henriques pointed out that "*[i]n those deals there is no single party that can exercise significant control so that their smaller fee stream is virtually assured,*" and that "*the velocity of deals is much lower and the effort to buy those 400mm of bonds will be higher than our 1.5bln.*" (Emphasis added.) Remarkably, he went so far as to say that "*[t]hese deals are not CDOs, but they are structured separate accounts.*" (Emphasis added.) Most significantly, for present purposes, he concluded: "*I think Putnam got it.* NIB doesn't." (Emphasis added.)

135.   Later in the same exchange, Henriques reiterated that "I don't think [NIBC's responses] reflect a spirit of partnership that is appropriate for a *separate account mandate,*" and complained that "we are being treated like a typical 3rd party cdo investor, but does nib have any asset management clients *who directly engaged them and pay $5.5mm/yr in fees*?" (Emphasis added.) Again, he drew a telling comparison to Putnam: "*We have provided a precedent with*

*respect to Putnam.*" (Emphasis added.)  Thus, in seeking to convince NIBC to accede to Magnetar's and Deutsche Bank's demands to exercise control over the CDO, Henriques pointed to Putnam as an example or "precedent" of a firm willing to manage CDOs as structured accounts for the benefit of Magnetar and Deutsche Bank, understanding that they were far more than "typical 3d party cdo investor[s]."

136.    This email exchange confirms that Putnam had a clear and compelling motive for acquiescing in Magnetar's control over the selection of the Pyxis Portfolio: to obtain large fees with relatively little effort, which would be "virtually assured" by Magnetar's equity stake in and its "significant control" over the CDO.  Moreover, if, but only if, Putnam cooperated with Magnetar on Pyxis, it stood to gain additional, similarly lucrative deal volume from Magnetar. Thus, Putnam's subsequent selection to serve as collateral manager for another Pyxis CDO, Pyxis 2, provides yet further confirmation of Putnam's abdication of its Pyxis Portfolio selection responsibilities.

137.    Calyon and Putnam understood that concealing knowledge of Magnetar's involvement in, and its shorting strategy for, Pyxis was inappropriate.  They also knew that knowledge of Magnetar's role would materially affect the investment decisions of Pyxis investors, like Intesa.  Specifically, Calyon and Putnam knew there was no way Intesa would enter into the Pyxis Swap if it knew this.  Thus, Calyon and Putnam actively worked to conceal this knowledge from investors.  For example, after an August 3, 2006 due diligence meeting with potential Pyxis investors, Bell emailed Rekeda that one of the investors, whom Rekeda described as "the only party that can prevent this deal from happening on time," was unhappy with the "triggerless" structure of Pyxis.  As Bell noted, this structure was important to Magnetar because it would protect its "recovery value in a high-stress environment."  Rekeda replied that Bell

should keep Magnetar out of any explanation of the structure: "*any time a manager is trying to negotiate a structure, while mentioning the equity investor, it immediately raises a red flag. ... we should try to offer [the investor] some other rationale rather than interests of the junior investors.*" (Emphasis added.)

138.   Indeed, Putnam continued to actively conceal the role of Magnetar in the Pyxis transaction long after the deal closed.  Thus, in November 2007, a representative of Financial Guaranty Insurance Company ("FGIC")—which provided insurance on the super senior Pyxis tranche, above Intesa's Class A-1 tranche—emailed Bell to request a meeting concerning Pyxis. Among other things, FGIC wanted to discuss "how Putnam became involved in the transaction. *Specifically, I believe you[r] equity investor has a rather unique approach to investing in ABS CDOs.  I would like to know what you know about them and what your level of communication is with them.*"  Bell replied: "*There is probably very little we can discuss under [that topic].*" (emphases added)

139.   Calyon and Putnam were well aware how much money Magnetar had made from shorting Pyxis.  Thus, on July 13, 2007, Michael Henriques, who had moved to Magnetar after Pyxis closed, emailed Bell to schedule drinks or dinner with himself and Prusko.  Bell replied: "Sure. *Going to bring your money bags?*" (Emphasis added).  Again, in early August 2007, Putnam's MBS team leader emailed Prusko: "*[A]re you enjoying this market?*"  Prusko replied: "[n]ot sure enjoy is the right word, watching [w]orld end always very stressful, but *at least making truckloads of loot like u read about.*"  (Emphasis added).

140.   After much of the above information came to light in the *Loreley* case, the claims of the Pyxis investors who filed suit in that case were promptly settled for an undisclosed amount.  The suit by the Commonwealth of Massachusetts against Putnam is still ongoing.

2.    **Magnetar Directed Putnam to Invest in Other Magnetar CDOs for the Pyxis Portfolio To Further Guarantee the Demise of Pyxis and the Success of the Magnetar Shorting Scheme**

141.    As a further demonstration of Magnetar's influence over Pyxis Portfolio selection, Pyxis invested heavily in other Magnetar CDOs—without informing Intesa—in an undisclosed arrangement designed to fuel Magnetar's broader CDO shorting machine. In fact, Putnam ultimately invested *over half* of Pyxis' cash allocated to CDO investments in four other Magnetar CDOs—even though there were *223* ABS CDOs issued in 2006 alone from which Putnam could have made its selection. These four Magnetar CDOs were in turn invested in yet more Magnetar CDOs, meaning that Pyxis ultimately had exposure to at least fifteen Magnetar CDOs. Not surprisingly, all fifteen defaulted—and Magnetar profited from each such default. Intesa was kept completely in the dark and had no way to discover this, as Magnetar's shorting scheme was a closely held secret.

142.    Further evidence of Magnetar's role is the fact that three of the Magnetar CDOs in which Pyxis invested did not close until well *after* Pyxis closed. On information and belief, even on other Magnetar deals, no collateral manager added more Magnetar CDOs to a portfolio after the deal had closed than Putnam, and, after the first five Magnetar CDOs had closed, no collateral manager added *as many* such CDOs post-closing as Putnam.

143.    Moreover, also unbeknownst to Intesa, at least six other Magnetar CDOs owned securities issued by Pyxis.

144.    Pyxis was thus an integral part of Magnetar's complex cross-ownership scheme among the Constellation CDOs to create a market for these CDOs to build Magnetar's shorting positions. As part of this scheme, Magnetar caused Pyxis to invest heavily in numerous other Magnetar CDOs, most of which Magnetar was also shorting. In turn, at Magnetar's direction,

these other CDOs invested heavily in Pyxis and in the other CDOs in the group, creating an extensive web of deception and interrelationships, which is graphically illustrated below:

## Constellation CDO Investments in other Constellation CDOs

### *Web of Deception*

54



145.    Calyon and Putnam were thus well aware of Magnetar's scheme and Pyxis's pivotal role in that scheme, and all three knowingly participated in furthering it, and in concealing this scheme from Intesa.

### 3.    Further Proof of Control Was the Fact that There Was a High Correlation Between the Pyxis Portfolio And the Portfolios of Other Constellation CDOs

146.    As the chart above graphically demonstrates, this scheme did not happen randomly. It was carefully choreographed to bring about a desired result. Magnetar had identified a set of high-risk CDO and RMBS transactions, in addition to its own CDOs, which it specifically targeted. Magnetar either instructed or persuaded its collateral managers to include in its CDOs (or reference in credit default swaps issued by its CDOs) securities issued by the targeted high-risk RMBS and CDO's. At Magnetar's behest, Putnam selected securities issued by many of the targeted RMBS and CDOs for Pyxis. This resulted in an undisclosed, remarkably high correlation between the issuers whose securities were held or referenced by Pyxis and the issuers whose securities were held or referenced by other Constellation CDOs. For instance, of the 163 unique CUSIPs in the Pyxis Portfolio, fully 90 CUSIPs (or 55%) referenced RMBS or CDOs whose securities were included in at least five other Magnetar CDOs, while 45 CUSIPs (or 28%) referenced RMBS or CDOs whose securities were included in at least ten other Magnetar CDOs. There is no way this could have happened by chance—especially given that there were well over *1,000* RMBS issued in 2005-2007 (more than half in 2006 alone) from which the RMBS in the Pyxis Portfolio could have been selected, and there were more than *500* ABS CDOs issued in the same period from which the CDOs in the Pyxis Portfolio could have been selected.

4.    **Defendants Breached Limits On Pyxis' ABX Index Investments.**

147.    Defendants also concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS. The ABX Index is a benchmark created by an independent financial information company called Markit. The Index is designed to measure the overall value of mortgages made to borrowers with subprime or weak credit. If the Index increases, it means the securities are less risky. If it decreases, the opposite is true. Magnetar pushed Putnam to breach the represented limit on investment in the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and the individual constituent RMBS in the ABX Index. In total, Pyxis sold protection on $240 million of RMBS comprising all 40 constituents included in the ABX BBB- 06-1 and ABX BBB- 06-2 Indices—more than three times the specified concentration limit of such assets set forth in the collateral eligibility guidelines contained in the Pyxis indenture and other transaction documents. Increasing the portion of the Pyxis portfolio devoted to the ABS Index resulted in a greater concentration of risk on a small number of transactions, and a greater correlation of the Pyxis portfolio with the ABS Index and with the portfolios of other Constellation CDOs. Increasing this concentration and correlation meant increasing the risk profile of the Pyxis Portfolio as well, which worked in favor of a net short investor like Magnetar, at the expense of long investors like Intesa.

148.    Thus, Pyxis' investments in ABX Index securities not only breached Pyxis' eligibility guidelines, but also provided further evidence of Putnam's abdication of its collateral selection responsibilities to Putnam, since there is no way Putnam would have caused Pyxis to breach the Pyxis eligibility guidelines and to deceive Intesa as to the level of the high risk investments it was making unless it was seeking to accommodate a short investor such as Magnetar.

5.     **Pyxis Included Offset Trades on ABX Index Components of a Type Unique to Magnetar CDOs.**

149.     Magnetar's control over the Pyxis Portfolio is further proven by the fact that, on at least three occasions, Pyxis purchased protection to offset previously acquired exposures to individual components of an ABX Index.  The February 6, 2007 Trustee Report for Pyxis shows three such offset securities referencing the following ABX Index components: Ace Securities 2005-HE7; BSABS 2005-HE11; and RASC 2005-KS11.  These trades represent a unique signature technique executed as part of a complex ABX Index arbitrage strategy used by Magnetar in many of its CDOs (including Norma, Draco, Octans, Auriga, Virgo, and Lacerta, among others), pursuant to which the CDO would buy protection (often from Magnetar) on an ABX Index component security to which the CDO had previously acquired a long exposure (by virtue of either an ABX Index trade which was part of a CDS referencing an ABX Index—as was the case in Pyxis—or by virtue of a disguised Index trade simultaneously referencing each individual Index component).  In many instances, these trades resulted in a cash loss to the CDO which accrued to the benefit of Magnetar.  Since this was a signature trading technique used only by Magnetar, it points to Magnetar's control over these trades.

150.     Two other features of these three offset trades also indicate Magnetar's control.  First, the BSABS 2005-HE11 trade is the same trade referenced in Paragraph 91 above, whose CDS terms do not correspond to this Pyxis 2006-1 trade but rather to an Octans III trade.  Second, it is noteworthy that the three Pyxis trades which were offset referenced 2005-vintage RMBS collateral.  This 2005-vintage collateral was generally viewed to be of higher quality than 2006-vintage collateral.  Thus the removal of these securities from the Pyxis Portfolio further weakened the credit quality of the Pyxis Portfolio and increased the chances of success of the Magnetar shorting strategy.

6. **Notwithstanding Representations to the Contrary, the Final Pyxis Portfolio Did Not Contain Any Prime RMBS Assets**

151.    The Pyxis "target portfolio" provided to Intesa by Calyon and Putnam included at least $60 million of prime RMBS assets.  However, the final ramped portfolio did not contain a *single* prime RMBS asset.  This is particularly telling since as of August 2006—two months before the deal's close—Putnam had actually slated Pyxis to purchase $145 million of prime RMBS assets.  In effect, these purported prime RMBS assets were merely "dummy" assets which were included on the target portfolio to induce investors to invest in Pyxis notes, but which neither Calyon nor Putnam ever had any intention of actually purchasing.  This behavior closely mirrored the behavior of Alex Rekeda's team a few months after Pyxis closed when—working now for Mizuho—they included "dummy assets" in a target portfolio to secure more attractive ratings for the Delphinus portfolio, resulting in claims brought by the SEC which Mizuho settled for $127.5 million in July 2012.

152.    The only plausible explanation for Putnam's decision to reject these relatively risk remote investments in favor of investments in higher risk mid-prime or subprime assets, despite Calyon's and Putnam's representations that a substantial amount of prime RMBS would be included in the portfolio, is that Putnam and Calyon acquiesced in Magnetar's direction to select higher risk investments which were more likely to, and in fact did, default, in order to further Magnetar's shorting strategy with respect to Pyxis.

7. **Magnetar's Control Over Pyxis, and Calyon's and Putnam's Acquiescence in Its Control, Was Strikingly Similar to the Process by Which Magnetar's Other CDOs Were Created.**

153.    As more information has come to light about the "Magnetar Trade" and Magnetar's involvement in the CDO business generally, it has become apparent that Pyxis was only one of numerous CDOs over which Magnetar exercised tight control over asset selection in

order to fuel its lucrative shorting scheme, securing the acquiescence of banks and collateral managers with the promise of large, easily realized fees and deal volume. The striking similarity between Magnetar's conduct with respect to each of these other deals makes it highly implausible that Magnetar would have allowed Putnam to control the selection of the Pyxis Portfolio. It provides still further confirmation that Magnetar in fact exercised close control over this process, with the knowledge and complicity of Calyon and Putnam, for Defendants' mutual benefit.

154.   ***Orion and Orion 2.***   As they did with Pyxis, Magnetar and Deustche Bank also exercised tight control over the collateral manager NIBC's selection of assets for the portfolios of the Orion and Orion 2 CDOs, working closely with NIBC to make sure that the assets included in the portfolio were assets Magnetar wanted to short. For example, in a July 2006 email to Alex Rekeda, Michael Henriques and Kurt Palmer relating to "Orion CDO Trades," Jim Prusko of Magnetar stated: "Arjun Kakar [NIBC] is going to send me a list of CDO's tomorrow. *We will buy protection from the deal on agreed upon names and that will fill the bucket.*" Similarly, Magnetar and Deutsche Bank insisted on the right to terminate NIBC as the collateral manager for Orion 2 if it performed inadequately. When NIBC balked at this, Michael Henriques of Deustche Bank threatened in a November 2006 email to make NIBC "*go back to the regular style CDOs [where] there is no single party that can exercise significant control so that their. . . fee stream is virtually assured.*" Henriques further complained that NIBC's conduct did not "*reflect a spirit of partnership that is appropriate for a separate account mandate where the equity[investor] . . . directly engaged them and pay $5.5mm/yr in fees?*" NIBC appears to have capitulated, given that it did ultimately act as the collateral manager for Orion 2 and that the

Orion 2 portfolio was eventually stocked with the usual collection of cross-owned Magnetar and Magnetar-approved CDOs and other Magnetar-approved investments.

155. ***Squared.*** Magnetar also exercised tight control over another CDO, Squared CDO 2007-1 ("Squared"), which was structured and marketed by J.P. Morgan Securities LLC ("JP Morgan") and for which GSCP (NJ) L.P. ("GSC") acted as the collateral manager. As in its other CDOs, Magnetar purchased the equity in Squared. However, as an internal Magnetar email from January 2007 confirms, Magnetar regarded its equity position as "basically nothing" and stated that it was "*just doing it [taking the equity position]. . . to buy some protection.*" Indeed, by the time the deal closed in May 2007, Magnetar's $600 million short position completely dwarfed its $8.9 million long position.

156. Magnetar played a significant role in selecting the collateral for Squared. For example, on February 8, 2007, Magnetar informed GSC via email that it would "like to do a list of names with [them] . . . if [they] have them ready." The next day, GSC gave Magnetar a list of 12 proposed CDO securities for the Squared portfolio, of which Magnetar agreed to short six. These six securities were subsequently included in the Squared portfolio, and both GSC and JP Morgan were aware that Magnetar was shorting them.

157. Similarly, in early April 2007, JP Morgan sent Magnetar a list of 28 names for inclusion in the Squared portfolio, which included ten names on which Magnetar had previously decided it did not want to take a short position. A Magnetar employee forwarded this list to GSC and complained: "To be honest, I don't love it, some recent deals I'd like to get in there are missing. Also, think they're missing some of the trades to which we've already agreed. Lets discuss [sic]." In an internal email about the same time, Magnetar characterized JP Morgan's list as "stupid" and explained that it needed to "*use GSC to get some decent shorts off on the balance*

*of the portfolio.*" All ten securities to which Magnetar objected were excluded from the final portfolio.

158.   Also in early April 2007, GSC sent Magnetar a list of certain bonds they had discussed for possible inclusion in the Squared portfolio, and "*highlighted the names which [Magnetar] had interest in shorting into the deal.*" A week later, JP Morgan sent GSC a list of CDO securities, on twelve of which Magnetar had agreed to take a short position, and asked GSC if all of these securities had been approved. That same day, Magnetar sent JP Morgan the CDO list and noted that it "*looks like we [Magnetar] are shorting in $168 million.*" Additional lists were exchanged between Magnetar and JP Morgan, and the next day JP Morgan sent GSC an updated Squared portfolio stating: "*These are the names and levels agreed with Magnetar.*"

159.   In June 2011, JP Morgan paid $153.6 million to settle charges brought against it by the SEC for its role in structuring the Squared CDO.

160.   *Norma.*        Magnetar also exercised tight control over the selection of assets for the portfolio of Norma CDO 1 Ltd ("Norma"), which was structured and marketed by Merrill Lynch ("Merrill") and for which NIR Capital Management, LLC ("NIR") acted as the collateral manager. Magnetar provided the equity investment in Norma, but also took a much more substantial short position in the very assets it was directing NIR to select for Norma's portfolio.

161.   Magnetar's control of the asset selection process for Norma is demonstrated by various emails that became public in a suit brought against Merrill by an investor in Norma. *See Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") v. Merrill Lynch & Co., Inc.*, Index No. 601832/09 (N.Y. Sup. Ct. N.Y. County Aug. 19, 2009). In an August 2006 email, for example, Magnetar assumed NIR's role in directing Merrill on what purchases to execute for Norma, stating: "Here is the first batch of protection purchases I'm planning for

NIR." A November 2006 email stated: "*Apparently NIR allowed Magnetar to do some trading for their [Norma] portfolio (in the area of 600MM).* This accounted for a large chunk of trading *that NIR originally didn't recognize.*" This prompted a Merrill corporate risk manager to ask: "*Dumb question. Is Magnetar allowed to trade for NIR?*"

162.   Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the selection of each asset. One Magnetar email stated: "*I definitely want to approve any CDO's that go in the deal.*" Another email rejected a NIR request to include TABS 2006-6A cash bonds in the portfolio, stating: "Afraid so, tabs in particular *I don't want the cash in there.*"

163.   By January 2007, Magnetar had already shorted $600 million of synthetic assets which were contained in Norma's portfolio. In an email, Merrill recognized that Magnetar's short positions were much more important to Magnetar than its long investments, noting that Magnetar "is less worried about [its] deal pricings and more worried about where [it] can short paper in the aftermarket." Indeed, Magnetar's equity investment in Norma totaled less than $50 million after receiving undisclosed amounts funded through the loan from Rabobank. This meant that Magnetar stood to make *ten times* more from its short position of $600 million if Norma failed than it had invested in Norma's equity.

164.   Rabobank's lawsuit against Merrill was also settled in 2010 for an undisclosed amount.

165.   ***Carina.***        Magnetar also closely controlled the selection of assets for the portfolio of another CDO, Carina CDO, Ltd. ("Carina"), which was structured by Deutsche Bank and for which State Street Global Advisors ("State Street") acted as the collateral manager. Once again, Magnetar provided the equity investment in Carina, at the same time as it was shorting the very assets it was directing State Street to include in Carina's portfolio.

166.    Magnetar's control of the selection of assets for the Carina portfolio is demonstrated by various emails which recently came to light in a consent order issued against State Street by the Commonwealth of Massachusetts.  In an email dated July 7, 2006, for example, the Magnetar Head of Structured Products (the "Magnetar Head") asked the State Street Head of Structured Products (the "State Street Head"):  "what's [the] plan of action looking like?"  In response, the State Street Head provided Magnetar with an update on the ramping phase of Carina and told him, "I'll keep you posted on my progress."  A week later, the Magnetar Head sent the State Street Head another email saying: "*I'd like to establish a bit more of a dialogue between us.  Discuss ramping strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing.  Just talk briefly a few times a week.*"  The State Street Head responded, "*Absolutely.*"

167.    A few weeks later, on August 3, 2006, the State Street Head emailed Deutsche Bank, copying Magnetar, to identify ten ABS CDO tranches on which State Street proposed to sell protection to establish a portion of Carina's synthetic exposure.  The Magnetar Head replied: "*I will buy protection on the four 06 deals at best bid+50bp.*"  A few weeks later still, high level personnel of State Street, Deustche Bank and Magnetar entered into discussions about a possible Carina II CDO transaction.  In one email, the Magnetar Head stated: "*As we did last time, I would like to strategize and discuss names for the CDO bucket before we execute any trades.  Thought that worked out well for Carina 1.  I will be taking the other side of this first trade as approved such that I am effectively pairing off its risk . . . .*"  The State Street Head responded: "*I'm happy to discuss the CDO bucket with you.*"

168.    In February of 2012, State Street agreed to pay the Commonwealth of Massachusetts a $5 million penalty for its conduct with respect to Carina.

169.   ***Class V III***      Just recently, details of Magnetar's potential involvement in yet another CDO as an equity investor and its interest in shorting the same CDO's portfolio came to light, in a case brought by the SEC against Citigroup and one of its executives, Brian Stoker, concerning their role in structuring and marketing the Class V Funding III CDO ("Class V III"). *See SEC v. Citigroup Global Markets Inc.*, 11-CV-7387 (S.D.N.Y. Oct. 19, 2011); *SEC v. Stoker*, 11-CV-7388 (S.D.N.Y. Oct. 19, 2011).  Documents filed last month in support of the SEC's claim include a number of emails from September-October 2006—around the time Pyxis closed—in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals, including Pyxis, which were being considered for inclusion in the Class V III portfolio.  This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko of Magnetar.  In a September 2006 exchange of emails between Prusko and various Citigroup employees, Prusko asked: "Pls have big DQ show them jackson, buchanan and baldwin [CDOs] in synthetic form *so I can buy protection.  This is a top priority for me!*"  Subsequent internal emails between Citigroup employees indicated that Prusko was also seeking shorts with respect to a Constellation CDO, Cetus 2, and stated "*we already created the short for him on Cetus 2.*"  The next day, Prusko told Citigroup again, "I would like them to sell me protection on Baldwin, Jackson and Buchanan if possible *as well as any of my deals of course.*"  Later that day, he provided a full list of deals against which he wanted to buy protection, again including Pyxis.

170.   In late October 2006, internal Citigroup emails focused on the possibility of finding an equity investor in Class V III who would also buy protection on the deal.  One email noted: "A lot of people are looking to do *this 'Prusko-like' trade , i.e. go long equity and short mezz in some form or other.*"  Two days later, an email from Brian Stoker stated: "*I'm torn on*

*whether to include Prusko. 1) If he doesn't add assets to the deal, and he keeps the equity, he'll bug us about the assets we pick and our structuring fee. 2) If he adds assets and keeps a proportional % of the equity and he agrees to the assets we put in, then I'd include him b/c we get diversity benefit and get more structuring fees.*"

171.    The SEC submitted a Consent Judgment along with its Complaint against Citigroup, pursuant to which Citigroup agreed, among other things, to disgorge its $160 million in profits on Class V III, plus $30 million in interest thereon, and to pay a civil penalty of $95 million—a total settlement of $285 million. This Court has refused to approve the Consent Judgment, on the basis that it is inadequate. *SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).

172.    Separately, on June 6, 2012, this Court denied Brian Stoker's motion to dismiss the SEC's Complaint against him personally. *SEC v. Stoker*, 11-CV-7388 (S.D.N.Y June 6, 2012). In its opinion, the Court noted, among other things, the SEC's allegation that, "as Citigroup knew, *a significant portion of the market interest in shorting the Constellation CDOs came from the very hedge fund that helped create those CDOs [i.e., Magnetar].*" *Id.*, Slip Op. at 3.

### (b)    Calyon's March, April and May 2007 Valuations Of The Pyxis Notes Were False.

173.    The valuations that Calyon provided to Intesa in March, April, and May 2007, prior to and shortly after execution of the Pyxis Swap, were egregiously false. They grossly overstated the contemporaneous value of the Pyxis securities, and thus concealed the substantial deterioration that had occurred in the portfolio since the CDO closed.

174.    Intesa has performed an intrinsic valuation of the Pyxis Swap as of the date of Calyon's valuations. It revealed that, on the dates on which Calyon provided its specious

valuations to Intesa, reflecting that the value of the A-1 Notes was almost at par, the true value of notes had dropped by over 90%.

175.    It is not plausible that such a drastic difference in valuation could be the result of legitimately differing opinions. Rather, Calyon's absurd over-valuation of the A-1 Notes must have resulted from its (well-founded) fear that Intesa would object to providing protection on a portfolio that had already deteriorated. At the time that Calyon provided those valuations to Intesa, Calyon was well aware that the Pyxis portfolio was composed of deteriorated assets and that the Pyxis portfolio and notes were worth far less than par. The value of the Pyxis portfolio in fact was actually only $555 million, just 37% of par. Indeed, Calyon much later disclosed that, for the period from January 1 through June 30, 2007, it had written down hundreds of millions of dollars worth of securities it held, taking impairment charges of 21% for the first quarter of 2007 against the value of CDO securities comparable to those contained in Pyxis and to the Pyxis notes themselves.

176.    In March, April, and May 2007, however, Calyon had to maintain the illusion that the Pyxis portfolio had been chosen by a reputable collateral manager acting independently, not built to fail at the behest of a net short investor. Had Calyon disclosed the true value of the Pyxis notes in March and April 2007, this would have been a red flag for Intesa that something was terribly amiss with the CDO. If Intesa had known the truth—that the deal was built to fail and, by March and April 2007, was comprised of toxic assets just as Magnetar intended—it would not have agreed to enter into the Pyxis Swap. Calyon would then have been left with $180 million of worthless CDO notes instead of passing on these losses to Intesa. Moreover, had Intesa learned the truth at some time before Pyxis suffered an Event of Default in December 2008,

triggering a credit event under the Pyxis Swap, Intesa would have rescinded the Pyxis Swap rather than pay Calyon $180 million thereunder.

## V.    Calyon, Magnetar And Putnam Benefited From Their Misconduct

177.    Calyon, Magnetar and Putnam all benefited from their fraudulent conduct. Calyon reaped tens of millions of dollars in underwriting fees for its role in structuring Pyxis and other Constellation CDOs for Magnetar.  Calyon also used Pyxis to help achieve its goal of increasing its CDO market share.  Moreover, had Calyon not succeeded in persuading Intesa to provide protection on the Class A-1 notes, Calyon would have been stuck with $180 million in losses.  In addition, Calyon benefited from the fees it received as the protection buyer on the credit default swaps that constituted much of the Pyxis portfolio.

178.    Putnam benefited by receiving unusually large fees—even by Magnetar deal standards—with relatively little effort or risk, for serving as collateral manager for Pyxis. Putnam also benefited from the promise of further deal volume from Magnetar, which was fulfilled when Putnam was chosen to act as collateral manager for Pyxis 2.  Had it not cooperated with Calyon and Magnetar's scheme, Putnam would not have been chosen as collateral manager for either Pyxis 1 or Pyxis 2.

179.    Finally, Magnetar pocketed tens of millions of dollars in profits from its net short positions on Pyxis and Pyxis collateral, at the expense of Pyxis investors like Intesa, who lost millions.

## VI.    The Class A-1 Notes Were Downgraded To Junk, And Intesa Lost $180 Million

180.    On April 30, 2008—less than two years after the trade date—Fitch downgraded the credit rating of the Class A-1 Pyxis notes from AAA to C, triggering a credit event under the Pyxis Swap.  Intesa made $180 million in credit protection payments and, in return, received

Class A-1 Pyxis notes, which are virtually worthless. Intesa has thus lost $180 million as a result of Defendants' fraud.

## VII.   Intesa Did Not Become Aware of Defendants' Misconduct Prior to July 21, 2011.

181.   Defendants continued to conceal their collusion in the sabotage of the Pyxis CDO, and of numerous other CDOs, long after the execution of the Pyxis Swap. As a result of this concealment, Intesa did not know and could not reasonably have known of Defendants' misconduct—most importantly, that they had secretly and knowingly colluded in ensuring that the Pyxis Portfolio was built to fail for the benefit of a net short investor, namely Magnetar, at the expense of long investors like Intesa—until, at the earliest, July 21, 2011, when certain critical facts confirming Defendants' knowing collusion in the Pyxis fraud were publicly disclosed in the *Loreley* plaintiffs' motion for leave to file a second amended complaint.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

### (Against Calyon and Putnam)

182.   Intesa repeats and re-alleges the allegations set forth above as though fully set forth herein.

183.   This is a claim against Calyon and Putnam pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).

184.   Calyon and Putnam made untrue statements of material fact in connection with Intesa's execution of the Pyxis CDS. In furtherance of their scheme to transfer the risk associated with the notes to Intesa, Calyon and Putnam represented, among other things, that the Pyxis Portfolio would be selected by a diligent and independent collateral manager, acting in the interests of long investors, and that the Pyxis notes maintained their market value between

closing and the execution of the Pyxis Swap. These representations were made in the Pitchbook, Offering Memorandum (incorporated in the Pyxis Swap), Term Sheet, Collateral Management Agreement (incorporated in the Pyxis Swap), the valuations sent by Calyon to Intesa in March, April and May 2007, other documents, and oral and written representations by Calyon and Putnam to Intesa, including the April 20, 2007 oral representation by Putnam's John Van Tassel to Intesa's Angelo Brizi that the Pyxis portfolio was still performing satisfactorily at that date.

185. Calyon and Putnam also omitted to state material facts necessary to make the statements they had made not materially misleading. Among other things, Calyon and Putnam knowingly or recklessly failed to disclose that:

- Pyxis was controlled by and designed for the benefit of a net short investor, namely Magnetar;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- In March 2007, far from the near-par value Calyon claimed that the Pyxis portfolio had at the time, it was in fact worth only 37% of par, and the value of the A-1 notes had dropped by over 90%.

186. All of this information was known to Calyon and Putnam but not known or readily available to Intesa. Calyon and Putnam had actual knowledge of the falsity of their statements of material fact and their omissions of material fact, or acted with reckless disregard for the truth concerning these facts. Intesa, by contrast, did not know, and could not have reasonably discovered, that the selection process had been corrupted by Magnetar or that the valuations provided by Calyon and Putnam were false; only Calyon and Putnam knew this. Calyon and Putnam further knew that Intesa was acting in reliance on their false statements and omissions of material fact, yet made no attempt to update or correct that information.

187.    Calyon's and Putnam's misstatements and omissions were material to Intesa's decision to enter into the Pyxis Swap since they bore directly on the performance of the Pyxis Portfolio, the likelihood of a credit event occurring under the Pyxis Swap, and the possibility that the Pyxis notes would default, leaving Intesa to bear any losses.

188.    Intesa reasonably relied on Calyon's and Putnam's misstatements and omissions in entering into the Pyxis Swap.  Without these material misstatements and omissions, Intesa would not have entered into the Pyxis Swap.

189.    In connection with their misstatements and omissions, Calyon and Putnam used the means or instrumentalities of interstate commerce and the mails.

190.    By virtue of the foregoing, Calyon and Putnam have violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

191.    Intesa would not have provided protection on the Class A-1 notes had it known the truth about Defendants' fraudulent statements and omissions.  Moreover, Intesa would not have incurred the losses it did under the Pyxis Swap had Pyxis not been built to fail pursuant to Defendants' fraudulent scheme.  Therefore, Intesa's damages arising from the fraud were proximately caused by Defendants' substantial assistance.

192.    As a direct and proximate result of Calyon's and Putnam's misstatements and omissions, Intesa executed the Pyxis Swap, and incurred damages in an amount to be proven at trial.

193.    This Count is brought within the time permitted by law.

## SECOND CAUSE OF ACTION:
## FRAUD

### (Against All Defendants)

194.    Intesa repeats and re-alleges the allegations set forth above as though fully set

forth herein.

195.    This is a claim for fraud brought against all Defendants relating to affirmative

misrepresentations and material omissions they made concerning the Pyxis Swap.

196.    In collusion with and at the direction of Magnetar, Calyon and Putnam made

untrue statements of material fact in connection with Intesa's execution of the Pyxis CDS.  In

furtherance of their scheme to transfer the risk associated with the notes to Intesa, Calyon and

Putnam represented, among other things, that the Pyxis Portfolio would be selected by a diligent

and independent collateral manager, acting in the interests of long investors, and that the Pyxis

notes maintained their market value between closing and the execution of the Pyxis Swap.  These

representations were made in the Pitchbook, Offering Memorandum (incorporated in the Pyxis

Swap), Term Sheet, Collateral Management Agreement (incorporated in the Pyxis Swap), the

valuations sent by Calyon to Intesa on March, April and May 2007, other documents, and oral

and written representations by Calyon and Putnam to Intesa, including the April 20, 2007 oral

representation by Putnam's John Van Tassel to Intesa's Angelo Brizi that the Pyxis portfolio was

still performing satisfactorily at that date.

197.    Defendants also omitted to state material facts necessary to make the statements

they had made not materially misleading.  Among other things, Defendants knowingly or

recklessly failed to disclose that:

- Pyxis was controlled by and designed for the benefit of a net short investor, namely Magnetar;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- In March, April and May 2007, far from the near-par value Calyon claimed that the Pyxis portfolio had at the time, it was in fact worth only 37% of par, and the value of the A-1 notes had dropped by over 90%.

198.   All of this information was known to Defendants but not known or readily available to Intesa. Intesa, by contrast, did not know, and could not have reasonably discovered, that the selection process had been corrupted by Magnetar or that the valuations provided by Calyon and Putnam were false; only Defendants knew this. Defendants further knew that their statements were false and misleading, and made the statements with the intent and expectation that Intesa would rely on them in agreeing to provide protection on the notes.

199.   Defendants' misstatements and omissions were material to Intesa's decision to enter into the Pyxis Swap since they bore directly on the performance of the Pyxis Portfolio, the likelihood of a credit event occurring under the Pyxis Swap, and the possibility that the Pyxis notes would default, leaving Intesa to bear any losses.

200.   Intesa reasonably relied on Defendants' misstatements and omissions in entering into the Pyxis Swap. Without these material misstatements and omissions, Intesa would not have entered into the Pyxis Swap.

201.   Defendants' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Intesa's interests. Specifically, Defendants engaged in this deceptive conduct in order to earn fees and to avoid losses they knew they would suffer if the Pyxis Swap did not close and in order to transfer those losses to Intesa.