UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTESA SANPAOLO, S.P.A., <br><br> Plaintiff, <br><br> -against- <br><br> CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CRÉDIT AGRICOLE SECURITIES (U.S.A.) INC., THE PUTNAM ADVISORY COMPANY, LLC, MAGNETAR CAPITAL LLC, MAGNETAR FINANCIAL LLC, AND MAGNETAR CAPITAL FUND, LP, <br><br> Defendants. | No. 12-cv-2683 (RWS) <br><br> **ECF CASE** <br> **Electronically Filed** |

## MEMORANDUM OF LAW IN SUPPORT OF PUTNAM ADVISORY COMPANY LLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

MILBANK, TWEED, HADLEY &
McCLOY LLP
James N. Benedict
Sean M. Murphy
Thomas A. Arena
Robert C. Hora
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*Putnam Advisory Company LLC*

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.   Intesa's Sophistication ................................................................... 3

    B.   Putnam's Role as Collateral Manager for the Pyxis CDO ...................................... 4

    C.   The Alleged Representations To Intesa Regarding Putnam's Role As Collateral Manager ........................................................................ 5

    D.   The SAC's Reliance on General News Reports ................................... 6

    E.   Intesa's Reference to Regulatory Investigation and Complaints Involving Other CDOs and Collateral Managers ................................ 7

    F.   The Massachusetts Securities Division's Administrative Complaint ................... 8

    G.   Justice Schweitzer Dismissed the Same Claims Against Putnam in Prior Litigation in New York Supreme Court; Putnam Did Not Settle .......................... 8

ARGUMENT .......................................................................................................... 9

I.    INTESA'S CLAIMS UNDER SECTION 10(b) OF THE 1934 ACT ARE BARRED BY THE FIVE-YEAR STATUTE OF REPOSE ............................. 9

    A.   Intesa's Amendments Do Not Relate Back ......................................... 9

    B.   The Swap Confirmation Does Not Save Intesa's Claim .......................... 10

    C.   Mr. Van Tassel's Purported Opinion Does Not Save Intesa's Claim ................. 12

II.   INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ..................................... 13

    A.   Intesa Fails to Plead an Actionable Misrepresentation or Omission ................ 13

        1.   Intesa Fails to Allege Any Misrepresentations Regarding Putnam's Role ............................................................. 13

        2.   Intesa's Claim Based on the Composition of the Pyxis Portfolio is Without Merit ........................................................ 15

        3.   Intesa Fails to Allege a Misrepresentation or Omission as to Any Short Counterparty's Identity ............................... 17

    B.   Intesa Fails to Allege That Putnam Acted with Scienter ....................... 17

        1.   Intesa Fails to Allege a Plausible Motive for Putnam's Participation in the Alleged Fraudulent Scheme ...................... 17

        2.   Intesa Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness ............................... 21

i

|  |  | a. | The *Loreley* Emails Do Not Plead Conscious Misbehavior or Recklessness ........................................................................ 21 |
|  |  | b. | Intesa's References to Allegations in the MSD's Administrative Complaint Do Not Establish Conscious Misbehavior or Recklessness ........................................ 24 |
| III. | INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS AGAINST PUTNAM SHOULD BE DISMISSED .......................................... 25 | | |
| IV. | CONCLUSION ................................................................................................. 26 | | |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Stock Transfer & Trust Co. v. Par Pharm. Cos., Inc.,*
06 Civ 13283BSJRLE, 2009 WL 1754473 (S.D.N.Y. June 22, 2009)...................................11

*Campo v. Sears Holdings Corp.,*
371 F. App'x 212 (2d Cir. 2010) .................................................................................................6

*Cohen v. Stevanovich,*
722 F. Supp.2d 416 (S.D.N.Y. 2010) (Sweet, J.)...................................................................20

*Dooner v. Keefe, Bruyette & Woods, Inc.,*
No. 00 Civ. 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003)....................................21

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009)...................................................................................................15

*Footbridge Ltd. Trust v. Countrywide Fin. Corp.,*
770 F. Supp.2d 618 (S.D.N.Y. 2011)......................................................................................10

*G-I Holdings, Inc. v. Baron & Budd,*
No. 01 Civ. 0216 (RWS), 2004 WL 1277870 (S.D.N.Y. June 10, 2004) (Sweet, J.) ............20

*Gissin v. Endres,*
739 F. Supp.2d 488 (S.D.N.Y. 2010).......................................................................................13

*HSH Nordbank AG v. UBS AG,*
95 A.D.3d 185 (1st Dep't 2012) ...............................................................................................16

*In re AHT Corp.,*
292 B.R. 734 (S.D.N.Y. 2003)..................................................................................................25

*In re CRM Holdings, Ltd. Sec. Litig.,*
No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10, 2012) ..................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
308 F. Supp.2d 249 (S.D.N.Y. 2004)........................................................................................7

*In re IndyMac Mortgage-Backed Sec. Litig.,*
793 F. Supp.2d 637 (S.D.N.Y. 2011)........................................................................................9

*In re Lehman Bros. Sec. & Erisa Litig.,*
799 F. Supp.2d 258 (S.D.N.Y. 2011)........................................................................................9

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
218 F.R.D. 76 (S.D.N.Y. 2003) .................................................................................................8

iii

*In re Wachovia Equity Sec. Litig.,*
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................21

*Janbay v. Canadian Solar, Inc.,*
  No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..................7

*Janus Capital Grp., Inc. v. First Derivative Traders,*
  131 S. Ct. 2296 (2011)..........................................................................12, 16

*Kinsey v. Cendant Corp,*
  No. 04-Civ-0582 (RWS), 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004) (Sweet, J.) ...........13

*Ledford v. Rapid-Am. Corp.,*
  No. 86 Civ. 9116 (JFK), 1988 U.S. Dist. LEXIS 79 (S.D.N.Y. Jan. 8, 1988) .........8

*Lipsky v. Commonwealth United Corp.,*
  551 F.2d 887 (2d Cir. 1976)........................................................................8

*Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United*
  *Aircraft Corp.,*
  534 F.2d 422 (2d Cir. 1975)........................................................................12

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.,*
  747 F. Supp. 2d 406 (S.D.N.Y. 2010)............................................................25

*Miller v. Lazard, Ltd.,*
  473 F. Supp. 2d 571 (S.D.N.Y. 2007)..............................................................7

*PaineWebber Inc. v. Bybyk,*
  81 F.3d 1193, 1201 (2d Cir. 1996)................................................................11

*Robbins v. Moore Med. Corp.,*
  894 F. Supp. 661 (S.D.N.Y. 1995)................................................................13

*Ryan, Beck & Co., LLC. v. Fakih,*
  268 F. Supp. 2d 210 (E.D.N.Y. 2003)............................................................11

*Stern v. Leucadia Nat'l Corp.,*
  844 F.2d 997 (2d Cir. 1988).........................................................................7

*Trust Corp. v. Olson,*
  768 F. Supp. 283 (D. Ariz. 1991) ................................................................10

*United States v. Foster Wheeler Corp.,*
  639 F. Supp. 1266 (S.D.N.Y. 1986)...............................................................12

**STATUTES**

28 U.S.C. § 1658(b) .....................................................................................1

iv

**RULES**

Federal Rule of Civil Procedure 9(b) ................................................................................1, 13, 20

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................1

SEC Rule 10b-5 .....................................................................................................................25, 13

**OTHER AUTHORITIES**

11 Williston on Contracts § 30:25 .............................................................................................11

Putnam Advisory Company, LLC ("Putnam"), respectfully submits this memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint ("SAC") filed by Intesa Sanpaolo, S.p.A. ("Plaintiff" or "Intesa") with prejudice.[1]

## PRELIMINARY STATEMENT

In dismissing the First Amended Complaint, this Court held that Intesa had failed timely to assert its Section 10(b) claim under 28 U.S.C. § 1658(b). The Court rejected Intesa's interpretation of Section 1658(b) and held that the five-year statute of repose begins to run on the date "the last alleged misrepresentation or omission was made." (Feb. 13, 2013 Op. at 21.) In its First Amended Complaint, Intesa did not attribute to Putnam a false statement or omission after October 2, 2006, the date of the publication of the Offering Memorandum. That date was well more than five years before Intesa filed its initial complaint on April 6, 2012. Searching in vain for a misrepresentation or omission attributable to Putnam post-dating April 2007, Intesa cobbles together two new theories, both of which fall well short of constituting a misrepresentation or omission within the five-year statute of repose period.

To begin with, Intesa's Section 10(b) claim is time-barred for the simple reason that the relation back doctrine does not apply to statutes of repose. Thus, it does not matter if Intesa can identify an alleged misrepresentation or omission from April 2007. The SAC was filed on March 4, 2013. Because Intesa has failed to allege a misrepresentation or omission by Putnam within five years of that date, its Section 10(b) claim is not timely.

Even assuming Intesa could establish that the SAC should relate back to the date

---

[1] Putnam incorporates by reference the arguments set forth in the memoranda of law in support of the motions to dismiss pursuant to Rules 9(b) and 12(b)(6) filed by co-defendants Crédit Agricole Corporate and Investment Bank and Crédit Agricole Securities (U.S.A.) Inc. (together "Calyon"), and Magnetar Capital LLC, Magnetar Financial LLC, and Magnetar Capital Fund, LP (collectively "Magnetar") in this action.

of its initial complaint, Intesa distorts the relevant documents beyond recognition in contending that the Offering Memorandum and the Collateral Management Agreement were "incorporated by reference" in the Pyxis Swap Confirmation issued on April 24, 2007 (the "Swap Confirmation" or "Confirmation"). Intesa's argument is based on a house of cards. Intesa concedes that the Swap Confirmation, a document to which Putnam was not a party, did not mention the Offering Memorandum or the Collateral Management Agreement. Instead, Intesa alleges that the Confirmation incorporated the CDO Indenture, which in turn purportedly incorporated the Offering Memorandum and the Collateral Management Agreement. Neither assertion is true. The Swap Confirmation did not incorporate the Indenture, and the Indenture did not incorporate the Offering Memorandum or the Collateral Management Agreement. Instead, in a small handful of places, the Indenture referenced specific provisions of the Offering Memorandum and the Collateral Management Agreement, none of which provisions had anything to do with Putnam's role as collateral manager.

Intesa also attempts to plead a timely misrepresentation or omission on the part of Putnam by alleging that on April 20, 2007, a Putnam employee named John Van Tassel told an Intesa representative that "[n]otwithstanding the spike in delinquencies the total losses [on the Intesa portfolio] should not be high." (SAC ¶ 109.) This allegation, however, does not even describe a statement of fact. On its face, it recounts a statement of opinion, which cannot be actionable under Section 10(b), absent specific allegations that Mr. Van Tassel did not believe the truth of what he was saying. Yet this is the only allegation in the entire SAC relating to Mr. Van Tassel. Moreover, the statement says nothing about whether Putnam would be selecting collateral without input from third parties—the heart of the fraudulent scheme alleged by Intesa.

Like Intesa's first two complaints, the SAC fails to plead a plausible theory of

2

scienter.  Intesa alleges that Putnam, a large and respected financial institution, knowingly

engaged in a billion-dollar fraud to earn purportedly "higher than normal" collateral manager

fees.  (SAC ¶ 2.)  Yet Putnam's fee percentages were *well below* the normal rate for a CDO

collateral manager.  Further, a significant portion of Putnam's fee was subordinated to the

payments owed by Pyxis to noteholders.  And the entire fee was to be calculated on the basis of a

monthly portfolio asset amount that *excluded* defaulted securities.  In other words, if the CDO

failed in whole or even in part, Putnam would not receive its full fee.  It is difficult to articulate a

less compelling reason to commit fraud; if the fraud were successful, Putnam would not get paid.

Lastly, the SAC does not allege any actionable misrepresentations or omissions

by Putnam, which was not responsible for the vast majority of the information in the Offering

Memorandum or other materials distributed to investors.  Even if Putnam bore such

responsibility, Intesa cannot point to anything in the offering materials that was inaccurate.  The

Offering Memorandum described at great length the composition of the securities that would be

collateralizing the CDO (the vast majority of which were subprime and mid-prime residential

mortgage-backed securities ("RMBS")), the relatively low credit rating of those securities (many

of which were rated "BBB"), and all structural features of the CDO.  Intesa does not identify any

assets selected by Putnam for the Pyxis portfolio that violated any of the detailed Eligibility

Criteria set forth in the Offering Memorandum.  And the Offering Memorandum, which Intesa

acknowledges it read and relied upon, fully disclosed that more than 75% of the portfolio would

consist of credit default swaps ("CDS") and that third parties would be taking the short position

on those securities, directly contrary to Intesa's long position.

## BACKGROUND

### A.    Intesa's Sophistication

Intesa, a large and sophisticated financial institution, was not an investor in the

3

Pyxis ABS CDO 2006-1 (the "Pyxis CDO" or "Pyxis"); it did not purchase any notes or equity issued by Pyxis, and it did not enter into any CDS that were to be included in the Pyxis CDO portfolio.  Instead, according to the SAC, in September 2006, Intesa and Calyon allegedly "came to an understanding" that they would enter into a swap, whereby Intesa would be the protection seller (*i.e.*, the long counterparty) and Calyon would be the protection purchaser (*i.e.*, the short counterparty) on $180 million of the Class A-1 notes issued by Pyxis.  (SAC ¶ 86.)  Intesa admits it performed "rigorous due diligence" before entering into the swap, including "an analysis of the deal's structure . . . and the assets included in the CDO's portfolio."  (*Id.* ¶ 84.)

Unmentioned in the SAC is that Intesa simultaneously entered into a second CDS with Calyon, in which Intesa *bought protection* (*i.e.*, took a short position) on the Class B notes issued by Pyxis.  Thus, Intesa engaged in precisely the type of short trade that it alleges the Defendants should have disclosed that Magnetar had made against the Pyxis collateral portfolio.

**B.      Putnam's Role as Collateral Manager for the Pyxis CDO**

Putnam served as the collateral manager for the Pyxis CDO, a role defined by a Collateral Management Agreement between Putnam and Pyxis, dated October 3, 2006.  (*See* SAC ¶¶ 39, 57, 101.)  Under this agreement, Putnam agreed to "supervise and direct the investment and reinvestment of the Collateral" in accordance with the detailed Eligibility Criteria and Collateral Quality Tests prescribed in the CDO Indenture.  (Collateral Management Agmt., Declaration of Robert C. Hora, dated March 19, 2013 ("Hora Decl."), Ex. 1 at §§ 2(a)-(b); Indenture, *id.* Ex. 2 at 237-52.)  With the exception of a new, defective allegation that Putnam "breached" purported limits on ABX index investments that finds no support in the actual text of the Pyxis Indenture (*see* Section II(A)(2) *infra*), the SAC does not allege that the collateral selected by Putnam did not meet any of these criteria or tests, or that any of the collateral received lower credit ratings than required by the Indenture or other offering documents.

4

C.    **The Alleged Representations To Intesa Regarding Putnam's Role As Collateral Manager**

The SAC alleges that in July 2006, Calyon provided Intesa with a 52-page investor presentation (the "Investor Presentation," Hora Decl. Ex. 3), which the SAC refers to as the "Pitchbook." (SAC ¶ 94, 96.) Intesa alleges that the Investor Presentation "purported to describe, among other things, the structure of the Pyxis CDO, the types of assets that would be selected for inclusion in the portfolio, and the rigorous selection process that would be employed by Putnam to identify and analyze those assets . . . ." (*Id.* ¶ 82.) Intesa further alleges that Calyon represented that Putnam was involved in the preparation of certain sections of the Pitchbook, including the "sections describing Putnam's superior knowledge, expertise, and purportedly rigorous asset selection criteria." (*Id.* ¶ 83.) The SAC alleges that these statements were false because Putnam purportedly ceded control over asset selection to the CDO's equity investor Magnetar, which, according to the SAC, also shorted the Pyxis CDO. (*Id.* ¶ 8.)

The SAC also alleges that Intesa received and reviewed the Offering Memorandum. (*See* SAC ¶¶ 100-101, 104, 184, 196, 207, 209.) The Offering Memorandum expressly disclosed that Putnam was not responsible for any information contained therein, except for a five-page section setting forth limited information regarding Putnam. This section simply described Putnam's corporate structure and investment management experience, and included biographies of employees expected to provide collateral management services to the Pyxis CDO. (*See* Offering Memorandum, Hora Decl. Ex. 4 at 187-91.) Intesa alleges that this section "further touted Putnam's vast experience in managing structured assets" and disclosed that Putnam would select and manage the assets in the Pyxis portfolio. (SAC ¶ 100.) According to the SAC, these statements were also purportedly false because Magnetar, not Putnam, allegedly selected the collateral for the Pyxis portfolio. (SAC ¶ 8.)

In addition, Intesa alleges that on April 20, 2007 a Putnam employee, John Van Tassel, opined that total losses on the Pyxis portfolio "should not be high." SAC ¶ 109.  The SAC does not, however, contain any particularized factual allegations demonstrating that Von Tassel did not believe this alleged statement to be true.

**D.      The SAC's Reliance on General News Reports**

Lacking particularized facts to support its claims that Magnetar had an overall net short position, Intesa relies heavily on news reports, which in turn rely on anonymous sources, to speculate about Magnetar's trading strategy, none of which suggests that Putnam knew about or was involved in implementing this alleged strategy.  In April 2010, the website ProPublica, based on anonymous, unverifiable sources, reported that beginning in 2005 and continuing through 2007 Magnetar purchased substantial stakes in the equity tranches of various CDOs at the same time it took short positions against these CDOs.  (*See* Apr. 9, 2010 ProPublica article, Hora Decl. Ex. 5.)  This article, however, acknowledges that "[n]obody but Magnetar knows" the specific CDOs Magnetar took short positions against, or the amount of these positions relative to its equity investments.  (*Id.* at 6.)  When asked to comment, Magnetar informed ProPublica that it was "net long" on the CDOs in which it invested. [2]  (*Id.*)

Speculation in the business press is not sufficient to support a fraud claim*, see Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 215 (2d Cir. 2010), and even if such speculation were true, it does not support the claim that Putnam "abdicated" its collateral

---

[2] Intesa complains at length that the Pyxis CDO was "structured in such a way that, as long as it avoided default, the preference shares and Class X notes [alleged to have been purchased by Magnetar] would receive much larger payments of principal and interest than the senior notes during the first five years of their existence" and "would receive a large portion of their investment back within just over a year." (SAC ¶ 68 (referring to structure as "triggerless").)  The Second Amended Complaint, however, contains no allegations that this structure was not fully disclosed to Intesa and other market participants in the Offering Memorandum and other offering documents, nor does Intesa's description of Pyxis' structure diminish that, in a default, the preference and Class X shares held by Magnetar and Deutsche Bank would suffer the first loss.

selection responsibilities to Magnetar.[3]  Where news articles are cited in a complaint, they "still must indicate particularized facts about Defendant['s] conduct in order to support the Plaintiff['s] claims." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007).  The ProPublica article *does not* implicate Putnam in any way or even discuss the Pyxis CDO.  The only mention of Putnam in the ProPublica article is a single reference to the employment history of a Magnetar employee Jim Prusko, who is reported to have previously worked at Putnam.  (Hora Decl. Ex. 5 at 7.)  Based solely on this innocuous fact, Intesa makes the speculative leap, unadorned with any factual support, that "the Putnam representative putatively responsible for selecting the Pyxis Portfolio" had an "especially close" relationship with Prusko, and that "in reality, Magnetar controlled" the asset selection process for the Pyxis portfolio. (SAC ¶ 113.)[4]

### E.   Intesa's Reference to Regulatory Investigation and Complaints Involving Other CDOs and Collateral Managers

In an effort to dress up its conclusory allegations by way of analogy, the SAC includes scores of allegations detailing complaints against and regulatory investigations of several other arrangers and collateral managers with respect to other CDO transactions.  (*See* SAC ¶¶ 2-4, 74, 153-172.)  Such allegations do not, however, support Intesa's claims against Putnam:  Putnam is not alleged to have had any involvement in these other CDO transactions. *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *5

---

[3] *See also Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives and press reports of other occasions . . . ."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (plaintiff's reliance on news articles discussing similar transactions entered into by defendant's rivals to artificially inflate revenues amounted to "guilt by association" and "more is required to plead securities fraud").

[4] Intesa also cites a book titled *Econned* written by a financial journalist that discusses Magnetar's alleged role in certain CDOs, but fails to mention either Putnam or Pyxis.  (*See* SAC ¶ 48.)  Although the Complaint misleadingly refers to *Econned*'s author, Susan Webber (who uses the pen name Yves Smith), as a "former Goldman Sachs banker" (*id.*), the book makes clear that the author had not worked at Goldman Sachs in more than 29 years and had no first-hand information relating to the structuring of CDOs in general, or the Pyxis CDO in particular.

(S.D.N.Y. Mar. 30, 2012) ("Allegations contained in the complaint of an unrelated matter . . . cannot establish the particularized facts necessary to support this securities fraud claim.").

> **F.     The Massachusetts Securities Division's Administrative Complaint**

Intesa also adds several references in its SAC to an administrative complaint recently filed by the Massachusetts Securities Division (the "MSD") against Putnam relating to the Pyxis CDOs,[5] and to various documents referenced in that pleading.  But the administrative complaint's unproven allegations, much like the complaints and investigations of other collateral managers referenced by Intesa, cannot form the basis of a fraud claim against Putnam. References to complaints in administrative proceedings that have not resulted in a decision on the merits are immaterial as a matter of law and should be stricken.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)).[6]

Even if Intesa's references to the administrative complaint could properly be considered, the administrative complaint makes no allegations of scienter or loss causation, both essential elements of Intesa's fraud claim.  And the emails it selectively quotes, far from showing that Magnetar controlled the selection of the Pyxis CDO's collateral, demonstrate that Magnetar did ***not*** have any ability to direct Putnam's asset selection.  (*See* Section II(B)(2), *infra*.)

> **G.     Justice Schweitzer Dismissed the Same Claims Against Putnam in
> Prior Litigation in New York Supreme Court; Putnam Did Not Settle**

As this Court is aware, on June 9, 2011, Justice Schweitzer of the New York Supreme Court dismissed a complaint asserting fraud claims against Calyon and Putnam based

---

[5] The "Pyxis CDOs" are Pyxis ABS CDO 2006-1 and a later CDO, Pyxis ABS CDO 2007-1.

[6] *See also In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034, at \*77-78 (S.D.N.Y. May 10, 2012) (citing *In re Merrill Lynch* and rejecting plaintiffs' citations to "unproven allegations" made in earlier regulatory complaints); *Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116 (JFK), 1988 U.S. Dist. LEXIS 79, at \*3 (S.D.N.Y. Jan. 8, 1988) (holding that "references in a complaint to proceedings which do not adjudicate underlying issues may be stricken").

on the same theories advanced by Intesa.  In an attempt to minimize the impact of Justice

Schweitzer's decision, Intesa repeatedly asserts that after allegedly "incriminating evidence came

to light" (the same Pyxis-related emails that Intesa quotes in its SAC), "the investors' claims

were promptly settled for an undisclosed amount." (*See* SAC ¶¶ 3, 140.)  This assertion is

misleading.  Justice Schweitzer dismissed Putnam from the *Loreley* action *prior* to this alleged

settlement by other parties, and after the *Loreley* plaintiffs had invoked many of the same

defective emails now raised in Intesa's complaint.  (*See* Hora Decl. Ex. 6 & Ex. 7 at 7-10.)

Putnam did not enter into any settlement with, and never paid a dime to, the *Loreley* plaintiff,

which simply discontinued its action after the court granted Putnam's motion to dismiss.

## ARGUMENT

### I.     INTESA'S CLAIMS UNDER SECTION 10(B) OF THE 1934 ACT ARE BARRED BY THE FIVE-YEAR STATUTE OF REPOSE

Intesa attempts to resurrect its time-barred federal securities fraud claim against

Putnam by invoking (i) an April 24, 2007 Swap Confirmation, and (ii) an alleged prediction by a

Putnam employee on April 20, 2007 that total losses on the Pyxis portfolio "should not be high."

Neither renders Intesa's claim timely.

#### A.     Intesa's Amendments Do Not Relate Back

The SAC's amendments do not relate back to the date of the initial filing of this

action for purposes of the statute of repose.  Thus, even if the five-year statute of repose did not

begin to run until April 24, 2007—and it in fact began to run much earlier—the SAC's Section

10(b) claim is time-barred.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d

637, 642-43 (S.D.N.Y. 2011) ("relation back" does not apply for purposes of the statute of

repose) (Kaplan, J.); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 310 (S.D.N.Y.

2011) ("[P]laintiffs [] cannot avoid the statute of repose on a 'relation back' theory under Rule

15(c) because the statute of repose by its terms allows no exceptions.") (Kaplan, J.); *Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 622 (S.D.N.Y. 2011) (statute of repose is "absolute"); *Trust Corp. v. Olson*, 768 F. Supp. 283, 285 (D. Ariz. 1991) (second amended complaint does not relate back to original complaint for purposes of statute of repose).

**B.     The Swap Confirmation Does Not Save Intesa's Claim**

Even if the SAC's amendments could relate back to the date of the filing of the original complaint, they do not save Intesa's Section 10(b) claim.

Intesa concedes that the Confirmation does not contain any actual statements by Putnam, but argues that the Confirmation "incorporates by reference" alleged misstatements by Putnam in the Offering Memorandum and Collateral Management Agreement by way of a reference to the Indenture.  According to this convoluted theory, (i) because the Confirmation, to which Putnam was not a party, mentions the Pyxis Indenture; (ii) because the Indenture in turn mentions certain parts of the Offering Memorandum and CMA; and (iii) because the Offering Memorandum and Collateral Management Agreement allegedly contain misstatements by Putnam, then the Confirmation should be deemed to constitute a republication of the alleged misrepresentations in the Offering Memorandum and Collateral Management Agreement, documents that Intesa first received more than seven months earlier.  (SAC ¶¶ 87-89.)

This argument has no basis.  Intesa concedes it received the Pyxis offering documents—and concedes it reached an "understanding" to enter into its swap with Calyon—in late 2006, well before Calyon issued the Confirmation.  (SAC ¶¶ 78-86; *id.* ¶ 86 (Intesa and Calyon reached "an understanding that they would enter into a CDS" in September 2006, in advance of the Pyxis closing.)  Under the terms of Intesa's ISDA agreement with Calyon, Intesa was bound to the swap as of this time—not when Calyon performed the ministerial task of

10

sending out a confirmation months later.[7]  The Confirmation, which states a trade date and an

effective date of the swap of October 3, 2006, confirms this.  (SAC ¶ 86.)  Thus, Intesa could not

have relied upon any alleged misstatements in the Confirmation in making its decision to enter

into the swap—it admits it had already bound itself to the swap months earlier.

Second, Intesa's "incorporation by reference" argument has no basis in the

documents on which Intesa purports to rely.  Intesa claims that the Confirmation incorporates the

entirety of the Pyxis Indenture.  It does not.  The Confirmation merely lists the Indenture in the

definition of "Underlying Instruments." (Declaration of Lea Haber Kuck ("Kuck Decl.") [Doc #

39], Ex. C at 27.)  This statement is not an incorporation by reference of the Indenture or any

document mentioned in the Indenture; it simply defines the scope of the "Reference Obligation",

which the Confirmation elsewhere defines as the Class A-1 notes.  One document does not

incorporate another simply by mentioning it.  *See Am. Stock Transfer & Trust Co. v. Par Pharm.

Cos., Inc.*, 06 Civ 13283BSJRLE, 2009 WL 1754473, at *4 (S.D.N.Y. June 22, 2009)

("mention" of Section 13 and 15(d) of the Exchange Act in an indenture is insufficient to

"incorporate[] by reference any obligations in those sections of the statute").[8]

The Indenture's scattered references to the Offering Memorandum and Collateral

Management Agreement, moreover, are inapposite to Intesa's claims.  In support of its argument

---

[7] The swaps were governed by an ISDA Master Agreement between the parties and the Schedule thereto. (*See* Kuck Decl. [Doc. # 39], Ex. B.)  The Master Agreement states that "[t]he parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable . . . ." (*Id.* at § 9(e)(ii); *see also id.*, Schedule at Part 5(a).)

[8] Intesa also alleges that the Swap Confirmation directly incorporates the Collateral Management Agreement through the Confirmation's reference to a general class of documents referred to as "other relevant agreement(s)." (SAC ¶ 88; Kuck Decl. [Doc. #39], Ex. C (Swap Confirmation) at 27.)  The Confirmation's vague reference to "other relevant agreements" is insufficient, as a matter of law, to incorporate the Collateral Management Agreement. *See Ryan, Beck & Co., LLC. v. Fakih*, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003) (extrinsic document is incorporated by reference only when the agreement "specifically reference[s] and sufficiently describe[s] the document to be incorporated, such that the latter 'may be *identified beyond all reasonable doubt*'") (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)) (emphasis in original); 11 Williston on Contracts § 30:25 (an extrinsic document can be incorporated only where there is a "clear reference to the document" and where it is "describe[d] [] in such terms that its identity may be ascertained beyond doubt").

11

that the Indenture incorporates misstatements by Putnam in the Offering Memorandum and

Collateral Management Agreement, Intesa cites provisions of the Indenture dealing with

Qualifying Investment Vehicles, amendments to certain documents, the confidential treatment of

documents, and assignment of rights.  (SAC ¶¶ 88-89.)  None of these provisions has anything to

do with the alleged misstatements made by Putnam regarding collateral selection.  *See Lodges*

*743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.,*

534 F.2d 422, 441 (2d Cir. 1975) (reference to an "extraneous writing for a particular purpose

makes it part of [an] agreement only for the purpose specified"); *United States v. Foster Wheeler*

*Corp.*, 639 F. Supp. 1266, 1270 (S.D.N.Y. 1986) (letter of credit agreement incorporates only

those portions of letter of commitment that are referenced in letter of credit).

Finally, any incorporation was "entirely within the control of" and made by "the

person who deliver[ed]" and prepared the document—Calyon; Putnam is not alleged to have had

any authority over the Confirmation or its contents, and cannot be liable for any statements made

therein.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011).

## C.   Mr. Van Tassel's Purported Opinion Does Not Save Intesa's Claim

Intesa's allegation that a Putnam employee, John Van Tassel, opined to a

representative of Intesa on April 20, 2007 that total losses on the Pyxis portfolio "should not be

high" likewise does not save Intesa's expired securities fraud claim.

Intesa could not have relied on this alleged statement in making its investment

decision:  it admits that it agreed to enter into its swap with Calyon months earlier, in September

2006.  (*See* SAC ¶ 86; Section I(B), *supra*.)  Moreover, the Offering Memorandum on which

Intesa claims it relied made clear that Intesa was required to perform its own due diligence.  The

Offering Memorandum stated, in bolded capital letters, that no investor was permitted to rely on

any representations other than those set forth in the Offering Memorandum, and that, in making

an investment decision, investors "must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved."  (Hora Decl. Ex. 4 at ii-iii.)

Finally, the SAC does not contain any particularized factual allegations that Mr. Van Tassel's purported opinion about the performance of the portfolio was "not honestly held", *Robbins v. Moore Med. Corp.,* 894 F. Supp. 661, 672 (S.D.N.Y. 1995), nor does Plaintiff allege "specifics which would convert an opinion or projection into a factual misrepresentation", *Gissin v. Endres*, 739 F. Supp. 2d 488, 512 (S.D.N.Y. 2010).  Absent such allegations, Mr. Van Tassel's alleged opinion is not actionable.  *See id.*; *see also Kinsey v. Cendant Corp,* No. 04-Civ-0582 (RWS), 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) ("[a] defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter") (Sweet, J.).

## II.    INTESA'S SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Intesa's SAC fails to plead facts making out the most basic elements of a securities fraud claim, let alone with the particularity required by Rule 9(b) and the PSLRA.

### A.    Intesa Fails to Plead an Actionable Misrepresentation or Omission

#### 1.    Intesa Fails to Allege Any Misrepresentations Regarding Putnam's Role

Intesa alleges that Putnam abdicated its collateral selection responsibilities to Magnetar so that Magnetar supposedly could "select toxic assets whose performance it could bet against . . . ."  (SAC ¶ 9; *see also* SAC ¶¶ 185, 197.)  Thus, Intesa claims that Putnam's alleged representations that it would act "diligently and independently in the interests of long investors" (SAC ¶¶ 93, 101) and its alleged representations regarding its processes and procedures for selecting collateral (*id.* ¶ 1) were false because Magnetar, not Putnam, selected the CDO's collateral.  But the contention that the Pyxis was designed to fail, notwithstanding that the

portfolio complied with the Indenture's Eligibility Criteria, presumes the impossible—that defendants knew how the market would perform—and is unsupported by any well-pleaded facts. And while the SAC repeatedly alleges that Putnam "abdicated" its collateral selection role to Magnetar, the SAC contains no well-pleaded facts supporting this sensational claim.

Intesa cites a draft agreement among Calyon, Deutsche Bank, and Magnetar, but *not* Putnam, that included a term that would have given Magnetar purported "veto rights" over assets selected for the Pyxis CDO's warehouse. (*See* SAC ¶ 118; Draft Warehouse Agmt., Hora Decl. Ex. 8.) But nowhere does the SAC allege well-pleaded facts showing (i) an agreement including this draft term, which was expressly conditioned on Magnetar maintaining its early commitment to purchase Pyxis' equity, was ever signed; (ii) that Putnam knew about this arrangement;[9] (iii) that this proposed veto right was ever exercised; (iv) that Putnam, Calyon, or any other party ever honored any request by Magnetar to remove or block collateral from the Pyxis CDO warehouse, let alone to substitute "toxic" assets for "good" ones; or (v) that Intesa did not have the ability to inspect the warehoused assets prior to entering into its swap.

Intesa also claims that there was a "remarkably high correlation between the issuers whose securities were held or referenced by Pyxis and the issuers whose securities were held or referenced by" other CDOs sponsored by Magnetar, and speculates that Putnam must have allowed Magnetar to select the portfolio. (SAC ¶ 146.) But there are no well-pleaded factual allegations that Putnam had any involvement in these other Magnetar CDOs, knew the contents of their portfolios, or did not perform a rigorous, independent analysis of any of the

---

[9] Intesa speculates that Putnam was aware of the letter because the draft agreement required "Calyon or the Investment Adviser" to provide notification of asset purchases to Deutsche Bank and Magnetar. (SAC ¶ 118.) Putnam, however, could not possibly be bound to language in an agreement to which it was not a party, and there are no well-pleaded allegations that Putnam consented to or was ever informed of such an arrangement.

14

common collateral.[10]  This purported comparison to other CDOs does not and cannot supply any

particularized factual allegations about Putnam itself or the Pyxis collateral selection process.

        Unable to come up with any other support for its conclusory allegation that Pyxis

was built to fail or that Magnetar, not Putnam, selected Pyxis' collateral, Intesa resorts to

mischaracterizing the contents of the same handful of emails that were submitted to Justice

Schweitzer before he dismissed virtually identical allegations brought against Putnam by a Pyxis

investor, and to blindly copying false descriptions of other emails from the MSD's administrative

complaint.  For the reasons discussed at length in Section II(B)(2) below, none of these emails

supports the allegation that Putnam acquiesced in the creation of a CDO built to fail or abdicated

its collateral selection responsibilities to Magnetar.[11]

      **2.**    **Intesa's Claim Based on the Composition of the Pyxis Portfolio
is Without Merit**

        Intesa also fails to plead an actionable misrepresentation or omission by Putnam

regarding the amount of prime RMBS in the Pyxis portfolio.  (*See* SAC ¶¶ 8, 103, 151.)

        In a section entitled "Security for the Notes", the Offering Memorandum

contained more than 40 pages of disclosures concerning the composition of the collateral assets

and the Eligibility Criteria governing the selection of these assets.  (Hora Decl. Ex 4 at 115-155.)

Among other things, the Offering Memorandum disclosed that not less than 80% of the Pyxis

portfolio's assets would consist of subprime and mid-prime RMBS assets.  (*Id.* at 31, 124, 139-

---

[10] Intesa's assertion that Putnam "included offset trades on ABX index components of a type unique to" other CDOs in which Magnetar invested (SAC at p. 57) fails for the same reasons—there is no well-pleaded allegation (i) that Putnam knew the composition of these other CDOs, (ii) that these alleged "offset" trades violated any of the Eligibility Criteria, or (iii) that Putnam failed to perform an independent analysis of these trades.

[11] Intesa also repeatedly alleges that, when choosing to enter into its swap, it relied upon statements in the offering materials and in purported oral statements regarding Putnam's experience and capabilities.  (See SAC ¶¶ 1, 93, 100.) As a threshold matter, Intesa fails to allege any facts suggesting that Putnam lacked the experience and capabilities described in such statements.  In any event, such general statements regarding Putnam's business practices are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009).

40.)  There was no corresponding minimum concentration of prime RMBS assets—in other words, the Offering Memorandum disclosed and Intesa was on notice that the Pyxis portfolio could contain *no* prime RMBS assets.  Likewise, the "Pitchbook" upon which Intesa claims it relied in making its investment expressly stated that its pie chart setting forth a proposed "asset type distribution" was "indicative," and that "[a]ll information contained herein is preliminary and subject to change without further notice."  (Investor Presentation, Hora Decl. Ex. 3 at 14.)  No investor reading the disclosures in the offering documents could have been misled into believing that the portfolio would consist of any minimum amount of "prime RMBS".[12]

Moreover, though Intesa complains that the final Pyxis portfolio differed from the "target" portfolio it alleges it received from Calyon (not Putnam), conspicuously absent is any allegation that Intesa made any effort to obtain either the portfolio as it existed at closing on October 3, 2006, or the final, fully-ramped portfolio, which it easily could have compared with the "target" portfolio it alleges it received on August 9, 2006.  As a sophisticated party, Intesa had "a duty to exercise ordinary diligence and conduct an independent appraisal of the risk," *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (1st Dep't 2012).[13]

Finally, there is no well-pleaded factual allegation to support the SAC's new contention that Putnam "breached limits on the Pyxis ABX Index investments" by selling

---

[12] Intesa's assertion that an "initial launch email" from Calyon stating that "the collateral manager [Putnam] is able to cherry-pick the collateral for this portfolio . . . with the ability to focus on seasoned product" was false because 60% of the Pyxis portfolio supposedly was not seasoned also states no claim against Putnam.  (SAC ¶ 95; *see also* Hora Decl. Ex. 9.)  There is no allegation that the CDO's terms required any specific amount of seasoned product.  Nor is there any well-pleaded allegation of what type of collateral security constituted "seasoned product," which was not a defined term in the Offering Memorandum or a component of any of the Eligibility Criteria governing the selection of collateral assets.  In any event, *Calyon*, not Putnam, made this statement.  Putnam cannot be held liable for it.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").

[13] Also notably absent from the Complaint is any allegation that the Pyxis portfolio would have performed any differently and avoided an event of default if it had contained the up to $60 million of prime RMBS assets that Intesa claims it should have pursuant to the last "target" portfolio it received.  This amount would have represented a mere 4% of the Pyxis CDO's total $1.5 billion portfolio—meaning that the overwhelming majority of the Pyxis portfolio (96% or $1.440 billion) *still* would have consisted of subprime and mid-prime RMBS assets.

protection on constituents of the Index.  (SAC at p. 56.)  The Eligibility Criteria in the Offering

Memorandum specified concentration limits on the ABX Index and the indices contained

therein, not on the constituent RMBS.  (*See* Hora Decl. Ex. 4 at 118.)  Intesa's attempt to create

new collateral selection criteria not set forth in the Offering Memorandum should be rejected.

> ### 3.  Intesa Fails to Allege a Misrepresentation or Omission as to Any Short Counterparty's Identity

Intesa has no cause to complain that it was unaware that the Pyxis CDO's equity

investor, Magnetar, allegedly took certain short positions on the CDO's assets.  (*See* SAC ¶ 70.)

The Pyxis Offering Memorandum expressly disclosed to Pyxis's sophisticated investors that

77% of the $1.5 billion portfolio would be comprised of CDS in which the Pyxis CDO would act

as the long counterparty.  (Hora Decl. Ex. 4 at 18, 34, 169.)  By definition, *someone* had to

assume the "short" side of these CDS trades, and it would have been readily apparent to Intesa, a

sophisticated investor, that the short counterparties on these CDS would have economic interests

diametrically opposed to those of Intesa.  (*See* SAC ¶¶ 57-58.)[14]

> ## B.  Intesa Fails to Allege That Putnam Acted with Scienter

> ### 1.  Intesa Fails to Allege a Plausible Motive for Putnam's Participation in the Alleged Fraudulent Scheme

Try as it might, Intesa cannot articulate a plausible theory of motive to defraud on

the part of Putnam.  According to Intesa, Putnam engaged in a billion-dollar fraud, risked its

reputation and business, abdicated its duties as collateral manager, and intentionally assisted in

the creation of a CDO designed to fail, all to put hundreds of millions of dollars in the pocket of

another entity, and to earn collateral management fees that were dependent on the Pyxis CDO

not failing, but instead performing well and meeting its payment obligations.

---

[14] The Offering Memorandum also disclosed that the ultimate short counterparties on these CDS trades would be selected by Calyon, the initial short counterparty, in its sole discretion.  (Hora Decl. Ex. 4 at 48.)  Investors were therefore put on notice that they might never learn the identities of the ultimate short counterparties.

To begin with, Intesa glosses over the fact that a significant portion of Putnam's collateral management fee was junior to the interest payments to be made to Pyxis noteholders. (*See* Hora Decl. Ex. 4 at 70-74.) In other words, Putnam would receive the subordinated incentive portion of its collateral management fee *only if* the Pyxis CDO performed well enough to first pay all six classes of noteholders the maximum amount they were entitled to receive on each applicable distribution date. Further, under the terms of the Collateral Management Agreement, *both* the senior and subordinated portions of Putnam's collateral management fee were dependent on a calculation of the underlying collateral assets that excluded defaulted securities. (*See* Hora Decl. Ex. 1 at §§ 8(a)-(b); *id.* Ex. 2 at 40, 43-44 ("Monthly Asset Amount" and "Net Outstanding Portfolio Collateral Balance" definitions).) Putnam had no incentive to design a CDO that would fail: any defaults would (and did) reduce the size of its fees.

In an effort to evade the implications of this fee structure, Intesa alleges that Putnam continued to receive its subordinated fee until Pyxis defaulted in December 2008 (SAC ¶¶ 62-63), was "still receiving part of its fixed fee from Pyxis as recently as February 11, 2013" (*id.* ¶ 63), and to date "has been paid approximately $5,707,429" in its role as collateral manager (SAC ¶ 64). None of this helps Intesa. That Putnam allegedly received its subordinated incentive fee until December 2008 cannot establish a motive on Putnam's part to abdicate its collateral selection responsibilities or design a toxic CDO: If Pyxis had *not* defaulted, Putnam would have continued to receive a subordinate fee in the amount of $750,000 per, or $3,000,000 more than it received over the last four years. Similarly, the fact that Putnam has received a small amount in senior fees (roughly $320,000 as alleged in the SAC) since Pyxis defaulted does not raise a plausible motive to defraud: If Pyxis had not defaulted, these fees would have amounted to a whopping $2.25 million per year, or *twenty-eight* times as much over the last four

18

years.[15]  In fact, if Pyxis had not defaulted, Putnam would have received a total of $18 million in

fees since 2006, far more than the $5.7 million the SAC alleges it actually received.

      Intesa next attacks Putnam's subordinated incentive fee on the grounds that it was

supposedly "dependent not on Pyxis performing well, but rather on Magnetar receiving its target

return," which Intesa claims was "effectively guaranteed" by provisions in the Pyxis Indenture

giving the equity and Class X noteholders larger payments of principal and interest than senior

noteholders in the first five years of the CDO's existence so long as Pyxis avoided default.  (SAC

¶¶ 61, 68.)  But the SAC's allegations show unmistakably that the incentive fee was dependent

on Pyxis performing well:  The SAC admits that Putnam received *no* subordinated fees after

Pyxis defaulted in 2008.  (*Id.* ¶¶ 62-63.)  Moreover, Intesa's contention is simply incorrect:

Under a plain reading of the Pyxis Indenture, Putnam's incentive fee was *not* dependent solely

on Magnetar receiving principal and interest payments.  It was dependent on (i) Pyxis not

defaulting, and (ii) *all* CDO investors, including the senior noteholders, *first* receiving the

amounts they were entitled to on each quarterly distribution date.  (Hora Decl. Ex. 2 at 224.)  The

incentive fee thus explicitly depended on the CDO performing well.

      Intesa's assertion that Putnam's subordinated fee was "virtually assured" by

Magnetar's alleged "control" over the Pyxis portfolio (*see* SAC ¶¶ 61, 134) also has no basis.  In

support of this assertion, Plaintiff quotes a November 2006 email between Deutsche Bank and

Calyon that copies no Putnam personnel, discusses an unrelated collateral manager (NIBC),

concerns a different CDO in which Putnam is not alleged to have participated (Orion 2),

mentions nothing about subordinated fees, and addresses the irrelevant issue of whether Orion

2's long (not short) investors should be given a right to terminate NIBC as collateral manager.

---

[15] Under the terms of the Collateral Management Agreement, Putnam is entitled to continue to be paid for its
management of performing, non-defaulted collateral assets.  (*See* Hora Decl. Ex. 1 § 8(a).)

(*See* Hora Decl. Ex. 10.) Nothing in this email even remotely supports Intesa's contention that

Putnam's subordinated fee would be "virtually assured": As the chart in Intesa's SAC shows,

those fees were not "assured"—they ended once Pyxis defaulted. (*See* SAC ¶ 62.)

   The SAC's allegation that Putnam's senior collateral management fees were

purportedly higher than normal because of Pyxis' $1.5 billion size (*see id.* ¶ 60) likewise fails

adequately to allege motive. A larger CDO involves more assets to select and manage, and the

emails cited in the SAC show that Putnam's 0.15% senior and 0.05% subordinated fee rates were

in fact much less than the 0.40% rate on smaller, so-called "regular style" $400 million CDOs.

(*Id.* ¶ 134.) The desire to earn ordinary fees is not a permissible basis for inferring scienter. *See,*

*e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.) ("[T]he desire

to earn management fees is a motive generally possessed by . . . managers, and as such, does not

suffic[iently] allege a 'concrete and personal benefit' resulting from fraud."). This principle

applies with even greater force to less than ordinary fees.[16]

   The bald allegation that Magnetar "promis[ed]" Putnam "additional, similarly

lucrative deal volume," which was purportedly "realized when Putnam was selected to serve as

collateral manager for a second Pyxis CDO" (SAC ¶¶ 65, 136), also does not suffice to allege

motive. There are no well-pleaded facts tying Putnam's selection as collateral manager for Pyxis

ABS CDO 2007-1 to any fraudulent conduct with respect to the Pyxis CDO, and the SAC does

not and cannot supply any particularized facts, as required by Rule 9(b), regarding who made the

alleged "promise," when it was made, to whom it was made, or what was said. Moreover, it

---

[16] Intesa alleges, solely on information and belief, that Putnam's senior fee on the Pyxis CDO was higher (by a mere five basis points) than the senior fee paid to the collateral manager in all but three Magnetar-sponsored CDOs and higher than the total fee on all but six Magnetar-sponsored CDOs. (SAC ¶ 60.) The SAC, however, fails to identify the sources upon which these information and belief allegations are based, as required by Rule 9(b). *See G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216 (RWS), 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (Sweet, J.). These allegations, moreover, say nothing about whether the fixed percentage fee was high for so-called "typical," non-Magnetar CDOs. The correspondence cited by Intesa, discussed above, shows that it was not.

lacks all plausibility to suggest that a large and respected financial institution would have a motive to commit a billion-dollar fraud to benefit another entity, design a toxic CDO, and damage its reputation as a collateral manager, all to guarantee a role in future CDOs also allegedly designed spectacularly to fail. *See Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572 (JGK), 2003 WL 135706, at *3 (S.D.N.Y. Jan. 17, 2003) (rejecting theory of motive that was "clearly self-defeating, if not irrational").

### 2.   Intesa Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness

Having failed to allege a plausible motive for Putnam's participation in the alleged fraud, Intesa must allege facts establishing circumstantial evidence of conscious misbehavior or recklessness. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011).  None of the sources cited in the SAC does so.

### a.   The *Loreley* Emails Do Not Plead Conscious Misbehavior or Recklessness

The SAC cites a number of emails disclosed in the *Loreley* action it claims confirm "Putnam's abdication of responsibility for selecting the Pyxis collateral." (SAC ¶ 114.) But an examination of these emails reveals no evidence of such abdication, and instead shows that Putnam independently selected Pyxis's collateral.

The August 2006 email exchange cited in paragraph 124 of the SAC, also submitted in *Loreley*, actually *disproves* Plaintiff's main thesis.  Rather than evidencing that "Putnam did in fact allow Magnetar to exercise . . . secret control over the Pyxis portfolio," as Intesa claims (*see* SAC ¶ 119), these emails show just the opposite:  Putnam reported that the "collateral pool" it was buying "score[d] well on [Putnam's] risk scoring model," and that only after it finished a "benchmarking" analysis which involved doing "preliminary work across a range of deals" would Putnam pursue additional trades. (Hora Decl. Ex. 11 at 2-3.)  In response,

Mr. Prusko replied that Magnetar "[would] buy CDO CDS on names of [Putnam's] *choosing* at mid-market, or bid list +3bp, whatever you prefer." (*Id.* at 2 (emphasis added).)  Thus, not only was Putnam performing the analyses that one would expect of a collateral manager, it was receiving offers from Magnetar to purchase specific CDS on competitive terms, and on names of Putnam's choosing.  Later emails in the chain are even more damaging to Plaintiff's claim, as Mr. Prusko asked Alexander Rekeda of Calyon to "stay on top of Putnam CDO situation," and stated that he "[didn't] like that [Putnam] [was] buying CDO's without us knowing about it"— showing that Putnam, not Magnetar, selected the collateral. (*See id.* at 1; SAC ¶ 125.)

The May 2006 email string among DB, Calyon, and Magnetar, *but not Putnam*, cited in paragraph 116 of the SAC also does not aid Plaintiff's allegations.  (SAC ¶ 116; *see* Hora Decl. Ex. 12.)  These emails do not copy Putnam, and were sent before Putnam entered into its engagement letter to serve as collateral manager and before Calyon agreed to provide warehouse financing for Pyxis.  In the emails, Mr. Prusko of Magnetar discussed the equity investors' desired internal rate of return on Pyxis, and referenced the fact that Putnam had purportedly learned of that desired rate.  The emails, however, say absolutely nothing to indicate that, if selected as collateral manager, Putnam would participate in a fraud whereby it would build a toxic CDO and abdicate its role as collateral manager to Magnetar.

Citing two June 2006 email strings, Intesa next alleges a "'behind the scenes' arrangement" whereby "[Calyon] or Putnam" purportedly granted Magnetar veto rights over assets proposed for the Pyxis warehouse. (SAC ¶ 118.)  But the emails cited copy *no Putnam employees*, and the draft letter between Calyon, DB, and Magnetar purportedly granting Magnetar veto rights over assets to be included in the Pyxis warehouse (Hora Decl. Ex. 8 & Ex. 13) fails to raise any inference of fraud against Putnam for the same reasons already discussed in

Section II(A)(1), *supra*: among other things, there are no well-pleaded facts that the letter was ever executed; that Putnam knew about the arrangement; that Magnetar ever exercised the purported veto; or that Putnam ever honored any request to remove or block collateral.

The remaining *Loreley* emails cited by Plaintiff similarly fail to support Plaintiff's claims. The September 2006 exchange between Putnam and Calyon cited in paragraph 132 of the SAC (*see also* Hora Decl. Ex.14) indicates the unremarkable fact that Putnam became aware at that time of a small short position taken by Magnetar in Pyxis. The Offering Memorandum disclosed that investors would be taking short positions in Pyxis through back-to-back hedging arrangements with Calyon. (Hora Decl. Ex. 4 at 48.) There is no allegation that Putnam arranged for this short position, nor are any facts pleaded to support Intesa's conclusory assertion that Putnam "was aware" that the credit protection Magnetar had purchased "far exceeded Magnetar's long position." (*See* SAC ¶ 70.) Even if Intesa could properly make such allegations, there is no basis to infer that Magnetar controlled Putnam's selection of collateral based on the fact that Putnam was aware of this or any other short position.

The November 2006 exchange between Calyon and Magnetar cited in paragraph 70 of the SAC, in which Calyon asks Mr. Prusko if he wanted to purchase protection on Pyxis, again *does not include any Putnam personnel.* (*See* SAC ¶ 70; Hora Decl. Ex. 15.) And the last *Loreley* email Plaintiff cites, claiming that it confirms "Putnam's abdication of its collateral selection responsibilities to Magnetar," consists of a discussion between Calyon, DB, and Magnetar (but again, *not Putnam*) of an entirely separate CDO and collateral manager. As discussed in Section II(B)(1) above, this email addresses the benign issue of whether the collateral manager in an unrelated deal should give equity holders, whose long investment is subject to the collateral manager's performance, a right to terminate the collateral manager. (*See*

23

SAC ¶¶ 134-35; Hora Decl. Ex.10.)  There is no discussion of any abdication collateral

management responsibilities, let alone by Putnam.  None of the *Loreley* emails pleads scienter.

> **b.     Intesa's References to Allegations in the MSD's
> Administrative Complaint Do Not Establish Conscious
> Misbehavior or Recklessness**

Intesa's blind quotation of emails cited in the MSD's administrative complaint

also fails to plead conscious misbehavior or recklessness.  Even if the Court could consider the

administrative complaint, and it cannot (*see* Background Section (F))*,* the allegations drawn from

it do not plead scienter.  First, the complaint does not even make any scienter allegations against

Putnam.  Second, the administrative complaint egregiously mischaracterizes the emails it

references.  Intesa, which does not have the underlying emails, unwittingly repeats this error.

As made clear by the emails cited by the MSD, Putnam repeatedly advised

Magnetar that Putnam intended to select the collateral assets with the best fundamental value.

For instance, in an email with Magnetar dated July 7, 2006, early in the collateral selection

process for Pyxis, Putnam's CDO Team Leader emphasized that Putnam would only select

collateral assets that it thought would perform well, stating:  "*We are going to pick the deals that

have the best fundamental value.*"  (Hora Decl. Ex. 16 at 2 (emphasis added).)

Remarkably, the MSD quotes substantial portions of this email but misleadingly

uses ellipses to give a nefarious gloss to this exchange.  (Hora Decl. Ex. 17 ¶ 103.)  Thus, the

MSD quotes the sentence before and the sentence after Putnam's statement that "*We are going

to pick the deals that have the best fundamental value*" (emphasis added), but somehow left out

the sentence in which Putnam announced its intent to select collateral with the "*best

fundamental value*"—a sentence that goes directly to the key issue in this case.  Similarly, the

MSD manages to quote Magnetar's statement that its short trades were a "natural delta hedge,"

but then uses ellipses rather than include the rest of the sentence: "*even if they are the best*

24

*names*." (Hora Decl. Ex. 17 ¶ 32 & Ex. 16 at 2.)  Intesa quotes the same email out of context in

the SAC.  (*See* SAC ¶ 122.)  These efforts to play fast and loose with the facts are precisely why

plaintiffs may not rely on unproven allegations in other proceedings to support their claims.

Far from helping Intesa, the emails cited in the administrative complaint disprove

Intesa's claims.  The emails reinforce the fact that Putnam was free to accept or reject the assets

discussed, as it deemed appropriate in its independent judgment.  (*See, e.g.*, Hora Decl. Ex. 17 ¶

105 (Magnetar stating it would buy CDS "***on names of [Putnam's] choosing***") (emphasis

added), SAC ¶ 124 & Hora Decl. Ex. 11; Hora Decl. Ex. 17 ¶ 141 (Magnetar had pre-

warehoused certain assets for Pyxis ABS CDO 2007-1 "***which [Putnam] can take if [it] like[s]***

***them.***") (emphasis added) & Ex. 18; Hora Decl. Ex. 17 ¶ 103 (Magnetar stating it would sell

protection on "***any*** deal late 05 up to now, don't have to stick to new deals") (emphasis added),

SAC ¶ 122 & Hora Decl. Ex. 16; *see also* Hora Decl. Ex. 17 ¶ 105 ("*[a]ny* recent mezz[anine]

[asset backed securities] deal is fine.") (emphasis added), SAC ¶ 124 & Hora Decl. Ex. 11.)  The

administrative complaint does not establish any conscious misbehavior or recklessness.

## III.    INTESA'S FRAUD AND AIDING AND ABETTING FRAUD CLAIMS
##         AGAINST PUTNAM SHOULD BE DISMISSED

Having failed to state a claim under Section 10(b) and Rule 10b-5, Intesa cannot

allege a cognizable claim against Putnam sounding in common law fraud.  Where "Section 10(b)

claims do not survive, plaintiffs' common law fraud claims, based on the same allegations of

fact, must be dismissed as well." *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,

747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).[17]

---

[17]  Because the underlying common-law fraud claim against Calyon and Magnetar fails for the reasons
advanced by those defendants, which are adopted herein, the derivative claim for aiding and abetting
fraud likewise fails as a matter of law.  *See, e.g., In re AHT Corp.*, 292 B.R. 734, 746 (S.D.N.Y. 2003)
(dismissing claim for aiding and abetting fraud because "there was no fraud").

## IV.   CONCLUSION

For the reasons set forth above, Putnam respectfully requests that the Court grant

its motion to dismiss the SAC with prejudice.

Dated:  New York, New York         MILBANK, TWEED, HADLEY & McCLOY LLP
        March 19, 2013           1 Chase Manhattan Plaza
                                       New York, New York  10005
                                       (212) 530-5000


                                By:   /s/ *Sean M. Murphy*
                                    James N. Benedict
                                    Sean M. Murphy
                                    Thomas A. Arena
                                    Robert C. Hora
                                    *Attorneys for Defendant*
                                    *Putnam Advisory Company LLC*

## CERTIFICATE OF SERVICE

I, Sean M. Murphy, am an attorney duly admitted to practice law before this

Court.  I hereby certify that on March 19, 2013, I caused a true and correct copy of the foregoing

Memorandum of Law in Support of Putnam Advisory Company's Motion to Dismiss the Second

Amended Complaint, dated March 19, 2013, to be served via hand delivery and operation of the

Court's CM/ECF system on:

Phillip Z. Selendy, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave., 22nd Fl.
New York , NY 10010
(212) 849-7000
phillipselendy@quinnemanuel.com
*Counsel for Plaintiff*

Lea Haber Kuck, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
lea.kuck@skadden.com
*Counsel for Defendants*
   *Credit Agricole Corporate and Investment Bank and*
   *Credit Agricole Securities (U.S.A.) Inc.*

Joseph Serino, Jr., Esq.
Kirkland & Ellis LLP
601 Lexington Ave.
New York, New York 10022
(212) 446-4800
joseph.serino@kirkland.com
*Counsel for Defendants*
   *Magnetar Capital LLC*
   *Magnetar Financial LLC*
   *Magnetar Capital Fund, LP*

DATED:   March 19, 2013
         New York, New York

                          _____/s/ Sean M. Murphy_____
                               Sean M. Murphy