UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTESA SANPAOLO, S.P.A.,

                 Plaintiff,

-against-

CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK, CRÉDIT
AGRICOLE SECURITIES (U.S.A.) INC.,
THE PUTNAM ADVISORY COMPANY,
LLC, MAGNETAR CAPITAL LLC,
MAGNETAR FINANCIAL LLC, AND
MAGNETAR CAPITAL FUND, LP,

                 Defendants.

12 Civ. 2683 (RWS)

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
CALYON'S AND PUTNAM'S
MOTIONS TO DISMISS THE
SECOND AMENDED COMPLAINT**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Philippe Z. Selendy
Jonathan E. Pickhardt
Nicholas F. Joseph
Sean P. Baldwin
Paul A. Riley

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Facsimile: 212-849-7100

*Attorneys for Plaintiff Intesa Sanpaolo,
S.p.A.*

April 2, 2013

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND .................................................................................................4

      A.    The Magnetar Scheme ................................................................................4

      B.    The Pyxis Fraud .........................................................................................5

            1.    Defendants' Motives To Commit Fraud ....................................5

            2.    Defendants' Misrepresentations..................................................6

            3.    Magnetar's Control of Collateral Selection................................7

ARGUMENT ...........................................................................................................................11

I.      INTESA'S SECURITIES FRAUD CLAIMS ARE TIMELY .........................................11

      A.    The Pyxis Swap Incorporates By Reference The Collateral Management Agreement's Misrepresentations As To Putnam's Role .......................................11

      B.    Putnam Made A Further Material Misrepresentation On April 20, 2007.............15

      C.    Intesa Does Not Need To Invoke Relation Back To Make Its § 10b Claims Timely .............................................................................................................15

      D.    Even If The Last Misrepresentations Were Made Before The Pyxis Swap Was Executed, The Statute of Repose Did Not Start Running Until Then ..........16

II.    INTESA HAS ADEQUATELY ALLEGED SECURITIES FRAUD AND COMMON LAW FRAUD AGAINST CALYON AND PUTNAM................................18

III.   THE PYXIS SWAP WAS NOT A FOREIGN TRANSACTION ...................................22

IV.   THE SAC SUPPORTS A PUNITIVE DAMAGES AWARD ..........................................23

CONCLUSION...........................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Absolute Activist Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)...................................................................23, 24

*Ambac Assur. Corp. v. EMC Mortg. Corp.*,
    No. 08 Civ. 9464, 2009 U.S. Dist. LEXIS 26456 (S.D.N.Y. Mar. 16, 2009).........24

*Am. Stock Transfer & Trust Co. v. Par Pharm. Cos.*,
    No. 06 Civ. 13283 (BSJ) 2009 WL 1754473 (S.D.N.Y. June 22, 2009)................13

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)................................................................17

*Arnold v. KPMG LLP*,
    334 F. App'x 349 (2d Cir. 2009) ................................................................17, 18

*Boudinot v. Shrader*,
    No. 09 Civ. 10163 (LAK), 2012 WL 489215 (S.D.N.Y. Feb. 12, 2012) .........17, 18

*In Re CRM Holdings., Ltd. Sec. Litig.*,
    No. 10-cv-975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10, 2012) ...................9

*Carlucci v. Han*,
    886 F. Supp. 2d 497, 514 (E.D. Va. 2012) ............................................................17

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)...................................................................19

*Cortec Indus, Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)...................................................................................16

*Federal Housing Finance Agency v. Merrill Lynch & Co.*,
    No. 10 Civ. 06202 (DLC) (S.D.N.Y. Nov. 8, 2012), ............................................24

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)................19

*Grondahl v. Merritt & Harris, Inc.*,
    964 F.2d 1290 (2d Cir. 1992)..............................................................................17

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
    748 F.2d 729 (2d Cir. 1984)................................................................................22

*HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012)................................22

*IBEW Local 9 Pension Fund v. Deutsche Bank AG*,
    No. 11-cv-4209 (KBF), (S.D.N.Y. Mar. 27, 2013)....................................................9

*Intesa Sanpaolo, S.P.A. v. Credit Agricole Corporate & Investment Bank,*
  No. 12 Civ. 2683 (RWS), 2013 WL 525000 (S.D.N.Y. Feb. 13, 2013).....................12, 17, 18

*Jones v. Cunard S.S. Co.,*
  238 A.D. 172 (2d Dep't 1933) .........................................................................13

*Kwon v. Yun,*
  606 F. Supp. 2d 344 (S.D.N.Y. 2009).............................................................20

*Ledford v. Rapid-Am. Corp.,*
  No. 86-cv-9116 (JFK), 1988 U.S. Dist. LEXIS 79 (S.D.N.Y. Jan. 8, 1988)...........................9

*Lipsky v. Commonwealth United Corp.,*
  551 F.2d 887 (2d Cir. 1976)..............................................................................9

*In Re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
  218 F.R.D. 76 (S.D.N.Y. 2003)..........................................................................9

*MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
  81 A.D.3d 419 (1st Dep't 2011) ......................................................................21
  911 N.Y.S.2d 694 (N.Y. Sup. Ct. 2010) .........................................................21

*Mfrs. Hanover Trust Co. v. Yanakas,*
  7 F.3d 310 (2d Cir. 1993) ...............................................................................20

*Morin v. Trupin,*
  711 F. Supp. 97 (S.D.N.Y. 1993).......................................................................21

*Morrison v. National Australia Bank Ltd.,*
  130 S. Ct. 2884 (2010)................................................................................23, 24

*N.Y. Univ. v. Cont'l Ins. Co.,*
  87 N.Y.2d *308 (1995)* ....................................................................................24

*Padilla v. Winger,*
  No. 11 Civ. 897 (DAK), 2012 WL 1379228 (D. Utah Apr. 12, 2012) ..................................17

*PaineWebber Inc. v. Bybyk,*
  81 F.3d 1193 (2d Cir. 1996)...........................................................................12

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.,*
  753 F. Supp. 2d 166 (S.D.N.Y. 2010)...............................................................23

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada,*
  645 F.3d 1307 (11th Cir. 2011) .....................................................................23

*Radiation Dynamics, Inc. v. Goldmuntz,*
  464 F.2d 876 (2d Cir.1972)............................................................................18

*Rocanova v. Equitable Life Assurance Soc'y,*
  83 N.Y.2d 603 (1994) ....................................................................................24

*Ryan, Beck & Co., LLC. v. Fakih,*
  268 F. Supp. 2d 210 (E.D.N.Y. 2003) ...............................................................13

*S.E.C. v. Goldman, Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011)..................................................................23

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...............................................................18

*Swersky v. Dreyer and Traub*,
  219 A.D.2d 321 (1st Dep't 1996) .........................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................19

*Walker v. Sheldon*,
  10 N.Y.2d 401 (1961) ..........................................................................................24

## <u>Statutes and Rules</u>

28 U.S.C. § 1658(b)(2) ................................................................................................11

Fed R. Civ. P. 9(b)  ........................................................................................................1

Plaintiff Intesa Sanpaolo, S.p.A. ("Intesa") respectfully submits this memorandum of law in opposition to the motions to dismiss the Second Amended Complaint by defendants Credit Agricole Corporate and Investment Bank and Credit Agricole Securities (U.S.A.) Inc. (together, "Calyon"), and The Putnam Advisory Company ("Putnam").

## PRELIMINARY STATEMENT

Intesa's Second Amended Complaint ("SAC") supplements the allegations in the Amended Complaint relating to Calyon and Putnam in two principal respects: (1) it lays out the relevant provisions of the credit default swap (the "Pyxis Swap") entered into by Intesa with respect to the Class A-1 notes of Pyxis ABS CDO 2006-1 ("Pyxis"), together with the Pyxis Indenture, Collateral Management Agreement and Offering Memorandum—all of which were incorporated by reference in the original Complaint—to show how Calyon's and Putnam's misrepresentations that Putnam would select the Pyxis collateral independently and in good faith were incorporated in the Pyxis Swap, and thus that Intesa's federal securities fraud claims were brought within five years of the date of the last such misrepresentation, within the five year statute of repose for such claims; and (2) it alleges new facts—derived, among other things, from the Massachusetts Securities Division's Complaint against Putnam (the "Massachusetts Complaint")—further confirming that, at Magnetar's behest and with Calyon's full knowledge and complicity, Putnam in fact allowed Magnetar, a net short investor with interests directly adverse to Intesa's, to dictate collateral selection.

Putnam and Calyon attempt to avoid liability for their fraud by numerous devices. *First*, they dispute the Court's holding that the "indenture … or other relevant agreement(s) setting forth the terms of" the Pyxis Class A-1 notes are incorporated by reference in the Pyxis Swap, arguing that the Pyxis Swap merely "mentions" these agreements. But the Pyxis Swap does far more than "mention" these agreements—it defines the swap's Reference Obligation (the Class

A-1 notes) by reference to these agreements, thus necessarily incorporating all of the provisions and representations in those agreements defining the rights and obligations of the Class A-1 notes.  Defendants' further argument that this incorporation provision does not incorporate the Collateral Management Agreement completely ignores Article XV of the Indenture, by which "all of [Pyxis'] estate, right, title and interest in, to and under the Collateral Management Agreement" is assigned to "the Trustee, for the benefit of," among others, Class A-1 noteholders. By virtue of this provision, any representations and other provisions of the Collateral Management Agreement inure to the benefit of and thus define rights and obligations attaching to the Class A-1 notes.  Therefore, the Collateral Management Agreement is an "agreement setting forth the terms of" the Class A-1 notes, and is incorporated in the Pyxis Swap; and the representations contained in the Collateral Management Agreement—including that "Putnam would supervise and direct the investment and reinvestment of the Collateral" and would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith"—are also incorporated in the Pyxis Swap, executed on April 24, 2007.

*Second*, Putnam argues that the April 20, 2007 misrepresentation—also within the repose period—by Putnam employee John Van Tassel to Angelo Brizi of Intesa, that total losses on the Pyxis portfolio "should not be high,"[1] was not actionable because it was a statement of opinion. But, as the SAC alleges, this statement, like the false valuations provided to Intesa by Calyon on March 6, April 2 and May 2, 2007, was intended to and did convey reassurance as to a matter of fact, namely that Putnam had selected the Pyxis portfolio itself, acting responsibly and independently, and had not abdicated its responsibility to another party, much less a net short investor.

---

[1] A copy of Mr. Brizi's internal email relaying this representation to another Intesa employee is attached to the Declaration of Sean P. Baldwin as Exhibit A.

*Third*, Putnam argues that Intesa cannot rely on the doctrine of relation back to bring its § 10b claims in the SAC within the statute of repose.  But Intesa does not need to invoke relation back to make its § 10b claims timely, *because those claims were made in the original complaint*.  The original complaint alleged the same § 10b claims as the SAC, based on the same misrepresentations, against the same parties, and seeking the same relief.  Relation back thus has no application.  The SAC does not include new § 10b claims that must relate back to a timely prior complaint, but merely sets forth facts explaining why the original complaint, including the § 10b claims, was timely.  These claims, having been timely when filed, obviously did not subsequently become untimely by being included, unchanged, in an amended complaint.  Moreover, for the most part, the facts set forth in the SAC to explain why the original complaint was timely merely consist of provisions of the transaction documents that were incorporated by reference in, and thus are deemed to have themselves been alleged in, the original complaint.

*Fourth*, Calyon's and Putnam's argument that Intesa has not adequately alleged securities fraud or common law fraud, on the same grounds as adduced in their prior motions to dismiss—most notably, that these claims are not pled with sufficient particularity and do not sufficiently allege scienter—ring even more hollow than before, given the plethora of particularized evidence set forth in the SAC that Putnam, with Calyon's complicity, allowed Magnetar to control collateral selection, and that not only did both defendants have a substantial financial motive to commit fraud—Calyon to transfer its $180 million risk on the Pyxis Class A-1 notes to Intesa and to obtain large fees for arranging Pyxis, and Putnam to obtain $5.7 million in fees for managing Pyxis and a further $3.1 million for managing Pyxis 2007-1 ("Pyxis 2") (for which it would not have been selected had it not cooperated on Pyxis)—but both Calyon and Putnam also

engaged in conscious wrongdoing by, among other things, deliberately hiding Magnetar's involvement in Pyxis from prospective investors.

*Finally*, defendants' remaining arguments are without merit: (1) Putnam's argument that Intesa has not adequately alleged that it aided and abetted fraud must fail, since it is based on the flawed premise that the underlying fraud claim against Calyon has not been adequately alleged; (2) Intesa has adequately alleged loss causation, since it alleges that its losses were the direct result of defendants' scheme to stock the Pyxis portfolio with toxic collateral;[2] (3) the Pyxis Swap was not a foreign transaction, since Intesa became irrevocably committed to it in New York; and (4) not only is Calyon's motion to strike Intesa's claim for punitive damages premature—the appropriate relief should not be determined until the Court has a full factual record before it—but this is precisely the sort of case where punitive damages are appropriate, involving a widespread systemic fraud that has had broad ramifications not only for the RMBS market, but for the economy as a whole.

## FACTUAL BACKGROUND

### A.    The Magnetar Scheme

Pyxis was one of at least 26 Constellation CDOs created by Magnetar as part of what the Court called the "Magnetar Scheme."  SAC ¶ 3; *see Intesa Sanpaolo, S.P.A. v. Credit Agricole Corporate & Investment Bank*, — F. Supp. 2d —, No. 12 Civ. 2683 (RWS), 2013 WL 525000, at *2 (S.D.N.Y. Feb. 13, 2013).  The Magnetar Scheme consisted of Magnetar taking an equity position in the Constellation CDOs, but a much larger short position in the same CDOs, and controlling the selection of their portfolios to ensure that they would fail.  SAC ¶¶ 3, 47.

---

[2]   Intesa respectfully refers the Court to the discussion of loss causation in its brief in opposition to Magnetar's motion.  *See* Opp'n at 22.

Magnetar's shorts and adverse selection of the CDOs' portfolios resulted in huge profits for Magnetar, but losses for investors like Intesa.  SAC ¶ 56.

### B.      The Pyxis Fraud

#### 1.      Defendants' Motives To Commit Fraud

Pyxis was one of five Constellation CDOs arranged by Calyon, the top underwriter of these CDOs.  SAC ¶¶ 1, 50.  The Calyon executive primarily responsible for Pyxis, Alex Rekeda, worked with Magnetar on its very first Constellation CDO, Orion 2006-1 ("Orion"). SAC ¶ 51.  Subsequently, he continued to work with Magnetar both at Calyon and Mizuho, where his team moved en masse in late 2006, shortly after Pyxis closed.  Last year, the SEC announced that Mizuho had agreed to pay $127.5 million to settle claims for securities fraud by Rekeda's team relating to another Magnetar CDO, Delphinus 2007-1, involving the creation of "dummy assets" in a target portfolio which were designed to mislead ratings agencies— misconduct similar to that in which Rekeda's team engaged on Pyxis in order to mislead investors.  SAC ¶ 51.

Calyon received tens of millions of dollars in underwriting fees for its work on Magnetar CDOs, including Pyxis, as well as fees for arranging CDS by which they sold protection on other CDOs.  SAC ¶ 5.  Moreover, had Calyon not persuaded Intesa to provide protection on the Class A-1 notes, Calyon would have been left with $180 million in losses.  SAC ¶¶ 11, 173.

Pyxis was a "hybrid" CDO: 23% of its $1.5 billion portfolio consisted of asset-backed securities and the rest consisted of "synthetic" assets, *i.e.*, CDS referencing other CDOs or RMBS.  SAC ¶ 57.  Since the performance of the portfolio thus depended on the performance of many underlying assets, investors were heavily dependent on the experience, independence and integrity of the collateral manager, who was tasked with selecting the CDO's portfolio.  SAC ¶ 37.  As Calyon itself stated in the Pyxis Offering Memorandum, "the performance of the

[portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]."  SAC ¶ 35.

Putnam, the putative collateral manager for Pyxis, received $5,707,429 in collateral management fees for its work on Pyxis.  SAC ¶ 64.  Because of the "triggerless" structure favoring the equity investors in Pyxis, SAC ¶ 68, Putnam's fees were "virtually assured," according to Michael Henriques (DBSI).  SAC ¶ 132.  Confirming this, Putnam continued to be paid its fees long after Pyxis began to fail and senior noteholders stopped being paid—indeed, up to the present.  SAC ¶ 62.  Moreover, Pyxis was Putnam's first subprime RMBS CDO, and Putnam saw it as its chance to secure a foothold in this lucrative market—taking advantage of the close relationship between Jim Prusko (Magnetar), a former Putnam employee, and Carl Bell, Putnam's lead employee on Pyxis, who had previously worked for Prusko.  Putnam's cooperation with Magnetar was rewarded when it was hired by Magnetar to manage Pyxis 2, which closed six months after Pyxis, and for which Putnam received a further $3,107,627.91 in fees.  SAC ¶¶ 65-66, 178.  If Putnam had not cooperated on Pyxis, Magnetar would have refused to work with it on again.  SAC ¶ 52.

### 2.   Defendants' Misrepresentations

To induce Intesa to enter into the Pyxis Swap, both Calyon and Putnam represented that Putnam would select the assets for the portfolio, acting independently, diligently and in good faith in the interests of long investors like Intesa.  SAC ¶¶ 78, 92.  For example: Calyon's launch email represented that Putnam would "cherry-pick the collateral for this portfolio via the CDS market with the ability to focus on **seasoned** product," SAC ¶¶ 95 (emphasis in original); the Pitchbook, prepared by Calyon and Putnam, stated that Putnam would undertake "rigorous portfolio construction" and "fundamental security selection," SAC ¶ 98, and devoted twenty pages to a description of Putnam's rigorous collateral selection process, SAC ¶¶ 95-97; and the

6

Offering Memorandum, again prepared by Calyon and Putnam, represented that Putnam "will select and manage the Collateral," and that, pursuant to the Pyxis Collateral Management Agreement, Putnam would "supervise and direct the investment and reinvestment of the Collateral" and "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing." SAC ¶¶ 100-01. Moreover, since the Collateral Management Agreement—including these critical representations—was an "agreement setting forth the terms of" the Pyxis Class A-1 notes, these representations were incorporated by reference in the Pyxis Swap. *See* p. 12 below.

In addition, on March 6, 2007 and April 2, 2007, prior to the execution of the Pyxis Swap, and again on May 2, 2007, Calyon provided Intesa with egregiously inflated "market valuations" of the Pyxis Class A-1 notes, SAC ¶¶ 105-08; and on April 20, 2007, John Van Tassel of Putnam orally represented to Angelo Brizi of Intesa that "notwithstanding the spike in delinquencies the total losses [on the Intesa portfolio] should not be high." SAC ¶ 109. Calyon and Putnam intended these valuations to reassure Intesa that, during the time between the deal's closing on October 3, 2006 and the execution of the Swap, Putnam had done its job responsibly in selecting collateral, and to conceal that the deal had in fact been built to fail. SAC ¶¶ 104-08.

### 3.    Magnetar's Control Of Collateral Selection

Defendants' representations were egregiously false. Most importantly, as Defendants deliberately concealed from Intesa, the Pyxis portfolio was not in fact selected by Putnam, acting diligently and independently in the interests of long investors like Intesa, but was instead

selected by a net short investor, Magnetar.  SAC ¶¶ 111, 173.  Had Intesa known this, it would

never have entered into the Pyxis Swap.  SAC ¶¶ 10, 110, 176.

Contrary to defendants' assertions, Intesa's allegations are not based simply on "news

reports" (Mag. Br. 17 n.9, Putnam Br. 6, Cal. Br. 5, 10), but on a wealth of documentary

evidence disclosed in numerous lawsuits relating to Magnetar's CDOs and on substantial other

evidence.  Based on the documentary evidence, Intesa alleges, among other things, that:

- Magnetar selected Putnam to act as the collateral manager for Pyxis.  SAC ¶ 112.

- Jim Prusko (Magnetar) used to work for Putnam and supervised Carl Bell (Putnam), who was supposed to be primarily responsible for selecting the Pyxis collateral.  SAC ¶ 113.

- Prusko (Magnetar) and Michael Henriques (Deutsche Bank, Magnetar's co-equity investor on Pyxis) discussed with Bell (Putnam) Magnetar's CDO short-selling strategy, both generally and with respect to Pyxis.  SAC ¶ 115-119.

- Prusko (Magnetar) insisted that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis.  SAC ¶ 114-16.

- Prusko (Magnetar) and Bell (Putnam) had numerous communications in which Prusko made clear which collateral Prusko wanted to include in the Pyxis portfolio, and Bell made just as clear his willingness to accommodate Prusko.  SAC ¶ 118-22.

- Prusko (Magnetar), Bell (Putnam) and other Putnam employees had numerous communications in which Prusko made clear his intention to short tens of millions of dollars of the collateral he was selecting for Pyxis—far more than Magnetar's equity stake in Pyxis—and Putnam agreed to help him do so.  SAC ¶¶ 122-23, 137.

- Prusko (Magnetar) and Bell (Putnam) specifically discussed having Pyxis enter into swaps referencing the low-rated ABX Index and its components, and increasing the synthetic portion of the Pyxis portfolio, to allow Magnetar to make sizable short sales with respect to these assets.  SAC ¶ 120.

- Bell (Putnam) and Alex Rekeda (Calyon, Pyxis' structurer) discussed the importance of concealing Magnetar's involvement in the selection of the Pyxis collateral, and Magnetar's short-selling strategy with respect to Pyxis.  SAC ¶ 136.

- Prusko (Magnetar), Henriques (Deutsche Bank) and Rekeda (Calyon) remarked on Putnam's compliance with Magnetar's wishes as to the Pyxis portfolio, noting that Magnetar's CDOs, including Pyxis, were "not CDOs but … structured separate accounts [for the benefit of Magnetar and Deutsche Bank]," and that "Putnam got it."  SAC ¶ 134.

- Magnetar selected Putnam to act as collateral manager for the Pyxis ABS CDO 2007-1 Ltd. Transaction ("Pyxis 2"), confirming its satisfaction with Putnam's cooperation on Pyxis.  SAC ¶ 65.

- After Pyxis defaulted, Bell (Putnam) joked with Prusko (Magnetar) about how much money Magnetar had made from its short-selling strategy, while continuing to conceal Magnetar's involvement in Pyxis from investors.  SAC ¶ 139.[3]

Further confirming Magnetar's control of collateral selection, the SAC alleges that:

(1) the Pyxis portfolio included collateral exposing Pyxis, directly or indirectly, to losses from *15* other Magnetar CDOs; (2) *55%* of the Pyxis collateral referenced RMBS or CDOs whose securities were included in at least *five* other Magnetar CDOs, and *28%* referenced RMBS or CDOs whose securities were included in at least *ten* other Magnetar CDOs; (3) the Pyxis portfolio contained no "prime" RMBS, despite Calyon's and Putnam's representations that the portfolio would include $60 million of such RMBS, indicating that Putnam had changed its original collateral selection strategy in a way that weakened the portfolio and could only be explained by its desire to comply with Magnetar's demands; (4) Putnam circumvented the portfolio limitation on low-rated ABX Index investments by investing in components of the ABX Index as well as the Index itself; (5) the Pyxis portfolio included offset trades on ABX Index components of a type unique to Magnetar CDOs; and (6) e-mails and other evidence

_____

[3]  Putnam's argument, Put. Br. 8, that Intesa should not be allowed to rely on *documentary evidence* and *sworn testimony* set forth in other complaints, such as the Massachusetts Complaint, is plainly wrong.  *See, e.g.*, *IBEW Local 9 Pension Fund v. Deutsche Bank AG*, No. 11-cv-4209 (KBF), slip op. at 2 (S.D.N.Y. Mar. 27, 2013) (declining to dismiss Amended Complaint where "[t]he bulk of the allegations in the Amended Complaint are drawn from alleged misconduct set forth in a [U.S. Senate] report …, a complaint filed by the Department of Justice against Deutsche Bank …, and a complaint filed by the Federal Housing Finance Agency").  Putnam's cases merely hold that the fact that a complaint has been filed against the defendant in another unresolved proceeding is not, in itself, evidence of the matters complained of.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976); *In Re Merrill Lynch & Co., Inc. Res. Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *In Re CRM Hldgs., Ltd. Sec. Litig.*, No. 10-cv-975 (RPP), 2012 U.S. Dist. LEXIS 66034, at *77-78 (S.D.N.Y. May 10, 2012); *Ledford v. Rapid-Am. Corp.*, No. 86-cv-9116 (JFK), 1988 U.S. Dist. LEXIS 79, at *3 (S.D.N.Y. Jan. 8, 1988).

adduced in numerous lawsuits involving other Magnetar CDOs—including, most recently, the Massachusetts Consent Order—indicate that Magnetar controlled collateral selection for its CDOs generally while simultaneously shorting them, making it, at best, implausible that Magnetar would not have controlled Pyxis collateral selection.

Defendants do not actually deny most of these allegations.  Instead, they cherry-pick a few of the documents underlying these facts, and argue—wholly inappropriately on a motion to dismiss—that they might be interpreted differently.  To take just one example, Putnam asserts that the "veto" side letter may never have been executed, and that Putnam may not have been aware of it.  The Amended Complaint alleges, however, that it was executed and that Putnam was aware of it, since the letter expressly required Putnam to obtain Magnetar's approval for any investments, and, more importantly, defendants in fact acted consistently with its terms—indeed, Calyon and Putnam allowed Magnetar not only to vet, and to veto, investments, but also to purchase CDOs for Pyxis directly.   Moreover, this arrangement explains—which defendants fail to explain in any other way—the extensive interconnections and collateral overlaps between Pyxis and other Constellation CDOs, the "dummy" prime RMBS assets in the target portfolio, the breach of the portfolio concentration limits with respect to ABX BBB- Index investments, and the Magnetar-style offset trades.  Nor do defendants explain why Magnetar would have allowed Putnam to select the Pyxis collateral independently, given that it didn't allow any of its other collateral managers to do so.  And finally, Magnetar was sufficiently satisfied with Putnam's cooperation on Pyxis ("Putnam got it") that Putnam was selected to manage Pyxis 2.

The same analysis can be applied to all of defendants' factual disputes.  Not only are these disputes inappropriate at the pleadings stage, but they ignore most of Intesa's particularized

factual allegations, which, read as a whole, not only support but render all but inescapable an inference that Magnetar controlled collateral selection.

## ARGUMENT

## I.   INTESA'S SECURITIES FRAUD CLAIMS ARE TIMELY

A securities fraud claim under § 10(b) of the Securities and Exchange Act of 1934 must be brought before "the earlier of (1) 2 years after the discovery of the facts constituting the violation or (2) 5 years after such violation." 28 U.S.C. § 1658(b)(2).  This Court has already held that "1658(b)'s two-year post-discovery deadline on Intesa's § 10(b) claims has not yet expired (and will not until July 21, 2013)."  *Intesa* , 2013 WL 525000, at *6.  The question, therefore, is whether Intesa filed suit within five years of the date of the "violation," which the Court held was "the date upon which the last alleged misrepresentation or omission was made." *Id.* at * 21.  The answer is yes:  Intesa filed its complaint on April 6, 2012, fewer than five years after April 24, 2007, the date of the Pyxis Swap, which incorporated by reference the misrepresentations in the Collateral Management Agreement and other Pyxis transaction documents, and fewer than five years after the date on which Putnam made its last oral misrepresentation to Intesa.

### A.   The Pyxis Swap Incorporates By Reference The Collateral Management Agreement's Misrepresentations As To Putnam's Role[4]

As the Court held previously, the Pyxis Swap "incorporates by reference a set of documents referred to as the 'Underlying [Instruments],' which are defined as 'the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.'"  *Id* at *8 n.9.  Putnam argues that this provision does not

---

[4] The Pyxis Swap also incorporates by reference the misrepresentations as to Putnam's role contained in the Offering Memorandum.  SAC ¶ 89.

incorporate the Underlying Instruments by reference, but merely "mentions" them.  Put. Br. 11.

But this is belied by the language of the full provision, which states that "references in this

Confirmation to [the Class A-1 notes] shall have the meaning and/or shall be subject to the terms

of the [Class A-1 notes] set out in the Underlying Instruments …."  SAC ¶ 87.  In other words,

the Underlying Instruments define the rights and obligations of the Class A-1 notes—the notes

referenced by the Pyxis Swap—and thus could not be more integral to the Pyxis Swap.

The Underlying Instruments include the Collateral Management Agreement.  Article XV

of the Indenture—which defendants completely ignore—expressly assigns "all of [Pyxis'] estate,

right, title and interest in, to and under the Collateral Management Agreement" to "the Trustee,

for the benefit of," among others, Class A-1 noteholders.  SAC ¶ 88.  By virtue of this provision,

any representations or other provisions of the Collateral Management Agreement inure "for the

benefit of" the Class A-1 notes, and are part of an "agreement setting forth the terms of" these

notes.  Thus, contrary to Putnam's assertion, Put. Br. 11 n.8, there is no question that the

Collateral Management Agreement is "sufficiently described" by the Pyxis Swap to be

incorporated by reference in the Pyxis Swap.  *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193,

1201 (2d Cir. 1996) ("Under New York law, 'a paper referred to in a written instrument and

sufficiently described may be made a part of the instrument as if incorporated into the body of

it.'" (quoting *Jones v. Cunard S.S. Co.*, 238 A.D. 172, 173 (2d Dep't 1933))).[5]

---

[5] *American Stock Transfer & Trust Co. v. Par Pharmaceutical Companies, Inc.*, No. 06 Civ. 13283 (BSJ) (RLE), 2009 WL 1754473, at *3 (S.D.N.Y. June 22, 2009), relied on by Putnam, Put. Br. 11, is inapposite as it involved the incorporation by reference of provisions of a statute, not related agreements.  Moreover, the lynchpin of the court's analysis was that "[w]here the parties wished to incorporate a statute by reference and impose upon the parties an independent duty to meet the requirements of that statute, they did so explicitly" elsewhere in the contract.  *Id.*  There was no such provision here.  Putnam's reliance on *Ryan, Beck & Co., LLC. v. Fakih*, 268 F. Supp. 2d 210, 222 (E.D.N.Y. 2003), Put. Br. 11 n.8, is also misplaced.  There,

Indeed, the representations and other provisions of the Collateral Management Agreement were among the most critical provisions in the transaction documents from Intesa's perspective, given the importance of the collateral manager to Pyxis' performance and to Intesa's risk under the Pyxis Swap.  SAC ¶ 93.  Thus, it would have been very surprising if they had *not* been incorporated by reference into the Pyxis Swap.

The Collateral Management Agreement included representations—which turned out to be egregiously false—that "Putnam would supervise and direct the investment and reinvestment of the Collateral" and would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and care no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing."  SAC ¶ 101.   Since these critical misrepresentations were incorporated in the Pyxis Swap, they were made as of the date of the Pyxis Swap, which was April 24, 2007.

Calyon and Putnam falsely assert that Intesa "admits it had already bound itself to the swap months earlier," Put. Br. 11; that "Intesa admits it agreed to invest [in Pyxis] in September 2006," Cal. Br. 8 n.10; and thus that Intesa could not have relied on misrepresentations incorporated in the Pyxis Swap in entering into the contract, Put. Br. 11.  Intesa admits no such thing.  On the contrary, Intesa alleges that "[i]n September 2006, Intesa and Calyon came to an understanding that they would enter into" the Pyxis Swap, but that the Pyxis Swap "was not executed by the parties until April 24, 2007," when Intesa "became irrevocably committed to the contract."  SAC ¶ 86.  Moreover, Putnam's assertion that the execution of the Pyxis Swap was a

unlike here, the extrinsic document sought to be incorporated by reference was a document to which the parties "were not privy" and which that "had not been provided or explained to them."

purely "ministerial task," Put. Br. 10, is belied by the facts that (1) it took Intesa and Calyon *seven months* after Pyxis closed to negotiate the terms of the transaction, plainly indicating that significant terms were yet to be resolved; and (2) right up until the time the Pyxis Swap was executed, both Calyon and Putnam were so concerned that Intesa might not actually commit to the transaction—*i.e.*, that Intesa was not yet bound to it—that Calyon repeatedly and egregiously misrepresented the value of the Pyxis Class A-1 notes, and Putnam's John Van Tassel misrepresented that losses on the portfolio would not be high, to try to disguise the fact that the portfolio had been built to fail.  SAC ¶¶ 105-09.[6]

Finally, Calyon and Putnam each attempts to distance itself from the misrepresentations incorporated in the Pyxis Swap by arguing that the other was responsible for these misrepresentations.  At a minimum, one of them had to be responsible.  In fact, both were.

Putnam made the misrepresentations in and executed the Collateral Management Agreement.  Hora Decl. Ex. 1.  Moreover, Putnam's assertion that Calyon was responsible for its incorporation in the Pyxis Swap ignores that Putnam worked closely with Calyon right up to the time of the transaction to ensure that it was completed without a hitch, as evidenced by Mr. Van Tassel's misrepresentation of the expected losses on the Class A-1 notes, which echoed and was designed to reinforce Calyon's false valuations of the notes.  SAC ¶ 109.

For its part, Calyon's  attempt to distance itself from the misrepresentations in the Collateral Management Agreement by arguing that the "document is a contract between the Issuers and the Collateral Manager," Cal. Br. 8 n.11, rings hollow, given that (1) the Issuer was Pyxis, which was created and marketed by Calyon, who exploited for this purpose, among other

---

[6] The provision in the ISDA Master Agreement, relied on by Putnam, Put. Br. 11 n.7, that "[t]he parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms" is irrelevant.  It obviously begs the question of when the parties "agreed to" the terms.

things, the misrepresentations in the Collateral Management Agreement—*see* SAC ¶ 101 (misrepresentations in Collateral Management Agreement incorporated in Offering Memorandum); (2) Calyon drafted all of the Pyxis transaction documents, including the Collateral Management Agreement—see SAC ¶ 79; and (3) Calyon executed, and thus incorporated the Collateral Management Agreement into, the Pyxis Swap.

Thus, the misrepresentations in the Collateral Management Agreement, incorporated in the Pyxis Swap, were made by both Calyon and Putnam on April 24, 2007, within five years of the filing of the Complaint.  Intesa's § 10(b) claims are therefore timely.

### B.  Putnam Made A Further Material Misrepresentation On April 20, 2007

Putnam argues, Put. Br. 13, that Mr. Van Tassel's April 20, 2007 misrepresentation—also within the repose period—to Angelo Brizi of Intesa that total losses on the Pyxis portfolio should not be high was not actionable because it was a statement of opinion.  But, as the SAC alleges, this statement, like the false valuations provided to Intesa by Calyon on March 6, April 2 and May 2, 2007, was intended to and did convey reassurance as to a matter of fact, namely that Putnam had selected the Pyxis portfolio itself, acting responsibly and independently, and had not abdicated its responsibility to another party, much less a net short investor.

### C.  Intesa Does Not Need To Invoke Relation Back To Make Its § 10b Claims Timely

Putnam argues, irrelevantly, that Intesa cannot rely on the doctrine of relation back to bring the § 10b claims in the SAC within the statute of repose.  But Intesa does not need to, nor does it, invoke relation back to make its § 10b claims timely, because those claims *were contained in the original complaint.*  The original complaint alleged exactly the same § 10b claims as the SAC—against exactly the same parties (Calyon and Putnam), based on exactly the same misrepresentations (that Putnam would independently select the Pyxis collateral) and

omissions (as to Magnetar's role), and seeking exactly the same relief (rescissory, compensatory and/or punitive damages).  Thus, relation back has no application here.  The SAC does not include new § 10b claims that need to relate back to a timely prior complaint, but merely adds allegations explaining why the original complaint, including the § 10b claims, was timely (in addition to recently-discovered evidence that further supports those claims but does not alter their nature in any way).  Since the § 10b claims were timely to begin with, they do not need to relate back to be timely.

Moreover, the Pyxis Swap, Indenture and Collateral Management Agreement were all incorporated by reference in the original Complaint.  *See, e.g.*, Compl. ¶¶ 1, 57, 79.  Thus, the provisions contained in these documents, which the SAC merely sets forth at greater length to show that the Complaint was timely, are also deemed to have been included in the original Complaint.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[C]omplaint is deemed to include any . . . statements or documents incorporated in it by reference").  Therefore, even if it were necessary that these allegations were contained in the original complaint, as opposed to the § 10b claims themselves, in fact they were.

### D.     Even If The Last Misrepresentations Were Made Before The Pyxis Swap Was Executed, The Statute of Repose Did Not Start Running Until Then

The Court previously concluded, following *Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 WL 489215 (S.D.N.Y. Feb. 12, 2012), that "[f]or the purposes of 1658(b), the violation that serves as the premise for a § 10(b) claim[] is deemed to have occurred on the date upon which the last alleged misrepresentation or omission was made."  *Intesa*, 2013 WL 525000, at *6.  The Court distinguished *Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009), which held that the Section 1658's five year statute of repose begins running on "the date the parties . . . committed themselves to complete the purchase or sale transaction.'"  *Id.* at 351.  The

Court held that *Arnold* was "inapposite to the instant case because it addresses a scenario where the alleged misrepresentation was made after the purchase." *Intesa*, 2013 WL 525000, at *7.

However, just such a post-purchase misrepresentation is now alleged here, since one of the false market valuations of the Pyxis securities provided by Calyon and Putnam was sent to Intesa on May 2, 2007, after the Pyxis Swap was executed. SAC ¶ 105. Moreover, although, as the Court noted, *Arnold* was an unpublished decision, (1) *Arnold* followed *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290 (2d Cir. 1992), which held that "the statute of limitations in federal securities law cases starts to run on the date that the parties have *committed* themselves to complete the purchase or sale transaction," *id.* at 1294; (2) the only prior decision in this Circuit to have addressed *Arnold—Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010)—followed it (*Boudinot* did not address *Arnold*); and (3) both *Arnold* and *Anwar* have been followed in other Circuits. *See Carlucci v. Han*, 886 F. Supp. 2d 497, 514 (E.D. Va. 2012) ("The statute of repose for a Section 10(b) claim starts to run on the date the parties have committed themselves to complete the purchase or sale transaction") (following *Arnold*); *Padilla v. Winger*, No. 11 Civ. 897 (DAK), 2012 WL 1379228, at *3 (D. Utah Apr. 12, 2012) ("The five-year statute of repose . . . begins to run on the date the plaintiff purchased the security.") (following *Anwar*); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011) ("The [repose] period begins to run on the date that the plaintiff purchased the securities at issue.") (following *Arnold*).

Furthermore, although *Boudinot* stated that the repose period begins to run at the time of the last alleged misrepresentation or omission, the actual holding in that case was that the statute of repose began to run on the date of the transaction by which the plaintiff committed himself. The plaintiff "argue[d] … that the alleged violations did not occur until he retired on March 31,

2005 while the … Defendants assert[ed] that they occurred at or before the date in September 2004 when he tendered his resignation." *Boudinot*, 2012 WL 489215, at *4 n.46.  The Court ruled for defendants, on the basis that "the time of a 'purchase or sale' of securities within the meaning of Rule 10b–5 is to be determined as of the time when the parties to the transaction are committed to each other" (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)), while plaintiff "became committed, for all meaningful purposes, to retirement in September 2004, and the five-year period of repose commenced at that time." *Id.*  This holding can only be explained on the basis that either (1) the repose period began to run at the time the plaintiff committed itself to the transaction, not the time of the last misrepresentation or omission, or (2) the omission (which was all that was alleged in *Boudinot*[7]) continued up to the time the plaintiff committed itself to the transaction.[8]  On either basis, the statute of repose for Intesa's § 10b claims did not begin to run until the date Intesa committed itself to the Pyxis Swap, within five years of the date of the Complaint.

## II.   INTESA HAS ADEQUATELY ALLEGED SECURITIES FRAUD AND COMMON LAW FRAUD AGAINST CALYON AND PUTNAM

The SAC contains a wealth of particularized allegations—far more than necessary to satisfy the pleading requirements of the PSLRA, let alone Fed. R. Civ. P. 9(b), that: (1) Calyon and Putnam represented that Putnam would control collateral selection, SAC ¶¶ 93-104; (2) Putnam, with Calyon's complicity, allowed Magnetar to control collateral selection even though they knew Magnetar  was a net short investor and indeed helped arrange its shorts, SAC

---

[7] *See id.* at *4 ("[T]he alleged fraud consisted of the failure to disclose the existence of the alleged scheme to sell BAH's government sector at the time that Boudinot and Pasternack were induced to retire.").

[8] If the latter, then *Boudinot* presumably resolves the concern raised by this Court that the repose period for a "continuing omission" claim could be delayed indefinitely, *Intesa*, 2013 WL 525000, at *7, by holding that the omission is complete at the time it achieves its intended effect, namely to persuade plaintiff to commit itself to the transaction.

¶¶ 114-40; (3) both defendants had a substantial financial motive to commit fraud—Calyon to transfer its $180 million risk on the Pyxis Class A-1 notes to Intesa and to obtain large fees for arranging Pyxis, and Putnam to obtain $5.7 million in "virtually assured" fees for managing Pyxis, which continued to be paid long after Pyxis began to default, and to obtain $3.1 million more in fees for managing Pyxis 2, SAC ¶¶ 113, 134, 177-79;[9] and (4) both defendants engaged in conscious wrongdoing, including by seeking to hide Magnetar's involvement in Pyxis from potential investors and insurers.  SAC ¶ 114-40, 173-76.

Calyon's attempt to evade responsibility for the misrepresentations as to Putnam's role by arguing that the "Collateral Manager" sections of the Pyxis Pitchbook and Offering Memorandum were prepared by Putnam, Cal. Br. 13-14, ignores Calyon's shared responsibility for large portions of these documents—including portions of the Collateral Manager sections[10]—

---

[9]   Contrary to defendants' assertions (*see, e.g.,* Cal. Br. 20; Put. Br. 20), "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).  Defendants' cases merely hold that a generalized profit motive, without more, is insufficient to provide a compelling inference of scienter—but that where defendant alleges "concrete benefits," that will suffice.  *Cohen v. Stevanovich,* 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.); *see also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, *20 (S.D.N.Y. Sept. 28, 2010).

In addition, an inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, *or even the most plausible of competing inferences* . . . , [but merely] cogent and *at least as compelling* as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 313-14 (emphasis added).  Moreover, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (emphasis in original).  Calyon's arguments, Br. 20-21, that it would have been irrational for it to build Pyxis to fail because it was Intesa's largest shareholder at the time of the Intesa Swap (this is wrong; its shareholding was only 5.4% at the time) and because it was trying to become an industry leader, raise questions of fact inappropriate at the pleadings stage and ignore that the interests of Rekeda's CDO team were obviously different from the institution's as a whole—as evidenced by the team's precipitate departure to Mizuho after Pyxis closed.  SAC ¶ 51.

[10]   *See, e.g.*, Hora Decl. Ex. 4 (Offering Memorandum) at 187 ("The Collateral Manager has provided the information contained in this section relating to the Collateral Manager (*other than the information contained under the subheading 'General'*)").  (Emphasis added).

which contained these representations, and that Calyon bore joint responsibility with Putnam for the entire Pyxis launch email, which also contained these representations.  Likewise, Putnam cannot seek to minimize (Put. Br. 5) its own involvement in these misrepresentations by disclaiming involvement in *other* sections of the Offering Memorandum; indeed, it concedes (*id.*) that it was responsible for the "five-page section" at issue setting forth information regarding Putnam.

Nor can Calyon rely on general boilerplate disclaimers, Cal. Br. 12-14, to avoid liability for its misrepresentations and omissions.  *See Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (general disclaimers are "ineffective … to preclude parol evidence that a party was induced to enter the contract by means of fraud….  even when the contract contains an omnibus statement that the written instrument embodies the whole agreement, *or that no representations have been made*") (citation and internal quotation marks omitted).  "The only exception to this rule is where 'a contract … contains explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement.'" *Kwon v. Yun*, 606 F. Supp. 2d 344, 358 (S.D.N.Y. 2009) (internal citations omitted).[11]  Since the disclaimers on which Calyon relies do not specifically exclude Intesa's reliance on any misrepresentation by Calyon

---

[11]   By contrast, in *MBIA Ins. Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 81 A.D.3d 419 (1st Dep't 2011), the case on which Calyon relies (Cal. Br. 12), the disclaimers at issue were held to be sufficiently specific to bar plaintiffs' fraud claims because the alleged misrepresentations related to the credit quality of the collateral in the CDOs at issue (*see* lower court decision, 911 N.Y.S.2d 694, 694 (N.Y. Sup. Ct. 2010)) and the disclaimers specifically provided "that plaintiff Lacrosse would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that it understood and accepted the risks."  81 A.D.3d at 419.  In addition, the court held that MBIA had waived its defenses to payment under its guaranties (81 A.D.3d at 420); among other things, MBIA's policy expressly provided that MBIA "'unconditionally and irrevocably guarantees to Merrill Lynch International [full payment on behalf of Lacrosse of any insured amount] without the assertion of any defenses to payment, *including fraud in the inducement or fact*."  911 N.Y.S.2d at 695 (emphasis added).

relating to Putnam's role as collateral manager as the basis of a fraudulent inducement claim, they do not bar any of Intesa's claims.[12]

More fundamentally, it is undisputed that neither Calyon nor Putnam ever disclosed to Intesa either Magnetar's control of collateral selection or its large net short position.  Calyon and Putnam were obviously aware that Intesa was operating under the mistaken belief that Putnam was selecting the collateral; Calyon and Putnam possessed superior knowledge, which Intesa could not have known because it was carefully concealed by defendants, that Magnetar was in fact controlling collateral selection and was a net short investor; and Calyon and Putnam knew that had it known the true facts Intesa would never have entered into the Pyxis Swap.  Thus, Calyon and Putnam had a duty to disclose Magnetar's role to Intesa, and their failure to do so was plainly actionable.  *See Morin v. Trupin*, 711 F. Supp. 97, 103 (S.D.N.Y. 1993) ("A duty to disclose arises … 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 738-39 (2d Cir. 1984))).  Neither Calyon nor Putnam can point to any disclaimer that shields them from liability for these omissions, as opposed to their affirmative misrepresentations in the offering materials.[13]

---

[12]   Moreover, even if the "no representations" disclaimer were effective, on its face it would only bar Intesa's reliance on misrepresentations by Calyon up to the Pyxis trade date (October 2006), not on any of the alleged misrepresentations or omissions which occurred after that date, including Calyon's false valuations and the misrepresentations in the Collateral Management Agreement incorporated in the Pyxis Swap.

[13]   Defendants' assertion (Put. Br. 3, 17; Cal. Br. 16-17) that Intesa was aware that some party must necessarily be taking short positions on Pyxis is irrelevant.  Intesa did not and could not know that the party taking those positions was the same party that was selecting collateral.  Moreover, the fact that the Offering Memorandum disclosed that "it is possible that Putnam could sell a security short that was held in other clients' portfolios,"  Mag. Br. 9, is also beside the point.  This disclosure falls far short of indicating that the party selecting the Pyxis portfolio might be taking a huge net short position on Pyxis on its own account.

Finally, Calyon and Putnam's repeated mantra that the Pyxis collateral did not breach the Pyxis eligibility criteria and that Intesa has no claim based on the composition of the portfolio (Cal. Br. 14-16; Put. Br. 15-17) is not only wrong,[14] but irrelevant, since Intesa's core claim is not based on the portfolio's failure to meet the eligibility criteria, but on defendants' misrepresentations as to *who controlled collateral selection*.[15]  Intesa's allegations that defendants represented that the portfolio would contain $60 million of prime RMBS when it actually contained none, and that they circumvented the portfolio limitation on ABX Index investments, support the inference that Putnam was acting at Magnetar's behest, since this behavior was highly deceptive to Intesa, exposed Pyxis to significant risk without a corresponding reward, and cannot be explained on any basis other than Putnam's submission to Magnetar.

## III.   THE PYXIS SWAP WAS NOT A FOREIGN TRANSACTION

Calyon makes a half-hearted argument that the Pyxis Swap was an extraterritorial transaction outside the reach of § 10b and Rule 10b-5.  Cal. Br. 24-25.  In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2884 (2010), the Supreme Court held that Section 10(b) only applies to "transactions in securities listed on domestic exchanges . . . and domestic transactions in other securities."  *Id.* at 2886.  Defendants ignores the "domestic transaction" prong of this test.  The Second Circuit has recently concluded that "to sufficiently allege the existence of a

---

[14]   Intesa alleges that defendants breached the portfolio concentration limit on Pyxis' ABX Index BBB- 2006-1 and 2006-1 investments, by investing in the individual components of these indices as well as the indices themselves, to provide Magnetar with a opportunity to short the indices.  SAC ¶¶ 147-48.

[15]   Thus, *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012)—relied on by Calyon (Cal. Br. 15) is irrelevant.  There, HSH alleged that UBS induced it to enter into a CDS by misrepresenting the risk involved, which HSH could have discovered by ordinary due diligence, and various disclaimers barred HSH from relying on UBS's representations.  By contrast, since Intesa's claims are predicated on representations concerning who selected the collateral, the disclaimers in the relevant documents are inapplicable.

'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or title transferred in the United States." *Absolute Activist Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 60 (2d Cir. 2012).  A plaintiff may satisfy the "irrevocable liability" test by alleging *either* "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, *or* that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68; *see also S.E.C. v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 159 (S.D.N.Y. 2011); *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176 (S.D.N.Y. 2010).  In addition, *Absolute Activist* held, "we do not believe this is the only way to locate a securities transaction. . . .  Thus, a sale of securities can be understood to take place at the location in which title is transferred."  677 F.3d at 68 (citing *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011)).  In determining where title was transferred, the Court may consider, among other things, "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money . . . ."  *Id.* at 70.

The Amended Complaint alleges that "[t]he contract was executed by Intesa … in New York" and that "[t]he funds paid pursuant to the transaction were exchanged between the New York bank accounts of Intesa and Calyon." SAC ¶ 86.  These allegations are more than sufficient to satisfy the *Morrison* test, as interpreted by *Absolute Activist*.  Thus, the Pyxis Swap was a "domestic transaction," and Section 10(b) and Rule 10b-5 apply.

## IV.    THE SAC SUPPORTS A PUNITIVE DAMAGES AWARD

Calyon asserts claims, Cal. Br. 25, that Intesa may not seek punitive damages because it has not adequately alleged that Defendants' conduct rose to the level of "moral turpitude" and "wanton dishonesty."  *See Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613 (1994).  To the contrary, Intesa has alleged that, through the Constellation CDOs, including

Pyxis, Calyon and Magnetar engaged in a spectacular series of frauds on investors, which had broad ramifications for the public at large, and that, specifically through Pyxis, all Defendants willfully and fraudulently inflicted huge losses on Pyxis investors, including Intesa, in order to secure enormous profits and fees for themselves.  These allegations support a prayer for punitive damages.  *Id.*; *see also Federal Housing Finance Agency v. Merrill Lynch & Co.*, No. 10-Civ-06202-DLC (S.D.N.Y. Nov. 8, 2012), slip op. at 17 ("FHFA alleges that the defendants acted recklessly by seeking to profit from ever more risky mortgage lending while, at the same time, passing on the risk (and ultimately the losses) associated with these practices to the public via their sale of securities to Fannie Mae and Freddie Mac.  FHFA further maintains that the defendants' practices in this regard contributed to a housing crisis that spurred the most severe economic downturn this country has experienced since the Great Depression. These allegations are sufficient to support the plaintiff's demand for punitive damages."); *Walker v. Sheldon*, 10 N.Y.2d 401, 406 (1961) (Punitive damages deter "those who deliberately and coolly engage in a far-flung fraudulent scheme, systematically conducted for profit."); *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315-16 (1995) (similar).

At a minimum, it is premature to strike this prayer for relief at the pleadings stage. *Ambac Assur. Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464, 2009 U.S. Dist. LEXIS 26456, at *4-5 (S.D.N.Y. Mar. 16, 2009) (motion to strike prayer for relief at pleadings stage was premature because "[t]he relief provided for [Plaintiff's] claims will be determined if any entitlement to remedies is proved.") (citation omitted); *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 328 (1st Dep't 1996) ("It is for the jury to decide whether [defendant's] direct dealings with [plaintiff] were so reprehensible as to warrant punitive damages.").

<u>**CONCLUSION**</u>

For the foregoing reasons, Intesa respectfully requests that Defendants' Motions to

Dismiss the Second Amended Complaint be denied.

Dated: New York, New York
April 2, 2013

                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
                                      By:    <u>/s/Philippe Z. Selendy</u>
                                                    Philippe Z. Selendy
                                                    (philippeselendy@quinnemanuel.com)
                                                  Jonathan E. Pickhardt
                                                  (jonpickhardt@quinnemanuel.com)
                                                  Nicholas F. Joseph
                                                  (nicholasjoseph@quinnemanuel.com)
                                                  Sean P. Baldwin
                                                  (seanbaldwin@quinnemanuel.com)
                                                  Paul A. Riley
                                                  (paulriley@quinnemanuel.com)
                                                  51 Madison Avenue, 22nd Floor
                                                  New York, New York  10010
                                                  (212) 849-7000
                                                  *Attorneys for Plaintiff Intesa Sanpaolo,*
                                                  *S.p.A.*