UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTESA SANPAOLO, S.P.A., <br><br>               Plaintiff, <br><br> -against- <br><br> CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CRÉDIT AGRICOLE SECURITIES (U.S.A.) INC., THE PUTNAM ADVISORY COMPANY, LLC, MAGNETAR CAPITAL LLC, MAGNETAR FINANCIAL LLC, AND MAGNETAR CAPITAL FUND, LP, <br><br>               Defendants. | 12 Civ. 2683 (RWS) <br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MAGNETAR'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Philippe Z. Selendy
Jonathan E. Pickhardt
Nicholas Joseph
Sean Baldwin
Paul Riley

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  212-849-7000
Facsimile:  212-849-7100

*Attorneys for Plaintiff Intesa Sanpaolo, S.p.A.*

April 2, 2013

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ......................................................................................4

    A.    The Magnetar Scheme .................................................................4

    B.    The Pyxis Fraud .........................................................................6

ARGUMENT ..........................................................................................................10

I.    INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR COMMITTED FRAUD ...............................................................................10

    A.    Intesa May Rely On The Group Pleading Doctrine With Respect To The Magnetar Defendants ...................................................................11

    B.    Magnetar Had A Duty To Disclose Its Role In Collateral Selection to Investors, And Its Failure To Do So Was Fraudulent.............................13

    C.    Magnetar Is Liable To Intesa As A Person Whom It Should Reasonably Have Expected To Rely On Its Fraudulent Omissions .........................15

    D.    Intesa Has Adequately Alleged Scienter..........................................16

    E.    Intesa Has Adequately Alleged Reasonable Reliance ..........................17

II.    INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR AND PUTNAM AIDED AND ABETTED FRAUD...................................................18

    A.    Intesa Has Adequately Alleged Actual Knowledge...............................18

    B.    Intesa Has Adequately Alleged that Magnetar Provided Substantial Assistance ...............................................................................18

III.    INTESA HAS ADEQUATELY ALLEGED LOSS CAUSATION .................................20

IV.    MAGNETAR'S DEFENSES, NOT INTESA'S CLAIMS, FAIL AS A MATTER OF PUBLIC POLICY........................................................................21

CONCLUSION........................................................................................................21

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*ABF Capital Mgmt. v. Askin Capital Mgmt., LP*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)................................................................19

*In re Ann Taylor Stores Sec. Litig.*,
    807 F. Supp. 990 (S.D.N.Y. 1992)................................................................12

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (2010) ...................................................................12, 13

*Berkowitz v. Baron*,
    428 F. Supp. 1190 (S.D.N.Y. 1977)..............................................................15

*Brass v. Am. Film Techs.*,
    987 F.2d 142 (2d Cir. 1993).........................................................................14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)...........................................................20

*Brown v. Sidley Austin Brown & Wood LLP*,
    38 A.D.3d 219 (1st Dep't 2007)....................................................................14

*Burns v. Del. Charter Guarantee & Trust Co.*,
    805 F. Supp. 2d 12 (S.D.N.Y. 2011).............................................................18

*Casey v. Merck & Co. Inc.*,
    653 F.3d 95 (2d Cir. 2011)...........................................................................19

*Donovan v. Aeolian Co.*,
    270 N.Y. 267 (1936) ..............................................................................13, 14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .....................................................................................20

*IBEW Local 9 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209 (KBF) (S.D.N.Y. Mar. 27, 2013) ................................6, 20

*Intesa Sanpaolo, S.P.A. v. Credit Agricole Corp. & Inv. Bank*,
    No. 12 Civ. 2683 (RWS), 2013 WL 525000 (S.D.N.Y. Feb. 13, 2013)...........4, 10

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)...........................................................19

*In re Keithley Instruments, Inc., Deriv. Litig.*,
    599 F. Supp. 2d 908 (N.D. Ohio 2009).........................................................10

*Kuntz v. N.Y.S. Bd. of Elections*,
    924 F. Supp. 364 (N.D.N.Y. 1996) ..............................................................10

*Lattanzia v. Deloitte & Touche LLP,*
   476 F.3d 147 (2d Cir. 2007)..................................................................................20

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006)..................................................................................18

*Luce v. Edelstein,*
   802 F.2d 49 (2d Cir. 1986)....................................................................................12

*Minpeco, S.A. v. ContiCommodity Servs., Inc.,*
   552 F. Supp. 332 (S.D.N.Y. 1982)........................................................................14

*Morin v. Trupin,*
   711 F. Supp. 97 (S.D.N.Y. 1993) ...............................................................3, 13, 19

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.,*
   600 F. Supp. 702 (1985) .......................................................................................14

*Pagan v. N.Y.S. Div. of Parole,*
   No. 98 Civ. 5840 (FM), 2002 WL 398682 (S.D.N.Y. Mar. 13, 2002) ....................10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,*
   652 F. Supp. 2d 495 (S.D.N.Y. 2009)...................................................................19

*Powers v. Ostreicher,*
   824 F. Supp. 372 (S.D.N.Y. 1993).........................................................................15

*Primavera Familienstifung v. Askin,*
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...................................................................19

*RMS Int'l Shipping GmbH v. Stemcor USA,  Inc.,*
   No. 90 Civ. 4918, 1991 U.S. Dist. LEXIS 9852 (S.D.N.Y. July 18, 1991)............15

*Rosner v. Bank of China,*
   528 F. Supp. 2d 419 (S.D.N.Y. 2007)...................................................................18

*Witzman v. Lehrman, Lehrman & Flom,*
   601 N.W.2d 179 (Minn. 1999)...............................................................................19

## **Statutes**

Fed R. Civ. P. 9(b) ............................................................................................2, 10, 16

iii

Plaintiff Intesa Sanpaolo, S.p.A. ("Intesa") respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Amended Complaint by defendants Magnetar Capital LLC, Magnetar Financial LLC and Magnetar Capital Fund, L.P. (collectively, "Magnetar").

## PRELIMINARY STATEMENT

Intesa's Second Amended Complaint ("SAC") supplements the allegations in the Amended Complaint relating to Magnetar in two principal respects: (1) it alleges new facts—derived, among other things, from the Massachusetts Securities Division's Complaint against Putnam (the "Massachusetts Complaint")—which confirm that Magnetar conceived and directed the fraudulent scheme with respect to Pyxis ABS CDO 2006-1 ("Pyxis"), whereby defendants fraudulently misrepresented that Putnam would select the Pyxis collateral acting independently and in good faith in the interests of long investors, including Intesa, and fraudulently concealed from investors that Magnetar, a net short investor with interests directly adverse to theirs, controlled collateral selection and built Pyxis to fail in order to profit from its short positions; and (2) given these new facts, Intesa alleges that Magnetar not merely aided and abetted but was primarily liable for the fraud by which Intesa was induced to enter into a credit default swap referencing the Pyxis Class A-1 notes (the "Pyxis Swap").

In fact, since the filing of the SAC, still more evidence has come to light regarding Magnetar's CDO shorting scheme generally, which further confirms that Magnetar operated like a spider at the center of a web of "Constellation" CDOs, including Pyxis, that it both controlled and shorted and that were specifically designed to trap and unwary foreign investors like Intesa. A consent order  (the "Consent Order") filed in a lawsuit brought by the Massachusetts Securities Division against Deutsche Bank Securities Inc. ("DBSI")—Magnetar's co-equity sponsor on Pyxis—with respect to DBSI's and Magnetar's misconduct on another Constellation

1

CDO ("Carina"), created just before Pyxis, lays out extensive documentary and testimonial evidence confirming, among other things, that (1) Magnetar cherry-picked the collateral manager for Carina to ensure that it would take direction from Magnetar, rejecting another less biddable candidate (as DBSI said, "the way we are probably going to go is create a deal that Magnetar likes and find another manager to do it"); (2) Magnetar insisted on having a "pre-ok" for any proposed collateral that was not "sub/mid-prime" (*i.e.*, that did not already have a high risk of default), on the basis that Magnetar's deals were not really CDOs but "highly structured separate account mandate[s];" (3) according to DBSI, although some "may be bothered by [Magnetar's 'pre-ok'], … it is the nature of the arrangement, and with the other deals [including Pyxis], we definitely have that interaction;" (4) Magnetar increased its structurer's and manager's fees as a "reward for good behavior" when they allowed Magnetar to short collateral into Carina; and (5) Magnetar deliberately sought to "hide" its involvement in its CDOs, specifically in order to target foreign subprime RMBS investors like Intesa who might not be aware of the "deal traits" and were "increasingly the critical link in the chain" of its shorting scheme.

Given the extensive particularized allegations in the SAC (not to mention the Consent Order), Magnetar cannot seriously dispute the sufficiency of Intesa's allegations that it directed the Pyxis fraud, that it deliberately concealed its role in collateral selection, and that it built Pyxis to fail in order to profit from its huge net short position.  Nevertheless, Magnetar seeks to do so, arguing against plain fact that Intesa has not alleged fraudulent concealment or scienter with the required particularity (and, incidentally, ignoring that scienter need only be alleged generally for common law fraud, *see* F.R.C.P. 9(b)).  In addition, Magnetar argues that (1) Intesa cannot employ group pleading against the Magnetar defendants—despite the fact that group pleading was designed for cases precisely like this, where defendants' separate roles in the fraud are

concealed; (2) Intesa has not alleged that Magnetar made any misrepresentations to Intesa or any other investors—despite the fact that, under New York law, a defendant can be liable for fraud based on its silence in the face of a duty to disclose, which can arise where, as here, "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Morin v. Trupin*, 711 F. Supp. 97, 103 (S.D.N.Y. 1993) (Sweet, J.) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 738-39 (2d Cir. 1984)); (3) Intesa has not alleged that Magnetar had any direct connection with Intesa or the Intesa Swap—despite the fact that, under New York law, fraud is adequately alleged where the plaintiff was within the class of persons whom defendant had reason to expect would rely on its misrepresentations or omissions; (4) Intesa has not alleged that Magnetar had any motive to deceive Intesa or to induce it to enter into the Pyxis Swap after Pyxis had closed—despite the fact that, as Intesa alleges, Pyxis was part of a massive shorting scheme, involving not just one but *26* Constellation CDOs, which continued long after Pyxis closed—and after the Pyxis Swap was executed—and which would have foundered if Magnetar's control of collateral selection for any of its CDOs had become publicly known, especially to the foreign investors, like Intesa, who were "the critical link in the chain" of its shorting scheme.

Given that Intesa has sufficiently alleged Magnetar's primary liability for fraud, and that indeed Magnetar was the central figure in the fraudulent scheme, Magnetar's argument that it cannot be liable for aiding and abetting fraud rings hollow.  It is based largely on the flawed premise that the underlying fraud as to Calyon and Putnam has not been adequately alleged, which is addressed in Intesa's brief in opposition to Calyon's and Putnam's motions.  Moreover, it is clear that substantial assistance may be sufficiently pled where plaintiff alleges that

defendant had actual knowledge of the fraud—which Magnetar clearly did, since it directed the fraud—and either motive or conscious wrongdoing, both of which are also sufficiently alleged.

Finally, Magnetar's argument that Intesa's claims fail as a matter of public policy is not only unsupported by any authority, but ignores that, if anything, public policy demands that a fraudulent scheme as egregious as Magnetar's—which, given its scale and scope, had a huge impact not only on Intesa and other investors and insurers, but on the public generally, likely contributing significantly to the 2007-08 housing and financial crises—must not go unsanctioned, and that the driving force behind such a scheme must not be allowed to walk away with billions in profits while the investors it has systematically exploited and defrauded are left with nothing but their losses.

## FACTUAL BACKGROUND

### A.     The Magnetar Scheme

Pyxis was one of at least 26 Constellation CDOs created by Magnetar as part of what this Court called the "Magnetar Scheme."  SAC ¶ 3; *see Intesa Sanpaolo, S.P.A. v. Credit Agricole Corp. & Inv. Bank*, — F. Supp. 2d —, No. 12 Civ. 2683 (RWS), 2013 WL 525000, at *2 (S.D.N.Y. Feb. 13, 2013).  Pursuant to the Magnetar Scheme, Magnetar took an equity position in the Constellation CDOs, but a much larger short position in the same CDOs, and controlled the selection of their portfolios to ensure that they would fail.  SAC ¶¶ 3, 45.  Magnetar's shorts and adverse selection of the CDOs' portfolios resulted in huge profits for Magnetar, but huge losses for investors like Intesa.  SAC ¶ 56.

The Consent Order recently filed by the Massachusetts Securities Division with respect to the Carina CDO further elucidates the nature and genesis of the Magnetar Scheme, and makes clear that Magnetar controlled collateral selection for all of its CDOs, including Pyxis, treating them as "highly structured separate account mandates;" that it increased the fees of compliant

4

structurers and collateral managers who facilitated its short trades as a "reward for good behavior;" and that it sought to "hide" its role in the CDOs from investors, specifically foreign investors like Intesa who were "the critical link in the chain." *See* Baldwin Aff. Ex. B. This evidence shows that:

- The CDO shorting scheme was in fact the brainchild of Michael Henriques of DBSI, but Magnetar took it "to a different level." *Id.* ¶ 24.

- Magnetar proposed establishing "[a] portfolio of core shorts," which was "key if we're going to run this thing like a pipeline." *Id.* ¶ 23.

- Magnetar cherry-picked the Carina collateral manager to ensure that it would take direction from Magnetar, rejecting another candidate who would not. As DBSI stated, "the way we are probably going to go is create a deal that Magnetar likes and find another manager to do it." *Id.* ¶ 50.

- Magnetar was listed as a signatory in the first drafts of the Carina collateral manager engagement letter, but the final version made no mention of Magnetar. *Id.* ¶ 72.

- Magnetar's hand-picked collateral manager initially stated that it was "not comfortable with Magnetar shorting into the deal," but eventually accepted it, helping to arrange these shorts. *Id.* ¶¶ 80, 109.

- In July 2006, Jim Prusko (Magnetar) warned the collateral manager not to acquire any collateral that was not "sub/mid-prime" (*i.e.*, that did not already have a high risk of default) without Magnetar's "pre-ok." *Id.* ¶ 98.

- Michael Henriques (DBSI) explained Prusko's requirement of a "pre-ok" on the basis that "this is not just sponsoring a cdo, but really a highly structured separate account mandate. I think [DBSI's CDO Group] and [the collateral manager] may be bothered by that, but it is the nature of the arrangement, and with the other deals [including Pyxis], we definitely have that interaction." *Id.* ¶ 100.

- In August 2006, Prusko increased the fee paid to both the structurer and the collateral manager with respect to the intermediation of certain collateral they allowed Magnetar to short into Carina, stating: "[W]ant to reward for good behavior." *Id.* ¶ 109.

- In September 2006, a DBSI employee noted that a prospective investor in Carina was "looking [to invest] but could get out. Do not like Magnetar shorts the BBBs." To which another DBSI employee responded: "Why does [prospective investor] know that Magnetar is shorting BBBs?" *Id.* ¶ 119.

- By October 20, 2006, according to Henriques, Prusko was shorting not only BBB notes, but "AA's as well"—indicating that he believed even higher rated Carina notes were likely to default.  *Id.* ¶ 28.

- In January 2007, after Carina closed, Prusko discussed with Henriques whether they could "hide" Magnetar's involvement in its CDOs, specifically to target foreign investors like Intesa, because "[while] magnetar involvement might be obvious to you, me, the dealers …, the deal traits are not necessarily obvious to the marginal mezz [subprime RMBS] buyer in japan, singapore, taiwan, germany, etc who is increasingly the critical link in the chain."  *Id.* ¶ 32.

Defendants argue that Intesa should not be allowed to rely on facts alleged in other complaints, such as the Massachusetts Complaint, or, presumably, the Consent Order.  Br. 6-8, 17 n.9.  However, Intesa does not rely on these *complaints*.  Rather, it relies on the *documentary evidence* and *sworn testimony* set forth in the complaints.  Defendants cite no support for the proposition that the evidence underlying another complaint cannot be used in this lawsuit—and it obviously can.  *See IBEW Local 9 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), slip op. at 2 (S.D.N.Y. Mar. 27, 2013) (declining to dismiss Amended Complaint where "[t]he bulk of the allegations in the Amended Complaint are drawn from alleged misconduct set forth in a [U.S. Senate] report …, a complaint filed by the Department of Justice against Deutsche Bank . . . , and a complaint filed by the Federal Housing Finance Agency").

## B.    The Pyxis Fraud

Like its other Constellation CDOs, Magnetar conceived and directed the creation of Pyxis, closely controlling collateral selection to ensure that the portfolio was built to fail and that it could profit from its massive net short investments in the collateral.  Magnetar netted approximately $80 million in profits from these short positions, at the expense of Pyxis investors like Intesa, who lost millions.  SAC ¶ 75.

At Magnetar's direction, Calyon and Putnam induced Intesa and other investors to enter into the Pyxis Swap, by representing that Putnam, a reputable collateral manager, would select

the assets for the portfolio, acting independently, diligently and in good faith in the interests of long investors like Intesa.  SAC ¶¶ 78, 92, 181, 192.  Magnetar was well aware that this representation was critical to investors like Intesa.  As the Pyxis Offering Memorandum stated, "the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]."  SAC ¶ 35.

Magnetar was also well aware that this representation was egregiously false.  Most importantly, as Magnetar deliberately concealed from investors, the Pyxis portfolio was not in fact selected by Putnam, acting diligently and independently in the interests of long investors like Intesa, but was instead selected by Magnetar, a net short investor.  SAC ¶¶ 111, 173.  As Magnetar knew, had investors like Intesa learned of this, they would never have invested in Pyxis.  *Id.* ¶¶ 108-09, 173.

Contrary to Magnetar's assertion, Br. 17 n.9, Intesa's allegations are not based simply on "news reports," but on a wealth of documentary and testimonial evidence disclosed in numerous lawsuits relating to Magnetar's CDOs, and on substantial other evidence.  Based on the documentary and testimonial evidence, Intesa alleges, among other things, that:

- Magnetar selected Putnam to act as the collateral manager for Pyxis.  SAC ¶¶ 111.

- Jim Prusko (Magnetar) used to work for Putnam, where he supervised Carl Bell (Putnam), who was supposed to be primarily responsible for selecting the Pyxis collateral.  SAC ¶ 111.

- Prusko (Magnetar) also selected Calyon to structure Pyxis, and introduced the Calyon executive primarily responsible for Pyxis, Alex Rekeda, to Carl Bell (Putnam).  SAC ¶ 113.

- Rekeda (Calyon) had worked with Magnetar on its very first Constellation CDO, Orion 2006-1 ("Orion").  SAC ¶ 51.  Subsequently, he continued to work with Magnetar at Mizuho, where his team moved en masse in late 2006, shortly after Pyxis closed.  SAC ¶ 148.

- Prusko (Magnetar) and Michael Henriques (DBSI, Magnetar's co-equity investor on Pyxis) discussed with Bell (Putnam) and Rekeda (Calyon) Magnetar's CDO short-selling strategy, both generally and with respect to Pyxis.  SAC ¶ 114-118.

- Prusko (Magnetar) insisted to Rekeda (Calyon), among others, that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter with Calyon requiring Calyon and Putnam to give Magnetar and DBSI notice of any proposed collateral acquisitions and giving Magnetar and Deutsche Bank "veto rights over any" such collateral.  SAC ¶¶ 114-116.

- Prusko (Magnetar), Bell (Putnam) and Rekeda (Calyon) had numerous communications in which Prusko made clear which collateral he wanted to include in the Pyxis portfolio, and Bell and Rekeda made just as clear their willingness to accommodate him. SAC ¶¶ 118-122.

- Prusko (Magnetar), Bell (Putnam), Rekeda (Calyon) and other Putnam employees had numerous communications in which Prusko made clear his intention to short tens of millions of dollars of the collateral he was selecting for Pyxis—far more than Magnetar's equity stake in Pyxis—and Putnam and Calyon helped him do so.  SAC ¶ ¶ 122-23, 137.

- Prusko (Magnetar), Bell (Putnam) and Rekeda (Calyon) specifically discussed having Pyxis enter into swaps referencing the low-rated ABX Index and its components, and increasing the synthetic portion of the Pyxis portfolio, to allow Magnetar to make sizable shorts against these assets.  SAC ¶ 120.

- Bell (Putnam) and Rekeda (Calyon) discussed the importance of concealing Magnetar's involvement in the selection of the Pyxis collateral, and Magnetar's shorting of Pyxis collateral.  SAC ¶ 135.

- After Pyxis closed, Prusko (Magnetar), Henriques (DBSI) and Rekeda (Calyon) discussed their satisfaction with Putnam's cooperation on Pyxis, noting that Magnetar's CDOs, including Pyxis, were "not CDOs but … structured separate accounts [for the benefit of Magnetar and Deutsche Bank]," and that "Putnam got it."  SAC ¶ 132.

- Magnetar selected Putnam to act as collateral manager for the Pyxis ABS CDO 2007-1 Ltd. Transaction ("Pyxis 2"), confirming its satisfaction with Putnam's cooperation on Pyxis.  SAC ¶ 65.

- After Pyxis defaulted, Bell (Putnam) joked with Prusko (Magnetar) about how much money Magnetar had made from its shorting strategy, while continuing to conceal Magnetar's involvement in Pyxis from investors.  SAC ¶ 137.

Further confirming Magnetar's control of collateral selection, the SAC alleges, in

addition, that: (1) the Pyxis portfolio included collateral exposing Pyxis, directly or indirectly, to

losses from *15* other Magnetar CDOs; (2) *55%* of the Pyxis collateral referenced RMBS or CDOs whose securities were included in at least *five* other Magnetar CDOs, and *28%* referenced RMBS or CDOs whose securities were included in at least *ten* other Magnetar CDOs; (3) the Pyxis portfolio contained no "prime" RMBS, despite Calyon's and Putnam's representations that the portfolio would include $60 million of such RMBS, indicating that Putnam had changed its original collateral selection strategy in a way that weakened the portfolio and could only be explained by its desire to comply with Magnetar's demands; (4) Putnam breached the portfolio limitation on low-rated ABX Index investments by investing in components of the ABX Index as well as the Index itself; (5) the Pyxis portfolio included offset trades on ABX Index components of a type unique to Magnetar CDOs; and (6) e-mails and other evidence adduced in numerous lawsuits involving other Magnetar CDOs—including, most recently, the Massachusetts Consent Order—indicate that Magnetar controlled collateral selection for its CDOs generally while simultaneously shorting them, making it, at best, implausible that Magnetar would not have also controlled Pyxis collateral selection.

Magnetar does not actually deny most of these allegations. Instead, it cherry-picks a few of the documents underlying these allegations, and argues—wholly inappropriately on a motion to dismiss—that they might be interpreted differently. To take just one example, Magnetar asserts that Intesa has no evidence that the "veto" side letter was ever executed. The Amended Complaint alleges, however, that it *was* executed, and, in support, that defendants acted consistently with its terms, since Calyon and Putnam in fact allowed Magnetar not only to vet, and to veto, investments, but also to purchase CDOs for Pyxis directly. Moreover, this agreement serves to explain—which Magnetar fails to explain in any other way—the extensive interconnections and collateral overlaps between Pyxis and other Constellation CDOs, the

"dummy" prime RMBS assets in the target Pyxis portfolio, the breach of the portfolio concentration limits with respect to ABX BBB- Index investments, and the Magnetar-style offset trades. Nor can Magnetar explain why it might have controlled collateral selection on all of its other CDOs, but not Pyxis. And finally, Magnetar was sufficiently satisfied with Putnam's cooperation on Pyxis ("Putnam got it") that Putnam was selected to manage Pyxis 2.

The same analysis can be applied to all of Magnetar's factual quibbles with respect to the evidence underlying Intesa's allegations. Not only are these disputes inappropriate at the pleadings stage, but they also ignore most of Intesa's particularized factual allegations, which, read as a whole, not only support but render all but inescapable an inference that Magnetar controlled collateral selection.

## ARGUMENT

### I. INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR COMMITTED FRAUD[1]

As noted above, Magnetar conceived and directed the entire Pyxis fraud. It operated like a spider at the center of a web of Constellation CDOs, using a phalanx of compliant structurers and collateral managers to draw investors into the web. It would be perverse if the guiding force behind a scheme of such scope and audacity could not be held liable for its wrongdoing, while

---

[1]   Magnetar asserts (Br. 10-11) that Intesa lacked leave to amend its First Amended Complaint to add a primary liability claim for securities and common law fraud against Magnetar. But the Court's opinion dismissing Intesa's claims "with leave to amend within 20 days" was, by its own terms, not so limited. *Intesa*, 2013 WL 525000, at *8. Magnetar's cases (Br. 11) all involve orders that specifically limited the scope of leave to amend. *E.g.*, *Pagan v. N.Y.S. Div. of Parole*, No. 98 Civ. 5840 (FM), 2002 WL 398682, at *2-3 (S.D.N.Y. Mar. 13, 2002); *Kuntz v. N.Y.S. Bd. of Elections*, 924 F. Supp. 364, 366-67 (N.D.N.Y. 1996); *In re Keithley Instruments, Inc., Deriv. Litig.*, 599 F. Supp. 2d 908 (N.D. Ohio 2009). In any event, as Magnetar concedes (Br. 11 n.7), leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a). Since Intesa's fraud claim against Magnetar is both plainly meritorious and based largely on the plethora of newly-discovered evidence relating to the Magnetar scheme set forth in the SAC, Intesa respectfully submits that it is properly included in the SAC.

the numerous structurers and managers who did its bidding have been obliged to pay vast sums of money to settle claims relating to their roles in the scheme.  *See* SAC ¶ 3.  In fact, Magnetar can, and should, be held fully accountable.

Given the wealth of new factual allegations set forth in the SAC (as well as the Consent Order) and the fact that Fed R. Civ. P. 9(b) allows scienter to be alleged generally, Intesa has more than sufficiently alleged that (1) Magnetar controlled collateral selection for Pyxis, *see* pp. 6-8 above; (2) Magnetar engaged in conscious wrongdoing in an attempt to conceal its role—by, for example, executing a secret "behind the scenes" veto side letter, SAC ¶ 52 (and, as the Consent Order shows, specifically discussing with DBSI how to "hide" its involvement from foreign investors like Intesa); and (3) Magnetar had a strong motive to conceal its control of collateral selection, namely to reap approximately $80 million in profits on its net short investments in Pyxis and to reap billions more from its continued creation and shorting of Constellation CDOs.   SAC ¶¶ 75, 175.  Despite all this, Magnetar still seeks to avoid liability by relying on various specious arguments.

## A. Intesa May Rely On The Group Pleading Doctrine With Respect To The Magnetar Defendants

*First,* Magnetar argues that Intesa must allege the individual wrongdoing of each of the Magnetar defendants separately, Br. 13, despite the fact that Magnetar is a privately held corporation, and a notoriously secretive one, whose internal workings are entirely opaque to the outside world.  If this were correct, it would be practically impossible for Magnetar to be held accountable for any misconduct, no matter how egregious.  Moreover, it would be a simple matter for any other privately held corporation to adopt the same stratagem to avoid liability, merely by dividing itself into various entities for no purpose other than obfuscation.

Not surprisingly, the law does not allow this.  Magnetar ignores the well-established "group pleading" doctrine, which "allows particular statements or omissions to be attributed to individual defendants even when the exact source of those statements is unknown." *Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d 372, 405 (2010); *see also Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir. 1986) ("[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders *or affiliates* participating in the offer of the securities in question." (emphasis added)); *In re Ann Taylor Stores Sec. Litig.*, 807 F. Supp. 990, 1005 (S.D.N.Y. 1992) (the "group pleading doctrine" allows plaintiff to leave "development of individual liability questions until some discovery has been undertaken, rather than to dismiss the plaintiff because he does not have what may be concealed information").

In *Anwar,* the plaintiffs brought claims against the Fairfield Greenwich Group ("FGG"), run by Bernard Madoff, against a set of corporate entities controlled by FGG "that all apparently existed to accomplish the same task—managing funds invested almost exclusively with Bernard Madoff." 728 F. Supp. 2d at 388.  Plaintiffs alleged that "FGG fulfilled a critical role for Madoff, who knew that secrecy and obfuscation were key to prolonging how long he could keep his big lie afloat and his sand castles grounded." *Id.*  The court held that the *Anwar* complaint "alleges a tight weave of connections between the Fraud Defendants such that group pleading is appropriate.  Because FGG 'controlled the day-to-day operations of FGG and its corporate partners,' … any entity that in turn was a corporate insider to FGG's day-to-day operations has the requisite connection for the group pleading doctrine to apply." *Id.* at 406.  The court further explained: "Like streams converging to form a mighty river, any entity playing an essential role in FGG is responsible for what FGG and its subsidiaries did downstream." *Id.*

Similarly here, Intesa alleges that "Magnetar Financial and Magnetar Capital Fund (together, the 'Magnetar Funds') are controlled by Magnetar.  The Magnetar Funds made CDO-related investments in 2006 and 2007."  SAC ¶ 18.  Thus, Intesa has adequately pled that (1) the Magnetar Funds made the day-to-day CDO investments at issue, (2) Magnetar "controlled the day-to-day operations of [Magnetar] and its corporate partners," and, therefore (3) "any entity that in turn was a corporate insider to [Magnetar's] day-to-day operations has the requisite connection for the group pleading doctrine to apply."  *Anwar,* 728 F. Supp. 2d at 406.

### B.    Magnetar Had A Duty To Disclose Its Role In Collateral Selection to Investors, And Its Failure To Do So Was Fraudulent

Magnetar argues that it is not alleged to have made any misrepresentations to Intesa, and that it had no duty to disclose any material facts to Intesa.  Br. 14-15.  However, Magnetar ignores settled authority that "a duty to disclose arises 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'"  *Morin v. Trupin*, 711 F. Supp. 97, 103 (S.D.N.Y. 1993) (Sweet, J.) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 738-39 (2d Cir. 1984)).

*Donovan v. Aeolian Co.*, 270 N.Y. 267, 271-72 (1936) is on point.  There, defendant manufactured and sold Steinway pianos.  Plaintiff saw a piano she liked in defendant's shop and assumed it was new.  She said nothing to the salesman to suggest that she wanted a used piano, and the salesman said nothing to suggest the piano was used.  The Court held that a warranty that the piano was new could be inferred from the salesman's silence:  "If the seller does not know that the buyer is acting under the belief that the article is new and unused, and has done nothing to induce that belief, the buyer cannot complain. … *Silence may, however, constitute fraud and deception where the seller has notice that the buyer is acting upon a mistaken belief as to a material fact.* …  Where failure to disclose a material fact is calculated to induce a false belief,

the distinction between concealment and affirmative misrepresentation is tenuous.  Both are

fraudulent."  *Id.* at 271-72 (emphasis added).  The Court concluded: "[I]t is clear that the

defendant's salesman was under a duty to inform the plaintiff that the piano she had selected was

not a new piano.  …  [Thus], the *acts* of the manufacturer, coupled with the *words* of the

salesman, may be regarded as an affirmation that the piano was taken out of stock and unused."

*Id.* at 272 (emphasis in original); *see also Brown v. Sidley Austin Brown & Wood LLP,* 38

A.D.3d 219, 219 (1st Dep't 2007) (trial court properly allowed investor's fraud claim against

lender involved in structuring tax shelters to move forward where, although "there were no

allegations of any misrepresentations by [the lender] itself," the lender "had had special

knowledge or information . . . that was not attainable by plaintiff" and the lender's "failure to

disclose the roles of the other defendants was a misleading partial disclosure"); *O'Connor &

Assocs. v. Dean Witter Reynolds, Inc.*, 600 F. Supp. 702, 705-706 (1985) (noting that "we do not

agree with the defendants that the allegation of an affirmative act is the *sine qua non* required to

state a cause of action" for fraud and allowing claim to move forward where plaintiffs sold

options on a security in reliance on defendants' non-disclosure of information that, if known to

plaintiffs, would have caused them not do so); *Minpeco, S.A. v. ContiCommodity Servs., Inc.*,

552 F. Supp. 332, 335-36 (S.D.N.Y. 1982) (rejecting defendants' contention that they made no

affirmative misrepresentations to plaintiff and denying motion to dismiss fraud claim where

defendants—banks that were part of an alleged fraudulent conspiracy to keep the price of silver,

which plaintiff had shorted, artificially high—"lured plaintiff into the market to its damage"); *cf.

Brass v. Am. Film Techs.*, 987 F.2d 142, 152 (2d Cir. 1993) (sustaining fraud claim against

corporation where its agent concealed from a buyer that securities in question were encumbered

because buyer likely would not have bought the securities had he known of the encumbrance and

14

noting that  "[i]t is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when . . . he would reasonably expect a disclosure." (citation and internal quotation marks omitted)).

There is no question that Magnetar was aware that prospective Pyxis investors were operating under the mistaken belief that Putnam was selecting the collateral and that no other entity, much less a net short investor, had any role in the collateral selection process.  There is also no question that Magnetar possessed superior knowledge as to its own role in collateral selection and its net short positions, which investors—in particular, foreign investors such as Intesa—could not have had, because Magnetar's role was carefully concealed from them.  There is also no question that Magnetar knew that, had investors learned the true facts they would never have invested in Pyxis—which is why it worked so hard to conceal its role.  Thus, Magnetar had a duty to disclose its role to investors, including Intesa, and its failure to do so was actionable.

### C.   Magnetar Is Liable To Intesa As A Person Whom It Should Reasonably Have Expected To Rely On Its Fraudulent Omissions

Magnetar also argues that it had no direct involvement with Intesa or the Intesa Swap. Br. 14-15.  However, Magnetar need not have made any misstatements or omissions directly to Intesa in order to be liable to it.  Rather, "New York courts and federal courts applying New York law have adopted the reason to expect standard.  Reliance upon fraudulent representations by persons who are not the direct addressees thereof but who may be intended or expected to learn of and act upon such representations will found an action in fraud or deceit."  *Powers v. Ostreicher*, 824 F. Supp. 372, 376 (S.D.N.Y. 1993) (citation and internal quotation marks omitted); *see also Berkowitz v. Baron,* 428 F. Supp. 1190, 1196 (S.D.N.Y. 1977) ("[I]n order for [defendant] to be liable to these plaintiffs, they must be within the class of persons that

15

[defendant] should reasonably have expected to rely on the [discredited financial] statements."); Restatement (Second) of Torts § 531 (1977); *accord RMS Int'l Shipping GmbH v. Stemcor USA, Inc.*, No. 90 Civ. 4918, 1991 U.S. Dist. LEXIS 9852, at *5 (S.D.N.Y. July 18, 1991) ("[T]here is no requirement that the plaintiff plead that the defendant intended specifically to defraud it."). Here, it is beyond cavil that Intesa, as a prospective investor in Pyxis, was among the class of persons that Magnetar "should reasonably have expected to rely on" Magnetar's material omissions as to its role in collateral selection and its net short position.  The fact that Magnetar may not have specifically known that Intesa itself would rely upon its omissions is irrelevant. Indeed, Jim Prusko (Magnetar) and Michael Henriques (DBSI) specifically discussed the fact that foreign investors like Intesa were peculiarly vulnerable, with Henriques stating:  "[While] magnetar involvement might be obvious to you, me, the dealers …, the deal traits are not necessarily obvious to the marginal mezz [subprime RMBS] buyer in japan, singapore, taiwan, germany, etc who is increasingly the critical link in the chain."  Baldwin Decl. Ex. B ¶ 32.

### D.    Intesa Has Adequately Alleged Scienter

Magnetar also argues that Intesa has failed to allege that it had any motive to induce Pyxis to enter into the Pyxis Swap, on the basis that Intesa has not alleged that Magnetar had any financial stake in the closing of the Pyxis Swap, as opposed to Pyxis itself.  Br. 16-18.  Magnetar ignores, *first*, that in a common law fraud claim scienter may be alleged generally, Fed. R. Civ. P. 9(b), and that Intesa plainly meets this standard by alleging that Magnetar both engaged in conscious wrongdoing and was motivated to defraud Pyxis investors, including those who invested after Pyxis closed.  SAC ¶¶ 60-75, 175.  But *second*, and more importantly, Magnetar asks the wrong question.  The primary question is not whether Magnetar had any interest in the Pyxis Swap closing, but rather whether Magnetar had an interest in concealing its role in collateral selection on Pyxis up to and after the Pyxis Swap closed.  The answer, obviously, is

yes.  Pyxis is alleged to have been part of a massive shorting scheme, involving not just one but *26* Constellation CDOs, which continued long after Pyxis closed—and, indeed, after the Pyxis Swap was executed—and which would have foundered if Magnetar's control of collateral selection for any of its CDOs had become publicly known.  SAC ¶ 60.  If a foreign investor like Intesa, in particular, had learned of Magnetar's role, that would have been disastrous for Magnetar, since, as the evidence in the Massachusetts Consent Order make clear, foreign investors were "the critical link in the chain" of Magnetar's shorting scheme.  Baldwin Aff. Ex. B ¶ 32.  Thus, Magnetar had a strong motive to conceal its wrongdoing with respect to Pyxis until long after both Pyxis and the Pyxis Swap were consummated.  Magnetar continued to breach its duty of disclosure to prospective investors, including Intesa, in the full knowledge that they had no idea that Pyxis had actually been built to fail, in order to continue to reap profits from its shorting scheme.[2]

### E.  Intesa Has Adequately Alleged Reasonable Reliance

Magnetar's argument that Intesa has not pled reasonable reliance because it never dealt directly with Intesa, Br. 18-19, ignores that Intesa's claim is based primarily on Magnetar's actionable omissions, and on the fact that Intesa was within the class of persons—prospective, especially foreign investors—whom Magnetar should reasonably have expected to rely on those omissions.  *See* pp. 4-6 above.

Magnetar's further argument that Intesa was barred from relying on its omissions by the provision in the Pyxis Swap that the Swap did "not create any rights or impose any obligations in respect of any entity that is not a party," Br. 19, is a non sequitur.  Intesa is not seeking to

---

[2]  These profits were enormous.  They caused Magnetar to grow 600% from 2005-2007, from approximately $1.5 billion under management to approximately $9 billion.  SAC ¶ 42.

enforce any rights under the Pyxis Swap, but rather to obtain relief from Magnetar based on its fraudulent inducement of that transaction.

## II.   INTESA HAS ADEQUATELY ALLEGED THAT MAGNETAR AIDED AND ABETTED FRAUD

As set forth in Intesa's brief in opposition to Calyon's and Putnam's motions, Intesa has adequately alleged fraud against Calyon and Putnam.  In order to establish that Magnetar  aided and abetted that fraud, Intesa need only allege facts showing that (1) it had actual knowledge of the fraud; and (2) it provided substantial assistance to advance the fraud.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006).  Intesa has met both of these requirements.

### A.   Intesa Has Adequately Alleged Actual Knowledge

Contrary to Magnetar's assertion, Br. 15, Intesa has plainly alleged that Magnetar not only had actual knowledge of, but *directed*, the Pyxis fraud.  "Actual knowledge" may be pled by alleging "circumstances indicating conscious behavior by the defendant, or a clear opportunity and a motive to aid the fraud."  *Burns v. Del. Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 30 (S.D.N.Y. 2011).  As set forth above, Intesa alleges both conscious misbehavior and motive against Magnetar.  *See* pp. 8-11 above.

### B.   Intesa Has Adequately Alleged that Magnetar Provided Substantial Assistance

As Magnetar concedes (Br. 21-22), "[g]enerally, 'substantial assistance' exists where: (1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed,' and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'"  *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426 (S.D.N.Y. 2007) (internal citations omitted).  Intesa has alleged numerous facts demonstrating that Magnetar not only affirmatively assisted but *directed* the Pyxis fraud, and that

it helped conceal the fraud by staying "behind the scenes" and keeping its activities secret—even breaching its duty to disclose its role to prospective investors.  *See* pp. 3-4, 8-11 above.

Magnetar's reliance on *Morin*, Br. 22-23, is misplaced.  *Morin* merely held that "where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself." *Morin*, 711 F. Supp. at 113.  Here, the primary violations consist not only of (1) misrepresentations in the Pyxis marketing documents, but also (2) Putnam's abdication of its portfolio selection responsibilities to Magnetar, and (3) defendants' concealment of Magnetar's control of collateral selection.  Magnetar obviously provided substantial assistance with respect to both the second and third of these factors.  Further, this Court has recognized that where, as here, a plaintiff alleges "a highly interdependent scheme in which both parties benefitted from [the] fraudulent activity, …. allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient." *ABF Capital Mgmt. v. Askin Capital Mgmt., LP*, 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997).

Finally, contrary to Magnetar's contention (Mag. Br. 23) that an ordinary financial transaction cannot constitute substantial assistance, ample precedent holds that, even if a transaction is perfectly lawful or routine in isolation, it can become unlawful (and substantial assistance of the arranger can be found) if the transaction is used to an unlawful end.  The test is not "whether the alleged aiding and abetting conduct was routine, but whether it made a

substantial contribution to the perpetration of the fraud." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009).[3]

## III.   INTESA HAS ADEQUATELY ALLEGED LOSS CAUSATION

Although "[p]leading loss causation is an essential element of a claim … [it] is not meant to impose a great burden on plaintiffs. …  There is no heightened standard for pleading loss causation.  …  A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient." *IBEW Local 9 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), slip op. at 26-27 (S.D.N.Y. Mar. 27, 2013) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-347 (2005); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)).

Intesa has plainly met this standard.  Intesa alleges that Pyxis was built to fail, and thus that it was far more likely to default than a typical CDO, even in the event of marketwide losses. This is borne out by the fact that 96% of Magnetar's deals—including Pyxis—were in default by the end of 2008, compared with 68% for comparable CDOs.  SAC ¶ 56.  *See Lattanzia v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (sufficient to allege "facts that would

---

[3]   *See also, e.g.*, *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005) (Defendant "is alleged to have been directly involved in bringing about—including negotiating—transactions, which while not themselves necessarily fraudulent, are alleged to have been carried out solely for the purpose of inflating revenue . . . and thus leading foreseeably to defrauding the banks"); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) ("[E]ven ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary motivation to aid in the fraud."), *abrogated on other grounds by Casey v. Merck & Co. Inc.*, 653 F.3d 95, 100 (2d Cir. 2011); *see generally Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186, 187 (Minn. 1999) ("[C]ourts have recognized the legitimacy of aiding and abetting claims against both attorneys and accountants . . . .  [To do otherwise] would conceivably give them free reign to provide any assistance short of fraud in helping clients engage in conduct the professionals know to be tortious.").

allow a factfinder to ascribe some rough proportion of the whole loss to [defendants']

misstatements"). Thus, Intesa has adequately alleged loss causation.[4]

## IV.     MAGNETAR'S DEFENSES, NOT INTESA'S CLAIMS, FAIL AS A MATTER OF PUBLIC POLICY

Magnetar's argument that Intesa's claims fail as a matter of public policy is not only

unsupported by any authority, but ignores that, if anything, public policy demands that Magnetar

finally be held accountable for its wrongdoing.  As Magnetar proudly asserts, Br. 20 n.19, this

has never happened—at least not publicly.  The scale and scope of Magnetar's scheme had a

huge impact not only on Intesa and other investors and insurers, but on the public generally.  As

Intesa alleges, 96% of Magnetar's deals—including Pyxis—were in default by the end of 2008,

compared with 68% for comparable CDOs.  It is more than plausible that such a huge proportion

of failures across a series of transactions involving more than $40 billion of RMBS assets had a

highly significant impact on the 2007-08 housing and financial crises.  It is perverse that

Magnetar—who made billions from its wrongdoing—has never successfully been held

accountable for any of this, despite the many hundreds of millions of dollars in penalties and

settlements that have been paid out by compliant structurers and collateral managers who

conspired with Magnetar, and despite the many billions of dollars in losses Magnetar and its co-

conspirators systematically inflicted on unsuspecting investors like Intesa.

### CONCLUSION

For the foregoing reasons, Magnetar's motion should be denied.

Dated: New York, New York
April 2, 2013

---

[4]   There is also a substantial question about how much of the housing crisis and the marketwide losses that resulted from it can be attributed to the activities of fraudulent investors like Magnetar.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:      /s/ Philippe Z. Selendy
       Philippe Z. Selendy
       (philippeselendy@quinnemanuel.com)
       Jonathan E. Pickhardt
       (jonpickhardt@quinnemanuel.com)
       Nicholas Joseph
       (nicholasjoseph@quinnemanuel.com)
       Sean Baldwin
       (seanbaldwin@quinnemanuel.com)
       Paul Riley
       (paulriley@quinnemanuel.com)
       51 Madison Avenue, 22nd Floor
       New York, New York  10010
       (212) 849-7000
       *Attorneys for Plaintiff Intesa Sanpaolo,*
       *S.p.A.*