UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTESA SANPAOLO, S.P.A.,

        Plaintiff,

  -against-

CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK, CRÉDIT
AGRICOLE SECURITIES (U.S.A.) INC.,
THE PUTNAM ADVISORY COMPANY,
LLC, MAGNETAR CAPITAL LLC,
MAGNETAR FINANCIAL LLC, AND
MAGNETAR CAPITAL FUND, LP,

        Defendants.

No. 12-cv-2683 (RWS)

**ECF CASE**
**Electronically Filed**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PUTNAM
ADVISORY COMPANY LLC'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

MILBANK, TWEED, HADLEY &
  McCLOY LLP

James N. Benedict
Sean M. Murphy
Thomas A. Arena
Robert C. Hora
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*Putnam Advisory Company LLC*

## <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................................ i

ARGUMENT ...................................................................................................... 1

    I.      INTESA'S CLAIMS UNDER § 10(b) OF THE 1934 ACT ARE
           BARRED BY THE FIVE-YEAR STATUTE OF REPOSE ................................ 1

          A.      The Second Amended Complaint Does Not Relate Back ........................ 1

          B.      The Pyxis Swap Confirmation Does Not Incorporate By Reference
                the Collateral Management Agreement or the Offering
                Memorandum ................................................................................ 2

          C.      Putnam Did Not "Make" Any Statements in the Swap
                Confirmation ................................................................................ 4

          D.      Intesa Could Not Have Relied Upon Any Purported Incorporation
                of the Offering Memorandum or Collateral Management
                Agreement ................................................................................ 4

          E.      Mr. Van Tassel's Alleged Opinion Does Not Save Intesa's Claim ........... 5

          F.      The Court's Prior Decision Was Correct .................................................... 5

    II.      THE SECOND AMENDED COMPLAINT FAILS TO PLEAD
           SCIENTER ................................................................................ 6

          A.      Intesa Fails to Plead Motive .................................................................... 6

          B.      Intesa Fails to Plead Conscious Misbehavior or Recklessness ................. 8

CONCLUSION ...................................................................................................... 11

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)................................................................2

*Cromwell v. Credit Suisse Grp.*,
  729 F. Supp. 2d 620 (S.D.N.Y. 2010).................................................6

*In re Lehman Bros. Sec. & Erisa Litig.*,
  800 F. Supp. 2d 477 (S.D.N.Y. 2011)................................................1

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)......................................................................4

*Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*,
  534 F.2d 422 (2d Cir. 1975).............................................................3

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities LLC*,
  No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ............7, 8, 9, 10

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996).............................................................3

*SEC v. Price Waterhouse*,
  797 F. Supp. 1217 (S.D.N.Y. 1992)..................................................8

*United States v. Lloyds TSB Bank PLC*,
  639 F. Supp. 2d 326 (S.D.N.Y. 2009)...............................................8

**RULES**

Local Civil Rule 6.3.........................................................................6

Federal Rule of Civil Procedure 9(b).............................................1, 9

Federal Rule of Civil Procedure 12(b)(6).........................................1

Federal Rule of Civil Procedure 15(c)(1)(B)....................................1

Putnam Advisory Company, LLC ("Putnam"), respectfully submits this reply memorandum of law in further support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint ("SAC") filed by Intesa Sanpaolo, S.p.A. ("Plaintiff" or "Intesa") with prejudice.[1]

## ARGUMENT

### I.   INTESA'S CLAIMS UNDER § 10(B) OF THE 1934 ACT ARE BARRED BY THE FIVE-YEAR STATUTE OF REPOSE

#### A.   The Second Amended Complaint Does Not Relate Back

Intesa argues that it does not need to invoke the relation back doctrine to render the SAC's § 10(b) claim against Putnam timely, because its original complaint, filed on April 6, 2012, would have been timely if it had included the SAC's additional allegations.  (Opp. [Doc. #65], at 15-16).  Notwithstanding Intesa's assertion, its position is a transparent attempt to relate its new complaint back to its old one.  *See* F.R.C.P. 15(c)(1)(B) (amendment relates back to initial pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading").

Intesa needs to rely on relation back to argue that the SAC should be deemed to have been filed at the time of the initial complaint.  It cannot do so.  As Judge Kaplan observed in a recent opinion, the "relation back doctrine does not apply to statutes of repose."  *In re Lehman Bros. Sec. & Erisa Litig.*, 800 F. Supp. 2d 477, 483 (S.D.N.Y. 2011); *see also* Putnam Mem. at 9-10.  Thus, for the SAC's § 10(b) claim against Putnam to be timely under the five-year statute of repose, the SAC, filed on March 4, 2013, must identify a misrepresentation or omission made by Putnam on or after March 4, 2008.  It does not, and is time-barred.[2]

---

[1]  Putnam also incorporates by reference the arguments set forth in Calyon's and Magnetar's reply memoranda.

[2]  In an apparent attempt to escape its relation back quandary, Plaintiff argues that the original complaint is deemed to include statements or documents incorporated by reference, and therefore the new allegations in the SAC were

**B.** **The Pyxis Swap Confirmation Does Not Incorporate By Reference the Collateral Management Agreement or the Offering Memorandum**

Even if Intesa could relate the allegations in the SAC back to the date of its original complaint, its § 10(b) claim would still be time-barred:  Intesa does not identify any misrepresentation or omission made by Putnam on or after April 6, 2007.

The Opposition clings to the unsupported contention that the Swap Confirmation issued by Calyon on April 24, 2007, a document to which Putnam was not a party, constitutes a misrepresentation by Putnam post-dating April 6, 2007, because the Confirmation purportedly "incorporates" the Pyxis Offering Memorandum ("OM") and Collateral Management Agreement ("CMA"), and by extension any statements made by Putnam in those documents.  The sole support for this assertion continues to be the statement in the Swap Confirmation that the term "'Reference Obligation' shall have the meaning and/or shall be subject to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments," the definition of which included the Indenture and unidentified "other relevant agreements."  (*See* Declaration of Lea H. Kuck, dated March 19, 2013 (Kuck Decl.) [Doc. #60], Ex. C (Swap Confirmation) at 1, 27.)  This statement is not an "incorporation by reference" of the terms of the OM or CMA; it simply defines the scope of the "Reference Obligation" of Intesa's swap, which the Swap Confirmation defines elsewhere as the Class A-1 notes.  Intesa was not a purchaser of Class A-1 notes, nor was it a party to the Indenture or the CMA.

Intesa nowhere alleges that the Indenture contained any false statements or omissions.  Rather, Intesa alleges that the Indenture, in a small handful of places, in turn referenced specific provisions of the OM and the CMA.  But as demonstrated in Putnam's

included in the original complaint.  (*See* Opp. at 16, citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).)  *Cortec* did not address relation back or statutes of repose, nor did it hold that *new allegations* based on documents previously referenced in a complaint are deemed included in any subsequent complaint.  In any event, the Court found Intesa's original § 10(b) claim untimely.

opening brief, none of these references concern the allegedly false provisions of the CMA or the OM discussing Putnam's role as collateral manager—a fact Intesa entirely ignores in its Opposition.  *See Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.,* 534 F.2d 422, 441 (2d Cir. 1975) (reference to an "extraneous writing for a particular purpose makes it part of [an] agreement only for the purpose specified").

Attempting to insert the entirety of the CMA into the Swap Confirmation by other means, Intesa argues that the Confirmation's reference in the definition of "Underlying Instruments" to unspecified "other relevant agreement(s) setting forth the terms of the Reference Obligation" incorporates the entirety of the CMA, again indirectly by way of a provision in the Indenture.  (*See* Opp. at 11−13; Kuck Decl. [Doc. #60], Ex. C (Swap Confirmation) at 27.) According to Intesa, because Article XV of the Indenture assigns the Pyxis estate's right, title, and interest in the CMA to the Trustee for the benefit of "Secured Parties," including the Class A-1 noteholders, the CMA must be an agreement setting forth the terms of the Class A-1 notes.

But, again, Intesa was not a Class A-1 noteholder, and thus was not among the parties referenced in Article XV of the Indenture.  (*See* Declaration of Robert C. Hora, dated March 19, 2013 (Hora Decl.) [Doc. #55], Ex. 2 (Indenture) at 264-5.)  Moreover, under New York law, an extrinsic document is incorporated by reference only where it is "so referred to and described in the instrument that [it] may be *identified beyond all reasonable doubt*." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (quotation omitted) (emphasis in original).  The Swap Confirmation's vague reference to "other relevant agreements" fails to satisfy this standard, and is insufficient, as a matter of law, to incorporate the CMA into the Confirmation.[3]

---

[3]  The same holds true for the alleged incorporation of the Offering Memorandum and Collateral Management Agreement in the Confirmation by way of scattered references to those documents in the Indenture.

### C.      Putnam Did Not "Make" Any Statements in the Swap Confirmation

Even if the Calyon-Intesa Swap Confirmation had incorporated the entirety of the OM and the CMA, Intesa's claims still would not be timely:  Putnam was not a party to the Swap Confirmation, and had no control over any of its provisions or its incorporation by reference of any extrinsic documents.  Unable to dispute this, Intesa contends, relying on an alleged conversation between Intesa and a Putnam employee, that "Putnam worked closely with Calyon right up to the time of the transaction" to ensure its completion.  (Opp. at 14.)  But the email memorializing this alleged conversation does not support this assertion (*see* Supplemental Declaration of Robert C. Hora, dated April 12, 2013 (Supp. Hora Decl.), Ex. 1); even if it did, "Rule 10b-5's private right of action does not include suits against aiders and abettors."  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).  Because Putnam did not issue the Swap Confirmation and had no control over its contents, it cannot be held liable under § 10(b) for any alleged falsehoods it contained.  *See id.* at 2301-2.

### D.      Intesa Could Not Have Relied Upon Any Purported Incorporation of the Offering Memorandum or Collateral Management Agreement

Even if the Swap Confirmation incorporated the OM and the CMA (and it does not), Intesa could not have relied on the alleged incorporation of those documents in entering into the swap, which was consummated months earlier.

Despite Intesa's admission that it reached "an understanding" with Calyon in September 2006 to enter into the swap (SAC ¶ 86), Intesa argues that it was not bound to the swap until the Confirmation was issued on April 24, 2007, more than six months after Pyxis closed on October 3, 2006.  Even a cursory examination of the Swap Confirmation, however, belies Intesa's claim.  The Confirmation incorporates the 2003 ISDA Credit Derivatives Definitions (the "Definitions").  (*See* Kuck Decl. [Doc. #60], Ex. C (Swap Confirmation) at 1.)

4

Section 1.5 of those Definitions defines "Trade Date" as "the date on which the parties *enter into the Credit Derivative Transaction*, as specified in the related Confirmation."  (Supp. Hora Decl., Ex. 2 at 1 (emphasis added).)  The Confirmation clearly "specifies" that date as October 3, 2006. (Kuck Decl. [Doc. #60], Ex. C at 1.)  This does not "beg[]" the question when the parties agreed to the swap (Opp. at 14 n.6)—it answers the question definitively.

### E.    Mr. Van Tassel's Alleged Opinion Does Not Save Intesa's Claim

Intesa proffers no particularized facts that would render actionable Mr. Van Tassel's alleged opinion on April 20, 2007, that "[n]otwithstanding the spike in delinquencies the total losses [on the Intesa portfolio] should not be high" (SAC ¶ 109).  (*See* Putnam Mem. at 13.) Plaintiff's new, conclusory assertion that Mr. Van Tassel's alleged opinion "was intended to and did convey reassurance as to a matter of fact, namely that Putnam selected the Pyxis portfolio itself" (Opp. at 15) distorts the alleged statement that "total losses should not be high" beyond recognition:  The statement says nothing about whether Putnam would be abdicating its collateral selection responsibilities to Magnetar—the heart of the fraudulent scheme alleged by Intesa—or about Putnam's collateral selection process.[4]  Moreover, the SAC contains no well-pleaded factual allegations, as it must, supporting an inference of fraudulent intent on Mr. Van Tassel's part, or an inference Mr. Van Tassel did not honestly believe that "losses should not be high."  (*See* Putnam Mem. at 13.)  Lastly, the alleged statement could not have been relied upon by Intesa:  it was made months after Intesa had already agreed to the swap.

### F.    The Court's Prior Decision Was Correct

Still unsatisfied with the dismissal of its First Amended Complaint, Intesa claims

---

[4]  A review of the email on which Plaintiff relies, shows that Mr. Van Tassel did not even opine that "total losses should not be high."  The email reveals that Putnam was still attempting to understand how losses caused by delinquencies would be distributed and specifically the effect of losses on the portfolio's bonds. (*See* April 2, 2013 Declaration of Sean P. Baldwin [Doc. #67], Ex. A; Supp. Hora Decl., Ex. 1 (translated copy of email).)

the Court got it wrong, rehashing its prior argument that the statute of repose begins to run on the date the parties committed themselves to a securities transaction, and not on the date of the last actionable misrepresentation or omission.  As a preliminary matter, this request for reconsideration is untimely and procedurally improper pursuant to Local Civil Rule 6.3, which sets a 14-day deadline for filing motions for reconsideration.  Reconsideration of a previous order, moreover, "is an extraordinary remedy . . . not designed to allow wasteful repetition of arguments already briefed, considered and decided."  *Cromwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 628 (S.D.N.Y. 2010) (quotation omitted).  Intesa cites no law or facts that were not already raised, considered, and rejected.  *See id.*

Even if the statute of repose began to run from the date Intesa "committed" itself to the Pyxis swap, Intesa's claim would still be untimely.  As detailed above, the documents referenced in the SAC show that Intesa committed itself to the swap no later than October 3, 2006.  (*See* Section I.D, *supra*.)  Thus, even under Intesa's incorrect formulation of the governing standard, Intesa's § 10(b) claim is untimely.

## II.   THE SECOND AMENDED COMPLAINT FAILS TO PLEAD SCIENTER

### A.   Intesa Fails to Plead Motive

Intesa simply ignores Putnam's demonstration that it would earn its collateral management fees only if the collateral assets continued to perform.  If a particular collateral asset defaulted, Putnam would no longer receive its management fee with respect to that security.  (Putnam Mem. at 17-18.)  For Putnam intentionally to design Pyxis to fail, therefore, defies all logic, as it would *deprive* Putnam of its fees, rather than guarantee or increase them.

Instead, Intesa focuses on an email, sent after the Pyxis CDO closed, in which a Deutsche Bank employee stated that the fees of a different collateral manager in a different CDO were "virtually assured."  (*See* Opp. at 6, 19.)  This is nonsense.  Even assuming, contrary to

fact, that the email pertained to Pyxis and that the SAC purported to allege that Deutsche Bank participated in the alleged fraud, there are no well-pleaded allegations that Putnam's fees in Pyxis 1 were "virtually assured."  To the direct contrary, the SAC alleges that Putnam's fees were less than one-third of what they would have been had the collateral assets not defaulted. That is not a motive to commit fraud; that is a motive to pick collateral assets with the "best fundamental value," as Putnam's senior banker pledged that Putnam intended to do in an email to Magnetar.  (Hora Decl. [Doc. #55], Ex. 16 at 2.)  Even now, more than six years after the Pyxis CDO closed, Intesa has failed to identify a single collateral asset that it claims Putnam put in the deal as part of its grand design to cause Pyxis to fail.

For the same reason, Intesa's recitation of the amount of fees earned by Putnam on Pyxis 1 cannot be evaluated in a vacuum.  That Putnam received roughly $5 million in fees for managing the Pyxis CDO is unremarkable, and does not supply an inference of motive:   Had Pyxis not defaulted, Putnam's fees would have been more than three times greater.  (*See* Putnam Mem. at 18-19.)  As a Judge Sullivan recently held in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities LLC*, No. 12 Civ. 3723, 2013 WL 1294668, at *14 (S.D.N.Y. Mar. 28, 2013), the mere receipt of ordinary collateral management fees does not support a strong inference of scienter.  It follows, therefore, that the receipt of less than ordinary fees also does not suffice to allege scienter.

Intesa's only other argument in support of motive is also deficient:  Intesa argues that Putnam was purportedly incentivized to commit a billion dollar fraud with respect to Pyxis 1, because that was the ticket of admission to participate in a second billion dollar fraud with respect to Pyxis 2.   But like the arrangement in Pyxis 1, the collateral management fees in Pyxis 2 were also dependent on the performance of the underlying collateral.  Just as the fee structure

7

of Pyxis 1 cannot supply a motive to defraud, allegations that Putnam had the opportunity to earn

fees on similar terms[5] for a second CDO transaction are immaterial.[6]

**B.     Intesa Fails to Plead Conscious Misbehavior or Recklessness**

As Putnam showed in its opening brief, none of the sources cited in the SAC

contains any facts suggesting that Putnam abdicated its collateral selection responsibilities to

Magnetar.  (Putnam Mem. at 21-25.)  Judge Sullivan's recent decision in *Loreley*, in which

plaintiff noteholders relied on similar alleged evidence of Magnetar's control over collateral

selection in other so-called Constellation CDOs, confirms the deficiency of the SAC's

allegations against Putnam.  In *Loreley*, Judge Sullivan dismissed with prejudice fraud-based

claims asserted by noteholders against, among others, collateral managers in two CDOs in which

Magnetar allegedly held an equity investment.  *Id.* at *1-2.  As recounted in Judge Sullivan's

decision, the allegations of the *Loreley* plaintiffs bear great similarity to the allegations in the

SAC.  As in this case, the *Loreley* plaintiffs alleged that (i) Magnetar held an undisclosed short

position in the CDOs at issue, (ii) the collateral managers "knowingly abdicated" their

responsibility to select collateral assets to Magnetar, and (iii) "in order to curry favor" with

Magnetar, the collateral managers "selected assets that would cause [the CDO] to fail."  *Id.* at *9,

*12.  The *Loreley* plaintiffs alleged that the collateral managers were accountable for allegedly

false statements in CDO offering circulars stating that the "[collateral manager] would select and

monitor the collateral for the CDO."  *Id.* at *3, *9.

Judge Sullivan held that the *Loreley* complaint "fail[ed] to plead facts that raise a

---

[5]  The fees earned by Putnam on Pyxis 2 were even less than it earned on Pyxis 1, and were a small fraction of what Putnam could have earned had the collateral assets not defaulted.

[6]  *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 326, 342 (S.D.N.Y. 2009) ("common sense" indicated that a "substantial international bank" would not risk its reputation by engaging in securities fraud when it had "no financial incentive other than to maintain the patronage of a fee-generating client"); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees.").

plausible inference of a material misrepresentation or omission, much less a strong inference of

scienter, under the Rule 9(b) standard." *Id.* at *9.  Specifically, Judge Sullivan rejected the

plaintiffs' contention that email exchanges between Magnetar and the collateral managers—

similar to those relied upon by Intesa here—provided an adequate basis for the fraud claims in

that case.  *See id.* at *2-3, *10-13.  For example, in connection with the Octans CDO, the *Loreley*

plaintiffs relied on emails in which a "Magnetar official" asked to be "copied on the whole

approval trade process and definitely would like to get an updated log each day that there is any

trading" and also stated that Magnetar wanted to "discuss CDO exposure as I will source the

CDO CDS."  *Id.* at *2-3 (internal quotation omitted).  In connection with the Sagittarius CDO,

plaintiffs relied on, *inter alia*, an email exchange between a Magnetar official and the deal

sponsor stating, "didn't mean to kill [the collateral manager] off . . . just wanted them to be more

user friendly"; the sponsor replied within the hour: "we're working on that angle as we speak –

let[']s talk tomorrow."  *Id.* at *3, *12 (internal quotations omitted).

   After reviewing these alleged communications, the court held that although the

emails may have plausibly implied "that Magnetar was an active and involved equity investor,"

they did not evidence that the collateral managers abdicated their responsibilities to Magnetar.

*See id.* at *11-12.  Importantly, Judge Sullivan rejected the plaintiff's argument that there was

anything "improper about Magnetar's hedging its exposure to the equity tranche," or with

Magnetar "wish[ing] to be kept apprised of which assets were going into the CDO," or with

Magnetar "sourc[ing]" the short positions of the CDOs selected for the collateral pool.  *Id.* at 10.

   The emails cited by Intesa in the SAC are equally benign.  Just like the plaintiffs

in *Loreley*, Intesa relies on emails in which Magnetar asked Putnam for a nightly "trade log" of

the collateral that had been purchased for the Pyxis portfolio (SAC ¶ 121), and informed Putnam

that it would like to "source" the portfolio's CDS exposure (*id.* ¶ 124).  The other emails cited by

Intesa are just as innocuous (*see* Putnam Mem. at 21-25); in fact, they confirm that Putnam acted

independently.  Emails cited in the SAC, for instance, show that Putnam was undertaking a

"benchmarking" analysis on the Pyxis collateral pool, that the pool performed "well on [its] risk

scoring model," that it was doing "preliminary work across a range of deals," and that "when this

benchmarking is finished" it would "be able to pursue a couple of synthetic trades [for the Pyxis

portfolio]."  (Hora Decl. [Doc. #55], Ex. 11, at 2-3; SAC ¶ 124.)  Other emails cited in the SAC

confirm that Putnam expressly told Magnetar it would pick assets with the "best fundamental

value."  (Hora Decl. [Doc. #55], Ex. 16; SAC ¶ 122.)  Nothing in the SAC indicates that

Magnetar was directing the selection of the collateral or that Putnam "abdicated" portfolio

selection to Magnetar.

       The *Loreley* court also held that there was no basis to conclude that the collateral

manager had any duty to disclose information about Magnetar's trading strategy to the debt

investors.  *Loreley*, 2013 WL 1294668 at \*11-12.  Like here, Judge Sullivan pointed out that all

pertinent features of the CDOs at issue, including the terms of any payout feature that would

benefit the equity holders, were fully disclosed in offering circulars that had been made available

to the debt investors.  *Id.* at \*11-13.  The court specifically held that the plaintiffs had failed to

point to any provision in the offering circular that prohibited the collateral manager from

communicating with Magnetar or any other investor.  *Id.* at \*12.  As in *Loreley*, the OM

disclosed all features of the Pyxis 1 CDO, including the terms under which the equity investors

would be compensated and the existence of short counter-parties on the CDS in the collateral

portfolio, whose interests would be directly opposite those of the long debt investors.

**<u>CONCLUSION</u>**

For the reasons set forth above, Putnam respectfully requests that the Court grant

its motion to dismiss the SAC with prejudice.


Dated:  New York, New York         MILBANK, TWEED, HADLEY & McCLOY LLP
         April 12, 2013                1 Chase Manhattan Plaza
                                     New York, New York  10005
                                     (212) 530-5000

                                     By: _ /s/ *Sean M. Murphy*_____
                                        James N. Benedict
                                        Sean M. Murphy
                                        Thomas A. Arena
                                        Robert C. Hora
                                        *Attorneys for Defendant*
                                        *Putnam Advisory Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Sean M. Murphy, am an attorney duly admitted to practice law before this

Court.  I hereby certify that on April 12, 2013, I caused a true and correct copy of the foregoing

Reply Memorandum of Law in Further Support of Putnam Advisory Company's Motion to

Dismiss the Second Amended Complaint, dated April 12, 2013, to be served via operation of the

Court's CM/ECF system on:

Phillip Z. Selendy, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010
(212) 849-7000
phillipselendy@quinnemanuel.com
*Counsel for Plaintiff*

Lea Haber Kuck, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
lea.kuck@skadden.com
*Counsel for Defendants*
    *Credit Agricole Corporate and Investment Bank and*
    *Credit Agricole Securities (U.S.A.) Inc.*

Joseph Serino, Jr., Esq.
Kirkland & Ellis LLP
601 Lexington Ave.
New York, New York 10022
(212) 446-4800
joseph.serino@kirkland.com
*Counsel for Defendants*
    *Magnetar Capital LLC*
    *Magnetar Financial LLC*
    *Magnetar Capital Fund, LP*

DATED:   April 12, 2013
         New York, New York


               */s/ Sean M. Murphy*
                   Sean M. Murphy